**No. 25-1845**

# United States Court of Appeals
# for the First Circuit

———————————————

RELENTLESS INC.; HUNTRESS INC.; SEAFREEZE FLEET LLC,
*Plaintiffs-Appellants*,

*v.*

U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; LAURA GRIMM, in her official capacity as Administrator of NOAA; NATIONAL MARINE FISHERIES SERVICE, a/k/a NOAA Fisheries; EUGENIO PINIERO SOLER, in his official capacity as Assistant Administrator for NOAA Fisheries,
*Defendants-Appellees*.

———————————————

On Appeal from the United States District Court for the District of Rhode Island,
Case No. 1:20-cv-00108-WES (Hon. William E. Smith)

---

## APPELLANTS' OPENING BRIEF

---

JOHN J. VECCHIONE (1177417)
**NEW CIVIL LIBERTIES ALLIANCE**
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
John.Vecchione@ncla.legal
*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellants Relentless Inc., Huntress Inc., and Seafreeze Fleet LLC provide the following disclosure statement.

Appellants Relentless Inc. and Huntress Inc. are wholly owned by Appellant Seafreeze Fleet LLC. Appellant Seafreeze Fleet is a limited liability company with no parent corporation, and no publicly held corporation holds 10% or more of its stock.

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................ ii

GLOSSARY ........................................................................................ viii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ......................... ix

JURISDICTIONAL STATEMENT ............................................................... 1

STATEMENT OF THE ISSUES ................................................................... 1

INTRODUCTION .................................................................................... 1

STATEMENT OF THE CASE ..................................................................... 4

    I.    PROCEDURAL HISTORY ................................................................ 4

    II.   ATLANTIC HERRING, THE HERRING FISHING FLEET AND THE FISHING SECTOR ................................................................................. 5

    III.  FISHING VESSELS AND BUSINESS PRACTICES .............................. 6

    IV.  THE 1990 AMENDMENTS AND STATUTORY COST-SHIFTING GRANTS IN THE MAGNUSON-STEVENS ACT ................................................ 8

    V.   THE INDUSTRY-FUNDED MONITORING AMENDMENT AND THE FINAL RULE .......................................................................................... 15

    VI.  THE DECISION BELOW ............................................................ 20

SUMMARY OF THE ARGUMENT ........................................................... 22

ARGUMENT ....................................................................................... 23

    I.    STANDARD OF REVIEW ............................................................ 23

    II.   WITH CHEVRON GONE THE MSA DOES NOT PROVIDE FOR AT-SEA MONITORS IN THE NEW ENGLAND FISHERY ............................... 23

A.    Section 1853(b)(8) Does Not Allow ASMs ...........................................27

B.    The Explicit Cost-Shifting Provisions of the MSA Preclude
      a General Power to Impose Cost-Shifting Elsewhere ..........................32

C.    The Penalty Provision of the MSA Does Not Provide the Power to
      Assign Industry-Funded ASMs at Government Agencies' Whim........41

D.    The Final Rule Is Neither Necessary Nor Appropriate and Certainly
      Not Both...................................................................................................43

E.    There Is No "Default Norm" Requiring Regulated Parties to Pay the
      Salaries of Their Monitors.....................................................................50

F.    Legislative History Does Not Support the Final Rule...........................53

CONCLUSION.....................................................................................................54

CERTIFICATE OF COMPLIANCE.......................................................................55

CERTIFICATE OF SERVICE ..............................................................................56

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  594 U.S. 758 (2021) ............................................................30

*Ala. Power Co. v. OSHA*,
  89 F.3d 740 (11th Cir. 1996) .............................................58

*Alaska S.S. Co. v. United States*,
  290 U.S. 256 (1933) ...........................................................38

*AMG Cap. Mgmt., LLC v. FTC*,
  593 U.S. 67 (2021) .............................................................30

*Anglers Conservation Network v. Pritzker*,
  139 F. Supp. 3d 102 (D.D.C. 2015) ............................ 60, 61

*Atlantic Fish Spotters Ass'n v. Evans*,
  321 F.3d 220 (1st Cir. 2003) ................................. 39, 40, 62

*Campanale & Sons, Inc. v. Evans*,
  311 F.3d 109 (1st Cir. 2002) ...................................... 38, 39

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .............................................................1

*Compania Di Navigacion La Flecha v. Brauer*,
  168 U.S. 104 (1897) ...........................................................37

*Ebert v. Poston*,
  266 U.S. 548 (1925) ...........................................................62

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ...........................................................48

*Gallo Motor Ctr. Corp. v. Mazda Motor of U.S.A.*,
  172 F. Supp. 2d 292 (D. Mass. 2001) ...............................47

*Goethel v. Dep't of Com.*,
  854 F.3d 106 (1st Cir. 2017) ...................................... 44, 64

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
  968 F.3d 454 (5th Cir. 2020) ...................................... 55, 59

*Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*,
  281 F. Supp. 2d 1 (D.D.C. 2003) ......................................56

*Herman v. Hector I. Nieves Transp., Inc.*,
  244 F.3d 32 (1st Cir. 2001) ...............................................39

*In re MCP No. 165, OSHA Admin., Interim Final Rule: Covid-19 Vaccination and
  Testing*
  *86 Fed Reg. 61402*,
  21 F.4th 357 (6th Cir. 2021) ..............................................58

*Iselin v. U.S.*,
    270 U.S. 245 (1926) .......................................................................62
*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ................................................................ 47, 48
*Loper Bright Enters. v. Raimondo* and *Relentless, Inc. v. Dep't of Com.*,
    603 U.S. 369 (2024) ............................................................ passim
*Loper Bright Enters., Inc. v. Raimondo*,
    45 F.4th 359 (D.C. Cir. 2022) ............................................ passim
*Lovgren v. Locke*,
    701 F.3d 5 (1st Cir. 2012) .............................................................29
*Loving v. U.S.*,
    517 U.S. 748 (1996) .......................................................................63
*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
    606 U.S. 146 (2025) .......................................................................31
*Mexican Gulf Fishing Co. v. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) ........................................................55
*Michigan v. EPA*,
    576 U.S. 743 (2015) ................................................................ 57, 63
*Nat'l Cable Television Ass'n, Inc. v. United States*,
    415 U.S. 336 (1974) .......................................................................67
*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
    595 U.S. 109 (2022) .......................................................................30
*Nat'l Grain & Feed Ass'n v. OSHA*,
    866 F.2d 717 (5th Cir. 1988)........................................................58
*NLRB v. SW General, Inc.*,
    580 U.S. 288 (2017) .......................................................................44
*Objio-Sarraff v. United States*,
    927 F. Supp. 30 (D.P.R. 1996)......................................................35
*Relentless Inc. v. U.S. Dep't of Com.*,
    561 F. Supp. 3d 226 (D.R.I. 2021)...........................................5, 29
*Relentless Inc. v. U.S. Dep't of Com.*,
    No. 20-108 WES, 2025 WL 1939025 (D.R.I. July 15, 2025) .................... passim
*Relentless Inc. v. U.S. Dep't of Com.*,
    No. 21-1886, 2024 WL 3647769 (1st Cir. July 31, 2024)................................2, 6
*Relentless, Inc. v. Dep't of Com.*,
    144 S.Ct. 325 (2023) (Mem.)...........................................................5
*Relentless, Inc. v. U.S. Dep't of Com.*,
    62 F.4th 621 (1st Cir. 2023) ..................................................... passim
*The Ocean Conservancy v. Gutierrez*,
    394 F. Supp. 2d 147 (D.D.C. 2005) ..............................................57

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
  508 U.S. 439 (1993) ................................................................................33
*United States v. Cleveland*,
  106 F.3d 1056 (1st Cir. 1997) ......................................................... 35, 36
*United States v. Cusick*,
  No. 11cr10066-LTS, 2012 WL 442005 (D. Mass. Feb. 9. 2012) ......................62

## Constitutional Provisions

U.S. Const. art. I, § 1 ................................................................... 41, 49
U.S. Const. art. I, § 7 ........................................................................41
U.S. Const. art. I, § 8 ........................................................................41

## Statutes

16 U.S.C. § 1387 ...............................................................................42
16 U.S.C. § 1802(31) ..........................................................................10
16 U.S.C. § 1821 ...............................................................................33
16 U.S.C. § 1821(h) ...................................................................... 13, 14
16 U.S.C. § 1821(h)(1)(A) ....................................................................13
16 U.S.C. § 1821(h)(4) ........................................................................37
16 U.S.C. § 1821(h)(6)(C) .....................................................................35
16 U.S.C. § 1827 ...............................................................................33
16 U.S.C. § 1827(b) ...........................................................................13
16 U.S.C. § 1827(b)(1) ........................................................................13
16 U.S.C. § 1827(b)(2) ........................................................................13
16 U.S.C. § 1827(d) ...................................................................... 13, 14
16 U.S.C. § 1827(e) ...........................................................................14
16 U.S.C. § 1827(f) ...........................................................................14
16 U.S.C. § 1853(a) ...........................................................................44
16 U.S.C. § 1853(b)(8) .................................................................. passim
16 U.S.C. § 1853a(c)(1)(H) ....................................................................37
16 U.S.C. § 1853a(e)(2) .......................................................................37
16 U.S.C. § 1854(d) ..................................................................... 12, 13
16 U.S.C. § 1854(d)(2)(B) .....................................................................12
16 U.S.C. § 1855(f) ...........................................................................23
16 U.S.C. § 1858(g)(1)(D) .....................................................................42

16 U.S.C. § 1862(a) ................................................................ passim
16 U.S.C. § 1862(b)(1).............................................................11
16 U.S.C. § 1862(b)(1)(B) .........................................................11
16 U.S.C. § 1862(b)(2)...............................................................11
16 U.S.C. § 1862(b)(2)(E) ..........................................................11
16 U.S.C. § 1881b .......................................................... 10, 12, 33
16 U.S.C. § 1881b(a)(2)..............................................................10
16 U.S.C. § 1881b(c) ..................................................................10
18 U.S.C. § 209 ...........................................................................48
28 U.S.C. § 1291 ...........................................................................1
31 U.S.C. § 1341(a)(1)...............................................................48
31 U.S.C. § 3302(b) ...................................................................48
49 U.S.C. § 44917(a) ..................................................................29
5 U.S.C. §§ 701-706...................................................................23

## Rules

Fed. R. App. P. 4(a)(1)(B) ............................................................1

H.R. Rep. 101-393 (Dec. 15, 1989) ...........................................54

S. Rep. No 101-414 (Aug. 2, 1990) .......................................9, 54

## Other Authorities

High Seas Fishing Compliance Act,
    16 U.S.C. § 5501 *et seq.*.......................................................42
NEFMC, *Industry-Funded Monitoring Amendment: Atlantic Herring Fishery* (Jan. 30, 2020),
    https://s3.amazonaws.com/nefmc.org/14_200130-IFM-Amendment-Presentation.pdf................................................................18
NEFMC, *Observer Policy Committee (Industry-Funded Monitoring), SBRM Overview*,
    https://www.nefmc.org/committees/observer-policy-committee (last visited Jan. 14, 2026) ................................................................15
NEMFC, NOAA,
    Industry-Funded Monitoring: An Omnibus Amendment to the Fishery

Management Plans of the Mid-Atlantic and New England Fishery Management
Councils (Sep. 2016) ............................................................................................3

NOAA Fisheries, *Atlantic Herring Framework 8 Interim Final Rule: 2021-2023
Quotas Bulletin* (Mar. 29, 2021),
https://www.fisheries.noaa.gov/bulletin/atlantic-herring-framework-8-interim-
final-rule-2021-2023-quotas ..............................................................................6

NOAA Fisheries, *Atlantic Herring Regulated and Closed Areas*,
https://www.fisheries.noaa.gov/new-england-mid-atlantic/sustainable-
fisheries/atlantic-herring-regulated-and-closed-areas (Mar. 23, 2022) .................5

NOAA Fisheries, *Atlantic Herring*,
https://web.archive.org/web/20201016190456/https://www.fisheries.noaa.gov/sp
ecies/atlantic-herring (archived by Internet Archive Wayback Machine on Oct.
16, 2020) ..........................................................................................................5, 6

NOAA Fisheries, *Atlantic Herring*,
https://www.fisheries.noaa.gov/species/atlantic-herring (Dec. 23, 2025) .............5

NOAA Fisheries, *Fishing Gear: Bottom Trawls*,
https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-bottom-trawls
(Jan. 8, 2026) ....................................................................................................6

NOAA Fisheries, *Industry-Funded Monitoring in the Atlantic Herring Fishery*,
https://www.fisheries.noaa.gov/infographic/industry-funded-monitoring-atlantic-
herring-fishery (May 7, 2025) ...........................................................................18

NOAA Fisheries,
*Laws & Policies: Magnuson-Stevens Act* ...........................................................33

NOAA Fisheries, Protected Species Observers,
https://www.fisheries.noaa.gov/national/endangered-species-
conservation/protected-species-observers (Feb. 20, 2025).................................43

NOAA, *Atlantic Herring: Industry-Funded Monitoring*,
https://www.fisheries.noaa.gov/species/atlantic-herring/industry-funded-
monitoring (Dec. 23, 2025)................................................................................19

NOAA, *Laws & Policies: Magnuson-Stevens Act*,
https://www.fisheries.noaa.gov/topic/laws-policies (last visited Jan. 8, 2026)...13

*Reauthorization of the Magnuson Fishery Conservation and Management Act of
1976—Part II, Hearing on H.R. 2061 Before the H. Comm. On Merch. Marine
& Fisheries, Subcomm. On Fisheries & Wildlife Conservation & Env't*, 101st
Cong. (1989) (Serial No. 101-37) ........................................................................9

*Sustainable Fisheries Act*,
Pub.L. No. 104-297, §§ 105, 113-14, 204,
110 Stat. 3559, 3563-69, 3597-99, 3609
(codified at 16 U.S.C. §§ 1821-24, 1857-58, 1881b) (Oct. 11, 1996)................42

The Declaration of Independence para. 12 (U.S. 1776) ...........................................2

William Strunk, Jr. & E.B. White,
 THE ELEMENTS OF STYLE 90 (4th ed. 2000) (definition "article")......................52

# GLOSSARY

ACL   Annual Catch Limit

APA   Administrative Procedure Act

ASM   At-Sea Monitor

FMP   Fishery Management Plan

FRAP   Federal Rules of Appellate Procedure

FRCP   Federal Rules of Civil Procedure

FRFA   Final Regulatory Flexibility Analysis

GARFO   Greater Atlantic Regional Fisheries Office

IFM   Industry-Funded Monitoring

IRFA   Initial Regulatory Flexibility Analysis

LAPP   Limited Access Privilege Program

MAFMC   Mid-Atlantic Fishery Management Council

MSA   Magnuson-Stevens Fishery Conservation and Management Act

NEFMC   New England Fishery Management Council

NEFOP   Northeast Fisheries Observer Program

NMFS   National Marine Fisheries Service

NOAA   National Oceanic and Atmospheric Administration

NPFMC   North Pacific Fishery Management Council

RFA   Regulatory Flexibility Act

RTO   Returns-to-owner

SBRM   Standardized Bycatch Reporting Methodology

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to Local Rule 34.0(a), Appellant respectfully requests that the Court schedule oral argument in this case. This case on remand from the U.S. Supreme Court presents important legal questions about the scope of an agency's ability to grant itself power not provided for by statute after the demise of *Chevron* deference, and whether the Magnuson-Stevens Fishery Conservation and Management Act governing the important New England fisheries has been followed, and what costs of government surveillance can be forced on industry without Congressional warrant. Oral presentation will aid the Court in seeking clarification from counsel for all parties and in its resolution of these weighty issues.

## JURISDICTIONAL STATEMENT

On July 15, 2025, the District of Rhode Island granted Appellees' motion for summary judgment and denied Appellants' motion for summary judgment. ADD15. Appellants Relentless Inc., Huntress Inc. and Seafreeze Fleet LLC filed a timely notice of appeal on September 23, 2025. A44; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Did the district court err in holding that the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") allows Appellees to create the office of At-Sea Monitors ("ASMs"), to force regulated fishers to contract with such monitors, and to pay for them?

## INTRODUCTION

*Chevron*[1] deference is no more. *Loper Bright Enters. v. Raimondo* and *Relentless, Inc. v. Dep't of Com.*, 603 U.S. 369, 412 (2024) ("*Loper Bright/ Relentless*") ("*Chevron* is overruled"). Similarly, the previous decisions of both this Court and the district court were vacated and are of no force or effect. *Relentless Inc. v. U.S. Dep't of Com.*, No. 21-1886, 2024 WL 3647769, at *1 (1st Cir. July 31, 2024) ("… the opinion and judgment issued on March 16, 2023 are vacated, the district

---

[1] *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("*Chevron*").

1

court's judgment is vacated …). Yet, the district court relied on those vacated opinions and a misreading of the MSA to affirm the creation of ASMs as if nothing had happened of moment in statutory interpretation since the court last opined on the subject, and it upheld the challenged regulation only through deference to the agency.

The Appellees, without statutory authority, created a new federal office: the ASMs.[2] They imposed the cost of such ASMs, which exist only as government agents and enforcers, on small, regulated businesses. Not only has Congress failed to explicitly grant this authority to Appellees, but where Congress has authorized ASMs, it capped such costs well below those imposed here.

This unlawful imposition is blameworthy. The people of New England famously rebelled against George III because he "erected a multitude of New Offices, and sent hither swarms of Officers to harass our people, and eat out their substance." *See* Declaration of Independence para. 12 (U.S. 1776). On the 250th anniversary of that allegation, this Court should not affirm that agencies have such power from unclear delegations from Congress, when the MSA itself shows Congress knew how to make such delegations clearly.

---

[2] Even if the ASMs are a subset of the "observers" referenced in the MSA, the agency has no power to make fishers pay for either.

2

Appellants, Relentless Inc. ("Relentless"), Huntress Inc. ("Huntress"), and Seafreeze Fleet LLC ("Seafreeze") (collectively "the Fishermen"), were correct that the Department of Commerce ("the Department"), the National Oceanic and Atmospheric Administration ("NOAA"), the National Marine Fisheries Service ("NMFS"), and the individual defendants in their official capacities (collectively "the Government Agencies") have implemented an unlawful and unconstitutional ASM mandate on the nation's Atlantic herring fishermen, and the lower court erred in holding otherwise. Specifically, the New England Fishery Management Council's ("NEFMC") Industry-Funded Monitoring Omnibus Amendment ("IFM Amendment") and the February 7, 2020 Final Rule, which implements the IFM Amendment, are unlawful as exceeding the powers granted to those agencies by the MSA and its National Standards. Both fail to withstand scrutiny under the Administrative Procedure Act ("APA"). The lower court's decision should be reversed with instructions to enjoin the enforcement of the IFM Amendment and the Final Rule and set it aside. *See* A191–828 (excerpts from the "IFM Amendment"); NEMFC, NOAA, Industry-Funded Monitoring: An Omnibus Amendment to the Fishery Management Plans of the Mid-Atlantic and New England Fishery Management Councils (Sep. 2016); *see also* A75–103 ("Final Rule").

## STATEMENT OF THE CASE

### I.    PROCEDURAL HISTORY

On February 7, 2020, NMFS and NOAA adopted the Final Rule implementing the IFM Amendment. *See* A83.

On March 4, 2020, the Fishermen timely filed a Complaint challenging the Final Rule in the court below. The parties eventually cross-moved for summary judgment, and on September 20, 2021, the district court denied the Fishermen's motion for summary judgment on all counts and granted it on behalf of Government Agencies. *Relentless Inc. v. U.S. Dep't of Com.*, 561 F. Supp. 3d 226 (D.R.I. 2021); ADD15. That order was timely appealed to the First Circuit on October 28, 2021. (No. 1:20-cv-00108, Dkt. 49). This Court issued its opinion in that case on March 16, 2023. *Relentless, Inc. v. U.S. Dep't of Com.*, 62 F.4th 621 (1st Cir. 2023) ("*Relentless I*"). The Fishermen timely petitioned for *certiorari* which was granted by the Supreme Court on October 13, 2023. *Relentless, Inc. v. Dep't of Com.*, 144 S.Ct. 325 (2023) (Mem.). On June 24, 2024, the Supreme Court overturned *Relentless I. Loper Bright/Relentless*, 603 U.S. at 413 ("Because the D.C. and First Circuits relied on *Chevron* in deciding whether to uphold the Rule, their judgments are vacated, and the cases are remanded for further proceedings consistent with this opinion.").

Upon remand, this Court again vacated its decision and that of the district court below and remanded the case to the district court for further proceedings. *Relentless*, 2024 WL 3647769, at *1 "*Relentless 2024*"). The district court denied

summary judgment to the Fishermen and granted it to the Government agencies. ADD15. The Fishermen filed a timely notice of appeal on September 3, 2025. A44.

## II.    ATLANTIC HERRING, THE HERRING FISHING FLEET AND THE FISHING SECTOR

Atlantic herring, or *Culpea harengus*, are small schooling fish from the family *Clupeidae*. Atlantic herring are found across the North Atlantic, but in the western North Atlantic they are distributed from Labrador, Canada to Cape Hatteras, North Carolina.     *See*     NOAA     Fisheries,     *Atlantic     Herring*, https://www.fisheries.noaa.gov/species/atlantic-herring (Dec. 23, 2025).

In federally managed waters, the Atlantic herring population is concentrated from New England to New Jersey. *See* NOAA Fisheries, *Atlantic Herring Regulated and     Closed     Areas*,     https://www.fisheries.noaa.gov/new-england-mid-atlantic/sustainable-fisheries/atlantic-herring-regulated-and-closed-areas (Mar. 23, 2022). Atlantic herring is a biologically important species as it is vital to the marine food chain, but it is also economically important in its own right.

At the time the IFM Amendment and Final Rule were promulgated, NOAA had indicated that Atlantic herring were not overfished, nor subject to overfishing. *See*     NOAA     Fisheries,     *Atlantic     Herring*, https://web.archive.org/web/20201016190456/https://www.fisheries.noaa.gov/species/atlantic-herring (archived by Internet Archive Wayback Machine on Oct. 16, 2020). The 2018 stock assessment also indicated that Atlantic herring stock levels

were well above their target levels. *Id*. Despite this, the 2018 herring stock assessment led to a nearly 70 percent reduction in herring quotas for 2019. *See* NOAA, Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 84 Fed. Reg. 2,760, 2,765 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648). And the quotas have continued to drop in accord with new assessments that the stock is "overfished, but not subject to overfishing." NOAA Fisheries, *Atlantic Herring Framework 8 Interim Final Rule: 2021-2023 Quotas Bulletin* (Mar. 29, 2021), https://www.fisheries.noaa.gov/bulletin/atlantic-herring-framework-8-interim-final-rule-2021-2023-quotas.

## III.    FISHING VESSELS AND BUSINESS PRACTICES

There are three primary gear types used to catch and harvest Atlantic herring: midwater trawl, purse seine, and bottom trawl. The only type pertinent to this appeal are small mesh bottom trawls which are used by Relentless and Huntress's vessels. Bottom trawlers generally harvest herring by using nets fitted with weights and special gear that allow the net to stay open as it is trawled along the ocean floor. The nets are fitted with mesh that confine the fish as they are pulled to the surface. *See* NOAA Fisheries, *Fishing Gear: Bottom Trawls*, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-bottom-trawls   (Jan. 8, 2026).

6

The Atlantic herring fishery is regulated through a permitting system. Only two categories of Atlantic herring permits are impacted by the IFM Amendment and Final Rule, Categories A and B. *See* A78. Category A permits are "All Areas Limited Access" permits. Vessels holding Category A permits can possess an unlimited amount of herring in all areas. Appellants' vessels, F/Vs *Relentless* and *Persistence* each hold Category A permits. A42 ¶ 4.

Appellants Relentless and Huntress are small businesses whose primary industry is commercial fishing. Their annual gross receipts are less than or equal to $11 million. *Id.* They are subject to the IFM Amendment and the Final Rule. Both Relentless and Huntress are corporations organized under Rhode Island law and operating out of North Kingstown, Rhode Island. Relentless owns the F/V *Relentless* and Huntress owns the F/V *Persistence*. Both vessels are high-capacity freezer trawlers that harvest Atlantic herring, Loligo and Illex squids (*Doryteuthis* (*Amerigo*) *pealeii*, and *Illex illecebrosus*, respectively), Butterfish (*Peprilus triacanthus*), and Atlantic mackerel (*Scomber scombrus*). *See* A288–301 ("June 30, 2015 Comment Letter"), A27 ¶ 48.

Both ships use a unique at-sea freezing technique that allows the vessels to stay at sea longer than other vessels in the Atlantic herring fishery and provides each vessel flexibility in what catch it harvests during fishing trips. A15–17 ¶¶ 9–11 Both vessels hold several permits and operate across the jurisdictional boundaries of the

7

NEFMC and the Mid-Atlantic Fishery Management Council ("MAFMC"). Appellants typically declare[3] into herring, squid, and mackerel fisheries on the trips they take from late November through April because they harvest all those species alternatively but sometimes simultaneously during the season. *See* A27–28¶ 50. That is, they may take each species, some, or all species during any given trip. This flexible style of fishing allows Appellants to cover operating costs by switching over to a different species based on what they encounter. Because of the type of vessels they own, the amount of time they spend at sea, and the fishing they do, the Fishermen cannot take advantage of any of the exemptions for herring fishermen under the final rule. *See* A291; A182–187 ("Dec. 24, 2018 Comment Letter"), A238 (noting longer trips, freezing catch at sea, and catching different fish than herring).

## IV. THE 1990 AMENDMENTS AND STATUTORY COST-SHIFTING GRANTS IN THE MAGNUSON-STEVENS ACT

The 1990 amendments, *inter alia*, allowed Observers to be placed on fishing vessels. 16 U.S.C. § 1853(b)(8) (the "Observer Amendment"). There is no statement that fishermen will have to pay for the Observers and at the time the only Observers in the fishery were paid by the Government. The district court relied on this provision to grant the Government Agencies the power to force permitholders to pay for the cost of Observers. The Fishermen were in the fishing business at this time and did

---

[3] "Declaring" means informing regulatory authorities of what species a vessel intends to pursue on any given trip.

not oppose this amendment or contact their representatives concerning it. As far as their knowledge and the entire record shows, there was no opposition to this amendment from either industry or Members of Congress involved with the fishing industry. The power of the agency to place Observers on vessels was in doubt, so Congress acted to make it clear they could be placed. S. Rep. No 101-414, at 20 (Aug. 2, 1990) (The amendment "would clarify the existing authority in the [MSA] for fishery management plans to require that observers be carried on board domestic fishing vessels for conservation and management purposes."). Prior to amending the MSA, the authority to do so was denied by some and aside from the Northern Pacific amendments there was no fee shifting.[4] The Government has usually relied on the Observer Amendment to bolster its argument. But the contemporaneous original meaning of that amendment was understood to relate to government paid agents, not Observers paid by industry. The "regulatory costs" of the statute were the costs associated with "carrying" the Observers, not paying them. Indeed, the section itself exempts vessels that cannot bear the regulatory cost of berths and space:

> (8) require that one or more observers be carried on board a vessel of
> the United States engaged in fishing for species that are subject to the

---

[4] *See*, *e.g.*, *Reauthorization of the Magnuson Fishery Conservation and Management Act of 1976—Part II, Hearing on H.R. 2061 Before the H. Comm. On Merch. Marine & Fisheries, Subcomm. On Fisheries & Wildlife Conservation & Env't*, 101st Cong. 431 (1989) (Serial No. 101-37) (written testimony of Henry Mitchell, Exec. Dir., Bering Sea Fishermen's Ass'n) ("Currently, councils appear to be unable to charge fees to cover such costs, and appear merely to be left now to mandating their existence."); A110.

> plan, for the purpose of collecting data necessary for the conservation and management of the fishery; *except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized* ….

16 U.S.C. § 1853(b)(8) (emphasis added).

Subsequently, in 1996, Congress made this explicit by stating exactly what powers the Secretary has in creating regulations concerning the adequacy of vessels to carry Observers and what the Observers would do on the vessels, as well as how they were to be trained. 16 U.S.C. § 1881b. It says Government Agencies must be "reasonable" in requiring what steps a vessel owner must take to enable it to support an Observer. 16 U.S.C. § 1881b(a)(2). It also expressly stated that Congress assumed such Observers would be federal employees:

> (c) Observer Status
> An observer on a vessel and under contract to carry out responsibilities under this chapter or the Marine Mammal Protection Act of 1972 (16 U.S.C. 1361 et seq.) shall be deemed to be a Federal employee for the purpose of compensation under the Federal Employee Compensation Act (5 U.S.C. 8101 et seq.).

16 U.S.C. § 1881b(c). Observer is defined as "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this chapter."[5] 16 U.S.C. § 1802(31).

---

[5] "Authorized" by the Government Agencies, in other words, not the Fishermen.

Simultaneously, in the 1990 Amendments, Congress allowed the agencies to charge fees for Observers and shift the costs of such observers to the regulated party in the Northern Pacific, but did not permit the same in any other fishery. Section 1862(a) states:

(a) In general
The North Pacific Council may prepare, in consultation with the Secretary, a fisheries research plan for any fishery under the Council's jurisdiction except a salmon fishery which—
(1) requires that observers be stationed on fishing vessels engaged in the catching, taking, or harvesting of fish and on United States fish processors fishing for or processing species under the jurisdiction of the Council, including the Northern Pacific halibut fishery, for the purpose of collecting data necessary for the conservation, management, and scientific understanding of any fisheries under the Council's jurisdiction; and
(2) establishes a system, or system, of fees, which may vary by fishery, management area, or observer coverage level, to pay for the cost of implementing the plan.

16 U.S.C. § 1862(a) (footnote omitted). The statute then provides the standards that must be used to provide for this industry funding. *See* 16 U.S.C. §§ 1862(b)(1)(A)–(D), (b)(2)(A)–(J). Those standards include to "be fair and equitable to all vessels and processors[.]" 16 U.S.C. § 1862(b)(1)(B). They also severely restrict what the fees can be used for and provide that they not "exceed 2 percent, of the unprocessed ex-vessel value of fish and shellfish harvested…." 16 U.S.C. § 1862(b)(2)(E). Congress has amended the MSA three times since 1990 to define "Observers," specify their training, and say what fishing vessels they would be assigned to, but Congress never authorized fee shifting in any other domestic fishery. *See* 16 U.S.C.

11

§ 1881b (describing placement and training of "observers" but making no provision for them to be paid by the regulated fishers).

The MSA explicitly authorizes the collection of fees for Observers in certain circumstances and for specific purposes. It does not generally allow industry funding of agency wishes. The statute does authorize the Secretary to collect fees to cover actual costs directly related to the management of, data collection for, and enforcement of limited access privilege programs ("LAPPs") and certain community development quota programs. 16 U.S.C. § 1854(d). Such fees are capped at 3 percent of the ex-vessel value of fish harvested under those programs. *Id*. (d)(2)(B). In § 1854(d), Congress laid out the requirement that the level of fees be established by regulation and stated:

(d) Establishment of fees
(1) The Secretary shall by regulation establish the level of any fees which are authorized to be charged pursuant to section 1853(b)(1) of this title. The Secretary may enter into a cooperative agreement with the States concerned under which the States administer the permit system and the agreement may provide that all or part of the fees collected under the system shall accrue to the States. The level of fees charged under this subsection shall not exceed the administrative costs incurred in issuing the permits.
(2)(A) Notwithstanding paragraph (1), the Secretary is authorized and shall collect a fee to recover the actual costs directly related to the management, data collection, and enforcement of any—
    (i) limited access privilege program; and
    (ii) community development quota program that allocates a percentage of the total allowable catch of a fishery to such program.

(B) Such fee shall not exceed 3 percent of the ex-vessel value of fish harvested under any such program, and shall be collected at either the

time of the landing, filing of a landing report, or sale of such fish during a fishing season or in the last quarter of the calendar year in which the fish is harvested.

*Id*.

Finally, the MSA has allowed Observers on foreign fishing vessels to be charged to them in at least two places. 16 U.S.C. § 1821(h) and § 1827(d). The MSA was created in large part to control foreign fishers from injuring America's fishing resources. NOAA, *Laws & Policies: Magnuson-Stevens Act*, https://www.fisheries.noaa.gov/topic/laws-policies (last visited Jan. 8, 2026). These provisions are specific and allow the Secretary to contract with private Observers *and to require foreign fishers to contract with Observers*. 16 U.S.C. §§ 1821(h)(3)–(6); 1827(b)(2). They also state that the Secretary shall establish a program that puts an Observer on *every* foreign fishing vessel while it is in American waters. 16 U.S.C. §§ 1821(h)(1)(A); 1827(b)(1). Congress directed that such Observers may be acquired by the Secretary "for such program through contract with qualified private persons." 16 U.S.C. § 1827(b). Congress explicitly stated that "the Secretary" could "impose" fees on such foreign vessels "in an amount sufficient to cover all of the costs of providing an observer aboard that vessel." 16 U.S.C. § 1827(d); *see also* § 1821(h)(4)–(5) (establishing a fund to pay for Observers, that unlike permit fees goes into a fund earmarked within the treasury to be used to pay these observer costs).

13

These fees are placed in a fund that can only be drawn upon as authorized by Congress in appropriations. 16 U.S.C. §§ 1821(h)(4)–(5); 1827(d)–(e). Congress then prohibited any foreign vessel from refusing to pay the fee or refusing to allow an observer aboard. 16 U.S.C. § 1827(f). If Congress does not appropriate the amounts necessary for the Secretary to draw from the "Observer Fund," the Secretary is given full power to force foreign fishers into a contract with private Observers. 16 U.S.C. § 1821(h)(6) states:

> If at any time the requirement set forth in paragraph (1) cannot be met because of insufficient appropriations, the Secretary shall, in implementing a supplementary observer program:
> (A) certify as observers, for the purposes of this subsection, individuals who are citizens or nationals of the United States and who have the requisite education or experience to carry out the functions referred to in paragraph (3);
> (B) establish standards of conduct for certified observers equivalent to those applicable to Federal personnel;
> (C) *establish a reasonable schedule of fees that certified observers or their agents shall be paid by the owners and operators of foreign fishing vessels for observer services; and*
> (D) monitor the performance of observers to ensure that it meets the purposes of this chapter.

*Id.* (emphasis added).

The ability to charge industry for Observers has never been extended beyond the Northern Pacific, LAPPs and Foreign Fishers. The ability to force fishers into contracts with Observers has never been extended beyond foreign fishers.

14

## V.    THE INDUSTRY-FUNDED MONITORING AMENDMENT AND THE FINAL RULE

The IFM Amendment and Final Rule are the culmination of almost seven years of design and development. *See* NEFMC, *Observer Policy Committee (Industry-Funded Monitoring), SBRM Overview*, https://www.nefmc.org/committees/observer-policy-committee (last visited Jan. 14, 2026). The IFM Amendment and Final Rule allow industry-funded monitoring in NEFMC[6] Fishery Management Plans, except for those under joint management with MAFMC, *e.g.*, mackerel. *See* A75. On or about April 20, 2017, twenty-seven years after the 1990 Amendments, the NEFMC finalized its preferred alternatives and adopted the IFM Amendment. *See id*. A year later, on April 19, 2018, the NEFMC "refined" its IFM recommendations. *Id*. On September 19, 2018, the NEFMC published a Notice of Availability for the IFM Amendment in the Federal Register. *See* A54; A75. The Notice of Availability permitted interested parties to submit comments regarding adoption of the IFM Amendment for a 61-day period ending on November 19, 2018. A54; A75. On November 7, 2018, while the IFM Amendment comment period was still open, the proposed rule implementing the IFM Amendment was published in the Federal Register. A52–74 ("Proposed Rule"). The Proposed Rule permitted interested parties to submit comments regarding the implementing rule for a 47-day period ending on December 24, 2018. *Id*. On

---

[6] "New England Fishery Management Council."

15

February 7, 2020, NMFS and NOAA adopted the Final Rule implementing the IFM Amendment, which was substantially the same as the Proposed Rule. *See* A83.

On December 18, 2018, while the comment period for the Proposed Rule was still open, the Secretary of Commerce notified the NEFMC in an unpublished letter that the Secretary approved the IFM Amendment. *See* A75; *see also* A104–06 ("Pentony Letter"). Plaintiffs, through their sister company, Seafreeze Ltd., as well as other industry stakeholders, submitted comments during the Proposed Rule's comment period. *See* A182–87. In contrast to the 1990 Amendments, there was an avalanche of opposition to the IFM Amendment. A45–51, A47 ("Oliver Mem."). Many fishermen stated that the proposed regulations were unaffordable, particularly considering other restrictions on herring and mackerel catches. *Id*.

One agency memorandum complained about the agencies' "limited funding for monitoring," *see* A45, so a scheme was developed to have "the fishing industry [] pay costs for additional monitoring, when Federal funding is unavailable to cover industry's costs." *Id*. While purporting to be consistent with Federal law, the plan was adopted to avoid the problem of spending money Congress had not yet appropriated or the problems of splitting costs between fishers and NMFS in ways that violated the law. *Id*. The proposed regulation was controversial; and fishers did not believe the 1990 amendments had allowed industry funding, as every contemporaneous record bears out:

> This action is controversial. Development of this action has been contentious and has taken several years. Some participants in New England fisheries, including those in the Atlantic herring fishery, have expressed concern that they cannot afford industry-funded monitoring or that the Magnuson-Stevens Act does not authorize industry-funded monitoring.

Oliver Mem. at 3.

Despite the controversy and comments, Defendants forged ahead and implemented the Final Rule containing all of the objectionable requirements and rejecting all counterproposals.

The $700–800 per day cost of Observers proposed in the Final Rule is far higher than the cost in the high-value Alaskan fishery, which is where the MSA authorizes industry-funded Observers but caps the amount to be charged. *See* A81. The Defendants' response to concerns raised by stakeholders was a near wholesale rejection of the comments submitted. *See* A83–88.

The IFM Amendment and the Final Rule establish a 50 percent monitoring coverage target for Observers. *See* A83, A86. This target is achieved by combining Standardized Bycatch Reduction Methodology ("SBRM") of the Northeast Fishers Observer Program ("NEFOP") plus IFM[7] coverage. *See* A78, A79. The Atlantic herring vessel owners pay for the IFM sampling cost—approximately $710 per

---

[7] In previous submissions, the parties have used either "IFM Amendment" or "Omnibus Amendment." This brief adopts "IFM Amendment," but refers to IFM when necessary.

day—and NOAA Fisheries purportedly pays for IFM administrative costs. *See* A76, A79. SBRM NEFOP is funded by NOAA Fisheries. *See* NOAA Fisheries, *Industry-Funded Monitoring in the Atlantic Herring Fishery*, https://www.fisheries.noaa.gov/infographic/industry-funded-monitoring-atlantic-herring-fishery (May 7, 2025). The Final Rule forces many Atlantic herring vessel owners, including Plaintiffs, to enter forced negotiations with private Observers who are approved and trained by NOAA. *See* NEFMC, *Industry-Funded Monitoring Amendment: Atlantic Herring Fishery* 4 (Jan. 30, 2020), https://s3.amazonaws.com/nefmc.org/14_200130-IFM-Amendment-Presentation.pdf. The ASM market is highly regulated and controlled by the Government Agencies. *See, e.g.*, 50 C.F.R. § 648.11(h)(5). The Government Agencies approve the companies allowed to offer services. *See id.* § 648.11(h)(1), (i). There are only four ASM providers for the Atlantic herring fishery, with a fourth approved to conduct portside sampling, which the Fishermen cannot use. *See* NOAA, *Atlantic Herring: Industry-Funded Monitoring*, https://www.fisheries.noaa.gov/species/atlantic-herring/industry-funded-monitoring (Dec. 23, 2025) (NOAA Fisheries has approved "four companies to provide IFM services"). Those companies do not operate in the same geographic regions. The Fishermen are limited by the Government Agencies' regulations in their

ability to negotiate a favorable rate, and the ASMs have no incentive to cater to "customers" without choice.

The information that ASMs collect is directed by NOAA Fisheries and the NEFMC. *See* A79. As small-mesh bottom trawls, Plaintiffs' F/Vs *Relentless* and *Persistence* are not eligible for the ASM alternative—electronic monitoring with portside sampling—thus, they can only comply with the Final Rule by carrying and bearing the cost of an ASM. *See id*. The IFM Amendment and the Final Rule project that, for vessels like F/Vs *Relentless* and *Persistence* that cannot use electronic monitoring, implementing the IFM Amendment will reduce Returns to Owners by almost ***20 percent***. *See id*., A86.

The Government Agencies have admitted certain facts regarding the program in the record. First, when formulating the Final Rule, the Government Agencies acknowledged that established herring "observer coverage" ("HER OBS") was different from the herring at-sea monitors ("HER ASM"). A576. Further, the cost of the ASMs is mostly their "labor, i.e., wages/salary[.]" A577. ("sometimes upwards of 50% of sea day cost"). The balance is insurance, training, benefits and overhead. *Id*. At the time of the proposed rule there were "no industry-funded monitoring programs in the Greater Atlantic Region that include contracts between service provider companies and fishing industry participants." *Id*. at A578. Until that time, all such contracts of either observers or ASMs were between the monitors (of

whatever kind) and the Government Agencies. *Id*. The Government Agencies have described the direct costs of at-sea monitoring as "the daily salary of the at-sea monitor." A559 (discussing ASM costs generally). And they have considered cost-sharing of "Observer monitoring costs, such as observer salary and travel costs" as violating the Anti-Deficiency Act. *Id*.; A560 (noting that "there is no current legal mechanism to allow cost-sharing of monitoring between NMFS and the industry"). But the Government Agencies state elsewhere, "It is illegal for industry to pay inherently government costs (*e.g.*, administrative costs), but *either group can pay for sampling costs*." A228 (emphasis added). The Government Agencies described "sampling costs" as "observer salary and travel costs[.]" A227.[8] The Government Agencies did not provide an explanation for these inconsistent statements.

## VI.    THE DECISION BELOW

The district court's opinion, ADD1, found for the Government Agencies. The parties agreed that the only issue before the Court was "whether the MSA authorizes the Final Rule." *Relentless Inc. v. U.S. Dep't of Com.*, No. 20-108 WES, 2025 WL 1939025, at *4 (D.R.I. July 15, 2025), ADD 9. The district court found that "the Final Rule is consistent with the MSA, specifically Section 1853(b)." *Id*. It put enormous weight on the vacated opinion of this Court that there is a "default norm" that the cost of complying with properly enacted regulations is borne by the regulated

---

[8] The salary of agents performing government tasks, as ASMs are, is an "inherently government cost."

party. *Id.* (citing *Relentless I* and *Goethel v. Dep't of Com.*, 854 F.3d 106, 117-18 (1st Cir. 2017) (Kayatta, J., concurring)). The district court further relied on 16 U.S.C. § 1853(b)(14), which allowed fishery management plans to "prescribe such other measures, requirements, or conditions and restrictions as determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* The district court again agreed with this Court's vacated opinion to conclude that 16 U.S.C. § 1858(g)(1)(D), which provides for penalties for any vessel owner who does not make a "payment required for observer services provided to or contracted by an owner operator." *Id.* at *5. ADD11. Finally, it relied on the general admonition of the MSA that the Government Agencies use the best scientific evidence and that fishery participants get to advise on any plan. *Id.*

The Court rejected the Fishermen's arguments regarding the structure of the MSA and that Congress obviously knew how to require fishermen to pay for observers or monitors. *See id.* The district court again relied on the "necessary and appropriate" language of Section (b)(14) to reject any limit on what the Government Agencies can do to pass on their own governmental costs to industry. *Id.* It never explained why it did not look to Congress's limits on shifting such costs when it expressly did so to determine what was "necessary and appropriate" as far as costs to industry are concerned. Finally, it rejected legislative history entirely. *Id.* The district court did not grapple with the contemporaneous understanding of the 1990 amendments by all parties over 30 years nor how it could change by administrative fiat in the teeth of the understanding of everyone involved when those amendments were passed.

21

## SUMMARY OF THE ARGUMENT

The court below erroneously held that the MSA, simply by requiring Fishermen to "carry" observers (not ASMs), also allowed the Government Agencies to require the Fishermen to contract and pay for the services of ASMs. *Id*. at *4–5 (ADD10–13). It further erroneously held that the "necessary and appropriate" language of the MSA granted the Government Agency this power. *Id*. at *5 (ADD 13). It further erroneously held that the provision of the MSA providing a penalty for failing to pay contracted observers *sub silentio* demonstrated that Congress gave the Government Agencies this power under the MSA. *Id*. (ADD10–13). The district court also relied on the vacated decision of this Court overturned by the Supreme Court, that there is a "default norm" that the regulated party pays administrative costs, including the salaries of government regulators.[9] *Id*. at *4–*5 (ADD10–11). Finally, it ignored the admissions by the Government Agencies that administrative costs could not be assigned to the regulated party, ASMs were different from Observers, and that the Final Rule was explicitly adopted to avoid Congress's control of the agency through its appropriations power. (ADD105–6; A45, A47). The ruling below flouts clear rules of statutory construction, the respective roles of Congress and the Executive in imposing costs on Americans, and Congressional intent. This Court should reverse the erroneous decision below.

---

[9] No such "default rule" exists, and this Court's vacated decision in *Relentless I* is the sole opinion supporting it besides the district court below.

# ARGUMENT

## I.    STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo*. *Lovgren v. Locke*, 701 F.3d 5, 20 (1st Cir. 2012). Judicial review of regulations promulgated under the MSA is governed by the APA. *Id*. The review is limited to the administrative record, and the regulation can be overturned if the agency action is "otherwise not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" *Id*.; *see also* 5 U.S.C. §§ 701-706(2)(A), (C); 16 U.S.C. § 1855(f).

## II.    WITH *CHEVRON* GONE THE MSA DOES NOT PROVIDE FOR AT-SEA MONITORS IN THE NEW ENGLAND FISHERY

Neither this Court in *Relentless I* nor the district court found a clear statement allowing industry-funded monitoring in the Atlantic Herring Fishery. *See, e.g.*, *Relentless*, 561 F. Supp. 3d at 236; *Loper Bright/Relentless*, 603 U.S. at 406 ("though [the First Circuit] ultimately appears to have deferred under Step 2 [of *Chevron*]") (citing *Relentless I*, 62 F.4th at 634). With *Chevron* deference gone, this Court's analysis should end there. Congress did not provide the extraordinary power to impose ASM costs on private fishers, so it may not be invented from vague language. No natural reading of the text and structure of the MSA confers such a power in the Secretary.

The Supreme Court has thoroughly rejected claims of broad authority by agencies to create their own power to impose new and novel regulations based on vague and ambiguous language in a statute. *Loper Bright/Relentless*, 603 U.S. at 411 ("statutory ambiguity … is not a reliable indicator of actual delegation of discretionary authority to agencies."); *NFIB v. Dep't of Lab., OSHA*, 595 U.S. 109 (2022) (statutory authority to regulate workplace safety was not authority to regulate general health); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021) (statutory authority to prevent spread of communicable diseases did not include power to place a moratorium on evictions); *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021) (rejecting FTC's 40-year claim of disgorgement remedy based on the statutory grant of ability to obtain injunctions). Repeatedly, in recent years the Supreme Court has admonished agencies (and some lower courts) not to infer power when none is given. *See, e.g.*, *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 162 (2025) (relying on *Loper Bright* and stating "[t]o deny a party like McLaughlin the opportunity to contest the agency's interpretation in an enforcement proceeding, *Congress must clearly preclude such review*. The Hobbs Act does not do so.").

The only appellate judge to address the present question without reference to *Chevron* Step Two correctly determined that the MSA does not allow the Government Agencies the power to force regulated parties into contracts to pay the

24

salaries of government monitors, however termed. *Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359, 372 (D.C. Cir. 2022) ( "*Loper Bright I*") (Walker, J., dissenting) ("I would reverse the judgment of the district court because the Magnuson-Stevens Act unambiguously does not authorize the Fisheries Service to force the fishermen to pay the wages of federally mandated monitors."). Judge Walker is correct that, "[A]ll else equal, [congressional] silence indicates a lack of authority." *Id*. at 374 (citations omitted). Nor is it the Fishermen's burden to show Congress prohibited the action; instead, "an agency must positively demonstrate where Congress explicitly or implicitly empowered it to act." *Id*. at 375. It is undisputed that no explicit authority in the MSA allows the Government Agencies to "require fishermen to fund an at-sea monitoring program." *Id*.

Critically, Judge Walker explained why reliance on 16 U.S.C. § 1853(b)(8) requiring Fishermen to "carry" observers does not require them to pay those observers' salaries. He noted that § 1853(b)(4) gives the Government Agencies the power to "require the use" of certain equipment. But people and equipment are different. *Id*. And "the Fisheries Service has identified no other context in which an agency, without express direction from Congress, requires an industry to fund its inspection regime." *Id*. at 376.

Judge Walker then dismantled the Government Agencies' assertions that the "necessary and appropriate" clauses in § 1853(a)(1)(A) and § 1853(b)(14) provide

the needed implicit authority, and provided three reasons for doing so. First, for context, the types of "necessary and appropriate" actions in Sections 1853(a) and (b) look nothing like the ASM requirement. *Id*. at 376-377; *see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc*., 508 U.S. 439, 460 (1993) (noting that sections of a statute "travel[] together" with those that surround it.). Second, he notes the uncomfortable problem that the Final Rule was explicitly created to evade the lack of Congressional appropriations for the Government Agencies' responsibilities. *Loper Bright I*, 45 F.4th at 374 (Walker, J., dissenting). If Congress ceased funding the observer programs it authorized by statute, could the agencies escape its control by requiring industry to fund a "legion of independent contractors" simply because of the "necessary and appropriate" language? *Id*. at 377. The district court's interpretation of this language leaves far too much power to the Government Agencies and does not infuse any limiting meaning into the words Congress used. *Id*. n. 37. Finally, Judge Walker relies on the fact that Congress provided for cost-shifting to industry in the 1990 amendments relied upon by the Government Agencies in three limited circumstances. *Id*. at 378-79. Such provisions, particularly the foreign fishers provision, have no reason to exist if the Government Agencies' interpretation of the MSA is correct. This Court should adopt Judge Walker's persuasive statutory interpretation analysis. Every other statutory excuse for this

extraordinary power being implicitly granted to the Government Agencies is unconvincing.

## A. Section 1853(b)(8) Does Not Allow ASMs

The district court erred in holding that the 1990 Amendment that empowers the Government Agencies to require that Fishermen "carry" an Observer entails requiring them to pay an ASM's salary. *Relentless*, 2025 WL 1939025, at *4. That is not what "carry" means. There is no plain text that even suggests that "carried" includes "pay the salary of." The MSA requires that "one or more observers be carried on board a vessel[.]" 16 U.S.C. § 1853(b)(8). Not one fisherman, including the Fishermen here, nor one Congressman, nor anyone else protested the addition of this requirement to the MSA. *See supra* Part IV. But when the Final Rule was proposed, a flood of objections arose. That contrast provides as clear evidence of understood meaning at the time as the Court will ever see. This section cannot bear the weight the district court placed on it.

The Government needs a *grant* of authority or power before it can act. The ability to enforce "carrying" an Observer is not a grant to enforce payment of that Observer, or an ASM, and Congress does not have to limit the administrative agencies' ability to enforce payment because it never granted that power. The MSA does not define "carried," but courts in this Circuit have considered the term before. One court noted:

27

> Accordingly, like the Supreme Court in *Bailey,* this Court shall look to Black's Law Dictionary for the ordinary and plain meaning of the term "carry." According to Black's Law Dictionary, "carry" means "to bear, bear about, sustain, transport, remove, or convey. …" Black's Law Dictionary 214 (6th ed. 1990).

*Objio-Sarraff v. United States*, 927 F. Supp. 30, 34 & n.4 (D.P.R. 1996) (citing *United States v. Ramirez–Ferrer*, 82 F.3d 1149 (1st Cir. 1996)), *rev'd on other grounds*, 108 F.3d 421 (1st Cir. 1997). That definition does not denote payment of wages; it has to do with carriage. In *United States v. Cleveland*, 106 F.3d 1056, 1066 (1st Cir. 1997), the Court noted that the "ordinary and natural" meaning of the word "carry" is:

> CARRY indicates moving to a location some distance away while supporting or maintaining off the ground. Orig. indicating movement by car or cart, it is a natural word to use in ref. to cargoes and loads on trucks, wagons, planes, ships, or even beasts of burden.

*Id*. (quoting *Webster's Third New International Dictionary of the English Language Unabridged* 343 (3d ed. 1971)). Nothing in that definition connotes paying salaries. No "plain" reading of the text in its "ordinary and natural" meaning supports the district court's ruling.

As noted, Judge Walker's dissent made this point in the context of the MSA itself. *Loper Bright I*, 45 F.4th at 375–76 (Walker, J., dissenting) (comparing the word "carried" in § 1853(b)(8) and "use" in the context of fishing gear and equipment in § 1853(b)(4)). For instance, Air Marshals are required to be carried by airlines, but these government agents are not paid by the airlines. Instead, only a seat

28

is required for them. *See* 49 U.S.C. § 44917(a)(1)–(5) (providing for deployment of Air Marshals on passenger flights, including a seat on such flights). Likewise, the MSA only requires provision of adequate and safe quartering facilities for observers—not payment of their salaries. *See* 16 U.S.C. § 1853(b)(8) (vessels not required to carry observer if quartering facilities "are so inadequate or unsafe that the health or safety of the observer of the safe operation of the vessel would be jeopardized"). Carriage is the regulatory cost Congress put on fishermen, not the salaries of those carried.

In no dictionary nor in any context does the mere word "carry" connote "pay the salary of." Whatever can be said about the meaning of "carry," no transmogrification of its meaning to "pay the salary of" can be called a "plain reading." "[T]here is no inherent, or even intuitive, connection between paying a monitor's wage and providing him passage." *Loper Bright I*, 45 F.4th at 376 (Walker, J., dissenting). The district court's suggestion that mere administrative will can change this statutory word's meaning is in error and it cannot, under any circumstances, be the "best" reading of that word or the statute.

The MSA addresses men and vessels at sea. The term "carry" is used often in maritime and admiralty law, typically for goods. "Carrying" in the maritime sense means what it means here, to take on the voyage—not to pay for the goods or people. *See, e.g.*, *Compania Di Navigacion La Flecha v. Brauer*, 168 U.S. 104, 118 (1897)

("By the laws of both countries, the ordinary contract of a common carrier by sea involves an obligation on his part to use due care and skill in navigating the vessel and in carrying the goods"). That does not mean "to pay for the goods." Similarly, in deciding what a provision meant, the Court held:

> That section imposes on masters of United States vessels homeward bound the duty, upon request of consular officers, to receive and carry destitute seamen to the port of destination at such compensation [to the "carrying" vessel] not exceeding a specified amount as may be agreed upon by the master with a consular officer, and authorizes the consular officer to issue certificates for such transportation ….

*Alaska S.S. Co. v. United States*, 290 U.S. 256, 258 (1933). "Carry" did not mean "pay the salary of such seamen." Neither does it mean that for Observers or ASMs here. In similar cases this Court has not allowed fanciful interpretation of words to expand agencies' power. *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 117 (1st Cir. 2002) ("[o]ur general rules of statutory interpretation dictate a narrow course for us on review: unless the statutory language is ambiguous, we generally are limited by its plain meaning." (citations omitted)). The issue in that case was what the word "consultation" meant. The Court found it had as its plain meaning "the act of asking the advice or opinion of someone." *Id.* at 117 (citations omitted). There the appellees argued that because they had taken comments from some of the "consultants" they had fulfilled their duty. This Court disagreed. "Consultation, within the parameters of the Atlantic Coastal Act, must mean something more than general participation in the public comment process on environmental impact

30

statements, otherwise the consultation requirement would be rendered nugatory." *Id.* at 118.

Appellees seek to read out of the MSA the limited industry-funding authorizations, and accompanying protections for fishers, explicitly put there by Congress for LAPPs, foreign vessels, and the North Pacific fisheries. This Circuit's precedent forbids doing so. *See Campanale & Sons, Inc.*, 311 F.3d at 121 (reversing the district court for misconstruing "consultation"); *see also Herman v. Hector I. Nieves Transp., Inc.*, 244 F.3d 32, 36 (1st Cir. 2001) (the "primary canon of statutory construction is that a statute should be construed so as not to render any of its phrases superfluous").

*Atlantic Fish Spotters Ass'n v. Evans* provides further support. 321 F.3d 220 (1st Cir. 2003). Statutory interpretation "begins—and sometimes ends—with the relevant statutory text. … When the words of a statute neither create ambiguity nor lead to an entirely unreasonable interpretation, an inquiring court need not consult other aids to statutory construction." *Id.* at 223–24. There, the Court determined that the words of a yearly appropriations bill, prohibiting spotting tuna from the air, did not support a permanent law against the practice. NOAA could not condition permits on such prohibition, thereafter. *Id.* at 229. Here, Appellants cannot use the three statutory exceptions allowing industry funding to create a general agency prerogative for such funding.

31

With *Chevron* deference's demise, the complete statutory silence—except in three cases—concerning industry-paid Observers does not allow a plain reading that "carry" means "pay salaries." In dictionaries and in traditional maritime law, "carry" never meant "pay." ASMs are government servants and answer to the government. They provide no work for the functioning of the regulated vessel. Thus, "carry" does not mean "pay" on a plain reading of the statute, and the analysis should end there.

## B. The Explicit Cost-Shifting Provisions of the MSA Preclude a General Power to Impose Cost-Shifting Elsewhere

In *Relentless I*, which was overruled, vacated and of no force or effect, this Court held that the fact that Congress knew how to shift costs of ASMs or Observers and did so explicitly in three places was of no moment. It also dismissed the fact in a footnote that Congress had in Section 1821(h)(6) required explicitly that foreign fishers contract directly with observers in certain circumstances, because it was not raised below and only in the Reply and because under *Chevron* was only determining if the agency's interpretation was reasonable. *Relentless I*, 62 F.4th at 633 n. 6. This Court then invented a supposition that Congress wanted to be explicit for foreign fishers in the "sensitive area (foreign relations)" and posited that it was no evidence that Congress did not delegate the authority for industry-funded monitors in other (domestic) instances. *Id*.

This reading fights the MSA's text. The MSA was passed to address the depredations by foreign fishers of American fish stocks. NOAA Fisheries, *Laws &*

*Policies:* *Magnuson-Stevens* *Act* (last visited Jan. 14, 2026), https://www.fisheries.noaa.gov/topic/laws-policies. Congress passed the MSA with provisions both for 100% Observer coverage of foreign fishers in American waters and with a provision allowing the Secretary to force such fishers to contract Observer services. 16 U.S.C. §§ 1821, 1827. Congress knew what Observers were and only required foreign fishers to pay for them. It specifically added a requirement that allowed the Secretary to require permitted domestic fishers to carry them in 1990. 16 U.S.C. § 1853(b)(8). In doing so, it did not say permitted fisherman had to pay for such Observers. Congress amended the MSA again in 1996 to better define what vessels had to cover Observers, what they were and how they were to be trained. 16 U.S.C. § 1881b. At no time did Congress say that such Observers were to be contracted to the vessels, except for foreign fishers. This Court's prior speculative footnote flies in the face of the MSA's language and entire history. The notion that Congress was more concerned with the sensibilities of foreign fishers and their nations than actual Americans the statute was designed to protect has no basis in law, text or history.[10]

Upon remand the Fishermen put 16 U.S.C. § 1821(h)(6) front and center before the district court, so it can be addressed by this Court. The Fishermen

---

[10] It also contradicts National Standard 8 that explicitly requires the agency to protect fishers and their communities. 50 C.F.R. § 600.345. Not one of the Standards has any special concern for foreign fleets or their nations. 50 C.F.R §§ 600.310-355.

explained that that section provides an apples-to-apples, oranges-to-oranges comparison between the Final Rule and a section of the MSA that did grant the Secretary the power to force (foreign) vessels to contract and pay Observers directly. The district court still rejected the argument relying once again on "necessary and appropriate." *Id*. at * 5 ADD 13. This despite the district court's first decision having put great weight on the fact that the other cost-shifting provisions of the MSA cited to it were not the direct-contracting model of the Final Rule. *See id*., 561 F. Supp. 3d at 235. It stated that those fee-based programs "are distinguishable 'from the industry-funded observer measures at issue here, in which the fishing vessels contract with and make payments directly to third-party monitoring service providers.'" *Id*. (citing *Loper Bright I*). Even though § 1821(h)(6) is *not* so distinguishable, the court's result below still did not change.

For statutory interpretation purposes, § 1821(h)(6) is lethal to the assertion that Congress gave a general power to force domestic fishermen to contract with ASMs. It is exact, and it confers the power in plain English, regarding foreign vessels fishing in American waters, that the Government Agencies attempt to conjure out of thin air for all domestic vessels. It states the Secretary can:

> (C) establish a reasonable schedule of fees that certified observers or their agents shall be paid by the owners and operators of *foreign* fishing vessels for observer services ....

16 U.S.C. § 1821(h)(6)(C) (emphasis added). Interpretation of statutes should not make any part of them superfluous. *NLRB v. SW General, Inc.*, 580 U.S. 288, 137 (2017) ("[T]he Board's interpretation makes the first requirement superfluous, a result we typically try to avoid.") (citation omitted). Failing to acknowledge Congress knew exactly how to give the Government Agencies the power they now claim—but did not do so—ignores the canon against superfluousness.

Congress provided for the exact contracts that the district court expected to find somewhere in the MSA because of that "fleeting and unspecific" mention of contracting in §1858(g)(1)(D).[11] Not only does the MSA allow such direct contracting by foreign fishing vessels, but NMFS has provided all the specifications and requirements for the payments and contracting by those foreign vessels. 50 C.F.R. § 600.506(f)–(h).

With this statutory provision now squarely before the Court, the MSA is clear and unambiguous. The statute fits together neatly. Section 1853(b)(8) requires domestic fishers to "carry" Observers. Section 1827(h)(6) allows the Secretary to require certain fishers (but not Plaintiffs or those in the Atlantic fishery) to be forced into contracts with providers of Observer services. Section 1858(g)(1)(D) allows sanctions for those vessels required to contract with Observers under statute if they

---

[11] Neither *Goethel v. Dep't of Com.*, 854 F.3d 106 (1st Cir. 2017), nor *Loper Bright I* mentions this section of the MSA. This Court's glancing citation in *Relentless I* fails to apply standard interpretive tools, which must be applied post-*Chevron*.

do not pay such Observers.[12] The statute is neatly wrapped together, and none of it

provides the power the agencies assert in the IFM Amendment and the Final Rule.

The question is not whether Congress *prevented* the agency from doing something

but whether it *gave* it the power to force vessels to pay Observers. It did so

elsewhere, but it did not do so here. Finally, the other cost-shifting provisions that

Congress allowed—and that this Court discussed in *Relentless I*—bolster the

argument, combined with appropriations for Observers by Congress, that the MSA

does not contemplate charging the regulated Fishermen for the monitors who work

for the government. In short, § 1853(b)(8) contradicts this Court's previous

determination in *Relentless I*, asserting that the fee programs created by Congress

are structurally distinct from the forced contracting power Appellees claim here.

Nonetheless, the other cost-shifting provisions demonstrate three things: (1)

Congress knows how to impose Observer costs on industry when it wants to; (2)

Congress, when it does shift fees, caps the costs shifted;[13] and (3) the Alaska

provision was put in precisely to alter the Alaska Regulation within months of the

---

[12] It should be noted that that statute also refers to the Marine Mammal Protection Act and other statutes that unambiguously require contracting with Observers. It does not of its own force allow an agency to require private contracting with Observers but only to penalize those who don't pay properly contracted Observers where required by statute. It also makes no distinction between "contracting" with private parties or with the Government. In any case failing to pay such "contracted" Observers draws the penalty.

[13] *See infra* III.D.

agencies asserting it. That is, the agency attempted something and with modifications Congress ratified it. That has not happened here.

Congress's conscious decision *not* to grant the Government agencies a general power to require industry funding is evident from its express authorization in three specific contexts. None of them includes the Atlantic herring fishery. And, as discussed previously, one of them explicitly allows forced contracting with Observers by the regulated party. *See* 16 U.S.C. §§ 1821(h)(4), (6) (foreign fishing); 1853a(c)(1)(H), (e)(2) (limited access privilege programs); 1862(a) (North Pacific). None of these programs is so "distinct" from the Final Rule so as to reject the negative implication of these provisions. Hence, applying the "*expressio unius est exclusio alterius*" canon here means that if Congress put a term in one portion of a statute and not in another it did not grant that power in the portion not containing it. *See Gallo Motor Ctr. Corp. v. Mazda Motor of U.S.A.*, 172 F. Supp. 2d 292, 294 (D. Mass. 2001) (applying the canon to interpret a statute). In this case, it is clear that Congress knew how to force industry into contracts with Observers. *See* 16 U.S.C. § 1821(h)(6). It is also clear Congress knew other ways to transfer such costs to industry. That Congress expressed that intention in § 1821(h)(6) but did not do so in the 1990 Observer Amendment is powerful evidence of its intent not to do so in the Observer Amendment.

The bedrock foundation of administrative law is that an agency is without power to act "unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "An agency may not confer power upon itself." *Id*. To do that would permit an agency to override Congress, which is something the Supreme Court is "both unwilling and unable to do." *Id*. at 374–75. Nothing in the MSA confers this power on any Defendant. "[A]n administrative agency's power to regulate … must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). The MSA explicitly allows "observers" to be placed on vessels "for the purpose of collecting data." 16 U.S.C. § 1853(b)(8). It is silent as to forcing fishers into contracts with such Observers. *Loper Bright I*, 45 F.4th at 368 ('construe [a statute's] silence as exactly that: silence.") (citing *EEOC v. Abercrombie & Fitch Stores, Inc*, 575 U.S. 768, 774 (2015)). Post *Loper Bright*, statutory silence does not indicate a Congressional intent to force domestic fishers to enter into contracts nor to pay ASM's salaries.

Other than the district court in *Loper I*, all the courts to review this Rule have only upheld it using *Chevron* deference—and the D.C. Circuit reversed the district court in *Loper I* on that point. *Relentless I*, 62 F.4th at 634 (citing reasonableness of agency's interpretation of statute); *Relentless*, 561 F. Supp. 3d at 236–37 (ambiguous statutory commands allow court to simply assess reasonableness of agency

interpretation). *Loper Bright I*, 45 F.4th at 366; *see id*. at 368 (noting that the "necessary and appropriate" language of the statute does not unambiguously provide the agencies such power and concluding that "Congress has thus provided no wholly unambiguous answer[.]"). But the U.S. Supreme Court has now expressly overruled that methodological approach. *See Loper Bright/Relentless*, 603 U.S. at 413 ("Because the D.C. and First Circuits relied on *Chevron* in deciding whether to uphold the Rule, their judgments are vacated ….").

Instead, the Supreme Court now requires courts to determine the "single, best meaning" of a statute. "In an agency case as in any other, … even if some judges might (or might not) consider the statute ambiguous, there is a best reading all the same[.] … In the business of statutory interpretation, if it is not the best, it is not permissible." *Loper Bright/Relentless*, 603 U.S. at 400.

The near unanimity of Courts on the failure of the MSA to provide this power to the agencies absent *Chevron* deference should make the statute's best meaning abundantly clear in a post-*Chevron* world. That power was not provided. All that happened in 1990 was that a clarifying amendment was included empowering the agencies to require properly outfitted vessels (but not others) to carry Observers. 16 U.S.C. § 1853(b)(8). The best interpretation of the MSA is that it does not provide the power to the agencies to force fishers into contracts with ASMs. The MSA does not generally allow the Government to charge fishermen for the cost of their own

39

Observers or ASMs and, when the law does, it says so. The statute's deafening silence on any power to force domestic Atlantic fishers to pay for Observers should end the matter.

Not only is there no language granting the power to require the herring fishery in New England to fund the ASMs, but there are many statutes limiting analogous costs, fees, and impositions of this kind to amounts far below what the Appellees inflicted here. It is undisputed the Government Agencies were trying to wriggle out of these limiting provisions in creating the Final Rule. A105–06; A45, A47. Congress's design to limit these Government Agencies from seeking revenue or services from the regulated would be stymied if this Court interprets the statutes here to require Congress to continue to play "whack-a-mole" with agency attempts to evade the actual limits Congress has imposed on the power it granted.

Under the district court's interpretation of the MSA, the Government Agencies can require a regulated party to pay for ASMs when: (1) Congress has explicitly authorized it by statute; and (2) when Congress has not authorized it by statute but has allowed the placement of such monitors on private vessels by implication. This position, were it to prevail, would allow the Appellees to evade the congressional controls constitutionally assigned by its powers to lay and collect taxes, appropriate funds, and spend. U.S. Const. art. I, §§ 1, 7, 8. The Supreme Court has been clear that the plain language of the statute governs, not the desire and will

40

of the agency. Here, the statute plainly allows on-board monitors to be placed on vessels, but it nowhere states the Appellees can create other monitors to provide a service for the government and charge the regulated parties for them.

### C. The Penalty Provision of the MSA Does Not Provide the Power to Assign Industry-Funded ASMs at Government Agencies' Whim

The district court, as this Court did in *Relentless I*, leaned on penalty provisions of the MSA to conclude that the statute provides a general power to require the regulated to contract with a monitor or observer. *See Relentless I*, 62 F.4th 621, 630 (citing 16 U.S.C. § 1858(g)(1)(D), which allows revocation of license for any vessel if "payment required for observer services provided to or contracted by the owner or operator [of the vessel] … has not been paid and is overdue."). The Court also relied on the now-overruled *Loper Bright Enterprises I*. *Id*. at 632. But a penalty provision does not provide the agency with power to force contracting. This Court speculated that Congress would have "cross-referenced" the penalties if there was no general right of the Government Agencies to require industry-funded monitors. *Id*. at 631. There is, of course, no requirement that Congress do so. Congress created § 1858(g)(1)(D) (the "Penalty Provision") in 1996 when it was modifying aspects of § 1821 governing the Observer program and set guidelines for all statutorily authorized Observer programs. *See Sustainable Fisheries Act*, Pub.L. No. 104-297, §§ 105, 113-14, 204, 110 Stat. 3559, 3563-69, 3597-99, 3609 (codified at 16 U.S.C. §§ 1821-24, 1857-58, 1881b) (Oct. 11, 1996).

Note, this provision was inserted into the law six years after the 1990 amendments. As we have described, the overwhelming view of the public and Congress at that time was that Observers were government-paid servants, except as to foreign fishers. That is the preferred time of analysis in statutory interpretation. *Loper Bright/Relentless*, 603 U.S. at 394. But more to the point the Penalty Provision applies to *any* monitoring program where payment of some kind is expressly required of the fishermen whether the Government or a fishermen contracts with the Observer. By its terms the Penalty Provision applies to "any marine resource law." 16 U.S.C. § 1858(g)(1)(D). Those laws, outside the MSA, independently require Observers. *See* High Seas Fishing Compliance Act, 16 U.S.C. § 5501 *et seq.*; 50 C.F.R. § 300.338; The Marine Mammal Protection Act, *see, e.g.*, 16 U.S.C. § 1387; and the Endangered Species Act; *see also* NOAA Fisheries, Protected Species Observers, https://www.fisheries.noaa.gov/national/endangered-species-conservation/protected-species-observers (January 16, 2026). Congress knew of the foreign fishers requirement, and it also applied it to other marine resources statutes that independently require observers. The natural and best reading of the Penalty Provision is that it applies to those areas where Congress has allowed paid observers—which are broad—but it does not grant general power on the Government Agencies to impose payments.

42

### D. The Final Rule Is Neither Necessary Nor Appropriate and Certainly Not Both

The district court leaned heavily on the MSA's "necessary and appropriate" language to uphold the Final Rule. *Relentless Inc.*, 2025 WL 1939025 *4, 5; ADD 10–13. This was an error. The district court relied on the vacated *Relentless I* and 16 U.S.C. § 1853(a)'s language, governing requirements of fishery management plans, to support its ruling. That section requires fishery management plans to contain "conservation and management measures" that are "necessary and appropriate" to stop overfishing and maintain and rebuild fish stocks. Such plans also had to have regulations that were "'necessary or appropriate' to implement the plan." 16 U.S.C. § 1853(c). But those words do not give the Government Agencies powers they were not given elsewhere. As noted, § 1853 requires that all fishery management plans contain "conservation and management measures …" "necessary and appropriate for the conservation and management of the fishery" and that they be consistent with the National Standards, "the other provisions of this chapter," and "any other applicable law." 16 U.S.C. § 1853(a)(1)(A)–(C).

That language does not allow the Government to do whatever it wants at sea. *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 468 (5th Cir. 2020) ("necessary and appropriate" language did not grant NMFS authority over aquaculture); *see also Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956,

43

965 (5th Cir. 2023) ("As an initial matter, we stress that the adjectives *necessary* and *appropriate* limit the authorization contained in this provision." (emphasis in the original)). The attempt to wrest authority from a limiting provision is even less lawful given *Chevron'*s demise. "Necessary and appropriate" ought not become a stealth *Chevron* allowing the agencies to determine what the law is with little or no Court supervision.

The language "necessary and appropriate" requires choice-making by Congress. It cannot delegate the decision about what is necessary and appropriate to the agency. Even if it could, here it did not. Congress has not funded the ASMs and it directed what administrative costs, the berths and board of the Obsrevers, it wanted industry to bear. That legislative decision determined what was "necessary and appropriate" that cannot be countermanded by the agency.

Courts in many Circuits have concluded that the "necessary and appropriate" adjectives have meaning other than "the agency gets to do whatever it wishes." *See, e.g.*, *Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 3 (D.D.C. 2003) (rule struck as NMFS did not properly determine whether regulation was "necessary and appropriate" despite argument adopted rule was consistent with "other applicable law[.]"); *id*. at 37 ("To reach a contrary holding would be to allow Defendants to flout the procedural rights of Plaintiff, circumvent judicial review, and

44

ignore some of the most basic tenets of administrative law."). The adjectives "necessary" and "appropriate" have been held to "temper"—not expand—agency power. *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 156 (D.D.C. 2005) ("This broad discretion is tempered by substantive elements of the [MSA] that require all regulations to be 'necessary and appropriate for the conservation and management of the fishery,' and consistent with ten National Standards defined by the statute." (quoting 16 U.S.C. § 1851(a)(1)–(10)).

In *Michigan v. EPA*, 576 U.S. 743 (2015), the Supreme Court held that a requirement under the Clean Air Act for regulations to be "appropriate" required the agency to ensure a reasonable relationship between costs imposed on the industry and air quality benefits before promulgating such a regulation. *Id*. at 752 ("One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits"). Courts likewise have concluded that "necessary or appropriate" language "encompasses a specie of cost-benefit justification[.]" *Nat'l Grain & Feed Ass'n v. OSHA*, 866 F.2d 717, 733 (5th Cir. 1988); s*ee also Ala. Power Co. v. OSHA*, 89 F.3d 740, 746 (11th Cir. 1996) (interpreting "necessary or appropriate" language). The *National Grain* and *Alabama Power* statutes had language that allowed a regulation to be "necessary or appropriate," that is *either* of those two alternatives. The MSA requires that all FMP's be *both*. The "necessary and appropriate" language thus

45

cabins rather than expands Defendants' power. *See In re MCP No. 165, OSHA Admin., Interim Final Rule: Covid-19 Vaccination and Testing 86 Fed Reg. 61402*, 21 F.4th 357, 391–97 (6th Cir. 2021) (Larsen, J., dissenting) (distinguishing "necessary" from "necessary or appropriate").

Here, it is not necessary and appropriate to create a new office (the ASMs) nowhere mentioned in the MSA other than the Observers Congress identified, knew about, and considered Government-paid inspectors. In this case, the Final Rule explicitly notes that ASMs have different duties than "observers." A79 (noting the types of data and information observers collect is different than the type of data and information ASMs collect). The MSA explicitly allows "observers" to be placed on vessels "for the purpose of collecting data." 16 U.S.C. § 1853(b)(8). It does not generally allow the government to charge fishermen for the cost of their own monitors and, when the law does, it says so. This Court may not supply the lack.

Such agency overreach has been rejected. *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 455 (5th Cir. 2020) (prohibiting NOAA and the Secretary from regulating "aquaculture" when not explicitly authorized by statute). That court noted that the agency's attempt to "create an entire industry the statute does not even mention" was founded on a "slippery" use of the word "harvest." *Id*. The ASMs office—being a wholly industry funded position—is

46

equally unmentioned in the statute and is a newly created industry, so the result here should be the same.

In judging whether the Final Rule is "necessary and appropriate," the Court should examine Congress's language and prohibitions in the MSA. At every turn, Congress has *explicitly* allowed industry funding in the fisheries when it wanted to, but it erected barriers like the Anti-Deficiency Act and others to limit costs to protect fishers in the MSA. *See Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102 (D.D.C. 2015), *aff'd*, 809 F.3d 664 (D.C. Cir. 2016) (government explains the many ways Congress has prevented the Government Agencies from burdening the regulated). *Anglers Conservation Network v. Pritzker* noted the plaintiffs' claims for 100% funding of observers would "have violated federal statutes outside of the MSA framework, in contravention of 16 U.S.C. § 1853(a)(1)(C)'s requirement that provisions of fishery management plans 'shall [be] consistent with … any other applicable law[.]'" *Id*. (alterations in original). Upholding the Government Agencies' interpretation would also traduce the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1), and the Miscellaneous Receipts Statute, 31 U.S.C. § 3302(b) and 18 U.S.C. § 209, which prohibits payment of "federal employees' salaries from non-governmental sources." *Anglers Conservation Network*, 139 F. Supp. 3d at 116. The *Anglers* court held the record "amply" supported this concern and noted only the

Alaskan fisheries allowed such a program. *Id.*; *see* 16 U.S.C. § 1862(a); *see also Anglers Conservation Network*, 139 F. Supp. 3d at 116 n.9.

Here, the Government Agencies explicitly in writing chafed against (1) Congress's level of appropriation and (2) the limit on cost-sharing with industry. (A105–06; A45, A47). That is neither necessary nor appropriate. This Court should not interpret the MSA in such a way that allows the agencies to get around these statutory safeguards. The MSA carefully balances protection of fish and fishers but an interpretation by this Court that anything the Government Agencies want to do they can foist on fishers misbalances the statute away from Congress's design.

There is a broader reason the requirement to contract with ASM violates the law. It violates the very structure of the Congressional grants of agency power. The levels at which various government activities shall be funded is quintessentially a nondelegable legislative function. *Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 229 (1st Cir. 2003) ("Deciding what funds shall be appropriated from the public fisc and how that money is to be spent is a task that the Constitution places in the congressional domain."). Here, Appellees approved neither the level of observers Congress was willing to fund nor the laws that prevented them from dunning the industry. The scheme creating a new federal office, ASMs, followed. *See United States v. Cusick*, No. 11cr10066-LTS, 2012 WL 442005, at *3 (D. Mass. Feb. 9,

48

2012) (ASM was a "representative of the Federal government" and impeding their work, a crime).

The *casus omissus* canon controls, which instructs the courts not to engage in judicial legislation by adding to what the text states or reasonably implies. *See Ebert v. Poston*, 266 U.S. 548, 554 (1925); *Iselin v. United States*, 270 U.S. 245, 251 (1926) ("To supply omissions transcends the judicial function."); *Loving v. United States*, 517 U.S. 748, 758 (1996) ("[T]he lawmaking function belongs to Congress … and may not be conveyed to another branch or entity." (*citing* U.S. Const. art. I, § 1)). Here, the two domestic cases where Congress has allowed domestic cost-shifting, LAPPs and the Northern Pacific Fisheries, demonstrate another reason by statute the Final Rule is neither necessary nor appropriate. They each cap the cost of Observers to a percentage of the catch to about 3 to 5% *See* A83. The Final Rule imposes costs of over 20%. Congress by statute has given the Court a yardstick to measure what costs are necessary and appropriate for what benefits. The Government Agencies have greatly exceeded that measure.

Words like "appropriate and necessary" do not create magical administrative powers. *Michigan v. EPA*, 576 U.S. 743, 752 (2015). There as here, the agency claimed an ability to ignore costs when regulating power plants that was directly contradicted by part of the statute.

### E. There Is No "Default Norm" Requiring Regulated Parties to Pay the Salaries of Their Monitors

The district court, undeterred by the overruling and vacation of *Relentless I*, relied on its statement of "the 'default norm' as 'manifest without express statement in literally hundreds of regulations … that the government does not reimburse regulated entities for the cost of complying with properly enacted regulations, at least short of a taking." *Relentless* Slip Copy at *4 (citing *Relentless I* (quoting *Goethel*, 854 F.3d at 117-18 (1st Cir. 2017) (Kayatta, J., concurring)). This Court should make clear there is no such "default norm" as to paying the *salaries* of Government employees and acknowledge that such a rule would destroy nearly every attempt by the Supreme Court to cabin the powers of agencies to those that Congress gave them. Worse, by relying on Government Agencies' view of their own power in "hundreds of regulations," the supposed default norm flatly contradicts *Loper Bright*. It constitutes deference to agency decision-making on a colossal scale that was never authorized by Congress.

Undersigned counsel has been involved in every single case where this "default norm" has been mentioned or applied. There are only two. *Goethel*,[14] where it first appeared without any citation whatsoever in a concurrence by Judge Kayatta. *Goethel*, 854 F.3d at 117. Then in *Relentless I* where it resurfaced with a citation

---

[14] While not Counsel of Record, undersigned counsel was President and CEO of the firm, Cause of Action, that represented Mr. Goethel at that time.

only to that prior concurrence that cited nothing at all. *Relentless I*, 62 F.4th at 630. *Goethel* was decided in 2017, more than 8 years ago. Yet the concurrence, and the restatement of this supposed norm has only been mentioned to describe it in *Loper Bright* and to follow it in the court below. It has no progeny and no ancestor. No other court has ever mentioned it.

Critically, the Supreme Court has undermined any such principle, while the three cases in this Circuit mentioning it have called it "*the* default norm." *See Goethel* (Kayatta, J., concurring), *Relentless I*, at 629 and the district court. ADD10. (emphasis added). No other Court has ever mentioned it save one. The Supreme Court described it as follows: "[The First Circuit] relied on *a* 'default norm' that regulated entities must bear compliance costs… ." *Loper Bright/Relentless*, 603 U.S. at 384 (emphasis added). The indefinite article is important. A definite article, "the" refers to a particular item. The indefinite article "a" or "an" refers to a general noun never mentioned before. *See* William Strunk, Jr. & E.B. White, THE ELEMENTS OF STYLE 90 (4th ed. 2000) (definition "article"). The Supreme Court was signaling that this "default norm"—which it put in scare quotes—was unknown to it. That is because outside of a concurrence, overruled cases, or the district court below, it is unknown to everybody.

As noted, Air Marshals must be carried by air carriers but they are not paid by them. They perform a government function. The "default norm" would allow the

Transportation Safety Administration to require United to pay for the air marshals it carries on its planes. Similarly, the "default norm" could permit ICE to require immigrants to pay for the salaries of the men arresting them. Or USDA could require food inspectors' salaries to be paid for by meat-processing facilities. It would allow every inspection regime in the country to be paid not by appropriations but by the regulated entity at the whim of the regulator. As pointed out by Judge Walker, things are different from people who perform government functions. The so-called default norm would encourage every agency to break the surly bonds of Congress and outsource myriad government functions to mandatory contractors. There is no such default norm because, although the administrative state was ushered into being with the creation of the Interstate Commerce Commission in 1887, from that day to this no case outside the cases cited here has ever mentioned it.

But even were there such a "default" norm, it is overcome here by Congressional direction. Not only has Congress by statute indicated when Observers on boats are to be paid by industry, it has also indicated what regulatory costs it expects the Fishermen to bear. Those are the costs associated with providing a berth and "carrying" the Observer. As the MSA states, vessels that can't safely quarter an Observer are exempt. *See supra*, p. 10, quoting 16 U.S.C. § 1853(b)(8).

The statute itself delineates what it expects the costs to be and, when it wants to shift other costs to the regulated fishermen, it does so explicitly. There is no

52

"default norm" and if there were one, it has been overcome by the actual text of the statute. The "ASM" charges are not related in any way to a benefit received by the regulated industry. The information gathered does not help the individual fisherman. It helps the government monitor its own property—fish stocks. Such a scheme is on dangerous ground constitutionally. *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 342 (1974) (when a fee scheme was not premised on benefit granted regulated company, it approached being a tax, and to avoid a non-delegation issue the Court would remand to allow a fee assessment along these constitutional lines).

### F.  Legislative History Does Not Support the Final Rule

Legislative history is used, it also favors Appellants. The 1990 MSA amendments added fee-shifting provisions in the North Pacific and placed observers on vessels. *See* 16 U.S.C. §§ 1862(a), 1853(b)(8). It did not "clarify" or "approve" the fee requirements. The Senate comments state that § 1853(b)(8) "would clarify the existing authority in the [MSA] for fishery management plans to require that observers be carried on board domestic fishing vessels for conservation and management purposes." S. Rep. No 101-414 at 20 (Aug. 2, 1990). Nothing in that statement provides support for making those vessels pay for the observers.

As for 16 U.S.C. § 1862(a), Section 118 of Public Law 101-627 in the Committee notes says: "This section adds a new provision to the [MSA] which is

specific to the North Pacific Management Council. Nothing in this section should be construed as affecting the rights and responsibilities of other Regional Fishery Management Councils or as affecting fisheries other than those within the jurisdiction of the North Pacific Fishery Management Council." H.R. Rep. 101-393 at 31 (Dec. 15, 1989). Congress practically screamed "don't do this in other fisheries." If anything, the legislative history reveals that Congress considered charging industry observer fees and did not do so widely.

## CONCLUSION

The Court should reverse the erroneous legal conclusions of the district court and set aside the Final Rule.


Respectfully submitted on January 16, 2026, by:

*/s/ John J. Vecchione*

John J. Vecchione (1177417)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
John.Vecchione@ncla.legal
*Counsel for Plaintiff-Appellants*

54

## CERTIFICATE OF COMPLIANCE

This document complies with the 13,000-word limit established by FRAP 32(a)(7) because it contains 12,991 words. This document complies with the typeface and typestyle requirements of FRAP 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, Times New Roman, and set at 14-point or larger.

Dated: January 16, 2026

*/s/ John J. Vecchione*
JOHN J. VECCHIONE

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, I electronically filed the foregoing document, along with the Appendix and Addendum, with the United States Court of Appeals for the First Circuit using the CM/ECF system. Counsel for all parties are registered users of the CM/ECF system. They will be served by the CM/ECF system:

Daniel J. Halainen, Daniel.J.Halainen@usdoj.gov, Counsel for Appellees

Dated: January 16, 2026          */s/ John J. Vecchione*

                                     John J. Vecchione

                                     *Counsel for Appellants*