**No. 25-1845**

# United States Court of Appeals
# for the First Circuit

———————————

RELENTLESS INC.; HUNTRESS INC.; SEAFREEZE FLEET LLC,
*Plaintiffs-Appellants*,

*v.*

U.S. DEPARTMENT OF COMMERCE; HOWARD W. LUTNICK, in his
official capacity as Secretary of Commerce; NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION; NEIL JACOBS, in his official capacity
as Acting Administrator of NOAA; NATIONAL MARINE FISHERIES
SERVICE, a/k/a NOAA Fisheries; EUGENIO PINEIRO SOLER, in his official
capacity as Assistant Administrator for NOAA Fisheries,
*Defendants-Appellees*.

———————————

On Appeal from
the United States District Court for the District of Rhode Island,
Case No. 1:20-cv-00108-WES (Hon. William E. Smith)

---

## APPENDIX - VOLUME 1

---

JOHN J. VECCHIONE (1177417)
**NEW CIVIL LIBERTIES ALLIANCE**
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
John.Vecchione@ncla.legal
*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page #**

Docket Report ...................................................................................A1

Complaint, ECF No. 1 ......................................................................A13

Declaration of Meghan Lapp, ECF No. 37–4......................................A42

Notice of Appeal, ECF No. 66...........................................................A44

Memorandum from Michael Pentony, GARFO Reg'l Adm'r, to Chris
Oliver, Asst. Adm'r for Fisheries (Sep. 11, 2018) (AR16992–16998) ...............A45

Proposed Rule, 83 Fed. Reg. 55,665 (Nov. 7, 2018)
(AR16969–16991) ............................................................................A52

NOAA, Industry-Funded Monitoring Final Rule, 85 Fed. Reg. 7,414
(Feb. 7, 2020) (codified at 50 C.F.R. pt. 648) (AR17731–17759) ......................A75

Letter from Michael Pentony, GARFO Regional Adm'r, to Dr. John
Quinn, NEFMC Chairman (Dec. 18, 2018) (AR17760–17762) ........................A104

Congressional Testimony of Henry Mitchell, ECF No. 59–1 ...........................A107

Excerpts from Public Comments to NOAA–NMFS–2018–0109
(AR17647–17718) ............................................................................A119

### *1:20cv108, Relentless Inc Et Al V. U.S. Department Of Commerce Et Al*

US District Court Docket

United States District Court, Rhode Island

(Providence)

**This case was retrieved on 01/14/2026**

## Header

**Case Number:** 1:20cv108
**Date Filed:** 03/04/2020
**Assigned To:** District Judge William E. Smith
**Referred To:** Magistrate Judge Patricia A. Sullivan
**Nature of Suit:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision (899)
**Cause:** Administrative Procedure Act
**Lead Docket:** None
**Other Docket:** First Circuit Court of Appeals, 25-01845, U.S. Court of Appeals for the First Circuit, 21-01886
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Closed
**Closed:** 07/15/2025
**Statute:** 05:702
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision

## Participants

| Litigants | Attorneys |
|---|---|
| Relentless Inc<br>**Plaintiff** | John J. Vecchione<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>New Civil Liberties Alliance<br>4250 North Fairfax Dr. Ste 300<br>Arlington, VA  22203<br>USA<br>202-918-6902 Email:John.Vecchione@ncla.Legal<br><br>Kara M. Rollins<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>New Civil Liberties Alliance<br>1225 19th Street Nw, Ste 450<br>Washington, DC  20036<br>USA<br>202-869-5210 Fax: 202-869-5238 Email:Kara.Rollins@ncla.Legal<br><br>Timothy J. Robenhymer<br>ATTORNEY TO BE NOTICED<br>Timothy J. Robenhymer<br>303 Jefferson Blvd. 2nd Floor<br>Warwick, RI  02888<br>USA<br>921-4800 Fax: 921-4805 Email:Tjr@lawofficesri.Com |

A1

1:20cv108, Relentless Inc Et Al V. U.S. Department Of Commerce Et Al

| Litigants | Attorneys |
|---|---|
| | Kevin J. Holley<br>ATTORNEY TO BE NOTICED<br>[Terminated: 02/25/2021]<br>Holley Law, LLC<br>33 College Hill Road Suite 25c<br>Warwick, RI  02886<br>USA<br>521-2622 Fax: 521-6901 Email:Kevin@holleylawllc.Com |
| Huntress, Inc<br>**Plaintiff** | John J. Vecchione<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>New Civil Liberties Alliance<br>4250 North Fairfax Dr. Ste 300<br>Arlington, VA  22203<br>USA<br>202-918-6902 Email:John.Vecchione@ncla.Legal |
| | Kara M. Rollins<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>New Civil Liberties Alliance<br>1225 19th Street Nw, Ste 450<br>Washington, DC  20036<br>USA<br>202-869-5210 Fax: 202-869-5238 Email:Kara.Rollins@ncla.Legal |
| | Timothy J. Robenhymer<br>ATTORNEY TO BE NOTICED<br>Timothy J. Robenhymer<br>303 Jefferson Blvd. 2nd Floor<br>Warwick, RI  02888<br>USA<br>921-4800 Fax: 921-4805 Email:Tjr@lawofficesri.Com |
| | Kevin J. Holley<br>ATTORNEY TO BE NOTICED<br>[Terminated: 02/25/2021]<br>Holley Law, LLC<br>33 College Hill Road Suite 25c<br>Warwick, RI  02886<br>USA<br>521-2622 Fax: 521-6901 Email:Kevin@holleylawllc.Com |
| Seafreeze Fleet LLC<br>**Plaintiff** | John J. Vecchione<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>New Civil Liberties Alliance<br>4250 North Fairfax Dr. Ste 300<br>Arlington, VA  22203<br>USA<br>202-918-6902 Email:John.Vecchione@ncla.Legal |
| | Kara M. Rollins<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>New Civil Liberties Alliance<br>1225 19th Street Nw, Ste 450<br>Washington, DC  20036<br>USA |

A2

1:20cv108, Relentless Inc Et Al V. U.S. Department Of Commerce Et Al

| Litigants | Attorneys |
|---|---|
| | 202-869-5210 Fax: 202-869-5238 Email:Kara.Rollins@ncla.Legal |
| | Timothy J. Robenhymer ATTORNEY TO BE NOTICED Timothy J. Robenhymer 303 Jefferson Blvd. 2nd Floor Warwick, RI  02888 USA 921-4800 Fax: 921-4805 Email:Tjr@lawofficesri.Com |
| | Kevin J. Holley ATTORNEY TO BE NOTICED [Terminated: 02/25/2021] Holley Law, LLC 33 College Hill Road Suite 25c Warwick, RI  02886 USA 521-2622 Fax: 521-6901 Email:Kevin@holleylawllc.Com |
| U.S. Department of Commerce **Defendant** | Alison Finnegan ATTORNEY TO BE NOTICED DOJ-Enrd Environment & Natural Resources Division Wildlife & Marine Resources Section Benjamin Franklin Station, P.O. Box 7611 Washington, DC  20044-7611 USA 202-532-3312 Email:Alison.C.Finnegan@usdoj.Gov |
| | Kristine S. Tardiff ATTORNEY TO BE NOTICED US Department of Justice Environmental And Natural Resources Division 53 Pleasant Street 4th Floor Concord, NH  03301 USA 603-496-3858 Email:Kristine.Tardiff@usdoj.Gov |
| Wilbur L. Ross, Jr. in his official capacity as Secretary of Commerce \| **Defendant** | Alison Finnegan ATTORNEY TO BE NOTICED DOJ-Enrd Environment & Natural Resources Division Wildlife & Marine Resources Section Benjamin Franklin Station, P.O. Box 7611 Washington, DC  20044-7611 USA 202-532-3312 Email:Alison.C.Finnegan@usdoj.Gov |
| | Kristine S. Tardiff ATTORNEY TO BE NOTICED US Department of Justice Environmental And Natural Resources Division 53 Pleasant Street 4th Floor Concord, NH  03301 USA 603-496-3858 Email:Kristine.Tardiff@usdoj.Gov |
| National Oceanic and Atmospheric Administration **Defendant** | Alison Finnegan ATTORNEY TO BE NOTICED DOJ-Enrd Environment & Natural Resources Division Wildlife & Marine Resources Section Benjamin Franklin Station, P.O. Box 7611 Washington, DC  20044-7611 |

1:20cv108, Relentless Inc Et Al V. U.S. Department Of Commerce Et Al

| Litigants | Attorneys |
|---|---|
| | USA<br>202-532-3312 Email:Alison.C.Finnegan@usdoj.Gov<br><br>Kristine S. Tardiff<br>ATTORNEY TO BE NOTICED<br>US Department of Justice<br>Environmental And Natural Resources Division 53 Pleasant Street 4th Floor<br>Concord, NH  03301<br>USA<br>603-496-3858 Email:Kristine.Tardiff@usdoj.Gov |
| Neil Jacobs<br>in his official capacity as Acting Administrator of NOAA \|<br>**Defendant** | Alison Finnegan<br>ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>Environment & Natural Resources Division Wildlife & Marine Resources Section Benjamin Franklin Station, P.O. Box 7611<br>Washington, DC  20044-7611<br>USA<br>202-532-3312 Email:Alison.C.Finnegan@usdoj.Gov<br><br>Kristine S. Tardiff<br>ATTORNEY TO BE NOTICED<br>US Department of Justice<br>Environmental And Natural Resources Division 53 Pleasant Street 4th Floor<br>Concord, NH  03301<br>USA<br>603-496-3858 Email:Kristine.Tardiff@usdoj.Gov |
| National Marine Fisheries Service<br>a/k/a NOAA FISHERIES \|<br>**Defendant** | Alison Finnegan<br>ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>Environment & Natural Resources Division Wildlife & Marine Resources Section Benjamin Franklin Station, P.O. Box 7611<br>Washington, DC  20044-7611<br>USA<br>202-532-3312 Email:Alison.C.Finnegan@usdoj.Gov<br><br>Kristine S. Tardiff<br>ATTORNEY TO BE NOTICED<br>US Department of Justice<br>Environmental And Natural Resources Division 53 Pleasant Street 4th Floor<br>Concord, NH  03301<br>USA<br>603-496-3858 Email:Kristine.Tardiff@usdoj.Gov |
| Chris Oliver<br>in his official capacity as Assistant Administrator for NOAA Fisheries \|<br>**Defendant** | Alison Finnegan<br>ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>Environment & Natural Resources Division Wildlife & Marine Resources Section Benjamin Franklin Station, P.O. Box 7611<br>Washington, DC  20044-7611<br>USA<br>202-532-3312 Email:Alison.C.Finnegan@usdoj.Gov<br><br>Kristine S. Tardiff<br>ATTORNEY TO BE NOTICED<br>US Department of Justice<br>Environmental And Natural Resources Division 53 Pleasant Street 4th Floor |

1:20cv108, Relentless Inc Et Al V. U.S. Department Of Commerce Et Al

## Litigants

## Attorneys

Concord, NH  03301
USA
603-496-3858 Email:Kristine.Tardiff@usdoj.Gov

## Proceedings

| # | Date | Proceeding Text |
|---|------|-----------------|
| 1 | 03/04/2020 | COMPLAINT ( filing fee paid $ 400.00, receipt number 0103-1480902 ), filed by Seafreeze Fleet LLC, Huntress, Inc, Relentless Inc. (Attachments: # 1 Exhibit, # 2 Civil Cover Sheet, # 3 Attachment to Civil Cover Sheet)(Holley, Kevin) (Entered: 03/04/2020) |
|   | 03/04/2020 | Case assigned to District Judge William E. Smith and Magistrate Judge Patricia A. Sullivan. (Hicks, Alyson) (Entered: 03/04/2020) |
| 2 | 03/04/2020 | CASE OPENING NOTICE ISSUED (Hicks, Alyson) (Entered: 03/04/2020) |
| 3 | 03/09/2020 | MOTION for John Vecchione to Appear Pro Hac Vice for Plaintiffs ( filing fee paid $ 100.00, receipt number 0103-1481878 ) filed by All Plaintiffs. (Holley, Kevin) (Entered: 03/09/2020) |
| 4 | 03/09/2020 | MOTION for Kara Rollins to Appear Pro Hac Vice for Plaintiffs ( filing fee paid $ 100.00, receipt number 0103-1482000 ) filed by All Plaintiffs. (Holley, Kevin) (Entered: 03/09/2020) |
| 5 | 03/09/2020 | Summons Request filed by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC. (Attachments: # 1 Chris Oliver, # 2 Neil Jacobs, # 3 NMFS, # 4 NOAA, # 5 Wilbur Ross)(Holley, Kevin) (Entered: 03/09/2020) |
| 6 | 03/09/2020 | Corporate Disclosure Statement by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC. (Holley, Kevin) (Entered: 03/09/2020) |
| 7 | 03/09/2020 | Summons Issued as to All Defendants. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(Hicks, Alyson) (Entered: 03/09/2020) |
|   | 03/10/2020 | TEXT ORDER granting 3 Motion to Appear Pro Hac Vice for John Vecchione filed by All Plaintiffs and granting 4 Motion to Appear Pro Hac Vice for Kara Rollins filed by All Plaintiffs. - So Ordered by District Judge William E. Smith on 3/10/2020. (McGuire, Vickie) (Entered: 03/10/2020) |
| 8 | 03/30/2020 | AFFIDAVIT of Service, filed by Seafreeze Fleet LLC, Huntress, Inc, Relentless Inc for Affidavit of service for Plaintiffs Neil Jacobs served on 3/16/2020, answer due 4/6/2020; National Marine Fisheries Service served on 3/16/2020, answer due 4/6/2020; National Oceanic and Atmospheric Administration served on 3/16/2020, answer due 4/6/2020; Chris Oliver served on 3/16/2020, answer due 4/6/2020; Wilbur L. Ross, Jr. served on 3/16/2020, answer due 4/6/2020; U.S. Department of Commerce served on 3/16/2020, answer due 4/6/2020. (Holley, Kevin) (Entered: 03/30/2020) |
| 9 | 03/31/2020 | NOTICE of Appearance by Alison Finnegan on behalf of All Defendants (Finnegan, Alison) (Entered: 03/31/2020) |
| 10 | 04/02/2020 | MOTION to Transfer Case to the District of Columbia filed by All Defendants. Responses due by 4/16/2020. (Attachments: # 1 Supporting Memorandum, # 2 Proposed Form of Order, # 3 Exhibit A (Loper Bright Enterprises v. Ross, Case No. 20-cv-0466 (D.D.C.)), # 4 Exhibit B (Admin. Office of the Courts, U.S. District Court Judicial Caseload Profiles for D.R.I. and D.D.C.))(Finnegan, Alison) (Entered: 04/02/2020) |
| 11 | 04/16/2020 | RESPONSE In Opposition to 10 MOTION to Transfer Case to the District of Columbia filed by All Plaintiffs. Replies due by 4/23/2020. (Attachments: # 1 Exhibit A Mulvey Declaration)(Holley, Kevin) (Entered: 04/16/2020) |
| 12 | 04/23/2020 | REPLY to Response re 11 Response to Motion, filed by All Defendants. (Finnegan, Alison) (Entered: 04/23/2020) |
| 13 | 04/30/2020 | ANSWER to Complaint by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce.(Finnegan, Alison) (Entered: 04/30/2020) |
| 14 | 07/09/2020 | NOTICE by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC requesting rule 16 conference (Holley, Kevin) (Entered: 07/09/2020) |
|   | 07/14/2020 | TEXT ORDER: Pursuant to Rule 26 of the Federal Rules of Civil Procedure, the parties are directed to begin their mandatory disclosures immediately, before the Rule 16 conference. To the extent that the parties wish to begin discovery on a cooperative basis prior to the initial conference, they are encouraged to do so. So Ordered by District Judge William E. Smith on 7/14/2020. (Jackson, Ryan) (Entered: 07/14/2020) |

1:20cv108, Relentless Inc Et Al V. U.S. Department Of Commerce Et Al

| # | Date | Proceeding Text |
|---|------|-----------------|
| 15 | 08/25/2020 | MEMORANDUM AND ORDER denying 10 Motion to Transfer Case. So Ordered by District Judge William E. Smith on 8/25/2020. (Jackson, Ryan) (Entered: 08/25/2020) |
| 16 | 08/27/2020 | NOTICE of Hearing: Telephonic Rule 16 Conference scheduled for WEDNESDAY 9/2/2020 at 9:30 AM before District Judge William E. Smith. Dial-in instructions will be emailed to all counsel. (Jackson, Ryan) (Entered: 08/27/2020) |
| 17 | 08/31/2020 | NOTICE of Appearance by Kristine S. Tardiff on behalf of All Defendants (Tardiff, Kristine) (Entered: 08/31/2020) |
| 18 | 08/31/2020 | NOTICE by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC Plaintiffs' Witness Statement Filed (Vecchione, John) (Entered: 08/31/2020) |
| 19 | 08/31/2020 | RULE 16 STATEMENT by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce. (Finnegan, Alison) (Entered: 08/31/2020) |
| | 09/02/2020 | Minute Entry for proceedings held before District Judge William E. Smith: Telephonic Rule 16 Conference held on 9/2/2020; counsel on call: J. Vecchione; K. Rollins; A. Finnegan; K. Tardiff. (Jackson, Ryan) (Entered: 09/03/2020) |
| 20 | 09/11/2020 | NOTICE by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce of Filing Administrative Record (Attachments: # 1 Exhibit A (Index to Administrative Record), # 2 Exhibit B (Certification))(Finnegan, Alison) (Entered: 09/11/2020) |
| 21 | 09/11/2020 | ADMINISTRATIVE RECORD filed by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Attachments: # 1 Bates Numbers 1-853, # 2 Bates Numbers 854-1409)(Finnegan, Alison) (Entered: 09/11/2020) |
| 22 | 09/11/2020 | ADMINISTRATIVE RECORD filed by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Attachments: # 1 Bates Numbers 1410-2651, # 2 Bates Numbers 2652-3506, # 3 Bates Numbers 3507-3881)(Finnegan, Alison) (Entered: 09/11/2020) |
| 23 | 09/11/2020 | ADMINISTRATIVE RECORD filed by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Attachments: # 1 Bates Numbers 3882-4980, # 2 Bates Numbers 4981-5832)(Finnegan, Alison) (Entered: 09/11/2020) |
| 24 | 09/11/2020 | ADMINISTRATIVE RECORD filed Bates Numbers 5833-6581 by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Attachments: # 1 Bates Numbers 6582-7596)(Finnegan, Alison) (Entered: 09/11/2020) |
| 25 | 09/11/2020 | ADMINISTRATIVE RECORD filed Bates Numbers 7597-8814 by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Attachments: # 1 Bates Numbers 8815-9754)(Finnegan, Alison) (Entered: 09/11/2020) |
| 26 | 09/11/2020 | ADMINISTRATIVE RECORD filed Bates Numbers 9755-10663 by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Attachments: # 1 Bates Numbers 10664-11554)(Finnegan, Alison) (Entered: 09/11/2020) |
| 27 | 09/11/2020 | ADMINISTRATIVE RECORD filed Bates Numbers 11555-12893 by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Attachments: # 1 Bates Numbers 12894-13544)(Finnegan, Alison) (Entered: 09/11/2020) |
| 28 | 09/11/2020 | ADMINISTRATIVE RECORD filed Bates Numbers 13545-14488 by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Attachments: # 1 Bates Numbers 14489-15757)(Finnegan, |

1:20cv108, Relentless Inc Et Al V. U.S. Department Of Commerce Et Al

| # | Date | Proceeding Text |
|---|------|-----------------|
| | | Alison) (Entered: 09/11/2020) |
| 29 | 09/11/2020 | ADMINISTRATIVE RECORD filed Bates Numbers 15758-16690 by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Attachments: # 1 Bates Numbers 16691-17641)(Finnegan, Alison) (Entered: 09/11/2020) |
| 30 | 09/11/2020 | ADMINISTRATIVE RECORD filed Bates Numbers 17642-17800 by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Finnegan, Alison) (Entered: 09/11/2020) |
| 31 | 09/11/2020 | NOTICE by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC of Joint Proposed Schedule (Vecchione, John) (Entered: 09/11/2020) |
| 32 | 09/11/2020 | AMENDED DOCUMENT by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce. Amendment to 20 Notice (Other), . (Attachments: # 1 Exhibit A (Corrected Index to Administrative Record), # 2 Exhibit B (Certification))(Finnegan, Alison) (Entered: 09/11/2020) |
| | 09/15/2020 | TEXT ORDER adopting the joint proposed schedule set forth in ECF No. 31 Notice (Other) filed by Relentless Inc, Seafreeze Fleet LLC, Huntress, Inc. So Ordered by District Judge William E. Smith on 9/15/2020. (Jackson, Ryan) (Entered: 09/15/2020) |
| 33 | 10/27/2020 | NOTICE by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce of Filing Supplement to Administrative Record (Attachments: # 1 Exhibit A (Certification), # 2 Exhibit B (Index))(Finnegan, Alison) (Entered: 10/27/2020) |
| 34 | 10/27/2020 | ADMINISTRATIVE RECORD filed (Supplement) (Bates Nos. 17801-17814) by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce NOTICE: In order to view this document, you must first log in using your CMECF Filer login.. (Attachments: # 1 Bates Nos. 17815-17819)(Finnegan, Alison) (Entered: 10/27/2020) |
| 35 | 10/30/2020 | STIPULATION and Proposed Order Setting Briefing Schedule filed by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce. (Finnegan, Alison) (Entered: 10/30/2020) |
| 36 | 11/23/2020 | Order Setting Brief Schedule: Plaintiffs' Motion for Summary Judgment due by 12/4/2020, and not to exceed 40 pages; Defendants' Cross Motion for Summary Judgment/Response to Plaintiffs' Motion for Summary Judgment due by 1/15/2021, and not to exceed 45 pages; Plaintiffs' Response to Defendants' Motion for Summary Judgment/Reply in support of their Motion for Summary Judgment due by 1/29/2021, and not to exceed 30 pages; and Defendants' Reply in support of thier Cross Motion for Summary Judgment due by 2/12/2021, and not to exceed 25 pages. So Ordered by District Judge William E. Smith on 11/23/2020. (Simoncelli, Michael) (Entered: 11/23/2020) |
| 37 | 12/04/2020 | MOTION for Summary Judgment for Plaintiffs filed by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC. Responses due by 12/18/2020. (Attachments: # 1 Supporting Memorandum Summary Judgment Mem, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit)(Vecchione, John) (Entered: 12/04/2020) |
| 38 | 01/15/2021 | Cross MOTION for Summary Judgment  filed by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce. Responses due by 1/29/2021. (Attachments: # 1 Supporting Memorandum, # 2 Proposed Order)(Finnegan, Alison) (Entered: 01/15/2021) |
| 39 | 01/15/2021 | RESPONSE In Opposition to 37 MOTION for Summary Judgment for Plaintiffs  filed by All Defendants. Replies due by 1/22/2021. (Finnegan, Alison) (Entered: 01/15/2021) |
| 40 | 01/29/2021 | RESPONSE In Opposition to 38 Cross MOTION for Summary Judgment   filed by All Plaintiffs. Replies due by 2/5/2021. (Vecchione, John) (Entered: 01/29/2021) |
| 41 | 01/29/2021 | REPLY to Response re 39 Response to Motion Reply to Defendants' Response to Plaintiffs' Motion for Summary Judgment filed by All Plaintiffs. (Vecchione, John) (Entered: 01/29/2021) |
| 42 | 02/05/2021 | MOTION to Withdraw as Attorney  filed by All Plaintiffs. Responses due by 2/19/2021. (Robenhymer, Timothy) (Entered: 02/05/2021) |
| 43 | 02/12/2021 | REPLY to Response re 41 Reply to Response, 40 Response to Motion  filed by All Defendants. (Finnegan, Alison) (Entered: 02/12/2021) |

1:20cv108, Relentless Inc Et Al V. U. S. Department Of Commerce Et Al

| # | Date | Proceeding Text |
|---|------|-----------------|
| | 02/25/2021 | TEXT ORDER granting 42 Motion to Withdraw as Attorney. Attorney Kevin J. Holley terminated. So Ordered by District Judge William E. Smith on 2/25/2021. (Jackson, Ryan) (Entered: 02/25/2021) |
| 44 | 03/26/2021 | NOTICE by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC re 37 MOTION for Summary Judgment for Plaintiffs Regarding facts subsequent to SJ (Vecchione, John) (Entered: 03/26/2021) |
| 45 | 06/01/2021 | NOTICE by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC re 37 MOTION for Summary Judgment for Plaintiffs Second Subsequent Facts (Attachments: # 1 Exhibit Notice of New Date For Monitoring)(Vecchione, John) (Entered: 06/01/2021) |
| | 06/08/2021 | NOTICE of Hearing on 37 MOTION for Summary Judgment for Plaintiffs and 38 Cross MOTION for Summary Judgment: Motion Hearing via Zoom scheduled for TUESDAY 7/27/2021 at 10:00 AM as a Remote Hearing before District Judge William E. Smith; Zoom information below.(Zoom Meeting ID: 160 634 6566, Passcode: 003698) (Jackson, Ryan) (Entered: 06/08/2021) |
| 46 | 06/16/2021 | NOTICE by Neil Jacobs, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Wilbur L. Ross, Jr., U.S. Department of Commerce of Supplemental Authority (Attachments: # 1 Exhibit A (Memorandum Opinion &amp; Order in Loper Bright Enterprises v Ross (D.D.C.)))(Finnegan, Alison) (Entered: 06/16/2021) |
| | 07/27/2021 | Minute Entry for proceedings held before District Judge William E. Smith: Motion Hearing held on 7/27/2021 re 37 MOTION for Summary Judgment for Plaintiffs filed by Relentless Inc, Seafreeze Fleet LLC, Huntress, Inc, 38 Cross MOTION for Summary Judgment  filed by Wilbur L. Ross, Jr., U.S. Department of Commerce, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Chris Oliver, Neil Jacobs. John Vecchione & Timothy Robenhymer for Plaintiff. Alison Finnegan & Kristine Tardiff for Defendants. Plaintiff and Defendant present arguments to the Court. Court to take under advisement. Order to issue. Court adjourned. (Court Reporter Lisa Schwam in Courtroom Zoom Video at 10:00 am.) (McGuire, Vickie) (Entered: 07/27/2021) |
| 47 | 09/20/2021 | OPINION AND ORDER: Plaintiffs' Motion for Summary Judgment, ECF No. 37 , is DENIED, and Defendants' Cross-Motion for Summary Judgment, ECF No. 38 , isGRANTED. So Ordered by District Judge William E. Smith on 9/20/2021. (Urizandi, Nisshy) (Entered: 09/20/2021) |
| 48 | 09/20/2021 | JUDGMENT in favor of National Marine Fisheries Service, National Oceanic and Atmospheric Administration, U.S. Department of Commerce, Chris Oliver, Neil Jacobs, Wilbur L. Ross, Jr. against Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC. So Ordered by The Clerk of Court on 9/20/2021. (Urizandi, Nisshy) (Entered: 09/20/2021) |
| 49 | 10/28/2021 | NOTICE OF APPEAL by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC as to 47 Order on Motion for Summary Judgment, ( filing fee paid $ 505.00, receipt number ARIDC-1680920 ) NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf Appeal Record due by 11/4/2021. (Vecchione, John) (Entered: 10/28/2021) |
| 50 | 10/28/2021 | CLERK'S CERTIFICATE AND APPELLATE COVER SHEET: Abbreviated record on appeal consisting of notice of appeal, order(s) being appealed, and a certified copy of the district court docket report transmitted to the U.S. Court of Appeals for the First Circuit in accordance with 1st Cir. R. 11.0(b). 49 Notice of Appeal,,. (Attachments: # 1 Relentless ROA)(DaCruz, Kayla) (Attachment 1 replaced on 10/29/2021) (DaCruz, Kayla). (Entered: 10/28/2021) |
| | 10/29/2021 | USCA Case Number 21-1886 for 49 Notice of Appeal, filed by Relentless Inc, Seafreeze Fleet LLC, Huntress, Inc. (Kenny, Meghan) (Entered: 10/29/2021) |
| 51 | 03/17/2023 | OPINION of the U.S. Court of Appeals for the First Circuit entered as to 49 Notice of Appeal filed by Relentless Inc, Seafreeze Fleet LLC, Huntress, Inc. (DaCruz, Kayla) (Entered: 03/17/2023) |
| 52 | 03/17/2023 | JUDGMENT of the U.S. Court of Appeals for the First Circuit entered as to 49 Notice of Appeal filed by Relentless Inc, Seafreeze Fleet LLC, Huntress, Inc. Affirmed. (DaCruz, Kayla) (Entered: 03/17/2023) |
| 53 | 05/10/2023 | MANDATE of the U.S. Court of Appeals for the First Circuit issued as to and in accordance with 52 Judgment of the U.S. Court of Appeals for the First Circuit (Kenny, Meghan) (Entered: 05/10/2023) |
| 54 | 11/30/2023 | DOCKET NOTE: Letter received from the Supreme Court of the United States requesting transfer of the District Court record. Record transferred to SCOTUS in accordance with the letter. (Attachments: # 1 Letter) (Simoncelli, Michael) (Entered: 11/30/2023) |

1:20cv108, Relentless Inc Et Al V. U.S. Department Of Commerce Et Al

| # | Date | Proceeding Text |
|---|------|-----------------|
| 55 | 08/01/2024 | JUDGMENT of the U.S. Court of Appeals for the First Circuit entered as to 49 Notice of Appeal filed by Relentless Inc, Seafreeze Fleet LLC, Huntress, Inc. JUDGMENT entered by William J. Kayatta, Jr., Appellate Judge; Kermit V. Lipez, Appellate Judge and Ojetta Rogeriee Thompson, Appellate Judge. 21-1886. Vacated and Remanded. [21-1886] (Hill, Cherelle) (Entered: 08/01/2024) |
| | 08/01/2024 | NOTICE of Hearing: Status Conference set for 8/22/2024 at 11:00 AM by Remote Hearing before District Judge William E. Smith. This is a non-public conference for attorneys of record only. (Meeting ID: 161 843 7684, Passcode: 703245) (Urizandi, Nissheneyra) (Entered: 08/01/2024) |
| | 08/22/2024 | Minute Entry for proceedings held before District Judge William E. Smith: Status Conference held on 8/22/2024. (Vecchione, Finnegan) Parties are to submit a proposed briefing schedule. (Urizandi, Nisshenyra) (Entered: 08/23/2024) |
| 56 | 09/03/2024 | STIPULATION & Proposed Order Setting Briefing Schedule filed by All Defendants. (Finnegan, Alison) (Entered: 09/03/2024) |
| 57 | 09/13/2024 | ORDER entering 56 Stipulation re Briefing Schedule. So Ordered by District Judge William E. Smith on 9/13/2024. (Urizandi, Nissheneyra) (Entered: 09/13/2024) |
| 58 | 09/26/2024 | MANDATE of the U.S. Court of Appeals for the First Circuit issued as to and in accordance with 49 Notice of Appeal, filed by Relentless Inc, Seafreeze Fleet LLC, Huntress, Inc. [21-1886] (Gonzalez Gomez, Viviana) (Entered: 09/26/2024) |
| 59 | 09/26/2024 | SUPPLEMENTAL MEMORANDUM by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC in support of 57 Order, 37 MOTION for Summary Judgment for Plaintiffs Supplemental Memorandum of Plaintifs. (Attachments: # 1 Exhibit Testimony of Henry Mitchell, Esq.)(Vecchione, John) (Entered: 09/26/2024) |
| 60 | 10/25/2024 | SUPPLEMENTAL MEMORANDUM by All Defendants in support of 57 Order, 38 Cross MOTION for Summary Judgment . (Finnegan, Alison) (Entered: 10/25/2024) |
| 61 | 11/07/2024 | STIPULATION & Proposed Order for Revisions to the Briefing Schedule filed by All Defendants. (Finnegan, Alison) (Entered: 11/07/2024) |
| 62 | 11/12/2024 | SUPPLEMENTAL MEMORANDUM by All Plaintiffs in opposition to 60 Supplemental Memorandum in Support of Government's Supplemental. (Vecchione, John) (Entered: 11/12/2024) |
| 63 | 11/26/2024 | SUPPLEMENTAL MEMORANDUM by All Defendants in opposition to 59 Supplemental Memorandum in Support, 62 Supplemental Memorandum in Opposition . (Finnegan, Alison) (Entered: 11/26/2024) |
| 64 | 07/15/2025 | OPINION AND ORDER denying Plaintiffs' 37 Motion for Summary Judgment and granting Defendants' Cross Motion for Summary Judgment 38 . So Ordered by Senior Judge William E. Smith on 7/15/2025. (Simoncelli, Michael) (Entered: 07/15/2025) |
| 65 | 07/15/2025 | JUDGMENT. So Ordered by Clerk of Court on 7/15/2025. (Simoncelli, Michael) (Entered: 07/15/2025) |
| 66 | 09/03/2025 | NOTICE OF APPEAL by Huntress, Inc, Relentless Inc, Seafreeze Fleet LLC as to 64 Opinion and Order, 65 Judgment ( filing fee paid $ 605.00, receipt number CRIDC-2179235 ). NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf Appeal Record due by 9/10/2025. (Vecchione, John) Docket text corrected by Clerk's Office on 9/4/2025. (Gonzalez Gomez, Viviana) (Entered: 09/03/2025) |
| 67 | 09/04/2025 | CLERK'S CERTIFICATE AND APPELLATE COVER SHEET: Abbreviated Record on Appeal consisting of notice of appeal, order(s) being appealed, and a copy of the district court docket report transmitted to the U.S. Court of Appeals for the First Circuit in accordance with 1st Cir. R. 11.0(b) re: 66 Notice of Appeal. Documents Sent: 64, 65. (Attachments: # 1 Record on Appeal) (Gonzalez Gomez, Viviana) (Entered: 09/04/2025) |
| | 09/05/2025 | USCA Case Number 25-1845 for 66 Notice of Appeal, filed by Relentless Inc, Seafreeze Fleet LLC, Huntress, Inc. (Gonzalez Gomez, Viviana) (Entered: 09/05/2025) |

# Judgments

| Date | In Favor Of | Against | Amount | | Interest | Court Cost | Status | Status Date |
|------|-------------|---------|--------|--|----------|------------|--------|-------------|

A9

1:20cv108, Relentless Inc Et Al V. U.S. Department Of Commerce Et Al

| Date | In Favor Of | Against | Amount | Interest | Court Cost | Status | Status Date |
|---|---|---|---|---|---|---|---|
| 09/20/2021 | Neil Jacobs | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | Neil Jacobs | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | Neil Jacobs | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | National Marine Fisheries Service | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | National Marine Fisheries Service | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | National Marine Fisheries Service | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | National Oceanic and Atmospheric Administration | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | National Oceanic and Atmospheric Administration | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | National Oceanic and Atmospheric Administration | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | Chris Oliver | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | Chris Oliver | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | Chris Oliver | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | Wilbur L. Ross, Jr | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | Wilbur L. Ross, Jr | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | Wilbur L. Ross, Jr | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | U.S. Department of Commerce | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | U.S. Department of Commerce | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 09/20/2021 | U.S. Department of Commerce | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 09/20/2021 |
| 07/15/2025 | Neil Jacobs | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payme | 07/15/2025 |

A10

1:20cv108, Relentless Inc Et Al V. U.S. Department Of Commerce Et Al

| Date | In Favor Of | Against | Amount | Interest | Court Cost | Status | Status Date |
|------|-------------|---------|--------|----------|------------|--------|-------------|
| 07/15/2025 | Neil Jacobs | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | Neil Jacobs | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | National Marine Fisheries Service | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | National Marine Fisheries Service | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | National Marine Fisheries Service | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | National Oceanic and Atmospheric Administration | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | National Oceanic and Atmospheric Administration | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | National Oceanic and Atmospheric Administration | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | Chris Oliver | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | Chris Oliver | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | Chris Oliver | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | Wilbur L. Ross, Jr | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | Wilbur L. Ross, Jr | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | Wilbur L. Ross, Jr | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | U.S. Department of Commerce | Huntress, Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | U.S. Department of Commerce | Relentless Inc | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |
| 07/15/2025 | U.S. Department of Commerce | Seafreeze Fleet LLC | $ 0.00 | 0.00% | $ 0.00 | No Payment | 07/15/2025 |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **RELENTLESS INC.;** | : | |
| **HUNTRESS INC.;** | : | |
| **SEAFREEZE FLEET LLC** | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| **U.S. DEPARTMENT OF COMMERCE;** | : | |
| **WILBUR L. ROSS, JR.,** in his official | : | |
| capacity as Secretary of Commerce; | : | Civil Action No. _____ |
| **NATIONAL OCEANIC AND** | : | |
| **ATMOSPHERIC ADMINISTRATION;** | : | |
| **NEIL JACOBS,** in his official capacity as | : | |
| **Acting Administrator of NOAA;** | : | |
| **NATIONAL MARINE FISHERIES** | : | |
| **SERVICE,** a/k/a NOAA FISHERIES; | : | |
| **CHRIS OLIVER,** in his official capacity | : | |
| as Assistant Administrator for | : | |
| **NOAA Fisheries** | : | |
| | : | |
| *Defendant*s. | : | |

Plaintiffs Relentless Inc. ("Relentless"), Huntress Inc. ("Huntress"), and Seafreeze Fleet LLC ("Seafreeze") submit this Complaint for Permanent Injunctive and Declaratory Relief to prohibit the Department of Commerce, by and through the National Oceanic and Atmospheric Administration and the National Marine Fisheries Service, from enforcing an unlawful and unconstitutional industry-funded at-sea monitor mandate on the nation's Atlantic herring fishermen promulgated through the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment ("IFM Amendment"), *available at* http://bit.ly/IFMOmnibus, and the February 7, 2020 Final Rule ("Final Rule"), *see* 85 Fed. Reg. 7,414 (to be codified at 50 C.F.R. pt. 648), implementing the IFM Amendment, and alleges as follows:

## INTRODUCTION

1.    Plaintiffs Relentless, Huntress, and Seafreeze bring this action because Defendants, a coterie of regulatory overseers, have exceeded the bounds that the Constitution and applicable statutes afford them and have imposed unwarranted, unlawful, and ruinous at-sea monitors ("ASMs") upon Plaintiffs' fishing fleet.  Defendants have done this despite the clear language in the Magnuson-Stevens Act, from which they purport to draw authority, which nowhere mentions "at-sea monitors" and fails to allow any Defendant to require any vessel to pay for such monitors. This unconstitutional power grab not only threatens the viability and livelihood of Plaintiffs but also the many others who draw their livelihood from the sea.

## JURISDICTION AND VENUE

2.    This is an action arising under the Magnuson-Stevens Fishery Conservation and Management Act, as amended by the Sustainable Fisheries Act, 16 U.S.C. § 1801 *et seq.* ("MSA"); the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; and the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* ("RFA").

3.    This Court has jurisdiction pursuant to the MSA. 16 U.S.C. §§ 1855(f), 1861(d). Review under the MSA is conducted in accordance with the APA, 5 U.S.C. § 701 *et seq.*

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the APA, 5 U.S.C. § 701 *et seq.* The challenged rule is final and reviewable agency action. 5 U.S.C. § 704.

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the RFA. 5 U.S.C. § 611.

6.    Venue is proper pursuant to 28 U.S.C. § 1391(e).

7.    Plaintiffs' petition for review is timely filed pursuant to the MSA and RFA. 16 U.S.C. § 1855(f); 5 U.S.C. § 611.

8.    This Court may issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 and grant permanent injunctive relief pursuant to the APA, 5 U.S.C. § 706; and the MSA, 16 U.S.C.

2

§§ 1855(f), 1861(d).

## PARTIES

9.     Plaintiff RELENTLESS INC. is a corporation organized and operating under the laws of the State of Rhode Island and Providence Plantations. Relentless Inc. was founded over 30 years ago and is headquartered in North Kingstown, Rhode Island. Relentless Inc. owns and operates F/V *Relentless* (collectively, "Relentless"), a high-capacity freezer trawler that alternatively but sometimes simultaneously harvests Atlantic herring (*Culpea harengus*), Loligo and Illex squids (*Doryteuthis (Amerigo) pealeii* and *Illex illecebrosus*, respectively), Butterfish (*Peprilus triacanthus*), and Atlantic mackerel (*Scomber scombrus*).  F/V *Relentless* uses a unique at-sea freezing technique that allows the vessel to stay at sea longer than other vessels in the Atlantic herring fishery and provides the vessel flexibility in what catch it harvests during fishing trips. For Atlantic herring, F/V *Relentless* uses small-mesh bottom trawl gear and holds a Category A permit. Plaintiff Relentless will be subject to Defendants' industry-funded at-sea monitoring mandate, and it will be adversely affected when the IFM Amendment and the Final Rule take effect. Due to F/V *Relentless*'s unique at-sea freezing technique, Relentless will also be subject to disparate treatment relative to the rest of the Atlantic herring fleet under the IFM Amendment and the Final Rule.

10.     Plaintiff HUNTRESS INC. is a corporation organized and operating under the laws of the State of Rhode Island and Providence Plantations. Huntress Inc. was founded over 30 years ago and is headquartered in North Kingstown, Rhode Island. Huntress Inc. owns and operates F/V *Persistence* (collectively, "Huntress"), a high-capacity freezer trawler that alternatively but sometimes simultaneously harvests Atlantic herring (*Culpea harengus*), Loligo and Illex squids (*Doryteuthis (Amerigo) pealeii* and *Illex illecebrosus*, respectively), Butterfish (*Peprilus triacanthus*), and Atlantic mackerel (*Scomber scombrus*). F/V *Persistence* uses a unique at-sea freezing technique that allows the vessel to stay at sea longer than other vessels in the Atlantic herring fishery and provides

the vessel flexibility in what catch it harvests during fishing trips. For Atlantic herring, F/V *Persistence* uses small-mesh bottom trawl gear and holds a Category A permit. Plaintiff Huntress will be subject to Defendants' industry-funded at-sea monitoring mandate, and it will be adversely affected when the IFM Omnibus Amendment and the February 7, 2020 Final Rule take effect. Due to F/V *Persistence*'s unique at-sea freezing technique, Huntress will also be subject to disparate treatment relative to the rest of the Atlantic herring fleet under the IFM Amendment and the Final Rule.

11.     Plaintiff SEAFREEZE FLEET LLC ("Seafreeze") is a Limited Liability Company organized and operating under the laws of the Commonwealth of Massachusetts. Seafreeze is headquartered in Ipswich, Massachusetts. Seafreeze owns plaintiffs Relentless and Huntress (collectively, "Plaintiffs"). Seafreeze's vessels will be subject to Defendants' industry-funded at-sea monitoring mandate, and it will be adversely affected when the IFM Amendment and the Final Rule take effect. Due to Seafreeze fishing vessels' unique at-sea freezing technique, Seafreeze will also be subject to disparate treatment relative to the rest of the Atlantic herring fleet under the IFM Amendment and the Final Rule.

12.     Defendant UNITED STATES DEPARTMENT OF COMMERCE ("Dept. of Commerce" or the "Department") is an agency of the United States of America. Under the MSA, the Department has primary management responsibility for domestic marine fisheries in federal waters, which it has delegated.

13.     Defendant WILBUR L. ROSS, JR. is the Secretary of the United States Department of Commerce. He is sued in his official capacity.

14.     Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION ("NOAA") is a scientific agency within the Dept. of Commerce. It has the delegated responsibility to manage

domestic marine fisheries in federal waters, which it has sub-delegated to the National Marine Fisheries Service. NOAA promulgated the final rule at issue.

15. Defendant DR. NEIL JACOBS is the Assistant Secretary of Commerce for Environmental Observation and Prediction and Acting Administrator of NOAA. He is sued in his official capacity.

16. Defendant NATIONAL MARINE FISHERIES SERVICE ("NMFS" or "NOAA Fisheries") is a line office within NOAA. It has the sub-delegated responsibility to manage domestic marine fisheries in federal waters.

17. Defendant CHRIS OLIVER is the Assistant Administrator for NOAA Fisheries. He is sued in his official capacity.

STATUTORY AND REGULATORY BACKGROUND

**The Magnuson-Stevens Act and the Fishery Conservation and Management Framework**

18. Recognizing the economic importance of commercial and recreational fishing, the MSA was adopted to protect, manage, and grow the United States' fishery resources. To achieve these goals, the MSA delineates scientific and conservation-based statutory obligations to sustainably manage fishery resources for the benefit of the fishing industry and the environment. 16 U.S.C. § 1801 *et seq.*

19. The MSA grants the Dept. of Commerce the ability to exercise "sovereign rights" to conserve and manage fisheries resources "for the purposes of exploring, exploiting, conserving, and managing all fish" in the Exclusive Economic Zone ("EEZ"). 16 U.S.C. §§ 1801(b)(1), 1811(a). Generally, the EEZ extends from the seaward boundary of each of the coastal States to 200 nautical miles offshore. 16 U.S.C. § 1802(11).

5

20. The MSA provides for the development and implementation of fishery management plans ("FMPs") for fisheries. 16 U.S.C. § 1801(b)(4). FMPs are implemented with the goal of continually achieving and maintaining optimum yield within such fishery. *Id.* All FMPs, and their implementing regulations, must be prepared and executed in accordance with ten fishery conservation and management "National Standards." *Id.*; 16 U.S.C. § 1851(a). At least, five of the standards are implicated by the IFM Amendment and the Final Rule:

a. National Standard One requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).

b. National Standard Two requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C.

§ 1851(a)(2).

c. National Standard Six requires that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6).

d. National Standard Seven requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7).

e. National Standard Eight requires that "[c]onservation and management measures shall, consistent with the conservation requirements…, take into account the importance of fishery resources to fishing communities by utilizing economic and social data that [are based upon the best scientific information available], in order to (A) provide

6

for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

21.     The MSA establishes eight Regional Fishery Management Councils ("Councils"). 16 U.S.C. § 1852(a)(1). The Councils share fishery conservation, management, and regulatory responsibilities with the Dept. of Commerce and NOAA. Two of the eight Councils are relevant to the action challenged here: the New England Fishery Management Council ("NEFMC") and the Mid-Atlantic Fishery Management Council ("MAFMC"). 16 U.S.C. § 1852(a)(1).

    a.  The NEFMC consists of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut and has jurisdiction over fisheries and waters seaward of the coastal waters of those states. 16 U.S.C. § 1852(a)(1)(A). The NEFMC has 18 voting members, including 12 appointed by the Secretary of Commerce (the "Secretary"). *Id.*

    b.  The MAFMC consists of the States of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and North Carolina and has jurisdiction over fisheries and waters seaward of the coastal waters of those states. 16 U.S.C. § 1852(a)(1)(B). The MAFMC has 21 voting members, including 13 that are appointed by the Secretary. *Id.*

    c.  Councils, including the NEFMC and MAFMC, are comprised of voting and non-voting members. 16 U.S.C. § 1852(b), (c).

22.     The Councils prepare, monitor, and revise FMPs. 16 U.S.C. § 1801(b)(5). The Councils, in conjunction with the Secretary, may also propose regulations implementing or modifying an FMP or plan amendment. 18 U.S.C. § 1853(c); *cf.* 18 U.S.C. § 1855(d).

23.     The Councils also provide a forum through which the fishing industry, as well as other interested parties, can take an active role in advising, establishing, and administering FMPs. 16 U.S.C. § 1801(b)(5).

24. The MSA prescribes the required and discretionary provisions of FMPs. 18 U.S.C. § 1853.

    a. Among other requirements, FMPs must include conservation and management measures; fishery descriptions; certain yield assessments; essential fish habitat identification; fishery impact statements; criteria for identifying overfishing within the fishery; standardized reporting methodology for bycatch analysis; and a mechanism for setting annual catch limits. 18 U.S.C. § 1853(a).

    b. Among other provisions, FMPs may include fishery permits; designation of limited or closed off fishing zones; limitations on catch and sale of fish; prohibitions and requirements related to gear types; requirements for carrying observers on board to collect conservation and management data; reservation of portions of allowable catch for use in scientific research. 18 U.S.C. § 1853(b).

25. The MSA does not contemplate or even use the term "at-sea monitor."

26. The MSA permits information collections that are beneficial for developing, implementing, or revising FMPs. 18 U.S.C. § 1881a(a)(1). If a Council determines such information collection is necessary, it may request that the Secretary implements the collection. *Id.* If the Secretary determines that the collection is justified, then the Secretary has the duty to promulgate regulations implementing the collection program. *Id.* If determined necessary, the Secretary may also initiate an information collection. 18 U.S.C. § 1881a(a)(2).

27. The MSA explicitly authorizes the collection of fees in certain circumstances for specific purposes:

    a. The MSA authorizes the Secretary to collect fees to cover actual costs directly related to the management, of, data collection for, and enforcement of limited access privilege programs and certain community development quota programs. 16 U.S.C.

§ 1854(d). Such fees are capped at 3 percent of the ex-vessel value of fish harvested under those programs. 16 U.S.C. § 1854(d)(2)(B).

b.  The MSA explicitly permits the North Pacific Fishery Council ("NPFC") to establish a system of fees to pay for the cost of implementing fisheries research plans, including mandated observers, for certain fisheries under its jurisdiction. 16 U.S.C.

§ 1862(a). There is no such provision for the NEFMC- or MAFMC-managed fisheries.

c.  The MSA also explicitly permits the Secretary to charge fees, under certain circumstances, to foreign fishing vessels that harvest fish in United States' jurisdictional waters to pay for observers. 16 U.S.C. § 1827.

### The Regulatory Flexibility Act

28.  The RFA requires administrative agencies to consider the effect of their actions on small entities, including small businesses. The purpose of the RFA is to enhance agency sensitivity to the economic impact of rulemaking on small entities to ensure that alternative proposals receive serious consideration at the agency level.

29.  The RFA provides that, whenever an agency is required by the APA to publish a general notice of proposed rulemaking, it must prepare and make available for public comment an Initial Regulatory Flexibility Analysis ("IFRA"), 5 U.S.C. § 603(a), and subsequently prepare and make public a Final Regulatory Flexibility Analysis ("FRFA"). 5 U.S.C. § 604. An agency must also publish the FRFA or a summary of the FRFA in the *Federal Register*. 5 U.S.C. § 604(b).

30.  When an agency takes a final action that is subject to the RFA, including the promulgation of final rules, but does not comply with the RFA, "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review." 5 U.S.C. § 611(a).

31.     Under NMFS regulations, the "small business size standard" for commercial fishing businesses, and their affiliates, "is $11 million in annual gross receipts." 50 C.F.R. § 200.2; 5 U.S.C. § 601(3).

**FACTUAL ALLEGATIONS**

**The Atlantic Herring Fishery and Atlantic Herring FMP**

32.     Atlantic herring, or *Culpea harengus*, are small schooling fish from the family *Clupeidae*.

33.     Atlantic herring are found across the North Atlantic, but in the western North Atlantic they are distributed from Labrador, Canada to Cape Hatteras, North Carolina. In federally managed waters, the Atlantic herring population is concentrated from New England to New Jersey.

34.     Atlantic herring is a biologically important species as it plays a base role in the food web of the marine ecosystem.

35.     Atlantic herring is also an economically important species. The commercial herring fishery has operated in New England for hundreds of years. And since 2010, the fishery has consistently landed over $20 million in Atlantic herring each year.

36.     According to the 2018 stock assessment, Atlantic herring are not overfished, nor are they subject to overfishing. *See* NOAA Fisheries, *Atlantic Herring* (last visited Mar. 2, 2020) *available at* https://www.fisheries.noaa.gov/species/atlantic-herring. The 2018 stock assessment also indicated that Atlantic herring stock levels are well above their target levels. *Id.* Despite this, the 2018 herring stock assessment has led to a nearly 70 percent reduction in herring quotas for 2019. *See* NOAA, Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 84 Fed. Reg. 2,760 at 2,765 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648).

37.     In state coastal waters, the states and the Atlantic States Marine Fisheries Commission ("ASMFC") manage and regulate Atlantic herring under Amendment 3 to the Interstate Fishery

10

Management Plan. *See* ASMFC, *Atlantic Herring* (last visited Mar. 2, 2020) *available at* http://www.asmfc.org/species/atlantic-herring.

38.     In federal waters, the NEFMC manages Atlantic herring under the Atlantic Herring FMP. *See* NEFMC, Final Atl. Herring Fishery Mgmt. Plan (Mar. 8, 1999) *available at* http://bit.ly/NEFMCAHFMP. The Atlantic herring population is distributed across the jurisdictional boundaries of the NEFMC and MAFMC, which consulted on the Atlantic Herring FMP.

39.     Since its March 1999 adoption, the Atlantic Herring FMP has been subject to seven amendments and four framework adjustments. *See generally* NEFMC, *Atlantic Herring* (last visited Mar. 2, 2020) *available* at https://www.nefmc.org/management-plans/herring. There are currently an additional two amendments and three framework adjustments to the Atlantic Herring FMP under development. *See id.*

40.     The Atlantic Herring FMP sets out, in its original form and through amendments and framework adjustments, numerous primary management measures to help develop a sustainable herring fishery. *See id.* (listing the Atlantic Herring FMP including approved and in-development amendments and framework adjustments). Such conservation and management measures include, but are not limited to:

    a.     Adopting a total catch limit, or annual catch limit ("ACL"), which is distributed across time and areas;[1]

    b.     Controlling and limiting catch as the ACL is neared, as well as closing off areas when the ACL is reached;

    c.     Closing spawning areas and designating essential Atlantic herring habitat;

---

[1] The ACL is the maximum amount of fish that can be sustainably harvested each year.

     d.    Mandatory permitting of certain Atlantic herring vessels, operators, dealers, and processors, as well as vessel, gear, and possession restrictions;

     e.    Requiring certain data reporting; and,

     f.    Defining overfishing of Atlantic herring.

41.    The NEFMC revises quota and management specifications every three years. The most recent quota and management specifications were finalized and approved in 2016, and specifications for the 2019-2021 period are under development. *See* NOAA, Specification of Management Measures for Atlantic Herring for the 2016-2018 Fishing Years, 81 Fed. Reg. 75,731 (Nov. 1, 2016) (to be codified at 50 C.F.R. pt. 648); *see also* NOAA, Framework Adjustment 6 and the 2019-2021 Atlantic Herring Fishery Specifications, 85 Fed. Reg. 4,932 (proposed Jan. 28, 2020) (to be codified at 50 C.F.R. pt. 648).

42.    There are three primary gear types used to catch and harvest Atlantic herring: midwater trawl, purse seine, and bottom trawl. While there are many variations in gear type, the three types of gear generally operate as follows:

     a.    Midwater trawlers generally harvest by deploying and towing nets that have a large opening at one end and that narrow at the back end. This allows the trawlers to capture the herring as they school in the water column. Midwater trawlers may also do "pair trawling," which is done by pulling a single net between two fishing vessels.



b.        Purse seiners generally deploy a wall of netting, a seine, around an area or schooling herring. The seine has floats along the top line and a lead line that threads through rings along the bottom of the seine. When catch is identified, the lead line is pulled causing the net to purse at the bottom, so the herring remain in the net as it is pulled to the surface.



Figure 2: Purse Seines, *available at* http://bit.ly/PurseSeines

c.        Bottom trawlers generally harvest herring by using nets fitted with weights and special gear that allow the net to stay open as it is trawled along the ocean floor. The nets are fitted with mesh that confine the fish as they are pulled to the surface.



Figure 3: Bottom Trawls *available at* http://bit.ly/BottomTrawls

43.     Midwater trawl and purse seine are responsible for most of the Atlantic herring landings.

44.     Under the Atlantic Herring FMP, there are four regulated Atlantic herring fishing management areas: Areas 1 (subdivided into Areas 1A and 1B), 2, and 3. The NEFMC allocates a stock-wide ACL across these four management areas ("sub-ACLs"). *See* 50 C.F.R. § 648.200(f).

  a.      Area 1 includes state and federal inshore (Area 1A) and offshore (Area 1B) waters in the Gulf of Maine that are adjacent to the states of Maine, New Hampshire, and Massachusetts.

  b.      Area 2 includes state and federal waters in the South Coastal Area that are adjacent to the states of Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia, and North Carolina.

  c.      Area 3 includes all federal waters in the Georges Bank.



Figure 4: Atlantic Herring Management Areas *available at* http://bit.ly/AHMAMap

45.     Permits for Atlantic herring vessels are divided by permit type—limited and open access—and permit category—A, B, C, D, E, and F—which place restrictions where vessels can fish and how much herring they can possess.  50 C.F.R. § 648.4(a)(10)(iv)-(v); 50 C.F.R. § 648.204;

*see also* NOAA Fisheries, *Atlantic Herring* (last visited Mar. 2, 2020) *available at* https://www.fisheries.noaa.gov/species/atlantic-herring. Only Categories A and B are impacted by the IFM Amendment and the Final Rule.

      a.     Category A permits are "All Areas Limited Access" permits. Vessels holding Category A permits can possess an unlimited amount of herring in all areas. Plaintiffs' vessels, F/Vs *Relentless* and *Persistence* each hold Category A permits.

      b.     Category B permits are "Areas 2/3 Limited Access" permits. Vessels holding Category B permits can possess an unlimited amount of herring in Areas 2 and 3, but they are excluded from Areas 1A and 1B.

46.     Subject to ACL closures and limitations, the Atlantic herring fishery year runs from January 1 through December 31.

### Plaintiffs' Vessels: F/V *Relentless* and F/V *Persistence*

47.     Plaintiffs Relentless and Huntress are small businesses whose primary industry is commercial fishing. Their annual gross receipts are less than or equal to $11 million. They are subject to the IFM Amendment and the Final Rule.

48.     F/Vs *Relentless* and *Persistence* are high-capacity freezer trawlers that alternatively and sometimes simultaneously harvest Atlantic herring, as well as other managed species including Loligo and Illex squids (*Doryteuthis (Amerigo) pealeii* and *Illex illecebrosus*, respectively), Butterfish (*Peprilus triacanthus*), and Atlantic mackerel (*Scomber scombrus*).

49.     F/Vs *Relentless* and *Persistence* hold several permits and operate across the jurisdictional boundaries of the NEFMC and the MAFMC. When harvesting Atlantic herring, F/Vs *Relentless* and *Persistence* use small mesh bottom trawl gear and operate under Category A permits.

50.     Plaintiffs typically declare into herring, squid, and mackerel fisheries on the trips they take from late November through April because they harvest all those species alternatively but

sometimes simultaneously during the season. That is, they may take each species, some or all species during a trip. This flexible style of fishing allows Plaintiffs to cover operating costs by switching over to a different species based on what they can catch.

51. "Declaring" means informing regulatory authorities of what species a vessel intends to pursue on any given trip.



<u>Figure 5</u>: From left, F/Vs *Persistence* and *Relentless* afloat.

52. Prior to every trip, Plaintiffs are required to call and notify for observers for their gear type for each trip.

53. For herring/mackerel trips, Plaintiffs have noticed a higher-than-average observer rate than NMFS has claimed is average for the herring fishery. For example, from November 2014 to April 2015 the F/V *Relentless* had 50 percent herring/mackerel observer coverage.

54. Under Plaintiffs' style of fishing it is possible to have a declared herring/mackerel trip, that is selected for observer coverage, that only harvests squid and butterfish.

55. Similarly, under the IFM Amendment and Final Rule, Plaintiffs may be forced to carry a herring at-sea monitor on a declared herring trip, that does not end up harvesting herring. Under

16

A28

the IFM Amendment and Final Rule, Plaintiffs will be forced to pay for the at-sea monitor from other-species revenue, not Atlantic-herring revenue.

56.     While other vessels in the herring fishery conduct multi-species trips—herring and mackerel, managed by MAFMC under its own FMP, school together and are regularly harvested together—on information and belief, F/Vs *Relentless* and *Persistence* are the only vessels in the Atlantic herring fleet who declare into and/or harvest squid and butterfish on the same trip as declared Atlantic herring trips.

57.     Plaintiffs process their catch and freeze at sea.  Under Plaintiffs' process, all catch is brought aboard, hand sorted on a conveyor belt, hand packaged, and then frozen. Any discards or unwanted bycatch are also hand sorted and retained in discard baskets.

58.     In comparison to other vessels in the Atlantic herring fishery, F/Vs *Relentless* and *Persistence* have more limited catching and processing capacity, longer trips, and higher overhead costs. For example,

> a.     Plaintiffs are limited up to about 125,000 pounds of catch per day due to limited freezing capacity, compared to other vessels in the herring fleet which can harvest in excess of 500,000 pounds of catch per day.

> b.     Plaintiffs' trips typically last 7-14 days at sea, compared to 2-3 days for other vessels in the herring fleet.

> c.     F/Vs *Relentless* and *Persistence* require twice as many crew members to operate, compared to other vessels in the herring fleet.

59.     If Plaintiffs are unable to use the flexible style of fishing they have developed—due to costs associated with the IFM Amendment and the Final Rule—it could result in fishing trips losing rather than making money.

**The New England Council's Industry-Funded Monitoring Omnibus Amendment**

60. The IFM Amendment and Final Rule are the culmination of almost seven years of design and development by the NEFMC, MAFMC, and NMFS. *See* NEFMC, *Observer Policy Committee (Industry-Funded Monitoring)* (last visited Mar. 2, 2020) *available at* https://www.nefmc.org/committees/observer-policy-committee. The IFM Amendment and Final Rule allows industry-funded monitoring in NEFMC FMPs, except for those under joint-management with MAFMC, *e.g.,* mackerel. *See* Final Rule at 7,414 (Exhibit 1).

61. Since announcing the development of the IFM Amendment, its reception has been contentious. Industry stakeholders, including Plaintiffs through their sister company, Seafreeze Ltd., have expressed concerns over the regulatory burdens placed on them by the proposed IFM Amendment and its alternatives. *See* Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Herring/Observer Committee Members (June 30, 2015) ("June 30, 2015 Comment Letter") (Exhibit 2); *see also* Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to NEFMC and MAFMC (Nov. 4, 2016) (submitted in response to NEFMC and MAFMC's published Notice of Public Hearings and request for comments (NOAA, Public Hearings, 81 Fed. Reg. 64,426 (Sept. 20, 2016))) ("Nov. 4, 2016 Comment Letter") (Exhibit 3).

    a. In the June 30, 2015 Comment Letter, Seafreeze explained how F/V *Relentless* and F/V *Persistence* declare into multiple fisheries on a typical trip, that flexibility is necessary to maintain their style of fishing and provided data in support of these assertions. *See* Exhibit 2 at 1. Among other issues, the letter also raised concerns over the high cost of at-sea monitoring coverage for these vessels and requested that the Committee create a separate category under any IFM Amendment that would account for the unique issues that arise from operating freezer vessels. *Id.* at 1, 4.

b.      Among other issues in the Nov. 4, 2016 Comment Letter, Seafreeze reiterated the positions it took in its June 30, 2015 Comment Letter and provided additional specific commentary regarding why it could only support "Omnibus Alternative 1, No Action." *See* Exhibit 3. The letter indicated disagreement with the funding mechanism for additional monitoring, *i.e.,* industry-funding, because the monitoring is inherently a public function, and it said that "[p]ublic funds should be used for public purposes." *Id.* at 2. The letter also indicated that costs to Seafreeze's vessels would be disproportionate relative to the rest of the herring fleet because of its style of fishing. *Id.* at 2-5.

62.      Seafreeze submitted subsequent comments raising concerns with the IFM Amendment to the Herring Committee. *See* Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Council Members (undated) ("Undated Comment Letter") (Exhibit 4); *see also* Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Herring Committee Members (Feb. 3, 2017) ("Feb. 3, 2017 Comment Letter") (Exhibit 5); *see also* Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Herring Committee Members (Mar. 30, 2017) ("Mar. 30, 2017 Comment Letter") (Exhibit 6).

a.      The Undated Comment Letter indicated Seafreeze's opposition to 100 percent observer coverage and electronic monitoring. *See* Exhibit 4. It also inquired about the availability of independent economic analysis of the amount of herring vessels typically catch and about requesting a separation or exemption between vessels that are herring-focused versus vessels that are mixed species-focused like F/Vs *Relentless* and *Persistence*. *Id.*

b.      The Feb. 3, 2017 Comment Letter requested that the NEFMC reconsider the economic impacts of its decision to select 50 percent at-sea monitor coverage. *See* Exhibit 5. The letter again raised Seafreeze's concerns over the disproportionate costs borne by

its vessels, including the fact that under the IFM Amendment, it would be forced to pay $39,313 a year for herring at-sea monitors on trips that do not land herring. *Id.*

  c.  The Mar. 30, 2017 Comment Letter resubmitted prior written comments. *See* Exhibit 6.

63.  On or about April 20, 2017, the NEFMC finalized its preferred alternatives and adopted the IFM Amendment. *See* Final Rule at 7,414.

64.  A year later, on April 19, 2018, the NEFMC "refined" its industry-funded monitoring recommendations. *Id.*

65.  On September 19, 2018, the NEFMC published a Notice of Availability for the IFM Amendment in the *Federal Register*. *See* NOAA, Industry-Funded Monitoring, 83 Fed. Reg. 47,326 (Sept. 19, 2018) (Exhibit 7). The Notice of Availability permitted interested parties to submit comments regarding adoption of the IFM Amendment for a 60-day period ending on November 18, 2018. *Id.*

66.  In early-October 2018, while the IFM Amendment comment period was still open, the MAFMC postponed action on the IFM Amendment for the mackerel fishery. *See* MAFMC, *Omnibus Industry Funded Monitoring Amendment* (last visited Mar. 2, 2020) *available at* http://www.mafmc.org/actions/omnibus-observer-funding.

67.  On November 7, 2018, while the IFM Amendment comment period was still open, the proposed rule implementing the IFM Amendment was published in the *Federal Register*. NOAA, Industry-Funded Monitoring Proposed Rule, 83 Fed. Reg. 55,665 (Nov. 7, 2018) ("Proposed Rule") (Exhibit 8). The Proposed Rule permitted interested parties to submit comments regarding the implementing rule for a 47-day period ending on December 24, 2018. *Id.*

68.  Plaintiffs, through their sister company, Seafreeze Ltd., as well as other members of the Atlantic herring fleet, submitted comments during the Proposed Rule's comment period. The

comments in response to the Proposed Rule were generally negative. *See, e.g.,* Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., regarding Comments on NOAA-NMFS-2018-0109 (Dec. 24, 2018) ("Dec. 24, 2018 Comment Letter") (Exhibit 9).

      a.    The Dec. 24, 2018 Comment Letter raised several issues with the Proposed Rule implementing the IFM Amendment. *See* Exhibit 9. First, the comment letter raised issue with NEFMC moving forward with the IFM Amendment without MAFMC, which could force Mid-Atlantic fisheries into industry-funding monitoring by default. *Id.* at 1. The letter also reiterated the fact that the IFM Amendment disproportionately impacts Seafreeze vessels. *Id.* Seafreeze also again raised the fact that at-sea monitoring for the purpose of data collection "is an inherently governmental function" and that such industry-funded monitoring is not permitted under the MSA. *Id.* at 2-3. The Dec. 24, 2018 Comment Letter also challenged that forcing vessels to contract with at-sea monitoring providers is an impermissible tax that has not been approved by Congress. *Id.* at 3. The Comment Letter also reiterated that Seafreeze's unique style of harvesting, processing, and freezing at sea should be taken into consideration in the Final Rule. *Id.* at 4-6.

69.    On December 18, 2018, while the comment period for the Proposed Rule implementing the IFM Amendment was still open, the Secretary notified the NEFMC in an unpublished letter that the Secretary approved the IFM Amendment. *See* Final Rule at 7,414; *see also* Letter from Michael Pentony, Greater Atlantic Region Sustainable Fisheries Office ("GARFO") Regional Administrator, to Dr. John Quinn, NEFMC Chairman (Dec. 18, 2018) (Exhibit 10).

70.    At the January 30, 2020, NEFMC meeting, a representative from GARFO presented information about the forthcoming Final Rule. *See* GARFO, *Industry-Funded Monitoring Amendment:*

*Atlantic Herring Fishery* (last visited Mar. 2, 2020) *available at* http://bit.ly/IFMAmendmentPresentation ("IFM Amendment Presentation") (Exhibit 11).

71.     On February 7, 2020, NMFS and NOAA adopted the Final Rule implementing the IFM Amendment, which was substantially the same as the Proposed Rule. *See* Final Rule at 7,422.

72.     The Defendants' response to concerns raised by stakeholders was a near wholesale rejection of the comments submitted. *See id.* at 7,422-7,427. All of Plaintiffs' comments and concerns, including a requested exclusion for small-mesh bottom trawlers that process and freeze at sea, were rejected by the Final Rule. *Id.*

73.     The IFM Amendment and the Final Rule establish a 50 percent monitoring coverage target for at-sea monitoring. *See* Final Rule at 7,422; 7,425; *see also* IFM Amendment Presentation at 4. This target is achieved by combining Standardized Bycatch Reporting Methodology ("SBRM") of the Northeast Fisheries Observer Program ("NEFOP") plus IFM coverage. *See* Final Rule at 7,417; 7,418. The Atlantic herring vessel owners pay for the IFM sampling cost— approximately $710 per day—and NOAA Fisheries pays for IFM administrative costs. *See* Final Rule at 7,415. SBRM NEFOP is funded by NOAA Fisheries. *See* NOAA Fisheries, *Industry-funded Monitoring in the Atlantic Herring Fishery* (last updated Feb. 28, 2020) *available at* http://bit.ly/IFMmonitoring.

74.     The IFM Amendment forces many Atlantic herring vessel owners, including Plaintiffs, to enter forced negotiations with private at-sea monitor providers that are approved and trained by NOAA. *See* IFM Amendment Presentation at 7. The information and data at-sea monitors collect is directed by NOAA Fisheries and the NEFMC. *See* Final Rule at 7,418.

75.     As small-mesh bottom trawls, F/Vs *Relentless* and *Persistence* are not eligible for the at-sea monitoring alternative—electronic monitoring with portside sampling—thus, they can only comply with the IFM mandate by carrying and bearing the cost of an at-sea monitor. *See id.* at

7,419. Even if the alternative were available, Plaintiffs would not receive any relief as it is their view that electronic monitoring violates the Fourth and Fifth Amendments of the U.S. Constitution. *See id.* at 7,423.

76.     The IFM Amendment and the Final Rule project that, for vessels like F/Vs *Relentless* and *Persistence* that cannot use electronic monitoring, implementing the IFM Amendment will reduce returns-to-owner ("RTO") by almost 20 percent. *See id.* at 7,418; 7,425.

77.     The Final Rule also develops a standard process to implement and revise industry-funded monitoring programs in the Atlantic herring and other FMPs under NEFMC's jurisdiction. *See* Final Rule at 7,415.

78.     Starting April 1, 2020, vessels issued Category A or B permits, including F/Vs *Relentless* and *Persistence* are required to pay for at-sea monitoring on trips NEFMC selects for IFM coverage. *Id.* at 7,420.

### CLAIMS FOR RELIEF

### COUNT ONE
### INDUSTRY FUNDING IS UNLAWFUL

79.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-78, as if fully set forth herein.

80.     Under the MSA, and in accordance with the APA, this Court is authorized to hold unlawful and set aside agency action, findings, and conclusions that it finds to be arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law, 5 U.S.C. § 706(2)(A); contrary to constitutional right, power, privilege, or immunity, 5 U.S.C. § 706(2)(B); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law, 5 U.S.C. § 706(2)(C). *See* 16 U.S.C. § 1855(f)(1).

23

81.     On February 7, 2020, Defendants promulgated the Final Rule implementing the IFM Amendment. Under the MSA and APA, that act is a final agency action subject to judicial review. 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 704.

82.     The IFM Amendment and the Final Rule violate the MSA and other applicable laws.

83.     Mandating Plaintiffs to pay for the Atlantic herring at-sea monitoring program is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law; contrary to constitutional right, power, privilege, or immunity; and in excess of statutory jurisdiction, authority, or limitations.

84.     By requiring Plaintiffs to pay for the Atlantic herring at-sea monitors, Defendants committed the following violations:

> a.     *Ultra vires* action in excess of any statutory authority granted by Congress; and

> b.     Infringing on Congress's exclusive legislative Powers vested by Article I, § 1 of the Constitution of the United States.

85.     Defendants lack the authority to require industry-funded at-sea monitoring in the Atlantic herring fishery. Thus, the IFM Amendment and the Final Rule are void and unenforceable to the extent they impose such a requirement.

### COUNT TWO
### THE INDUSTRY-FUNDED AT-SEA MONITORING PROGRAM IS NOT AUTHORIZED BY THE MSA OR ANY OTHER LAW, AND IT WOULD EXCEED CONGRESS' POWER IF IT WERE

86.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-78, as if fully set forth herein.

87.     Administrative agencies have only those powers and related regulatory abilities as delegated to them by statute. There is no other source of regulatory authority in an agency except statute. Agencies that exceed their delegated powers are acting unconstitutionally.

88.     The MSA explicitly authorizes the collection of fees in certain circumstances.

89.     The MSA authorizes the Secretary to collect fees to cover actual costs directly related to the management, of, data collection for, and enforcement of limited access privilege programs and certain community development quota programs. 16 U.S.C. § 1854(d). Such fees are capped at 3 percent of the ex-vessel value of fish harvested under those programs. 16 U.S.C. § 1854(d)(2)(B).

90.     The MSA explicitly permits the North Pacific Fishery Council ("NPFC") to establish a system of fees to pay for the cost of implementing fisheries research plans, including mandated observers, for certain fisheries under its jurisdiction. 16 U.S.C. § 1862(a).

91.     The MSA also explicitly permits the Secretary to charge fees, under certain circumstances, to foreign fishing vessels that harvest fish in United States' jurisdictional waters to pay for observers. 16 U.S.C. § 1827.

92.     This same statutory allocation of power to collect or order fees is absent from the MSA for domestic fisheries managed by the New England Fishery Management Council, including the Atlantic herring fishery.

93.     Only Congress has the power to "lay and collect Taxes, Duties, Imposts and Excises" and all such must be uniform throughout the United States.   U.S. Constitution, Article I., § 8. Similarly, under law, Congress must appropriate funds, and agencies may not augment the budgets assigned them by Congress.   The prohibition on non-statutory augmentation of budgets appropriated by Congress is a vital part of the structure of the Constitution and its separation of powers, and it also enjoys statutory support.

94.     There is in fact no such thing in the MSA as an "at-sea monitor" with the powers and duties ascribed in the IFM Amendment and the Final Rule.

95.     Congress has expressed in statute and by appropriations that it commands that the Atlantic herring fishery be regulated by appropriated funds.

96.     Through their promulgation of the IFM Amendment and the Final Rule, Defendants have therefore arrogated to themselves a power of Congress that has not been delegated to them by clear statutory language in violation of, *inter alia*, Article I of the Constitution of the United States.  Defendants have asserted a right of agencies to self-fund "off the books" that is alien to the Constitution and American law.

97.     Plaintiffs will suffer harm from this unconstitutional and statutorily unauthorized seizure of power by an executive agency, which power is beyond any power of the executive.

### COUNT THREE
### THE DEFENDANTS HAVE UNCONSTITUTIONALLY AND IN VIOLATION OF THE MSA FORCED PLAINTIFFS INTO A MARKET THEY DO NOT WISH TO ENTER

98.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-97, as if fully set forth herein.

99.     Defendants have also, without statutory authority, forced Plaintiffs into the artificially created "market" of at-sea monitors.  If Plaintiffs simply do nothing vis-à-vis this market, they will be fined or forbidden from fishing under their permits.  This also violates Article I of the Constitution of the United States. By forcing the Plaintiffs into a market that they do not wish to enter, Defendants' actions exceed the power of Congress or the Federal Government under the Constitution.

100.     Without authority of the MSA or other statute Defendants have A) invented an office "at-sea monitor" found nowhere in the statute; B) forced Plaintiffs to accept the presence of such officers on their vessels; C) forced Plaintiffs into the "market" for "at-sea monitors."

101.     Plaintiffs will suffer harm from this unconstitutional and statutorily unauthorized seizure of power by an executive agency, which power is beyond any power of the executive.

## COUNT FOUR
### INDUSTRY FUNDING VIOLATES THE REGULATORY FLEXIBILITY ACT

102. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-78, as if fully set forth herein.

103. Under the MSA, and in accordance with the APA, this Court is authorized to hold unlawful and set aside agency action, findings, and conclusions that are taken without observance of the procedure required by law. 16 U.S.C. § 1855(f)(1); *cf.* 5 U.S.C. § 706(2)(D).

104. Plaintiffs Relentless and Huntress are small businesses whose primary industry is commercial fishing. Their annual gross receipts are less than or equal to $11 million. They are subject to the IFM Amendment and the Final Rule. *See* 50 C.F.R. § 200.2; 5 U.S.C. § 601(3).

105. Defendants failed to prepare legally sufficient initial or final regulatory flexibility analyses in violation of the RFA.

106. Defendants' RFA violation is without observance of procedure required by law and is final agency action that is arbitrary, capricious, and an abuse of discretion in violation of the MSA and the APA.

107. Given Defendants' violation of the RFA, the IFM Amendment and the Final Rule are void and unenforceable.

### PRAYER FOR RELIEF

Wherefore, the Plaintiffs pray for the following relief against the defendants:

A. Declaratory judgment that the IFM Amendment and the Final Rule violate the United States Constitution's Article I, because Congress did not authorize the Defendants to create at-sea monitors to the Defendants, or to create the at-sea monitoring program in the Atlantic herring fishery, or the forced industry financing thereof.

B.      Declaratory judgment that the IFM Amendment and the Final Rule violate the United States Constitution.

C.      Declaratory judgment holding unlawful and setting aside the IFM Amendment and the Final Rule under the MSA.

D.      Declaratory judgment holding unlawful and setting aside the IFM Amendment and the Final Rule under the APA.

E.      Declaratory judgment that the IFM Amendment and the Final Rule are void and unenforceable under the RFA.

F.      Declaratory judgment that the Defendants cannot force Plaintiffs into a market they do not wish to enter.

G.      Injunctive relief permanently enjoining Defendants from enforcing the IFM Amendment and the Final Rule, and from requiring Plaintiffs to fund or contract for at-sea monitors and prohibiting their presence on Plaintiffs' vessels.

H.      For an award for all reasonable attorneys' fees and costs incurred herein and that Plaintiffs may be entitled to under law; and,

I.      For such other relief as this Court deems just and proper.

[Remainder of page intentionally left blank.]

Dated: March 4, 2020

Respectfully submitted,

/s/ Kevin J. Holley
Kevin J. Holley, Esq. #4639
Holley Law LLC
33 College Hill Road, Ste. 25C
Warwick, RI 02886
Phone: (401) 521-2622
kevin@holleylawllc.com

John Vecchione
Senior Litigation Counsel
Kara Rollins
Litigation Counsel
*Pro hac vice forthcoming*

New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, DC 20036
Phone: (202) 869-5210
john.vecchione@ncla.legal
kara.rollins@ncla.legal

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **RELENTLESS INC., et al.** | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | Case No. 1: 20-cv-00108-WES-PAS |
| | : | |
| | : | **DECLARATION OF** |
| **U.S. DEPARTMENT OF COMMERCE,** | : | **MEGHAN LAPP** |
| **et al.** | : | |
| | : | |
| *Defendant*s. | : | |

### DECLARATION OF MEGHAN LAPP

I, Meghan Lapp, am over the age of 18 and make this Declaration in support of the Plaintiffs'
motion for Summary Judgment and am familiar with the facts recited herein on personal knowledge
or consulting corporate records.

1.　　I am Fisheries Liaison, for Seafreeze Ltd., a sister company to Plaintiffs and am familiar
with the companies, vessels, and their fishing operations.

2.　　I submitted the comments on behalf of Plaintiffs and Seafreezee Ltd. that were
attached to the Complaint, included in the administrative record, and attached to Plaintiffs'
motion.

3.　　In those comments I discuss the nature of fishing done by Plaintiffs. Specifically, these
comments refer to the fishing done by Plaintiffs, Relentless, Inc., which owns and operates F/V
*Relentless*, and Huntress, Inc., which owns and operates F/V *Persistence*.

4.　　For Atlantic herring, F/Vs *Relentless* and *Persistence* use small-mesh bottom trawl gear
and hold Category A permits.

5.　　Plaintiffs, Relentless, Inc. and Huntress, Inc., each have less than $11 million in annual
gross receipts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On: 12/3/20

Meghan Lapp

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

Relentless Inc., et al.,
_____

Plaintiff

v.                                              Case No. 1:20-cv-00108-WES
                                                         _____

U.S. Dept. of Commerce, et al.,
_____

Defendant

**NOTICE OF APPEAL**

Notice is hereby given that  Relentless, Inc.; Huntress, Inc.; Seafreeze Fleet LLC
                            _____,
                                                    Name

the  Plaintiffs                     in the above-referenced matter, hereby appeals to the United States
    _____
         Party Type

Court of Appeals for the First Circuit from the:

☑ Final judgment entered on  7/15/2025                    .
                            _____
                                  Date of Judgment

                                    and/or

☑ The order  _____ entered on  _____.
                      Description of Order                                  Date of Order

John J. Vecchione                          Respectfully submitted,
_____                 /s/ John J. Vecchione
Name                                       _____
                                           Signature
Admitted pro hac vice                      9/3/2025
_____                 _____
Bar Number                                 Date
New Civil Liberties Alliance               2029186902
_____                 _____
Firm/Agency                                Telephone Number
4250 Fairfax Dr., Suite 300                john.vecchione@ncla.legal
_____                 _____
Address                                    Email Address
Arlington Va., 2203
_____
City/State/Zip Code

| Reset Form |  | Print Form |  | Save Form |



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

**SEP 1 1 2018**

MEMORANDUM FOR:    Chris Oliver
                   Assistant Administrator for Fisheries

FROM:              Michael Pentony
                   Regional Administrator

SUBJECT:           Clearance of a Proposed Rule; New England Industry-Funded
                   Monitoring Omnibus Amendment (RIN 0648-BG91)--DECISION
                   MEMORANDUM

I request that you make determinations about the proposed rule and transmit it to the NOAA
General Counsel and the Department of Commerce General Counsel for clearance to publish in
the *Federal Register*.

## BACKGROUND

### *Amendment Development*

The New England Fishery Management Council is considering ways to increase monitoring in
some fisheries above the baseline levels required by the Standardized Bycatch Reporting
Methodology (SBRM) to assess the amount and type of catch and to reduce uncertainty around
catch estimates. We have limited funding for monitoring, so the Council would like the option to
allow the fishing industry to pay its costs for additional monitoring, when Federal funding is
unavailable to cover industry's costs. In these cases, the industry would pay for its cost
responsibilities associated with additional monitoring to meet fishery management plan (FMP)-
specific coverage targets.

We disapproved past Council proposals for industry-funded monitoring because the proposals
either required NOAA's National Marine Fisheries Service (NMFS) to spend money that was not
yet appropriated or they tried to split monitoring costs between the industry and NMFS in ways
that were inconsistent with Federal law. This amendment remedies issues related to those
disapprovals by establishing a process through which we can: 1) Approve new monitoring
programs without committing funding that is not yet appropriated; and 2) allow the industry to pay
its monitoring costs to meet coverage targets in a manner consistent with Federal law.
Additionally, this amendment would establish a process to prioritize industry-funded monitoring
programs according to Council monitoring priorities.

Initially, this amendment was a joint effort between the New England and Mid-Atlantic Fishery
Management Councils to allow for industry-funded monitoring in all their managed fisheries. The
amendment included alternatives that would have modified all the FMPs managed by both
Councils to allow for the standardized development of future industry-funded monitoring

A45

_0000016992

programs. The amendment also included specific alternatives for industry-funded monitoring in the Atlantic Herring FMP and the Atlantic Mackerel, Squid, and Butterfish FMP. In April 2017, the Mid-Atlantic Council decided to postpone further action on the amendment, while the New England Council selected preferred alternatives and recommended the amendment be submitted to us for approval and implementation. Therefore, the joint omnibus amendment was refined to apply only to New England Council fisheries. At its October 2018 meeting, the Mid-Atlantic Council is scheduled to re-consider whether it wants to continue developing industry-funded monitoring measures for its FMPs. If the Mid-Atlantic Council decides to move ahead with this action, we expect it would complete the Mid-Atlantic version of the amendment sometime in 2019.

***Proposed Omnibus Measures***

The proposed omnibus measures would amend all New England Council FMPs to standardize the development and administration of future industry-funded monitoring programs.

The proposed omnibus measures include:
- A process for FMP-specific industry-funded monitoring to be implemented via amendment and revised via framework adjustment;
- Standard cost responsibilities for us and the fishing industry;
- Standard administrative requirements for industry-funded observers/monitors and monitoring service providers;
- A process to prioritize monitoring coverage that may be provided by available Federal funding across FMPs for new industry-funded monitoring programs; and
- A process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.

The existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs would not be included in the proposed process to prioritize industry-funded monitoring programs for available Federal funding. The New England Council may incorporate these existing industry-funded monitoring programs into the prioritization process in a future action. Future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the proposed omnibus measures.

***Proposed Atlantic Herring Measures***

The proposed Atlantic herring measures would implement an industry-funded monitoring program in the herring fishery. This rule proposes a 50-percent monitoring coverage target for vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permit. Fewer than 40 vessels have Category A or B herring permits, but those vessels typically catch over 95 percent of the herring harvest.

The proposed 50-percent coverage target includes a combination of SBRM and industry-funded monitoring coverage. Industry participants would pay for any additional monitoring coverage above SBRM to meet the 50-percent coverage target. The Council recommended this combined method to achieve the coverage target to help reduce monitoring costs for the fishing industry.

2

_0000016993

During 2016 and 2017, we conducted an electronic monitoring project aboard herring vessels using midwater trawl gear. The purpose of the project was to evaluate the feasibility of using electronic monitoring to verify catch retention and track discarded catch. In April 2018, the New England Council reviewed results from the electronic monitoring project and approved electronic monitoring, in combination with portside sampling, as a monitoring option for midwater trawl vessels to meet industry-funded monitoring requirements. But the Council did not recommend requiring electronic monitoring and portside sampling as part of this action; instead it recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. Additionally, the EFP would provide us with the flexibility to respond quickly to emerging issues, thus helping make the monitoring program more robust. Using the results of the EFP, the Council would consider establishing electronic monitoring and portside sampling requirements in regulation via a framework adjustment when it revisits industry-funded monitoring requirements two years after implementation.

Lastly, this rule maintains the existing requirement that any midwater trawl vessels fishing in the Groundfish Closed Areas must carry an observer, but it would allow vessels to purchase observer coverage to access Groundfish Closed Areas. Midwater trawl vessels are currently only able to fish in the Groundfish Closed Areas if they are carrying an observer to meet SBRM requirements.

### *Proposed Correction and Updates*

This rule also proposes a correction and updates under the authority of section 305(d) to the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), which provides that the Secretary of Commerce may promulgate regulations necessary to carry out an FMP or the Magnuson-Steven Act. The correction would remedy a typographical error in an existing regulation. The updates would revise existing regulations to ensure consistent notification requirements across the herring fishery and allow us to use catch data from both observers and monitors (i.e., at-sea monitors or portside samplers) to track catch against haddock catch caps in the herring fishery.

## CONTROVERSIALITY

This action is controversial. Development of this action has been contentious and has taken several years. Some participants in New England fisheries, including those in the Atlantic herring fishery, have expressed concern that they cannot afford industry-funded monitoring or that the Magnuson-Stevens Act does not authorize industry-funded monitoring. Environmental advocates (e.g., Pew Environment, Earth Justice, Herring Alliance) and individuals in other fisheries (e.g., groundfish, tuna, recreational) are adamant that the herring fishery, in particular the midwater trawl fleet, needs monitoring in addition to coverage required by the SBRM.

SBRM coverage on vessels participating in the herring fishery is variable. Coverage aboard midwater trawl vessels ranged from 40 percent to 5 percent from 2015 to 2017. The 50-percent industry-funded monitoring coverage target for vessels with Category A or B herring permits has the potential to reduce the uncertainty around catch estimates. Analysis in the environmental assessment supporting this action suggests a 50-percent coverage target would likely result in a coefficient of variation of less than 30 percent on catch tracked against fishery catch caps.

3

_0000016994

However, that same 50-percent coverage target has the potential to reduce annual returns-to-owner for vessels with Category A and B herring permits up to 20 percent for at-sea monitoring coverage and up to an additional 5 percent for access to Groundfish Closed Areas. The Council considered other coverage targets, including 100 percent, 75 percent, and 25 percent, but recommended the 50-percent coverage target to balance the benefit of increased monitoring with the cost of increased monitoring.

## RECOMMENDATIONS

I recommend that you sign the attached clearance memorandum to the NOAA General Counsel, and sign the attached clearance memorandum to the Chief Counsel for Regulation, Department of Commerce.

1. I concur _____ *Chris Oliver* _____ 9/19/18.

                                                                           Date

2. I do not concur _____.

                                                                             Date

Attachment

_0000016995

## DETERMINATIONS

### MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT (MAGNUSON-STEVENS ACT)

Pursuant to section 304 (b)(1)(A) of the Magnuson-Stevens Act, I have preliminarily determined that this proposed rule is consistent with the New England Industry-Funded Monitoring Amendment, other provisions of the Magnuson-Stevens Act, and other applicable law, subject to further consideration after public comment.

### NATIONAL ENVIRONMENTAL POLICY ACT

An environmental assessment (EA) has been prepared that describes the impact on the human environment that would result from implementation of this action. Based on the EA, and review of the NEPA criteria for significant events (40 CFR 1508.27), and NMFS criteria for significance evaluated above (NOA 216-6 Section 6.02), no significant effect on the quality of the human environment is anticipated from this action.

### COASTAL ZONE MANAGEMENT ACT (CZMA)

NMFS determined that this action is consistent to the maximum extent practicable with the enforceable policies of the approved coastal management programs of Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, and North Carolina. This determination was submitted on December 21, 2017, for review by the responsible state agencies under section 307 of the CZMA.

### REGULATORY FLEXIBILITY ACT (RFA)

An Initial Regulatory Flexibility Analysis (IRFA) was prepared, as required by section 603 of the RFA, as part of the regulatory impact review. The IRFA describes the impact this proposed rule, if adopted, would have on small entities. Each of the statutory requirements of section 603(b) and (c) has been addressed and is summarized in the Classification section of the attached proposed rule.

### PAPERWORK REDUCTION ACT (PRA)

This proposed rule contains a collection-of-information requirement subject to review and approval by the Office of Management and Budget (OMB) under the PRA. This requirement has been submitted to OMB for approval under Control Number 0648-0674.

### ESSENTIAL FISH HABITAT (EFH)

The area affected by the proposed action has been identified as EFH for species managed under the following FMPs: Northeast Multispecies; Monkfish; Atlantic Sea Scallop; Atlantic Mackerel, Squid, and Butterfish; Spiny Dogfish; Summer Flounder, Scup, and Black Sea Bass; Atlantic Bluefish; Surfclam and Ocean Quahog; Tilefish; and Atlantic Tunas, Swordfish, and Sharks. The

5

_0000016996

proposed action will not have an adverse impact on EFH; therefore, an EFH consultation is not required. The basis for this determination is described in a memorandum dated October 18, 2017.

ENDANGERED SPECIES ACT (ESA)

The batched fisheries Biological Opinion completed on December 16, 2013, concluded that the continued operation of several fisheries would not jeopardize the continued existence of any ESA-listed species and would not result in the destruction or adverse modification of designated critical habitat. On October 17, 2017, NMFS reinitiated consultation on the batched Biological Opinion due to updated information on the decline of North Atlantic right whale abundance. New information on all listed species will be incorporated into an updated batched Biological Opinion that will be used to evaluate the impact of these fisheries on listed species.

Section 7(d) of the ESA prohibits Federal agencies from making any irreversible or irretrievable commitment of resources with respect to the agency action that would have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives during the consultation period. Resource commitments may occur and non-jeopardizing activities may proceed as long as their implementation would not violate section 7(d) and would allow the action agency to retain sufficient discretion and flexibility to modify its action to allow formulation and implementation of an appropriate reasonable and prudent alternative.

This action does not represent any irreversible or irretrievable commitment of resources with respect to the FMP that would affect the development or implementation of reasonable and prudent measures during the consultation period. NMFS has discretion to amend its Magnuson-Stevens Act and ESA regulations, and may do so at any time subject to the Administrative Procedure Act and other applicable laws. As a result, I have determined preliminarily that fishing activities conducted pursuant to proposed rule is consistent with Section 7(d) of the ESA and will not affect endangered and threatened species or critical habitat in any manner beyond what has been considered in prior consultations on this fishery.

MARINE MAMMAL PROTECTION ACT (MMPA)

I have preliminarily determined that fishing activities conducted under this rule will have no adverse impact on marine mammals. This action would not result in any substantial change in fishing activity.

EXECUTIVE ORDER (E.O.) 12866

Pursuant to the procedures established to implement section 6 of E.O. 12866, OMB has determined that this proposed rule is not significant.

EXECUTIVE ORDER 13132

This proposed rule does not contain policies with federalism implications under E.O. 13132.

6

_0000016997

INFORMATION QUALITY ACT

Pursuant to section 515 of Public Law 106-554, this information product has undergone a pre-dissemination review by the Sustainable Fisheries Division, Greater Atlantic Regional Fisheries Office, completed on July 26, 2018. The signed Pre-dissemination Review and Documentation Form is on file in that Office, and a copy of the form is included with this package.

NATIONAL MARINE SANCTUARIES ACT (NMSA)

I have preliminarily determined that this action will not destroy, cause the loss of, or injure any sanctuary resource subject to consultation with the Secretary under the NMSA.

7

_0000016998

| Rule No. | Rule title | State effective date | EPA effective date | Final rule citation date | Comments |
|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| (32) XXXII ........... | Wyoming State Implementation Plan 5-Year Progress Report for Regional Haze, Appendix B: Alternative to BART for $NO_X$ and PM for PacifiCorp Naughton Unit 3. | November 28, 2017. | December 7, 2018. | [Federal Register citation], November 7, 2018. | Only includes Appendix B: Alternative to BART for $NO_X$ and PM for PacifiCorp Naughton Unit 3. |

■ 3. Section 52.2636 is amended by revising paragraph (a)(1)(vii) and amending paragraph (c)(1) by revising Table 1 to § 52.2636 to read as follows:

**§ 52.2636   Implementation plan for regional haze.**

(a) * * *

(1) * * *

(vii) PacifiCorp Naughton Power Plant Units 1 and 2 (PM and $NO_X$); and

* * * * *

(c) * * *

(1) * * *

TABLE 1 TO § 52.2636

[Emission limits for BART units for which EPA approved the State's BART and Reasonable Progress determinations]

| Source name/BART unit | PM emission limits—lb/MMBtu | $NO_X$ emission limits—lb/MMBtu (30-day rolling average) |
|---|---|---|
| FMC Westvaco Trona Plant/Unit NS–1A | 0.05 | 0.35 |
| FMC Westvaco Trona Plant/Unit NS–1B | 0.05 | 0.35 |
| TATA Chemicals Partners (General Chemical) Green River Trona Plant/Boiler C | 0.09 | 0.28 |
| TATA Chemicals Partners (General Chemical) Green River Trona Plant/Boiler D | 0.09 | 0.28 |
| Basin Electric Power Cooperative Laramie River Station/Unit 1 | 0.03 | N/A |
| Basin Electric Power Cooperative Laramie River Station/Unit 2 | 0.03 | N/A |
| Basin Electric Power Cooperative Laramie River Station/Unit 3 | 0.03 | N/A |
| PacifiCorp Dave Johnston Power Plant/Unit 3 | 0.015 | N/A |
| PacifiCorp Dave Johnston Power Plant/Unit 4 | 0.015 | 0.15 |
| PacifiCorp Jim Bridger Power Plant/Unit 1 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 2 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 3 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 4 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Naughton Power Plant/Unit 1 | 0.04 | 0.26 |
| PacifiCorp Naughton Power Plant/Unit 2 | 0.04 | 0.26 |
| PacifiCorp Wyodak Power Plant/Unit 1 | 0.015 | N/A |

[1] The owners and operators of PacifiCorp Jim Bridger Units 1, 2, 3, and 4 shall comply with the $NO_X$ emission limit for BART of 0.26 lb/MMBtu and PM emission limit for BART of 0.03 lb/MMBtu and other requirements of this section by March 4, 2019. The owners and operators of PacifiCorp Jim Bridger Units 1, 2, 3 and 4 shall comply with the $NO_X$ emission limit for reasonable progress of 0.07 lb/MMBtu by: December 31, 2022, for Unit 1, December 31, 2021, for Unit 2, December 31, 2015, for Unit 3, and December 31, 2016, for Unit 4.

* * * * *

[FR Doc. 2018–24372 Filed 11–6–18; 8:45 am]

**BILLING CODE 6560–50–P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 648**

[Docket No. 170831847–8853–01]

**RIN 0648–BG91**

**Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Proposed rule, request for comments.

**SUMMARY:** This action proposes regulations to implement the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment. The New England Council is considering ways to increase monitoring in certain fisheries to assess the amount and type of catch and reduce uncertainty around catch estimates. This amendment would implement a process to standardize future industry-funded monitoring programs in New England Council fishery management plans and industry-funded monitoring in the Atlantic herring fishery. This action would ensure consistency in industry-funded monitoring programs across fisheries and increase monitoring in the Atlantic herring fishery.

**DATES:** Public comments must be received by December 24, 2018.

**ADDRESSES:** You may submit comments, identified by NOAA–NMFS–2018–0109, by either of the following methods:

• *Electronic Submission:* Submit all electronic public comments via the Federal eRulemaking Portal.

1. Go to *www.regulations.gov/ #!docketDetail;D=NOAA-NMFS-2018-0109;*

2. Click the "Comment Now!" icon and complete the required fields; and

3. Enter or attach your comments.

• *Mail:* Submit written comments to Michael Pentony, Regional Administrator, National Marine Fisheries Service, 55 Great Republic Drive, Gloucester, MA 01930. Mark the outside of the envelope, "Comments on

_0000016969

the Proposed Rule for the Industry-Funded Monitoring Amendment.''

*Instructions:* Comments sent by any other method, to any other address or individual, or received after the end of the comment period, may not be considered by us. All comments received are a part of the public record and will generally be posted for public viewing on *www.regulations.gov* without change. All personal identifying information (*e.g.,* name, address, etc.), confidential business information, or otherwise sensitive information submitted voluntarily by the sender will be publicly accessible. We will accept anonymous comments (enter ''N/A'' in the required fields if you wish to remain anonymous).

Copies of the Industry-Funded Monitoring Omnibus Amendment, including the Environmental Assessment, the Regulatory Impact Review, and the Initial Regulatory Flexibility Analysis (EA/RIR/IRFA) prepared in support of this action are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http://www.nefmc.org.*

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this proposed rule may be submitted to the Greater Atlantic Regional Fisheries Office and by email to *OIRA_Submission@omb.eop.gov* or fax to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:**
Carrie Nordeen, Fishery Policy Analyst, phone: (978) 282–9272 or email: *Carrie.Nordeen@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

In 2013, the Mid-Atlantic and New England Fishery Management Councils initiated a joint omnibus amendment to allow industry-funded monitoring in all of the fishery management plans (FMP) that the Councils manage. The joint amendment would provide a mechanism to support industry-funded monitoring and remedy issues that prevented NMFS from approving some of the Councils' previous industry-funded monitoring proposals. The industry-funded monitoring would be in addition to monitoring requirements associated with the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), and the Marine Mammal Protection Act (MMPA). The Councils were interested in increasing monitoring

in certain FMPs to assess the amount and type of catch and to reduce uncertainty around catch estimates. Previous Council proposals for industry-funded monitoring either required NMFS to spend money that was not yet appropriated or split monitoring costs between the fishing industry and NMFS in ways that were inconsistent with Federal law.

In their development of the joint amendment, the Councils needed to remedy disapproved monitoring measures in Amendment 5 to the Atlantic Herring FMP (Amendment 5) (79 FR 8786, February 13, 2014) and Amendment 14 to the Atlantic Mackerel, Squid, and Butterfish FMP (Amendment 14) (79 FR 10029, February 24, 2014). Those measures recommended 100-percent observer coverage for the herring and mackerel fisheries and that NMFS would fund the increased monitoring along with a contribution by the fishing industry. Because NMFS's spending is limited by its Congressional appropriations, NMFS could not approve the Councils' recommendation because it could not guarantee that it would have sufficient funds to pay for the required increase in monitoring. Amendments 5 and 14 also recommended that the fishing industry contribution for industry-funded monitoring would be no more than $325 per day. Similarly, Framework 48 to the Northeast Multispecies FMP (78 FR 53363, August 29, 2013) recommended limiting the types of costs that industry would be responsible for paying in an industry-funded program, such that the industry would only have to pay for observer salaries. NMFS disapproved these proposals because they proposed the industry share monitoring costs with the government in ways that were inconsistent with Federal law.

To remedy the disapproved measures, the joint amendment would use a monitoring coverage target, as opposed to a mandatory coverage level, to allow NMFS to approve new monitoring programs without committing to support coverage levels above appropriated funding or before funding is determined to be available. Using a coverage target instead of mandatory coverage level means the realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year. Industry-funded monitoring coverage targets would be specified in individual FMPs and realized coverage for a fishery in a given year would be anywhere from no additional coverage above SBRM up to the specified coverage target. Additionally, the joint amendment

would define cost responsibilities for industry-funded monitoring programs between the fishing industry and NMFS in a manner that is consistent with legal requirements. Monitoring cost responsibilities may be divided between the industry and the government, provided government cost responsibilities are paid by the government and the government's costs are differentiated from the industry's cost responsibilities. Currently, that cost delineation is between administrative and sampling costs. The joint omnibus amendment would use that delineation to define cost responsibilities for future industry-funded monitoring programs.

The omnibus alternatives in the joint amendment, meaning those alternatives that would apply to all Council FMPs, considered measures to standardize the development and administration of future industry-funded monitoring programs. The joint amendment also included industry-funded monitoring coverage targets for the herring and mackerel fisheries. Information from industry-funded monitoring would primarily be used to help track catch (retained and discarded) against catch limits. The industry-funded monitoring types considered in the joint amendment for the herring and mackerel fisheries included observers, at-sea monitors, electronic monitoring, and portside sampling. To help the Councils evaluate the utility of electronic monitoring to verify catch retention and track discarded catch, NMFS conducted a voluntary electronic monitoring study in 2016 and 2017 with midwater trawl vessels that participate in the herring and mackerel fisheries.

At its April 2017 meeting, the Mid-Atlantic Council decided to postpone action on the joint amendment until the midwater trawl electronic monitoring study was completed. The Mid-Atlantic Council's decision was based, in part, on its desire to have more information on the use of electronic monitoring to track catch against catch limits and the monitoring costs associated with electronic monitoring that would be borne by the mackerel industry. The Mid-Atlantic Council is expected to re-consider whether it wants to continue developing industry-funded monitoring measures for its FMPs at its October 2018 meeting. The New England Council selected preferred omnibus and herring coverage target alternatives at its April 2017 meeting, and recommended NMFS consider the amendment for approval and implementation. Therefore, the joint amendment initiated by both Councils to allow for industry-funded monitoring has become the New England Industry-Funded

Monitoring Omnibus Amendment and the proposed measures would only apply to FMPs that the New England Council manages.

The midwater electronic monitoring study concluded in January 2018. NMFS, New England Council, and Mid-Atlantic Council staff reviewed the study's final report in March 2018 and concluded that electronic monitoring was suitable for detecting discarding events aboard midwater trawl vessels. The study also evaluated costs associated with using EM in the herring fishery, especially the sampling costs that would be paid by the fishing industry. Based on the study, NMFS estimated the industry's costs for EM at approximately $296 per coverage day, not including the initial costs of purchasing and installing equipment. The EA for the amendment estimated the industry's annual costs for portside sampling at $96,000 for the midwater trawl fleet and $8,700 per vessel. Therefore, NMFS estimated the industry's costs for using electronic monitoring and portside sampling would be approximately $515 per coverage day.

A Notice of Availability (NOA) for the New England Industry-Funded Omnibus Amendment was published in the **Federal Register** on September 19, 2018 (83 FR47326). The comment period for the NOA ends on November 19, 2018. Comments submitted on the NOA and/or this proposed rule prior to November 19, 2018, will be considered in our decision to approve, partially approve, or disapprove the Industry-Funded Monitoring Omnibus Amendment. We will consider comments received by the end of the comment period for this proposed rule December 24, 2018 in our decision to implement measures proposed by the Council.

**Proposed Omnibus Measures**

This amendment would standardize the development and administration of future industry-funded monitoring programs for New England Council FMPs only. However, only the Atlantic Herring FMP would be subject to an industry-funded monitoring program resulting from this amendment. In the future, if the New England Council develops an industry-funded monitoring program, the New England Council would develop those programs consistent with the specifications and requirements for industry-funded programs established in this amendment. The existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs would not be affected by

this amendment. While proposed cost responsibilities and monitoring service provider requirements are consistent with the existing programs, the industry-funded monitoring programs in the Multispecies and Scallop FMPS would not be included in the proposed process to prioritize industry-funded monitoring programs for available Federal funding. The New England Council may incorporate these existing industry-funded monitoring programs into the prioritization process in a future action. Additionally, future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the proposed omnibus measures.

As described previously, NMFS cannot approve and implement monitoring requirements for which it does not have available Federal funding to cover NMFS cost responsibilities. For that reason, this amendment proposes establishing industry-funded monitoring coverage targets in New England FMP with the understanding that annual funding available to cover NMFS cost responsibilities would likely vary and dictate realized coverage levels. The realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

The standardized structure for future industry-funded monitoring programs in New England fisheries would apply to several types of monitoring, including observing, at-sea monitoring, electronic monitoring, portside sampling, and dockside monitoring. This rule proposes the following principles to guide the selection and implementation of future industry-funded monitoring programs. The Council's development of an industry-funded monitoring program must consider or include the following:

• A clear need or reason for the data collection;
• Objective design criteria;
• Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;
• Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;
• Prioritize the use of modern technology to the extent practicable; and
• Incentives for reliable self-reporting.

All proposed omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-

aside programs, and do not directly affect fishing effort or amounts of fish harvested. However, the proposed omnibus measures may have indirect effects on New England FMPs. Standardizing the process for developing and administering future industry-funded monitoring programs may help reduce the administrative burden associated with implementing new programs and may lead to greater consistency in the information collected through industry-funded monitoring programs. Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources. The prioritization process may help ensure that available Federal funding is used to support industry-funded monitoring programs consistent with Council monitoring priorities. While industry-funded monitoring programs are expected to have an economic impact on the fishing industry, standard cost responsibilities may help the industry better understand and plan for their industry-funded monitoring cost responsibilities. Standard cost responsibilities may also aid the industry in negotiating coverage costs with service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Lastly, monitoring set-aside programs may help minimize the economic burden on the fishing industry associated with paying for monitoring coverage.

*1. Standard Process To Implement and Revise Industry-Funded Monitoring Programs*

This amendment would specify that future industry-funded monitoring programs would be implemented through an amendment to the relevant FMP. Because industry-funded monitoring programs have the potential to economically impact the fishing industry, the Council determined that implementing new industry-funded monitoring programs through an amendment would help ensure additional public notice and comment during the development of new programs. The details of any new industry-funded monitoring program implemented via amendment may include, but are not limited to:

• Level and type of coverage target;
• Rationale for level and type of coverage;
• Minimum level of coverage necessary to meet coverage goals;
• Consideration of waivers if coverage targets cannot be met;
• Process for vessel notification and selection;

_0000016971

- Cost collection and administration;
- Standards for monitoring service providers; and
- Any other measures necessary to implement the industry-funded monitoring program.

This amendment would also specify that future industry-funded monitoring programs, implemented through an amendment, may be revised through framework adjustments to the relevant FMP. Additional National Environmental Policy Act (NEPA) analysis would be required for any action implementing and/or modifying industry-funded monitoring programs, regardless if the vehicle is an amendment or framework adjustment.

*2. Standard Cost Responsibilities*

Cost responsibilities for industry-funded monitoring must be divided by cost category, rather than a dollar amount or percentage of total cost, between the fishing industry and NMFS. NMFS is obligated to pay any cost for which the benefit of the expenditure accrues to the government. This means that NMFS would be responsible for administrative costs to support industry-funded programs, but not the costs associated with sampling activities. Costs associated with sampling activities would be paid by the fishing industry. NMFS may help offset industry cost responsibilities through reimbursement if Federal funding is available, but NMFS cannot be obligated to pay sampling costs in industry-funded sampling programs. Cost responsibilities dictated by legal requirements cannot be modified through this amendment. Instead, this amendment would codify NMFS cost responsibilities for industry-funded monitoring in New England FMPs to ensure consistency and compliance with legal requirements.

NMFS would be responsible for paying costs associated with setting standards for, monitoring the performance of, and administering, industry-funded monitoring programs. These program elements would include:
- The labor and facilities costs associated with training and debriefing of monitors;
- NMFS-issued gear (*e.g.*, electronic reporting aids used by human monitors to record trip information);
- Certification of monitoring providers and individual observers or monitors;
- Performance monitoring to maintain certificates;
- Developing and executing vessel selection;
- Data processing (including electronic monitoring video audit, but

excluding service provider electronic video review); and
- Costs associated with liaison activities between service providers, NMFS, Coast Guard, Council, sector managers, and other partners.

NMFS's costs to administer industry-funded monitoring for all monitoring types would be paid with Federal funds. The industry would be responsible for funding all other costs of the monitoring program, those costs would include, but are not limited to:
- Costs to the service provider for deployments and sampling (*e.g.*, travel and salary for observer deployments and debriefing);
- Equipment, as specified by NMFS, to the extent not provided by NMFS (*e.g.*, electronic monitoring system);
- Costs to the service provider for observer or monitor time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time;
- Costs to the service provider for installation and maintenance of electronic monitoring systems;
- Provider overhead and project management costs (*e.g.*, provider office space, administrative and management staff, recruitment costs, salary and per diem for trainees); and
- Other costs of the service provider to meet performance standards laid out by a FMP.

The cost responsibilities described above are consistent with the existing scallop and multispecies industry-funded monitoring programs, although cost responsibilities are not explicitly defined in those FMPs. This amendment would codify NMFS cost responsibilities for industry-funded monitoring for all New England FMPs, but it would not alter current requirements for existing industry-funded monitoring programs.

*3. Standard Requirements for Monitoring Service Providers and Observers/Monitors*

The SBRM Omnibus Amendment adopted general industry-funded observer service provider and observer requirements (at 50 CFR 648.11(h) and (i), respectively) should a Council develop and implement a requirement or option for an industry-funded observer program to support SBRM in any New England or Mid-Atlantic Council FMP. However, the SBRM Amendment did not address requirements for other types of industry-funded monitoring programs or coverage in addition to SBRM.

This action would modify existing observer and service provider requirements to apply more broadly to

monitoring by observers, at-sea monitors, portside samplers, and dockside monitors. Additionally, this amendment would apply those requirements to supplementing coverage required by SBRM, ESA, and MMPA. This rule proposes to expand and modify existing observer service provider requirements at § 648.11(h) to apply to service providers for observers, at-sea monitors, portside samplers, and dockside monitors. Similarly, this rule proposes to expand and modify existing observer requirements at § 648.11(i) to apply to observers, at-sea monitors, portside samplers, and dockside monitors, described collectively as observers/monitors. These observer/monitor requirements would serve as the default requirements for any future industry-funded monitoring programs in New England Council FMPs. The Council may specify new requirements or revise existing requirements for FMP-specific industry-funded monitoring programs, as part of the amendment developing those programs or the framework adjustment revising those programs.

*4. Prioritization Process*

This amendment would establish a Council-led process to prioritize industry-funded monitoring programs for available Federal funding across New England Council FMPs. This prioritization process would allow the Council discretion to align Council monitoring priorities with available funding to pay NMFS cost responsibilities associated with industry-funded monitoring. Revising the prioritization process would be done in a framework adjustment. The existing scallop and multispecies industry-funded monitoring programs would not be included in the proposed prioritization process, unless the New England Council takes action in the future to include those programs in the prioritization process or develops new industry-funded monitoring programs within those FMPs consistent with this amendment.

Available Federal funding refers to any funds in excess of those allocated to meet SBRM or other existing monitoring requirements that may be used to cover the government's costs associated with supporting industry-funded monitoring programs. Funding for SBRM, ESA, and MMPA observer coverage would not be affected by this prioritization process. Any industry-funded monitoring programs would be prioritized separately from and in addition to any SBRM coverage or other statutory coverage requirements. The realized industry-funded monitoring coverage in

A55

a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

When there is no Federal funding available to cover NMFS cost responsibilities above SBRM coverage in a given year, then no industry-funded monitoring programs would operate that year. If available funding in a given year is sufficient to support all industry-funded monitoring programs, the prioritization process would fully operationalize the industry-funded monitoring coverage targets specified in each FMP. If there is some available funding, but not enough to support all industry-funded monitoring programs, the Council would determine how to prioritize industry-funded monitoring coverage targets for available funding across FMPs.

As part of the Council-led prioritization process, this amendment would establish an equal weighting approach to prioritize industry-funded monitoring programs for available funding. An example of an equal weighting approach would be funding all industry-funded monitoring programs at 70 percent, if only 70 percent of the Federal funding needed to administer all the programs was available. Additionally, this rule proposes that the Council would adjust the equal weighting approach on an as-needed basis. This means that the equal weighting approach would be adjusted whenever a new industry-funded monitoring program is approved or whenever an existing industry-funded monitoring program is adjusted or terminated. The Council would review the weighting approach for the Council-led prioritization process in a framework adjustment or by considering a new weighting approach at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the weighting approach, consistent with the Administrative Procedure Act (APA).

The SBRM coverage year begins in April and extends through March. SBRM coverage levels in a given year are determined by the variability of discard rates from the previous year and the availability of SBRM funding. During the spring, NMFS determines SBRM coverage for the upcoming year. Once NMFS finalizes SBRM coverage levels for the upcoming year, NMFS would then evaluate what Federal funding was available to cover its costs for meeting the industry-funded monitoring coverage targets for the next year. For example, once NMFS determines SBRM coverage for 2018, it would then evaluate what amount of

government coverage costs could be covered by available Federal funding to meet industry-funded monitoring coverage targets for 2019. NMFS would provide the Council, at the earliest practicable opportunity: (1) The estimated industry-funded monitoring coverage levels, incorporating the prioritization process and weighting approach and based on available funding, for each FMP-specific monitoring program; and (2) the rationale for the industry-funded monitoring coverage levels, including the reason for any deviation from the Council's recommendations. NMFS would inform the Council of the estimated industry-funded coverage levels during a Council meeting. At that time, the Council may recommend revisions and additional considerations by the Regional Administrator and Science and Research Director. If NMFS costs associated with industry-funded coverage targets are fully funded in a given year, NMFS would also determine, in consultation with the Council, the allocation, if any, of any remaining available funding to offset industry costs. The earlier in the year that industry-funded monitoring coverage targets are set for the following year, the more time the affected fishing industry would have to plan for industry-funded monitoring the following year. FMP-specific industry-funded monitoring programs would determine if industry-funded coverage targets were administered consistent with the FMP's fishing year or the SBRM year.

### 5. Monitoring Set-Aside Programs

This amendment would standardize the process to develop future monitoring set-aside programs and would allow monitoring set-aside programs to be developed in a framework adjustment to the relevant FMP. A monitoring set-aside program would use a portion of the annual catch limit (ACL) from a fishery to help offset industry cost responsibilities associated with industry-funded monitoring coverage targets. There are many possible ways to structure a monitoring set-aside program, and the details of each program would be developed on an FMP-by-FMP basis. Monitoring set-aside programs are an option to help ease industry cost responsibilities associated with industry-funded monitoring, but they likely would only help offset a portion of the industry's cost responsibilities.

The details of monitoring set-aside programs may include, but are not limited to:

• The basis for the monitoring set-aside;
• The amount of the set-aside (*e.g.,* percentage of ACL, days-at-sea (DAS));
• How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* increased possession limit, differential DAS counting, additional trips against a percent of the ACL);
• The process for vessel notification;
• How funds are collected and administered to cover the industry's costs of monitoring coverage; and
• Any other measures necessary to develop and implement a monitoring set-aside.

**Proposed Atlantic Herring Measures**

This amendment would establish an industry-funded monitoring program in the Atlantic herring fishery that is expected to provide increased accuracy in catch estimates. Increased monitoring in the herring fishery would address the following goals: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and (3) affordable monitoring for the herring fishery.

This amendment would establish a 50-percent industry-funded monitoring coverage target on vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permits fishing on a declared herring trip. The Council considered other coverage targets, including 100-percent, 75-percent, and 25-percent, but the 50-percent coverage target balanced the benefits and costs of additional monitoring. When tracking catch against catch caps in the herring fishery, analyses in the EA supporting this amendment suggest that a 50-percent coverage target would greatly reduce the uncertainty around catch estimates, and likely result in a coefficient of variation less than 30 percent almost all of the time. Additionally, the industry's cost responsibilities associated with a 50-percent coverage target are substantially less than those associated with higher coverage targets. Vessels participating in the herring fishery also participate in the Atlantic mackerel fishery. Currently, the mackerel fishery does not have an industry-funded monitoring program. If the Mid-Atlantic Council develops industry-funded monitoring in the mackerel fishery and the industry-funded coverage targets do not match for the herring and mackerel fisheries, then the higher coverage target would apply on all trips declared into the fishery with the higher coverage target.

Herring coverage targets would be calculated for the herring fishing year, January through December, by

**55670** **Federal Register** / Vol. 83, No. 216 / Wednesday, November 7, 2018 / Proposed Rules

combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. For example, if there is 10-percent SBRM coverage in a given year, then 40-percent industry-funded monitoring coverage would be needed to achieve the 50-percent coverage target. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. Any vessel selected for SBRM coverage on a particular trip would not have the option of industry-funded monitoring on that trip. Per the prioritization process in the proposed omnibus measures, the realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the herring fishery in a given year would fall somewhere between no additional coverage in addition to SBRM and the specified coverage target. Combined coverage targets are intended to help reduce the cost of industry-funded coverage, but the level of SBRM coverage in the herring fishery varies by gear type and has the potential to vary year to year. The variability of SBRM coverage has the potential to make it difficult for the herring industry to plan for industry-funded monitoring year to year.

In addition to the proposed standard monitoring and service provider requirements in the proposed omnibus measures, this amendment would specify that requirements for industry-funded observers and at-sea monitors in the herring fishery include a high volume fishery (HVF) certification. Currently, NMFS's Northeast Fisheries Observer Program (NEFOP) observers must possess a HVF certification in order to observe the herring fishery. NMFS developed the HVF certification to more effectively train observers in high volume catch sampling and documentation. NEFOP determined that data quality on herring trips was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices and fast-paced operations proved more demanding for observers. Having additional training to identify these practices improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Additionally, this amendment would require the Council to examine the results of any increased coverage in the herring fishery two years after implementation of this amendment, and consider if adjustments to the coverage targets are warranted. Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via a framework adjustment or an amendment to the Herring FMP, as appropriate. Measures implemented in this amendment would remain in place unless revised by the Council.

### 1. Industry-Funded At-Sea Monitoring Coverage on Vessels Issued Category A or B Herring Permits

This rule proposes that vessels issued Category A or B herring permits would carry an industry-funded at-sea monitor on declared herring trips that are selected for coverage by NMFS, unless NMFS issues the vessel a waiver for coverage on that trip. Vessels would be selected for coverage by NMFS to meet the 50-percent coverage target. Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits would be required to notify NMFS for monitoring coverage. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether an at-sea monitor must be procured through a monitoring service provider. Because the 50-percent coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer on the same trip that would carry an at-sea monitor. If NMFS informs the vessel representative that they need at-sea monitoring coverage, they would then be required to obtain and pay for an at-sea monitor to carry on that trip. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on that trip. If NMFS informs the vessel representative that the vessel is not selected for at-sea monitoring coverage, NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip.

This rule proposes three reasons for issuing vessels waivers from industry-funded monitoring requirements on a trip-by-trip basis. First, if an at-sea monitor was not available to cover a specific herring trip (either due to logistics or a lack of available Federal funding to cover NMFS cost responsibilities), NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip. Second, if a vessel using midwater trawl gear intended to operate as a wing vessel on a trip, meaning that it would pair trawl with another midwater trawl vessel but

would not pump or carry any fish onboard, then that vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the wing vessel trip, and NMFS would issue a waiver for industry-funded monitoring requirements on that trip. Wing vessels would be prohibited from carrying fish onboard during these trips. If a wing vessel did carry fish, the vessel would be out of compliance with industry-funded monitoring requirements on that trip. Third, if a vessel intended to land less than 50 metric tons (mt) of herring on a trip, then the vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the trip on which they intend to land less than 50 mt of herring, and NMFS would issue a waiver for industry-funded monitoring requirements on that trip. Vessels would be prohibited from landing 50 mt or more of herring on these trips. If the vessel landed 50 mt or more of herring, the vessel would be out of compliance with industry-funded monitoring requirements on that trip.

At-sea monitors would collect the following information on herring trips:
• Fishing gear information (i.e., size of nets, mesh sizes, and gear configurations);
• Tow-specific information (i.e., depth, water temperature, wave height, and location and time when fishing begins and ends);
• Species, weight, and disposition of all retained and discarded catch on observed hauls;
• Species, weight, and disposition of all retained catch on unobserved hauls;
• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
• Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;
• Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
• Vessel trip costs (i.e., operational costs for trips including food, fuel, oil, and ice).

The primary biological data that at-sea monitors would collect are length data on retained and discarded catch. However, to verify species identification, at-sea monitors may also collect whole specimens or photos. In the future, the Council may recommend that at-sea monitors collect additional biological information upon request. Revising what information an at-sea monitor collects could be done in a framework adjustment. Alternatively,

_0000016794

the Council may recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors, consistent with the APA.

In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection.

Currently, vessels issued Category A or B herring permits are required to comply with all slippage restrictions, slippage reporting requirements, and slippage consequence measures when carrying an observer for SBRM coverage (§ 648.11(m)(4)). Because the purpose of slippage restrictions is to help ensure catch is made available for sampling, this rule proposes that existing slippage requirements would also apply when vessels are carrying an industry-funded at-sea monitor. Specifically, when vessels issued Category A or B herring permits are carrying either an SBRM observer or industry-funded at-sea monitor, vessels would be required to bring catch aboard the vessel and make it available for sampling prior to discarding. If vessels slipped catch for any reason, they would be required to report that slippage event on the daily vessel monitoring catch report and complete a slipped catch affidavit. If vessels slip catch due to excess catch of spiny dogfish, mechanical failure, or safety, then vessels would be required to move 15 nautical miles (27.78 km) following that slippage event and remain 15 nautical miles (27.78 km) away from that slippage event before making another haul and for the duration of that fishing trip. If vessels slip catch for any other reason, they would be required to terminate that fishing trip and immediately return to port.

Industry-funded monitoring would have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery. The EA estimated the industry's cost responsibility associated with carrying an at-sea monitor at $710 per day. The EA uses returns-to-owner (RTO) to estimate the potential reduction in annual RTO associated with paying for monitoring coverage. RTO was calculated by subtracting annual

operating costs from annual gross revenue and was used instead of net revenues to more accurately reflect fishing income. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of the proposed at-sea monitoring coverage may reduce the annual RTO for vessels with Category A or B herring permits up to approximately 20 percent. Waiving at-sea monitoring coverage requirements for wing vessel trips or trips that land less than 50 mt of herring would help reduce the cost of at-sea monitoring coverage on those trips, but those waivers are not an option for all vessels.

### 2. Industry-Funded Observer Coverage on Midwater Trawl Vessels Fishing in Groundfish Closed Areas

Midwater trawl vessels fishing in the Groundfish Closed Areas are required to carry an observer by measures at § 648.202(b). When Amendment 5 established that requirement, the Groundfish Closed Areas included Closed Area I, Closed Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Currently, the only mechanism for midwater trawl vessels to carry an observer is if an observer is assigned through the SBRM. As described previously, SBRM coverage for midwater trawl vessels has recently been variable (approximately 4 percent to 40 percent from 2015 through 2017). This rule would maintain the requirement to carry an observer for midwater trawl vessels fishing in a Groundfish Closed Area, but it proposes that midwater trawl vessels would be able to purchase observer coverage in order to access Groundfish Closed Areas.

Prior to any trip declared into a Groundfish Closed Area, representatives for midwater trawl vessels would be required to provide notice to NMFS for monitoring coverage. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative that an observer may be procured through a monitoring service provider. The vessel would be prohibited from fishing in the Groundfish Closed Areas without carrying an observer. Observers would collect the following information on midwater trawl trips:

• Fishing gear information (*i.e.*, size of nets, mesh sizes, and gear configurations);
• Tow-specific information (*i.e.*, depth, water temperature, wave height,

and location and time when fishing begins and ends);
• Species, weight, and disposition of all retained and discarded catch on observed hauls;
• Species, weight, and disposition of all retained catch on unobserved hauls;
• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
• Whole specimens, photos, length information, and biological samples (*i.e.*, scales, otoliths, and/or vertebrae);
• Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
• Vessel trip costs (*i.e.*, operational costs for trip including food, fuel, oil, and ice).

The proposed measure to allow midwater trawl vessels to purchase observer coverage to access Groundfish Closed Areas would also have economic impacts on vessels participating in the herring fishery. The EA estimated the industry's cost responsibility associated with carrying an observer at $818 per day. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of observer coverage may reduce the annual RTO for midwater trawl vessels up to 5 percent. That 5 percent reduction in RTO would be in additional to any reduction in RTO due to other types of industry-funded monitoring coverage. Coverage waivers are not an option to reduce the cost of observer coverage because coverage waivers do not apply on midwater trawl vessels fishing in the Groundfish Closed Areas.

If the Groundfish Closed Areas are modified, eliminated, or added in the future, existing observer coverage requirements for midwater trawl vessels would apply to the modified areas. Anticipating changes to the Groundfish Closed Areas in the Omnibus Essential Fish Habitat Amendment 2 (Habitat Amendment), the Industry-Funded Monitoring Amendment Development Team/Fishery Management Action Team (PDT/FMAT) recommended the Council clarify its intent regarding the requirement that midwater trawl vessels fishing in Groundfish Closed Areas must carry an observer. In a March 17, 2017, memorandum, the PDT/FMAT noted that the Habitat Amendment proposed changes to Groundfish Closed Areas, such as eliminating areas, boundary changes, and seasonality. That same memorandum proposed the Council clarify that this amendment maintains the 100-percent observer coverage requirement on midwater trawl

_0000016975

vessels fishing in Groundfish Closed Areas, as modified by the Habitat Amendment. The Council accepted the FM PDT/FMAT's proposed clarification when it took final action on this amendment in April 2017.

In January 2018, NMFS partially approved the Habitat Amendment, including changes to Closed Area I, Nantucket Lightship Closed Area, and the Western Gulf of Maine Closure Area. Consistent with Council intent regarding observer coverage, the final rule for the Habitat Amendment (83 FR 15240, April 9, 2018) maintained the 100-percent observer requirement for midwater trawl vessels fishing in Closed Area I North (February 1–April 15), Closed Area II, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Because the Habitat Amendment removed the Nantucket Lightship Closed Area from the list of Groundfish Closed Areas, the 100-percent observer coverage requirement no longer applies to midwater trawl vessels fishing in the area previously known as the Nantucket Lightship Closed Area.

Recognizing that it recommended multiple industry-funded monitoring types, including at-sea monitoring coverage and observer coverage in Groundfish Closed Areas, for the herring fishery, the Council also recommended prioritizing coverage aboard Category A and B vessels because those vessels harvest the majority of the herring. Consistent with that recommendation, if available Federal funding is insufficient to cover NMFS cost responsibilities associated with administering multiple monitoring programs for the herring fishery, this rule proposes prioritizing industry-funded monitoring coverage on Category A and B vessels before supporting observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas.

### Atlantic Herring Exempted Fishing Permit

On April 19, 2018, the New England Council considered whether electronic monitoring in conjunction with portside sampling, would be an adequate substitute for at-sea monitoring coverage aboard midwater trawl vessels. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to address monitoring goals for the herring fishery. The purpose of electronic monitoring would be to confirm catch retention and verify compliance with slippage restrictions, while the purpose of portside sampling would be to collect species composition

data along with age and length information. After reviewing the midwater trawl electronic monitoring study, the Council approved electronic monitoring and portside sampling as a monitoring option for midwater trawl vessels, but did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program.

The EFP would exempt midwater vessels from the proposed requirement for industry-funded at-sea monitoring coverage and would allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent industry-funded monitoring coverage target. The recent midwater trawl electronic monitoring study provides a good foundation for an electronic monitoring program. However, using an EFP would provide NMFS with further information about how to most effectively and efficiently administer the electronic monitoring and portside sampling program, while allowing NMFS the flexibility to respond quickly to emerging issues, helping to make the monitoring program more robust. An EFP would also enable NMFS to evaluate other monitoring issues in the herring fishery that are of interest to the Council and herring industry. Lastly, NMFS could use an EFP to evaluate the utility of electronic monitoring and portside sampling when midwater trawl vessels switch to purse seining and/or fish in Groundfish Closed Areas.

The EFP would be developed concurrently with rulemaking for this amendment. If the proposed herring measures are approved, then midwater trawl vessels issued EFPs would be allowed to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent industry-funded monitoring coverage target. The Council recommended reconsidering herring industry-funded monitoring requirements two years after implementation. The Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

### Proposed Corrections and Clarification

NMFS proposes the following corrections and updates under the authority of section 305(d) to the Magnuson-Stevens Fishery

Conservation and Management Act (Magnuson-Stevens Act), which provides that the Secretary of Commerce may promulgate regulations necessary to carry out a FMP or the Magnuson-Stevens Act.

First, this rule proposes correcting the typographic error in § 648.7(b)(2)(i). This correction would correct ''opn 9access'' to ''open access'' and is necessary to clarify the intent of the regulation.

Second, this rule proposes updating outdated requirements for vessels operating under the midwater trawl and purse seine exempted fisheries. Regulations at § 648.80(d)(5) and (e)(5) require vessels to notify NMFS 72 hours in advance of a fishing trip to coordinate observer deployment. Amendment 5 replaced the 72-hour notification requirement with a 48-hour notification requirement to allow herring vessels more flexibility in their trip planning and scheduling. The 72-hour notification requirements for herring vessels in § 648.80 were overlooked in Amendment 5, so this rule proposes updating the 72-hour notification requirements with 48-hour notification requirements for midwater trawl and purse seine vessels to ensure consistent requirements across the herring fishery. Regulations at § 648.80(d)(5) also require midwater trawl vessels to inform NMFS if the vessels intends to fish in Groundfish Closed Area I. This requirement initially facilitated placing observers on midwater vessels fishing in Groundfish Closed Area I, but is no longer necessary. Therefore, this rule proposes removing the reference to Groundfish Closed Area I from the notification requirements so that requirements are consistent with proposed notification requirements at § 648.11(m)(2).

Third, this rule proposes allowing us to use both observer and monitor data to track catch against the haddock catch caps. Regulations at § 648.86(a)(3)(ii) state that the Regional Administrator shall use haddock catches observed by observers to estimate of total haddock catch in a given haddock stock area. However, the Council has spent the last several years considering additional monitoring types to increase monitoring in the herring fishery, particularly to track catch against haddock and river herring/shad catch caps. In a February 2016 letter, the Council requested that we use observer and portside sampling data to monitor fishery catch caps. Additionally, in this amendment, the Council recommended that vessels issued Category A and B herring permits carry at-sea monitors to meet a 50-percent industry-funded monitoring

coverage target. In § 648.2, this rule proposes defining observers or monitors to include NMFS-certified observers, at-sea monitors, portside samplers, and dockside monitors. For these reasons, this rule also proposes updating § 648.86(a)(3)(ii) to allow the Regional Administrator to use observer and monitor data to track catch against haddock catch caps.

**Classification**

Pursuant to section 304(a)(1)(A) of the Magnuson-Stevens Act, the NMFS Assistant Administrator has made a preliminary determination that this proposed rule is consistent with the Magnuson-Stevens Act and other applicable law. In making the final determination, we will consider the data, views, and comments received during the public comment period.

This proposed rule has been preliminarily determined to be not significant for purposes of Executive Orders (E.O.) 12866.

NMFS prepared an Initial Regulatory Flexibility Analysis (IRFA) for this proposed rule, as required by section 603 of the Regulatory Flexibility Act (RFA), 5 U.S.C. 603. The IRFA describes the economic impact that this proposed rule would have on small entities, including small businesses, and also determines ways to minimize these impacts. The proposed omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested. Because the proposed omnibus measures have no direct economic impacts, they will not be discussed in this section. The proposed Atlantic herring measures affect levels of monitoring, rather than harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities due to the costs associated with the industry-funded monitoring measures for the herring fishery.

A description of the action, why it is being considered, and the legal basis for this action are contained at the beginning of this section in the preamble and in the **SUMMARY** section. The IRFA includes this section of the preamble to this rule and analyses contained in the Industry-Funded Monitoring Omnibus Amendment and its accompanying EA/RIR/IRFA. A copy of the full analysis is available from the Council (see **ADDRESSES**). A summary of the IRFA follows.

*Description of the Reason Why Action by the Agency Is Being Considered and Statement of the Objective of, and Legal Basis for, This Proposed Rule*

This action proposes management measures for New England Fishery Management Council FMPs. A complete description of the reasons why this action is being considered, and the objectives of and legal basis for this action, are contained in the preamble to this proposed rule and are not repeated here.

*Description and Estimate of the Number of Small Entities To Which the Proposed Rule Would Apply*

Effective July 1, 2016, NMFS established a small business size standard of $11 million in annual gross receipts for all businesses primarily engaged in the commercial fishing industry for RFA compliance purposes only (80 FR 81194, December 29, 2015). The directly regulated entities are businesses that own at least one limited access Atlantic herring vessel. As of 2016, there are 66 businesses that own at least one limited access herring vessel. Four businesses are large entities (gross receipts greater than $11 million). The remaining 62 businesses are small entities. Gross receipts and gross receipts from herring fishing for the small entities are characterized in Table 1.

TABLE 1—GROSS REVENUES AND REVENUES FROM HERRING FOR THE DIRECTLY REGULATED SMALL ENTITIES

|  | Gross receipts from herring permitted firms | Gross receipts from herring fishing |
|---|---|---|
| Mean ................................. | $1,847,392 | $422,210 |
| Median ............................. | $1,076,172 | $0 |
| 25th Percentile ................. | $656,965 | $0 |
| 75th Percentile ................. | $2,684,753 | $95,218 |
| Permitted Small Entities .. | 62 | 62 |

*Source:* NMFS.

Many of the businesses that hold limited access herring permits are not actively fishing for herring. Of those businesses actively fishing for herring, there are 32 directly regulated entities with herring landings. Two firms are large entities (gross receipts over $11 million). The remaining 30 businesses are small entities. Table 2 characterizes gross receipts and gross receipts from the herring fishery for the active firms.

TABLE 2—GROSS REVENUES AND REVENUES FROM HERRING FOR THE ACTIVE DIRECTLY REGULATED SMALL ENTITIES

|  | Gross receipts from active herring permitted firms | Gross receipts from herring fishing |
|---|---|---|
| Mean ................................. | $2,070,541 | $872,567 |
| Median ............................. | $1,030,411 | $95,558 |
| 25th Percentile ................. | $554,628 | $6,570 |
| 75th Percentile ................. | $2,955,883 | $1,696,758 |
| Active Small Entities ....... | 30 | 30 |

*Source:* NMFS.

For the 30 small entities, herring represents an average of 36 percent of gross receipts. For 12 of the small entities, herring represents the single largest source of gross receipts. For eight of the small entities, longfin squid is the largest source of gross receipts and Atlantic sea scallops is the largest source of gross receipts for five of the small entities. The largest source of gross receipts for the remaining five small entities are mixed across different fisheries. Eight of the 30 small entities derived zero revenues from herring.

*Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements*

This proposed rule contains collection-of-information requirements subject to review and approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA). The new requirements, which are described in detail in the preamble, have been submitted to OMB for approval as a new collection. The proposed action does not duplicate, overlap, or conflict with any other Federal rules.

The Industry-Funded Monitoring Amendment would replace the current phone-based observer pre-trip notification system with a new web-based pre-trip notification system. There would be no additional reporting burden associated with this measure because the new notification system would increase convenience and will require approximately the same time burden (5 minutes).

This amendment would implement a 50-percent industry-funded monitoring coverage target on vessels issued Category A or B herring permits. The herring industry would be required to pay for industry cost responsibilities associated with at-sea monitoring. There are an estimated 42 vessels with Category A or B permits in the herring fishery. After considering SBRM coverage, NMFS estimates that each vessel would incur monitoring costs for

_0000016977

an additional 19 days at sea per year, at an estimated maximum cost of $710 per sea day. The annual cost estimate for carrying an at-sea monitor for Category A and B vessels would be $566,580, with an average cost per vessel of $13,490.

In addition to the 50-percent industry-funded monitoring coverage target, midwater trawl vessels would have the option to purchase observer coverage to allow them to fish in Groundfish Closed Areas. This option would be available to the estimated 12 vessels that fish with midwater trawl gear. Since this option would be available on all trips not otherwise selected for SBRM or industry-funded at-sea monitoring coverage, it is estimated that each vessel may use this option for up to 21 days per year, at an estimated maximum cost of $818 per sea day. Therefore, the annual cost associated with industry-funded observer coverage for midwater trawl vessels fishing in Groundfish Closed Areas is estimated to be $206,136, with an average annual cost per vessel of $17,178.

To access Groundfish Closed Areas, owners/operators of the 12 affected midwater trawl vessels would request an observer by calling one of the approved monitoring service providers. The average midwater trawl vessel is estimated to take 7 of these trips per year, and each call would take an estimated 5 minutes at a rate of $0.10 per minute. Thus, the total annual burden estimate to the industry for calls

to obtain industry-funded observer coverage would be 7 hours and $42 (Per vessel: 1 hr and $3.50). For each of the 7 estimated trips that the vessel calls in to request an industry-funded observer to access Groundfish Closed Areas, the vessel has the option to cancel that trip. The call to cancel the trip would take an estimated 1 minute at a rate of $0.10 per minute. The total annual burden estimated to the industry for cancelling these trips would be 1 hour and $8 (Per vessel: 1 hr and $1).

NMFS expects that some monitoring service providers would apply for approval under the service provider requirements at § 648.11(h), specifically that four out of six providers may apply for approval, and would be subject to these requirements. These providers would submit reports and information required of service providers as part of their application for approval. Service providers must comply with the following requirements, submitted via email, phone, web-portal, fax, or postal service: Submit applications for approval as a monitoring service provider; formally request industry-funded at-sea monitor training by the NEFOP; submit industry-funded at-sea monitor deployment and availability reports; submit biological samples, safety refusal reports, and other reports; give notification of industry-funded at-sea monitor availability within 24 hours of the vessel owner's notification of a prospective trip; provide vessels with notification of industry-funded observer

availability in advance of each trip; maintain an updated contact list of all industry-funded at-sea monitors/ observers that includes the monitor's/ observer's identification number, name, mailing and email address, phone numbers, homeports or fisheries/trip types assigned, and whether or not the monitor/observer is "in service" (*i.e.*, available to provide coverage services). Monitoring service providers would have to provide raw at-sea monitoring data to NMFS and make at-sea monitors available to NMFS for debriefing upon request. The regulations would also require monitoring service providers to submit any outreach materials, such as informational pamphlets, payment notification, and descriptions of monitor duties, as well as all contracts between the service provider and entities requiring monitoring services for review to NMFS. Monitoring service providers also have the option to respond to application denials, and submit a rebuttal in response to a pending removal from the list of approved monitoring service providers. NMFS expects that all of these reporting requirements combined are expected to take 1,192 hours of response time per year for a total annual cost of $12,483 for all affected monitoring service providers ($3,121 per provider). The following table provides the detailed time and cost information for each response item.

TABLE 3—BURDEN ESTIMATE FOR PROPOSED MEASURES

| Monitoring service provider requirements | Number of entities | Total number of items | Response time per response (minutes) | Total time burden (hours) | Cost per response ($) | Total annual public cost ($) |
|---|---|---|---|---|---|---|
| Monitor deployment report by email | 4 | 444 | 10 | 74 | 0.00 | 0.00 |
| Monitor availability report by email | 4 | 216 | 20 | 72 | 0.00 | 0.00 |
| Safety refusals by email | 4 | 40 | 30 | 20 | 0.00 | 0.00 |
| Raw monitor data by express mail | 4 | 444 | 5 | 37 | 23.75 | 10,545 |
| Monitor debriefing | 4 | 124 | 120 | 248 | 12.00 | 1,488 |
| Other reports | 4 | 68 | 30 | 34 | 0.00 | 0.00 |
| Biological samples | 4 | 516 | 60 | 516 | 0.50 | 258 |
| New application to be a service provider | 4 | 4 | 600 | 40 | 0.49 | 2 |
| Applicant response to denial | 1 | 1 | 600 | 10 | 0.49 | 1 |
| Request to service provider to procure a monitor by web-portal | 90 | 360 | 10 | 60 | 0.00 | 0.00 |
| Notification of unavailability of monitors | 90 | 360 | 5 | 30 | 0.00 | 0.00 |
| Request to service provider to procure an observer for Groundfish Closed Areas by phone | 21 | 84 | 10 | 14 | 1.00 | 84.00 |
| Notification of unavailability of observers for Groundfish Closed Areas | 21 | 84 | 5 | 7 | 0.50 | 42.00 |
| Request for monitor training | 4 | 12 | 30 | 6 | 1.80 | 21.60 |
| Rebuttal of pending removal from list of approved service providers | 1 | 1 | 480 | 8 | 0.49 | 1 |
| Monitor contact list updates | 4 | 48 | 5 | 4 | 0.00 | 0.00 |
| Monitor availability updates | 4 | 48 | 5 | 4 | 0.00 | 0.00 |
| Service provider material submissions | 4 | 8 | 30 | 4 | 2.50 | 20.00 |
| Service provider contracts | 4 | 8 | 30 | 4 | 2.50 | 20.00 |
| Total | ............... | ............... | ....................... | 1,192 | ............... | 12,483 |

Public comment is sought regarding the following: Whether this proposed collection of information is necessary for the proper performance of agency functions, including whether the information shall have practical utility; the accuracy of the burden estimate; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the collection of information, including through the use of automated collection techniques or other forms of information technology. Send comments on these or any other aspects of the collection of information to the Regional Administrator (see **ADDRESSES**) and email to *OIRA_Submission@ omb.eop.gov* or fax to 202–395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to penalty for failure to comply with, a collection of information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB Control Number.

*Federal Rules Which May Duplicate, Overlap, or Conflict With the Proposed Rule*

This action does not duplicate, overlap, or conflict with any other Federal rules.

*Description of Significant Alternatives to the Proposed Action Which Accomplish the Stated Objectives of Applicable Statues and Which Minimize Any Significant Economic Impact on Small Entities*

None of the non-preferred herring alternatives would be expected to accomplish the stated objectives for monitoring in the herring fishery as well as the proposed action. The following are objectives for increased monitoring in the herring fishery: (1) Accurate estimates of catch (retained and discarded), (2) accurate catch estimates for incidental catch with catch caps (haddock and river herring/shad), and (3) affordable monitoring for the herring fishery. Herring alternatives considered different combinations of monitoring types (observers, at-sea monitors, electronic monitoring, portside sampling) and coverage targets (100 percent, 75 percent, 50 percent, 25 percent) on herring fleets (vessels with Category A or B permits, midwater trawl vessels). Non-preferred herring alternatives with coverage targets of 100 percent or 75 percent would have higher costs than the proposed action. Non-preferred herring alternatives for the midwater trawl fleet or those with 25-percent coverage targets may not have

improved monitoring in the herring fishery as well as the proposed action.

List of Subjects in 50 CFR Part 648

Fisheries, Fishing, Recordkeeping and reporting requirements.

Dated: October 30, 2018.

**Samuel D. Rauch, III,**
*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons set out in the preamble, 50 CFR part 648 is proposed to be amended as follows:

PART 648—FISHERIES OF THE NORTHEASTERN UNITED STATES

■ 1. The authority citation for part 648 continues to read as follows:

**Authority:** 16 U.S.C. 1801 *et seq.*

■ 2. In § 648.2, add the definition for ''Observer or monitor'' and revise the definitions for ''Electronic monitoring'' and ''Slippage in the Atlantic herring fishery'' and ''Slip(s) or slipping catch in the Atlantic herring fishery'' in alphabetical order to read as follows:

§ 648.2   Definitions.

\*   \*   \*   \*   \*

*Electronic monitoring* means a network of equipment that uses a software operating system connected to one or more technology components, including, but not limited to, cameras and recording devices to collect data on catch and vessel operations.

\*   \*   \*   \*   \*

*Observer or monitor* means any person certified by NMFS to collect operational fishing data, biological data, or economic data through direct observation and interaction with operators of commercial fishing vessels as part of NMFS' Northeast Fisheries Observer Program. Observers or monitors include NMFS-certified fisheries observers, at-sea monitors, portside samplers, and dockside monitors.

\*   \*   \*   \*   \*

*Slippage in the Atlantic herring fishery* means catch that is discarded prior to it being brought aboard a vessel issued an Atlantic herring permit and/ or prior to making it available for sampling and inspection by a NMFS-certified observer or monitor. Slippage also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slippage includes releasing catch from a codend or seine prior to the completion of pumping the catch aboard and the release of catch from a codend or seine while the codend or seine is in

the water. Fish that cannot be pumped and remain in the codend or seine at the end of pumping operations are not considered slippage. Discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor are also not considered slippage.

*Slip(s) or slipping catch in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-approved observer or monitor after the catch is on board. Slip(s) or slipping catch also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slip(s) or slipping catch includes releasing fish from a codend or seine prior to the completion of pumping the fish on board and the release of fish from a codend or seine while the codend or seine is in the water. Slippage or slipped catch refers to fish that are slipped. Slippage or slipped catch does not include operational discards, discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor, or fish that inadvertently fall out of or off fishing gear as gear is being brought on board the vessel.

\*   \*   \*   \*   \*

■ 3. In § 648.7, revise paragraph (b)(2)(i) to read as follows:

§ 648.7   Record keeping and reporting requirements.

\*   \*   \*   \*   \*

(b) \*  \*  \*
(2) \*  \*  \*

(i) *Atlantic herring owners or operators issued an All Areas open access permit.* The owner or operator of a vessel issued an All Areas open access permit to fish for herring must report catch (retained and discarded) of herring via an IVR system for each week herring was caught, unless exempted by the Regional Administrator. IVR reports are not required for weeks when no herring was caught. The report shall include at least the following information, and any other information required by the Regional Administrator: Vessel identification; week in which herring are caught; management areas fished; and pounds retained and pounds discarded of herring caught in each management area. The IVR reporting week begins on Sunday at 0001 hour

(hr) (12:01 a.m.) local time and ends Saturday at 2400 hr (12 midnight). Weekly Atlantic herring catch reports must be submitted via the IVR system by midnight each Tuesday, eastern time, for the previous week. Reports are required even if herring caught during the week has not yet been landed. This report does not exempt the owner or operator from other applicable reporting requirements of this section.

\*    \*    \*    \*    \*

■ 4. Revise § 648.11 and the section heading to read as follows:

### § 648.11  Monitoring coverage.

(a) The Regional Administrator may request any vessel holding a permit for Atlantic sea scallops, NE multispecies, monkfish, skates, Atlantic mackerel, squid, butterfish, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, tilefish, Atlantic surfclam, ocean quahog, or Atlantic deep-sea red crab; or a moratorium permit for summer flounder; to carry a NMFS-certified fisheries observer. A vessel holding a permit for Atlantic sea scallops is subject to the additional requirements specified in paragraph (k) of this section. A vessel holding an All Areas or Areas 2/3 Limited Access Herring Permit is subject to the additional requirements specified in paragraph (m) of this section. Also, any vessel or vessel owner/operator that fishes for, catches or lands hagfish, or intends to fish for, catch, or land hagfish in or from the exclusive economic zone must carry a NMFS-certified fisheries observer when requested by the Regional Administrator in accordance with the requirements of this section.

(b) If requested by the Regional Administrator or their designees, including NMFS-certified observers, monitors, and NMFS staff, to be sampled by an observer or monitor, it is the responsibility of the vessel owner or vessel operator to arrange for and facilitate observer or monitor placement. Owners or operators of vessels selected for observer or monitor coverage must notify the appropriate monitoring service provider before commencing any fishing trip that may result in the harvest of resources of the respective fishery. Notification procedures will be specified in selection letters to vessel owners or permit holder letters.

(c) The Regional Administrator may waive the requirement to be sampled by an observer or monitor if the facilities on a vessel for housing the observer or monitor, or for carrying out observer or monitor functions, are so inadequate or unsafe that the health or safety of the observer or monitor, or the safe operation of the vessel, would be jeopardized.

(d) An owner or operator of a vessel on which a NMFS-certified observer or monitor is embarked must:

(1) Provide accommodations and food that are equivalent to those provided to the crew.

(2) Allow the observer or monitor access to and use of the vessel's communications equipment and personnel upon request for the transmission and receipt of messages related to the observer's or monitor's duties.

(3) Provide true vessel locations, by latitude and longitude or loran coordinates, as requested by the observer or monitor, and allow the observer or monitor access to and use of the vessel's navigation equipment and personnel upon request to determine the vessel's position.

(4) Notify the observer or monitor in a timely fashion of when fishing operations are to begin and end.

(5) Allow for the embarking and debarking of the observer or monitor, as specified by the Regional Administrator, ensuring that transfers of observers or monitors at sea are accomplished in a safe manner, via small boat or raft, during daylight hours as weather and sea conditions allow, and with the agreement of the observers or monitors involved.

(6) Allow the observer or monitor free and unobstructed access to the vessel's bridge, working decks, holding bins, weight scales, holds, and any other space used to hold, process, weigh, or store fish.

(7) Allow the observer or monitor to inspect and copy any the vessel's log, communications log, and records associated with the catch and distribution of fish for that trip.

(e) The owner or operator of a vessel issued a summer flounder moratorium permit, a scup moratorium permit, a black sea bass moratorium permit, a bluefish permit, a spiny dogfish permit, an Atlantic herring permit, an Atlantic deep-sea red crab permit, a skate permit, or a tilefish permit, if requested by the observer or monitor, also must:

(1) Notify the observer or monitor of any sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, tilefish, skates (including discards) or other specimens taken by the vessel.

(2) Provide the observer or monitor with sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, skates, tilefish, or other specimens taken by the vessel.

(f) NMFS may accept observer or monitor coverage funded by outside sources if:

(1) All coverage conducted by such observers or monitors is determined by NMFS to be in compliance with NMFS' observer or monitor guidelines and procedures.

(2) The owner or operator of the vessel complies with all other provisions of this part.

(3) The observer or monitor is approved by the Regional Administrator.

(g) *Industry-Funded Monitoring Programs.* Fishery management plans (FMPs) managed by the New England Fishery Management Council (New England Council), including Atlantic Herring, Atlantic Salmon, Atlantic Sea Scallops, Deep-Sea Red Crab, Northeast Multispecies, and Northeast Skate Complex, may include industry-funded monitoring programs (IFM) to supplement existing monitoring required by the Standard Bycatch Reporting Methodology (SBRM), Endangered Species Act, and the Marine Mammal Protection Act. IFM programs may use observers, monitors, including at-sea monitors and portside samplers, and electronic monitoring to meet specified IFM coverage targets. The ability to meet IFM coverage targets may be constrained by the availability of Federal funding to pay NMFS cost responsibilities associated with IFM.

(1) *Guiding Principles for New IFM Programs.* The Council's development of an IFM program must consider or include the following:

(i) A clear need or reason for the data collection;

(ii) Objective design criteria;

(iii) Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;

(iv) Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;

(v) Prioritize the use of modern technology to the extent practicable; and

(vi) Incentives for reliable self-reporting.

(2) *Process To Implement and Revise New IFM Programs.* New IFM programs shall be developed via an amendment to a specific FMP. IFM programs implemented in an FMP may be revised via a framework adjustment. The details of an IFM program may include, but are not limited to:

(i) Level and type of coverage target,

(ii) Rationale for level and type of coverage,

(iii) Minimum level of coverage necessary to meet coverage goals,

(iv) Consideration of waivers if coverage targets cannot be met,

(v) Process for vessel notification and selection,

(vi) Cost collection and administration,

(vii) Standards for monitoring service providers, and

(viii) Any other measures necessary to implement the industry-funded monitoring program.

(3) *NMFS Cost Responsibilities.* IFM programs have two types of costs, NMFS and industry costs. Cost responsibilities are delineated by the type of cost. NMFS cost responsibilities include the following:

(i) The labor and facilities associated with training and debriefing of monitors;

(ii) NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);

(iii) Certification of monitoring service providers and individual observers or monitors; performance monitoring to maintain certificates;

(iv) Developing and executing vessel selection;

(v) Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and

(vi) Costs associated with liaison activities between service providers, and NMFS, Coast Guard, New England Council, sector managers, and other partners.

(vii) The industry is responsible for all other costs associated with IFM programs.

(4) *Prioritization Process to Cover NMFS IFM Cost Responsibilities.* (i) Available Federal funding refers to any funds in excess of those allocated to meet SBRM requirements or the existing IFM programs in the Atlantic Sea Scallop and Northeast Multispecies FMPs that may be used to cover NMFS cost responsibilities associated with IFM coverage targets. If there is no available Federal funding in a given year to cover NMFS cost responsibilities, then there shall be no IFM coverage during that year. If there is some available Federal funding in a given year, but not enough to cover all of NMFS cost responsibilities associated with IFM coverage targets, then the New England Council will prioritize available Federal funding across IFM programs during that year. Existing IFM programs for Atlantic sea scallops and Northeast multispecies fisheries shall

not be included in this prioritization process.

(ii) Programs with IFM coverage targets shall be prioritized using an equal weighting approach, such that any available Federal funding shall be divided equally among programs.

(iii) After NMFS determines the amount of available Federal funding for the next fishing year, NMFS shall provide the New England Council with the estimated IFM coverage levels for the next fishing year. The estimated IFM coverage levels would be based on the equal weighting approach and would include the rationale for any deviations from the equal weighting approach. The New England Council may recommend revisions and additional considerations to the Regional Administrator and Science and Research Director.

(A) If available Federal funding exceeds that needed to pay all of NMFS cost responsibilities for administering IFM programs, the New England Council may request NMFS to use available funding to help offset industry cost responsibilities through reimbursement.

(B) [Reserved]

(iv) Revisions to the prioritization process may be made via a framework adjustment to all New England FMPs.

(v) Revisions to the weighting approach for the New England Council-led prioritization process may be made via a framework adjustment to all New England FMPs or by the New England Council considering a new weighting approach at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the weighting approach. NMFS shall implement revisions to the weighting approach in a manner consistent with the Administrative Procedure Act.

(5) *IFM Program Monitoring Service Provider Requirements.* IFM monitoring service provider requirements shall be consistent with requirements in paragraphs (h) of this section and observer or monitor requirements shall be consistent with requirements in paragraph (i) of this section.

(6) *Monitoring Set-Aside.* The New England Council may develop a monitoring set-aside program for individual FMPs that would devote a portion of the annual catch limit for a fishery to help offset the industry cost responsibilities for monitoring coverage, including observers, at-sea monitors, portside samplers, and electronic monitoring.

(i) The details of a monitoring set-aside program may include, but are not limited to:

(A) The basis for the monitoring set-aside;

(B) The amount of the set-aside (*e.g.,* quota, days at sea);

(C) How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* an increased trip limit, differential days at sea counting, additional trips, an allocation of the quota);

(D) The process for vessel notification;

(E) How funds are collected and administered to cover the industry's costs of monitoring; and

(F) Any other measures necessary to develop and implement a monitoring set-aside.

(ii) The New England Council may develop new monitoring set-asides and revise those monitoring set-asides via a framework adjustment to the relevant FMP.

(h) *Monitoring service provider approval and responsibilities*—(1) General. An entity seeking to provide monitoring services, including services for IFM Programs described in paragraph (g) of this section, must apply for and obtain approval from NMFS following submission of a complete application. Monitoring services include providing NMFS-certified observers, monitors (at-sea monitors and portside samplers), and/or electronic monitoring. A list of approved monitoring service providers shall be distributed to vessel owners and shall be posted on the NMFS Fisheries Sampling Branch (FSB) website at: *https://www.nefsc.noaa.gov/femad/fsb/.*

(2) [Reserved]

(3) *Contents of application.* An application to become an approved monitoring service provider shall contain the following:

(i) Identification of the management, organizational structure, and ownership structure of the applicant's business, including identification by name and general function of all controlling management interests in the company, including but not limited to: owners, board members, officers, authorized agents, and staff. If the applicant is a corporation, the articles of incorporation must be provided. If the applicant is a partnership, the partnership agreement must be provided.

(ii) The permanent mailing address, phone and fax numbers where the owner(s) can be contacted for official correspondence, and the current physical location, business mailing address, business telephone and fax numbers, and business email address for each office.

(iii) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, that they are free from a

conflict of interest as described under paragraph (h)(6) of this section.

(iv) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, describing any criminal conviction(s), Federal contract(s) they have had and the performance rating they received on the contracts, and previous decertification action(s) while working as an observer or monitor or monitoring service provider.

(v) A description of any prior experience the applicant may have in placing individuals in remote field and/ or marine work environments. This includes, but is not limited to, recruiting, hiring, deployment, and personnel administration.

(vi) A description of the applicant's ability to carry out the responsibilities and duties of a monitoring service provider as set out under paragraph (h)(5) of this section, and the arrangements to be used.

(vii) Evidence of holding adequate insurance to cover injury, liability, and accidental death for observers or monitors, whether contracted or employed by the service provider, during their period of employment (including during training). Workers' Compensation and Maritime Employer's Liability insurance must be provided to cover the observer or monitor, vessel owner, and observer provider. The minimum coverage required is $5 million. Monitoring service providers shall provide copies of the insurance policies to observers or monitors to display to the vessel owner, operator, or vessel manager, when requested.

(viii) Proof that its observers or monitors, whether contracted or employed by the service provider, are compensated with salaries that meet or exceed the U.S. Department of Labor (DOL) guidelines for observers. Observers shall be compensated as Fair Labor Standards Act (FLSA) non-exempt employees. Monitoring service providers shall provide any other benefits and personnel services in accordance with the terms of each observer's or monitor's contract or employment status.

(ix) The names of its fully equipped, NMFS/FSB certified, observers or monitors on staff or a list of its training candidates (with resumes) and a request for an appropriate NMFS/FSB Training class. All training classes have a minimum class size of eight individuals, which may be split among multiple vendors requesting training. Requests for training classes with fewer than eight individuals will be delayed until further requests make up the full training class size.

(x) An Emergency Action Plan (EAP) describing its response to an "at sea" emergency with an observer or monitor, including, but not limited to, personal injury, death, harassment, or intimidation. An EAP that details a monitoring service provider's responses to emergencies involving observers, monitors, or monitoring service provider personnel. The EAP shall include communications protocol and appropriate contact information in an emergency.

(4) *Application evaluation.* (i) NMFS shall review and evaluate each application submitted under paragraph (h)(3) of this section. Issuance of approval as a monitoring service provider shall be based on completeness of the application, and a determination by NMFS of the applicant's ability to perform the duties and responsibilities of a monitoring service provider, as demonstrated in the application information. A decision to approve or deny an application shall be made by NMFS within 15 business days of receipt of the application by NMFS.

(ii) If NMFS approves the application, the monitoring service provider's name will be added to the list of approved monitoring service providers found on the NMFS/FSB website specified in paragraph (h)(1) of this section, and in any outreach information to the industry. Approved monitoring service providers shall be notified in writing and provided with any information pertinent to its participation in the observer or monitor programs.

(iii) An application shall be denied if NMFS determines that the information provided in the application is not complete or the evaluation criteria are not met. NMFS shall notify the applicant in writing of any deficiencies in the application or information submitted in support of the application. An applicant who receives a denial of his or her application may present additional information to rectify the deficiencies specified in the written denial, provided such information is submitted to NMFS within 30 days of the applicant's receipt of the denial notification from NMFS. In the absence of additional information, and after 30 days from an applicant's receipt of a denial, a monitoring service provider is required to resubmit an application containing all of the information required under the application process specified in paragraph (h)(3) of this section to be re-considered for being added to the list of approved monitoring service providers.

(5) *Responsibilities of monitoring service providers.* (i) A monitoring service provider must provide observers or monitors certified by NMFS/FSB pursuant to paragraph (i) of this section for deployment in a fishery when contacted and contracted by the owner, operator, or vessel manager of a fishing vessel, unless the monitoring service provider refuses to deploy an observer or monitor on a requesting vessel for any of the reasons specified at paragraph (h)(5)(viii) of this section.

(ii) A monitoring service provider must provide to each of its observers or monitors:

(A) All necessary transportation, lodging costs and support for arrangements and logistics of travel for observers and monitors to and from the initial location of assignment, to all subsequent vessel assignments, to any debriefing locations, and for appearances in Court for monitoring-related trials as necessary;

(B) Lodging, per diem, and any other services necessary for observers or monitors assigned to a fishing vessel or to attend an appropriate NMFS/FSB training class;

(C) The required observer or monitor equipment, in accordance with equipment requirements listed on the NMFS/FSB website specified in paragraph (h)(1) of this section, prior to any deployment and/or prior to NMFS observer or monitor certification training; and

(D) Individually assigned communication equipment, in working order, such as a mobile phone, for all necessary communication. A monitoring service provider may alternatively compensate observers or monitors for the use of the observer's or monitor's personal mobile phone, or other device, for communications made in support of, or necessary for, the observer's or monitor's duties.

(iii) *Observer and monitor deployment logistics.* Each approved monitoring service provider must assign an available certified observer or monitor to a vessel upon request. Each approved monitoring service provider must be accessible 24 hours per day, 7 days per week, to enable an owner, operator, or manager of a vessel to secure monitoring coverage when requested. The telephone or other notification system must be monitored a minimum of four times daily to ensure rapid response to industry requests. Monitoring service providers approved under paragraph (h) of this section are required to report observer or monitor deployments to NMFS for the purpose of determining whether the predetermined coverage levels are being achieved in the appropriate fishery.

(iv) *Observer deployment limitations.* (A) A candidate observer's first several

_0000016982

deployments and the resulting data shall be immediately edited and approved after each trip by NMFS/FSB prior to any further deployments by that observer. If data quality is considered acceptable, the observer would be certified. For further information, see *https://www.nefsc.noaa.gov/fsb/ training/*.

(B) For the purpose of coverage to meet SBRM requirements, unless alternative arrangements are approved by NMFS, a monitoring service provider must not deploy any NMFS-certified observer on the same vessel for more than two consecutive multi-day trips, and not more than twice in any given month for multi-day deployments.

(C) For the purpose of coverage to meet IFM requirements, a monitoring service provider may deploy any NMFS-certified observer or monitor on the same vessel for more than two consecutive multi-day trips and more than twice in any given month for multi-day deployments.

(v) *Communications with observers and monitors.* A monitoring service provider must have an employee responsible for observer or monitor activities on call 24 hours a day to handle emergencies involving observers or monitors or problems concerning observer or monitor logistics, whenever observers or monitors are at sea, stationed portside, in transit, or in port awaiting vessel assignment.

(vi) *Observer and monitor training requirements.* A request for a NMFS/ FSB Observer or Monitor Training class must be submitted to NMFS/FSB 45 calendar days in advance of the requested training. The following information must be submitted to NMFS/FSB at least 15 business days prior to the beginning of the proposed training: A list of observer or monitor candidates; candidate resumes, cover letters and academic transcripts; and a statement signed by the candidate, under penalty of perjury, that discloses the candidate's criminal convictions, if any. A medical report certified by a physician for each candidate is required 7 business days prior to the first day of training. CPR/First Aid certificates and a final list of training candidates with candidate contact information (email, phone, number, mailing address and emergency contact information) are due 7 business days prior to the first day of training. NMFS may reject a candidate for training if the candidate does not meet the minimum qualification requirements as outlined by NMFS/FSB minimum eligibility standards for observers or monitors as described on the NMFS/FSB website.

(vii) *Reports and Requirements*—(A) Deployment reports. The monitoring service provider must report to NMFS/ FSB when, where, to whom, and to what vessel an observer or monitor has been deployed, as soon as practicable, and according to requirements outlined on the NMFS/FSB website. The deployment report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week. The monitoring service provider must ensure that the observer or monitor reports to NMFS the required electronic data, as described in the NMFS/FSB training. Electronic data submission protocols will be outlined in training and may include accessing government websites via personal computers/ devices or submitting data through government issued electronics. The monitoring service provider shall provide the raw (unedited) data collected by the observer or monitor to NMFS at the specified time per program. For further information, see *https://www.nefsc.noaa.gov/fsb/scallop/ .*

(B) *Safety refusals.* The monitoring service provider must report to NMFS any trip or landing that has been refused due to safety issues (*e.g.,* failure to hold a valid USCG Commercial Fishing Vessel Safety Examination Decal or to meet the safety requirements of the observer's or monitor's safety checklist) within 12 hours of the refusal.

(C) *Biological samples.* The monitoring service provider must ensure that biological samples, including whole marine mammals, sea turtles, sea birds, and fin clips or other DNA samples, are stored/handled properly and transported to NMFS within 5 days of landing. If transport to NMFS/FSB Observer Training Facility is not immediately available then whole animals requiring freezing shall be received by the nearest NMFS freezer facility within 24 hours of vessel landing.

(D) *Debriefing.* The monitoring service provider must ensure that the observer or monitor remains available to NMFS, either in-person or via phone, at NMFS' discretion, including NMFS Office for Law Enforcement, for debriefing for at least 2 weeks following any monitored trip. If requested by NMFS, an observer or monitor that is at sea during the 2-week period must contact NMFS upon his or her return. Monitoring service providers must pay for travel and land hours for any requested debriefings.

(E) *Availability report.* The monitoring service provider must report to NMFS any occurrence of inability to respond to an industry request for observer or monitor coverage due to the lack of available observers or monitors as soon as practicable if the provider is unable to respond to an industry request for monitoring coverage. Availability report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week.

(F) *Incident reports.* The monitoring service provider must report possible observer or monitor harassment, discrimination, concerns about vessel safety or marine casualty, or observer or monitor illness or injury; and any information, allegations, or reports regarding observer or monitor conflict of interest or breach of the standards of behavior, to NMFS/FSB within 12 hours of the event or within 12 hours of learning of the event.

(G) *Status report.* The monitoring service provider must provide NMFS/ FSB with an updated list of contact information for all observers or monitors that includes the identification number, name, mailing address, email address, phone numbers, homeports or fisheries/ trip types assigned, and must include whether or not the observer or monitor is ''in service,'' indicating when the observer or monitor has requested leave and/or is not currently working for an industry-funded program. Any Federally contracted NMFS-certified observer not actively deployed on a vessel for 30 days will be placed on Leave of Absence (LOA) status (or as specified by NMFS/FSB according to most recent Information Technology Security Guidelines at *https:// www.nefsc.noaa.gov/fsb/memos/*. Those Federally contracted NMFS-certified observers on LOA for 90 days or more will need to conduct an exit interview with NMFS/FSB and return any NMFS/ FSB issued gear and Common Access Card (CAC), unless alternative arrangements are approved by NMFS/ FSB. NMFS/FSB requires 2-week advance notification when a Federally contracted NMFS-certified observer is leaving the program so that an exit interview may be arranged and gear returned.

(H) *Vessel contract.* The monitoring service provider must submit to NMFS/ FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and those entities requiring monitoring services.

(I) *Observer and monitor contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between

**55680**    **Federal Register** / Vol. 83, No. 216 / Wednesday, November 7, 2018 / Proposed Rules

the monitoring service provider and specific observers or monitors.

(J) *Additional information.* The monitoring service provider must submit to NMFS/FSB, if requested, copies of any information developed and/or used by the monitoring service provider and distributed to vessels, observers, or monitors, such as informational pamphlets, payment notification, daily rate of monitoring services, description of observer or monitor duties, etc.

(viii) *Refusal to deploy an observer or monitor.* (A) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider does not have an available observer or monitor within the required time and must report all refusals to NMFS/FSB.

(B) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider has determined that the requesting vessel is inadequate or unsafe pursuant to the reasons described at § 600.746.

(C) The monitoring service provider may refuse to deploy an observer or monitor on a fishing vessel that is otherwise eligible to carry an observer or monitor for any other reason, including failure to pay for previous monitoring deployments, provided the monitoring service provider has received prior written confirmation from NMFS authorizing such refusal.

(6) *Limitations on conflict of interest.* A monitoring service provider:

(i) Must not have a direct or indirect interest in a fishery managed under Federal regulations, including, but not limited to, a fishing vessel, fish dealer, and/or fishery advocacy group (other than providing monitoring services);

(ii) Must assign observers or monitors without regard to any preference by representatives of vessels other than when an observer or monitor will be deployed for the trip that was selected for coverage; and

(iii) Must not solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who conducts fishing or fishing related activities that are regulated by NMFS, or who has interests that may be substantially affected by the performance or nonperformance of the official duties of the observer or monitoring service providers.

(7) *Removal of monitoring service provider from the list of approved service providers.* A monitoring service provider that fails to meet the requirements, conditions, and

responsibilities specified in paragraphs (h)(5) and (6) of this section shall be notified by NMFS, in writing, that it is subject to removal from the list of approved monitoring service providers. Such notification shall specify the reasons for the pending removal. A monitoring service provider that has received notification that it is subject to removal from the list of approved monitoring service providers may submit written information to rebut the reasons for removal from the list. Such rebuttal must be submitted within 30 days of notification received by the monitoring service provider that the monitoring service provider is subject to removal and must be accompanied by written evidence rebutting the basis for removal. NMFS shall review information rebutting the pending removal and shall notify the monitoring service provider within 15 days of receipt of the rebuttal whether or not the removal is warranted. If no response to a pending removal is received by NMFS, the monitoring service provider shall be automatically removed from the list of approved monitoring service providers. The decision to remove the monitoring service provider from the list, either after reviewing a rebuttal, or if no rebuttal is submitted, shall be the final decision of NMFS and the Department of Commerce. Removal from the list of approved monitoring service providers does not necessarily prevent such monitoring service provider from obtaining an approval in the future if a new application is submitted that demonstrates that the reasons for removal are remedied. Certified observers and monitors under contract with observer monitoring service provider that has been removed from the list of approved service providers must complete their assigned duties for any fishing trips on which the observers or monitors are deployed at the time the monitoring service provider is removed from the list of approved monitoring service providers. A monitoring service provider removed from the list of approved monitoring service providers is responsible for providing NMFS with the information required in paragraph (h)(5)(vii) of this section following completion of the trip. NMFS may consider, but is not limited to, the following in determining if a monitoring service provider may remain on the list of approved monitoring service providers:

(i) Failure to meet the requirements, conditions, and responsibilities of monitoring service providers specified in paragraphs (h)(5) and (h)(6) of this section;

(ii) Evidence of conflict of interest as defined under paragraph (h)(6) of this section;

(iii) Evidence of criminal convictions related to:

(A) Embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; or

(B) The commission of any other crimes of dishonesty, as defined by state law or Federal law, that would seriously and directly affect the fitness of an applicant in providing monitoring services under this section;

(iv) Unsatisfactory performance ratings on any Federal contracts held by the applicant; and

(v) Evidence of any history of decertification as either an observer, monitor, or monitoring service provider.

(i) *Observer or monitor certification.* (1) To be certified, employees or sub-contractors operating as observers or monitors for monitoring service providers approved under paragraph (h) of this section. In addition, observers must meet NMFS National Minimum Eligibility Standards for observers specified at the National Observer Program website: *https://www.nmfs.noaa.gov/op/pds/categories/scienceandtechnology.html.* For further information, see *https://www.st.nmfs.noaa.gov/observer-home/.*

(2) *Observer or monitor training.* In order to be deployed on any fishing vessel, a candidate observer or monitor must have passed an appropriate NMFS/FSB Observer Training course and must adhere to all NMFS/FSB program standards and policies (refer to website for program standards, *https://www.nefsc.noaa.gov/fsb/training/*). If a candidate fails training, the candidate and monitoring service provider shall be notified immediately by NMFS/FSB. Observer training may include an observer training trip, as part of the observer's training, aboard a fishing vessel with a trainer. Refer to the NMFS/FSB website for the required number of program specific observer and monitor training certification trips for full certification following training, *https://www.nefsc.noaa.gov/fsb/training/.*

(3) *Observer requirements.* All observers must:

(i) Have a valid NMFS/FSB fisheries observer certification pursuant to paragraph (i)(1) of this section;

(ii) Be physically and mentally capable of carrying out the responsibilities of an observer on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this

section and shall be provided to each approved monitoring service provider;

(iii) Have successfully completed all NMFS-required training and briefings for observers before deployment, pursuant to paragraph (i)(2) of this section;

(iv) Hold a current Red Cross (or equivalence) CPR/First Aid certification;

(v) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vi) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(4) *Monitor requirements.* All monitors must:

(i) Hold a high school diploma or legal equivalent;

(ii) Have a valid NMFS/FSB certification pursuant to paragraph (i)(1) of this section;

(iii) Be physically and mentally capable of carrying out the responsibilities of a monitor on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iv) Have successfully completed all NMFS-required training and briefings for monitors before deployment, pursuant to paragraph (i)(2) of this section;

(v) Hold a current Red Cross (or equivalence) CPR/First Aid certification if the monitor is to be employed as an at-sea monitor;

(vi) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vii) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(5) Probation and decertification. NMFS may review observer and monitor certifications and issue observer and monitor certification probation and/or decertification as described in NMFS policy found on the NMFS/FSB website specified in paragraph (h)(1) of this section.

(6) *Issuance of decertification.* Upon determination that decertification is warranted under paragraph (i)(5) of this section, NMFS shall issue a written decision to decertify the observer or monitor to the observer or monitor and approved monitoring service providers via certified mail at the observer's or monitor's most current address provided to NMFS. The decision shall identify whether a certification is

revoked and shall identify the specific reasons for the action taken. Decertification is effective immediately as of the date of issuance, unless the decertification official notes a compelling reason for maintaining certification for a specified period and under specified conditions. Decertification is the final decision of NMFS and the Department of Commerce and may not be appealed.

(j) In the event that a vessel is requested by the Regional Administrator to carry a NMFS-certified fisheries observer pursuant to paragraph (a) of this section and is also selected to carry an at-sea monitor as part of an approved sector at-sea monitoring program specified in § 648.87(b)(1)(v) for the same trip, only the NMFS-certified fisheries observer is required to go on that particular trip.

(k) *Atlantic sea scallop observer program—(1) General.* Unless otherwise specified, owners, operators, and/or managers of vessels issued a Federal scallop permit under § 648.4(a)(2), and specified in paragraph (a) of this section, must comply with this section and are jointly and severally responsible for their vessel's compliance with this section. To facilitate the deployment of at-sea observers, all sea scallop vessels issued limited access and LAGC IFQ permits are required to comply with the additional notification requirements specified in paragraph (k)(2) of this section. When NMFS notifies the vessel owner, operator, and/or manager of any requirement to carry an observer on a specified trip in either an Access Area or Open Area as specified in paragraph (k)(3) of this section, the vessel may not fish for, take, retain, possess, or land any scallops without carrying an observer. Vessels may only embark on a scallop trip in open areas or Access Areas without an observer if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver of the observer requirement for that trip pursuant to paragraphs (k)(3) and (k)(4)(ii) of this section.

(2) *Vessel notification procedures—(i) Limited access vessels.* Limited access vessel owners, operators, or managers shall notify NMFS/FSB by telephone not more than 10 days prior to the beginning of any scallop trip of the time, port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl, or general category vessel.

(ii) *LAGC IFQ vessels.* LAGC IFQ vessel owners, operators, or managers must notify the NMFS/FSB by telephone by 0001 hr of the Thursday preceding the week (Sunday through

Saturday) that they intend to start any open area or access area scallop trip and must include the port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl vessel. If selected, up to two trips that start during the specified week (Sunday through Saturday) can be selected to be covered by an observer. NMFS/FSB must be notified by the owner, operator, or vessel manager of any trip plan changes at least 48 hr prior to vessel departure.

(3) *Selection of scallop trips for observer coverage.* Based on predetermined coverage levels for various permit categories and areas of the scallop fishery that are provided by NMFS in writing to all observer service providers approved pursuant to paragraph (h) of this section, NMFS shall notify the vessel owner, operator, or vessel manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified scallop trip, within 24 hr of the vessel owner's, operator's, or vessel manager's notification of the prospective scallop trip, as specified in paragraph (k)(2) of this section. Any request to carry an observer may be waived by NMFS. All waivers for observer coverage shall be issued to the vessel by VMS so as to have on-board verification of the waiver. A vessel may not fish in an area with an observer waiver confirmation number that does not match the scallop trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(4) *Procurement of observer services by scallop vessels.* (i) An owner of a scallop vessel required to carry an observer under paragraph (k)(3) of this section must arrange for carrying an observer certified through the observer training class operated by the NMFS/FSB from an observer service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected to carry an observer must contact the observer service provider and must provide at least 48-hr notice in advance of the fishing trip for the provider to arrange for observer deployment for the specified trip. The observer service provider will notify the vessel owner, operator, or manager within 18 hr whether they have an available observer. A list of approved observer service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/femad/fsb/*. The observer service provider may take up to 48 hr to arrange for observer

**55682** **Federal Register** / Vol. 83, No. 216 / Wednesday, November 7, 2018 / Proposed Rules

deployment for the specified scallop trip.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure a certified observer within 48 hr of the advance notification to the provider due to the unavailability of an observer may request a waiver from NMFS/FSB from the requirement for observer coverage for that trip, but only if the owner, operator, or vessel manager has contacted all of the available observer service providers to secure observer coverage and no observer is available. NMFS/FSB shall issue such a waiver within 24 hr, if the conditions of this paragraph (g)(4)(ii) are met. A vessel may not begin the trip without being issued a waiver.

(5) Owners of scallop vessels shall be responsible for paying the cost of the observer for all scallop trips on which an observer is carried onboard the vessel, regardless of whether the vessel lands or sells sea scallops on that trip, and regardless of the availability of set-aside for an increased possession limit or reduced DAS accrual rate. The owners of vessels that carry an observer may be compensated with a reduced DAS accrual rate for open area scallop trips or additional scallop catch per day in Sea Scallop Access Areas or additional catch per open area or access area trip for LAGC IFQ trips in order to help defray the cost of the observer, under the program specified in §§ 648.53 and 648.60.

(i) Observer service providers shall establish the daily rate for observer coverage on a scallop vessel on an Access Area trip or open area DAS or IFQ scallop trip consistent with paragraphs (k)(5)(i)(A) and (B), respectively, of this section.

(A) *Access Area trips.* (*1*) For purposes of determining the daily rate for an observed scallop trip on a limited access vessel in a Sea Scallop Access Area when that specific Access Area's observer set-aside specified in § 648.60(d)(1) has not been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, or any portion of a 24-hr period, regardless of the calendar day. For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time at sea equals 27 hr, which would equate to 2 full "days."

(*2*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for an observed scallop trip on a limited access vessel taken after NMFS has announced the industry-funded observer set-aside in that specific Access Area has been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(*3*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for observed scallop trips on an LAGC vessel, regardless of the status of the industry-funded observer set-aside, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(B) *Open area scallop trips.* For purposes of determining the daily rate for an observed scallop trip for DAS or LAGC IFQ open area trips, regardless of the status of the industry-funded observer set-aside, a service provider shall charge dock to dock where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on the July 1st at 10 p.m. and lands on July 3rd at 1 a.m., the time at sea equals 27 hr, so the provider would charge 1 day and 3 hr.

(ii) NMFS shall determine any reduced DAS accrual rate and the amount of additional pounds of scallops per day fished in a Sea Scallop Access Area or on an open area LAGC IFQ trips for the applicable fishing year based on the economic conditions of the scallop fishery, as determined by best available information. Vessel owners and observer service providers shall be notified through the Small Entity Compliance Guide of any DAS accrual rate changes and any changes in additional pounds of scallops determined by the Regional Administrator to be necessary. NMFS shall notify vessel owners and observer providers of any adjustments.

(iii) Owners of scallop vessels shall pay observer service providers for observer services within 45 days of the end of a fishing trip on which an observer deployed.

(6) When the available DAS or TAC set-aside for observer coverage is exhausted, vessels shall still be required to carry an observer as specified in this section, and shall be responsible for paying for the cost of the observer, but shall not be authorized to harvest additional pounds or fish at a reduced DAS accrual rate.

(l) *NE multispecies observer coverage*—(1) *Pre-trip notification.* Unless otherwise specified in this paragraph (l), or notified by the Regional Administrator, the owner, or manager of a vessel (*i.e.,* vessel manager or sector manager) issued a limited access NE multispecies permit that is fishing under a NE multispecies DAS or on a sector trip, as defined in this part, must provide advanced notice to NMFS of the vessel name, permit number, and sector to which the vessel belongs, if applicable; contact name and telephone number for coordination of observer deployment; date, time, and port of departure; and the vessel's trip plan, including area to be fished, whether a monkfish DAS will be used, and gear type to be used at least 48 hr prior to departing port on any trip declared into the NE multispecies fishery pursuant to § 648.10 or § 648.85, as instructed by the Regional Administrator, for the purposes of selecting vessels for observer deployment. For trips lasting 48 hr or less in duration from the time the vessel leaves port to begin a fishing trip until the time the vessel returns to port upon the completion of the fishing trip, the vessel owner, operator, or manager may make a weekly notification rather than trip-by-trip calls. For weekly notifications, a vessel must notify NMFS by 0001 hr of the Friday preceding the week (Sunday through Saturday) that it intends to complete at least one NE multispecies DAS or sector trip during the following week and provide the date, time, port of departure, area to be fished, whether a monkfish DAS will be used, and gear type to be used for each trip during that week. Trip notification calls must be made no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS of any trip plan changes at least 24 hr prior to vessel departure from port. A vessel may not begin the trip without being issued an observer notification or a waiver by NMFS.

(2) *Vessel selection for observer coverage.* NMFS shall notify the vessel owner, operator, or manager whether the vessel must carry an observer, or if a waiver has been granted, for the

_0000016986

specified trip within 24 hr of the vessel owner's, operator's or manager's notification of the prospective trip, as specified in paragraph (l)(1) of this section. All trip notifications shall be issued a unique confirmation number. A vessel may not fish on a NE multispecies DAS or sector trip with an observer waiver confirmation number that does not match the trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are valid for 48 hr from the intended sail date. If a trip is interrupted and returns to port due to bad weather or other circumstance beyond the operator's control, and goes back out within 48 hr, the same confirmation number and observer status remains. If the layover time is greater than 48 hr, a new trip notification must be made by the operator, owner, or manager of the vessel.

(3) *NE multispecies monitoring program goals and objectives.* Monitoring programs established for the NE multispecies are to be designed and evaluated consistent with the following goals and objectives:

(i) Improve documentation of catch:

(A) Determine total catch and effort, for each sector and common pool, of target or regulated species; and

(B) Achieve coverage level sufficient to minimize effects of potential monitoring bias to the extent possible while maintaining as much flexibility as possible to enhance fleet viability.

(ii) Reduce the cost of monitoring:

(A) Streamline data management and eliminate redundancy;

(B) Explore options for cost-sharing and deferment of cost to industry; and

(C) Recognize opportunity costs of insufficient monitoring.

(iii) Incentivize reducing discards:

(A) Determine discard rate by smallest possible strata while maintaining cost-effectiveness; and

(B) Collect information by gear type to accurately calculate discard rates.

(iv) Provide additional data streams for stock assessments:

(A) Reduce management and/or biological uncertainty; and

(B) Perform biological sampling if it may be used to enhance accuracy of mortality or recruitment calculations.

(v) Enhance safety of monitoring program.

(vi) Perform periodic review of monitoring program for effectiveness.

(m) *Atlantic herring monitoring coverage*—(1) *Monitoring requirements.* (i) In addition to the requirement for any vessel holding an Atlantic herring permit to carry a NMFS-certified observer described in paragraph (a) of this section, vessels issued an All Areas

or Areas 2/3 Limited Access Herring Permit are subject to industry-funded monitoring (IFM) requirements on declared Atlantic herring trips, unless the vessel is carrying a NMFS-certified observer to fulfill Standard Bycatch Reporting Methodology requirements. An owner of a midwater trawl vessel, required to carry a NMFS-certified observer when fishing in Northeast Multispecies Closed Areas at § 648.202(b), may purchase an IFM high volume fisheries (HVF) observer to access Closed Areas on a trip-by-trip basis. General requirements for IFM programs in New England Council FMPs are specified in paragraph (g) of this section. Possible IFM monitoring for the Atlantic herring fishery includes NMFS-certified observers, at-sea monitors, and electronic monitoring and portside samplers, as defined in § 648.2.

(A) IFM HVF observers shall collect the following information:

(1) Fishing gear information (*e.g.,* size of nets, mesh sizes, and gear configurations);

(2) Tow-specific information (*e.g.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

(3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(4) Species, weight, and disposition of all retained catch on unobserved hauls;

(5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(6) Whole specimens, photos, length information, and biological samples (*e.g.,* scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);

(7) Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(8) Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

(B) IFM HVF at-sea monitors shall collect the following information:

(1) Fishing gear information (*e.g.,* size of nets, mesh sizes, and gear configurations);

(2) Tow-specific information (*e.g.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

(3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(4) Species, weight, and disposition of all retained catch on unobserved hauls;

(5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(6) Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

(7) Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(8) Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

(9) The New England Council may recommend that at-sea monitors collect additional biological information upon request. Revisions to the duties of an at-sea monitor, such that additional biological information would be collected, may be done via a framework adjustment. At-sea monitor duties may also be revised to collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the duties for at-sea monitors. NMFS shall implement revisions to at-sea monitor duties in accordance with the APA.

(C) IFM Portside samplers shall collect the following information:

(1) Species, weight, and disposition of all retained catch (fish, sharks, crustaceans, invertebrates, and debris) on sampled trips;

(2) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling; and

(3) Whole specimens, photos, length information, and biological samples (*i.e.,* scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes).

(ii) Vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to IFM at-sea monitoring coverage. If the New England Council determines that electronic monitoring, used in conjunction with portside sampling, is an adequate substitute for at-sea monitoring on vessels fishing with midwater trawl gear, and it is approved by the Regional Administrator as specified in (m)(1)(iii), then owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose either IFM at-sea monitoring coverage or IFM electronic monitoring and IFM portside sampling coverage, pursuant with requirements in paragraphs (h) and (i) of this section. Once owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose an IFM monitoring type, vessel owners must select one IFM monitoring type per fishing year and notify NMFS of their selected IFM monitoring type via selection form six months in advance of

the beginning of the fishing year. NMFS will provide vessels owners with selection forms no later than June 1 of each year.

(A) In a future framework adjustment, the New England Council may consider if electronic monitoring and portside sampling coverage is an adequate substitute for at-sea monitoring coverage for Atlantic herring vessels that fish with purse seine and/or bottom trawl gear.

(B) IFM coverage targets for the Atlantic herring fishery are calculated by NMFS, in consultation with New England Council staff.

(C) If IFM coverage targets do not match for the Atlantic herring and Atlantic mackerel fisheries, then the higher IFM coverage target would apply on trips declared into both fisheries.

(D) Vessels intending to land less than 50 mt of Atlantic herring are exempt from IFM requirements, provided that the vessel requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(B) and (m)(3) of this section. Vessels issued a waiver must land less than 50 mt of Atlantic herring on that trip.

(E) A wing vessel (*i.e.,* midwater trawl vessel pair trawling with another midwater trawl vessel) is exempt from IFM requirements on a trip, provided the wing vessel does not possess or land any fish on that trip and requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(C) and (m)(3) of this section.

(F) Two years after implementation of IFM in the Atlantic herring fishery, the New England Council will examine the results of any increased coverage in the Atlantic herring fishery and consider if adjustments to the IFM coverage targets are warranted.

(iii) Electronic monitoring and portside sampling coverage may be used in place of at-sea monitoring coverage in the Atlantic herring fishery, if the electronic monitoring technology is deemed sufficient by the New England Council. The Regional Administrator, in consultation with the New England Council, may approve the use of electronic monitoring and portside sampling for the Atlantic herring fishery in a manner consistent with the Administrative Procedure Act, with final measures published in the **Federal Register**. A vessel electing to use electronic monitoring and portside sampling in lieu of at-sea monitoring must develop a vessel monitoring plan to implement an electronic monitoring and portside sampling program that NMFS determines is sufficient for monitoring catch, discards and slippage events. The electronic monitoring and

portside sampling program shall be reviewed and approved by NMFS as part of a vessel's monitoring plan on a yearly basis in a manner consistent with the Administrative Procedure Act.

(iv) Owners, operators, or managers of vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit are responsible for their vessel's compliance with IFM requirements. When NMFS notifies a vessel owner, operator, or manager of the requirement to have monitoring coverage on a specific declared Atlantic herring trip, that vessel may not fish for, take, retain, possess, or land any Atlantic herring without the required monitoring coverage. Vessels may only embark on a declared Atlantic herring trip without the required monitoring coverage if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver for the required monitoring coverage for that trip, pursuant to paragraphs (m)(2)(iii)(B) and (C) and paragraph (m)(3) of this section.

(v) To provide the required IFM coverage aboard declared Atlantic herring trips, NMFS-certified observers and monitors must hold a high volume fisheries certification from NMFS/FSB. See details of high volume certification at *https://www.nefsc.noaa.gov/fsb/ training/*.

(2) *Pre-trip notification.* (i) At least 48 hr prior to the beginning of any trip on which a vessel may harvest, possess, or land Atlantic herring, the owner, operator, or manager of a vessel issued a Limited Access Herring Permit, or a vessel issued an Areas 2/3 Open Access Herring Permit on a declared herring trip, or a vessel issued an All Areas Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), or a vessel acting as a herring carrier must notify NMFS/FSB of the trip.

(ii) The notification to NMFS/FSB must include the following information: Vessel name or names in the cases of paired midwater trawlers, permit category, and permit number; contact name for coordination of monitoring coverage; telephone number for contact; the date, time, and port of departure; gear type; target species; trip length and port of landing; and intended area of fishing.

(iii) For vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit, the trip notification must also include the following requests, if appropriate:

(A) For IFM NMFS-certified observer coverage aboard vessels fishing with midwater trawl gear to access the

Northeast Multispecies Closed Areas, consistent with requirements at § 648.202(b), at any point during the trip;

(B) For a waiver of IFM requirements on a trip that shall land less than 50 mt of Atlantic herring; and

(C) For a waiver of IFM requirements on trip by a wing vessel as described in paragraph (m)(ii)(E) of this section.

(iv) Trip notification must be provided no more than 9 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS/FSB of any trip plan changes at least 12 hr prior to vessel departure from port.

(3) *Selection of trips for monitoring coverage.* NMFS shall notify the owner, operator, and/or manager of a vessel with an Atlantic herring permit whether a declared Atlantic herring trip requires coverage by a NMFS-funded observer or whether a trip requires IFM coverage. NMFS shall also notify the owner, operator, and/or manager of vessel if a waiver has been granted, either for the NMFS-funded observer or for IFM coverage, as specified in paragraph (m)(2) of this section. All waivers for monitoring coverage shall be issued to the vessel by VMS so that there is an on-board verification of the waiver. A waiver is invalid if the fishing behavior on that trip is inconsistent with the terms of the waiver.

(4) *Procurement of monitoring services by Atlantic herring vessels.* (i) An owner of an Atlantic herring vessel required to have monitoring under paragraph (m)(3) of this section must arrange for monitoring by an individual certified through training classes operated by the NMFS/FSB and from a monitoring service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected for monitoring must contact a monitoring service provider prior to the beginning of the trip and the monitoring service provider will notify the vessel owner, operator, or manager whether monitoring is available. A list of approved monitoring service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/ femad/fsb/*.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure monitoring due to the unavailability of monitoring may request a waiver from NMFS/FSB from the requirement for monitoring on that trip, but only if the owner, operator, or vessel manager has contacted all of the available monitoring service providers to secure monitoring and no monitoring is available. NMFS/ FSB shall issue a waiver, if the

_0000016988

conditions of this paragraph (m)(4)(ii) are met. A vessel without monitoring coverage may not begin a declared Atlantic herring trip without having been issued a waiver.

(iii) Vessel owners shall pay service providers for monitoring services within 45 days of the end of a fishing trip that was monitored.

(5) When vessels issued limited access herring permits are working cooperatively in the Atlantic herring fishery, including pair trawling, purse seining, and transferring herring at-sea, each vessel must provide to observers or monitors, when requested, the estimated weight of each species brought on board and the estimated weight of each species released on each tow.

(6) *Sampling requirements for NMFS-certified observer and monitors.* In addition to the requirements at § 648.11(d)(1) through (7), an owner or operator of a vessel issued a limited access herring permit on which a NMFS-certified observer or monitor is embarked must provide observers or monitors:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers or monitors to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers or monitors; and collecting and carrying baskets of fish when requested by the observers or monitors.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(iv) Visual access to the net, the codend of the net, and the purse seine bunt and any of its contents after pumping has ended and before the pump is removed from the net. On trawl vessels, the codend including any remaining contents must be brought on board, unless bringing the codend on board is not possible. If bringing the codend on board is not possible, the vessel operator must ensure that the observer or monitor can see the codend and its contents as clearly as possible before releasing its contents.

(7) *Measures to address slippage.* (i) No vessel issued a limited access herring permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish which can be pumped from the net prior to release.

(ii) Vessels may make test tows without pumping catch on board if the net is re-set without releasing its contents provided that all catch from test tows is available to the observer to sample when the next tow is brought on board for sampling.

(iii) If a vessel issued any limited access herring permit slips catch, the vessel operator must report the slippage event on the Atlantic herring daily VMS catch report and indicate the reason for slipping catch. Additionally, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iv) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any of the reasons described in paragraph (m)(4)(i) of this section when an observer or monitor is aboard, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(v) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any reason on a trip selected by NMFS for portside sampling, pursuant to paragraph (m)(3) of this section, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(vi) If catch is slipped by a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit for any reason not described in paragraph (m)(4)(i) of this section when an observer or monitor is aboard, the vessel

operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

(n) *Atlantic mackerel, squid, and butterfish observer coverage*—(1) *Pre-trip notification.* (i) A vessel issued a limited access Atlantic mackerel permit, as specified at § 648.4(a)(5)(iii), must, for the purposes of observer deployment, have a representative provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, telephone number or email address for contact; and the date, time, port of departure, gear type, and approximate trip duration, at least 48 hr, but no more than 10 days, prior to beginning any fishing trip, unless it complies with the possession restrictions in paragraph (n)(1)(iii) of this section.

(ii) A vessel that has a representative provide notification to NMFS as described in paragraph (n)(1)(i) of this section may only embark on a mackerel trip without an observer if a vessel representative has been notified by NMFS that the vessel has received a waiver of the observer requirement for that trip. NMFS shall notify a vessel representative whether the vessel must carry an observer, or if a waiver has been granted, for the specific mackerel trip, within 24 hr of the vessel representative's notification of the prospective mackerel trip, as specified in paragraph (n)(1)(i) of this section. Any request to carry an observer may be waived by NMFS. A vessel that fishes with an observer waiver confirmation number that does not match the mackerel trip plan that was called in to NMFS is prohibited from fishing for, possessing, harvesting, or landing mackerel except as specified in paragraph (n)(1)(iii) of this section. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(iii) *Trip limits:* A vessel issued a limited access mackerel permit, as specified in § 648.4(a)(5)(iii), that does not have a representative provide the trip notification required in paragraph (n)(1)(i) of this section is prohibited from fishing for, possessing, harvesting, or landing more than 20,000 lb (9.07 mt) of mackerel per trip at any time, and may only land mackerel once on any calendar day, which is defined as the 24-hr period beginning at 0001 hours and ending at 2400 hours.

(iv) If a vessel issued a limited access Atlantic mackerel permit, as specified in § 648.4(a)(5)(iii), intends to possess, harvest, or land more than 20,000 lb (9.07 mt) of mackerel per trip or per

calendar day, and has a representative notify NMFS of an upcoming trip, is selected by NMFS to carry an observer, and then cancels that trip, the representative is required to provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, and telephone number or email address for contact, and the intended date, time, and port of departure for the cancelled trip prior to the planned departure time. In addition, if a trip selected for observer coverage is cancelled, then that vessel is required to carry an observer, provided an observer is available, on its next trip.

(2) *Sampling requirements for limited access Atlantic mackerel and longfin squid/butterfish moratorium permit holders.* In addition to the requirements in paragraphs (d)(1) through (7) of this section, an owner or operator of a vessel issued a limited access Atlantic mackerel or longfin squid/butterfish moratorium permit on which a NMFS-certified observer is embarked must provide observers:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers; and collecting and carrying baskets of fish when requested by the observers.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(3) *Measures to address slippage.* (i) No vessel issued a limited access Atlantic mackerel or a longfin squid/butterfish moratorium permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for sampling and inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish that can be pumped from the net prior to release.

(ii) If a vessel issued any limited access Atlantic mackerel permit slips catch, the vessel operator must report the slippage event on the Atlantic mackerel and longfin squid daily VMS catch report and indicate the reason for slipping catch. Additionally, vessels issued a limited Atlantic mackerel permit or a longfin squid/butterfish moratorium permit, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iii) If a vessel issued a limited access Atlantic mackerel permit slips catch for any of the reasons described in paragraph (n)(3)(i) of this section, the vessel operator must move at least 15 nm (27.8 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.8 km) from the slippage event location for the remainder of the fishing trip.

(iv) If catch is slipped by a vessel issued a limited access Atlantic mackerel permit for any reason not described in paragraph (n)(3)(i) of this section, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

■ 5. Amend § 648.14 by revising paragraphs (e), (r)(1)(vi)(A), (r)(2)(v), and (r)(2)(ix) through (xi) and adding paragraphs (r)(2)(xiii) and (xiv) to read as follows:

§ 648.14   Prohibitions.

\*    \*    \*    \*    \*

(e) *Observer program.* It is unlawful for any person to do any of the following:

(1) Assault, resist, oppose, impede, harass, intimidate, or interfere with or bar by command, impediment, threat, or coercion any NMFS-certified observer or monitor conducting his or her duties; any authorized officer conducting any search, inspection, investigation, or seizure in connection with enforcement of this part; any official designee of the Regional Administrator conducting his or her duties, including those duties authorized in § 648.7(g).

(2) Refuse monitoring coverage by a NMFS-certified observer or monitor if selected for monitoring coverage by the Regional Administrator or the Regional Administrator's designee.

(3) Fail to provide information, notification, accommodations, access, or reasonable assistance to either a NMFS-certified observer or monitor conducting his or her duties as specified in § 648.11.

(4) Submit false or inaccurate data, statements, or reports.

\*    \*    \*    \*    \*

(r) \*   \*   \*

(1) \*   \*   \*

(vi) \*   \*   \*

(A) For the purposes of observer deployment, fail to notify NMFS at least 48 hr prior to departing on a declared herring trip with a vessel issued an All Areas Limited Access Herring Permit and/or an Area 2 and 3 Limited Access Herring Permit and fishing with midwater trawl or purse seine gear, or on a trip with a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit that is fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), pursuant to the requirements in § 648.80(d) and (e).

\*    \*    \*    \*    \*

(2) \*   \*   \*

(v) Fish with midwater trawl gear in any Northeast Multispecies Closed Area, as defined in § 648.81(a)(3),(4), (5), and (c)(3) and (4), without a NMFS-certified observer on board, if the vessel has been issued an Atlantic herring permit.

\*   \*   \*

(ix) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to move 15 nm (27.78 km), as required by §§ 648.11(m)(8)(iv) and (v) and § 648.202(b)(4)(iv).

(x) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to immediately return to port, as required by § 648.11(m)(8)(vi) and § 648.202(b)(4)(iv).

(xi) Fail to complete, sign, and submit a Released Catch Affidavit as required by § 648.11(m)(8)(iii) and § 648.202(b)(4)(ii).

\*   \*   \*

(xiii) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to comply with industry-funded monitoring requirements at § 648.11(m).

(xiv) For a vessel with All Areas or Areas 2/3 Limited Access Herring Permit, fail to comply with its NMFS-approved vessel monitoring plan requirements, as described at § 648.11(m).

\*    \*    \*    \*    \*

■ 6. In § 648.80 revise paragraph (d)(5) and (e)(5) to read as follows:

**§648.80  NE Multispecies regulated mesh areas and restrictions on gear and methods of fishing.**

\*　　\*　　\*　　\*　　\*

(d) \* \* \*

(5) To fish for herring under this exemption, a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, or a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), must provide notice of the following information to NMFS at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment: Vessel name; contact name for coordination of observer deployment; telephone number for contact; the date, time, and port of departure; and

\*　　\*　　\*　　\*　　\*

(e) \* \* \*

(5) To fish for herring under this exemption, vessels that have an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit must provide notice to NMFS of the vessel name; contact name for coordination of observer deployment; telephone number for contact; and the date, time, and port of departure, at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment; and

\*　　\*　　\*　　\*　　\*

■ 7. In § 648.86 revise paragraph (a)(3)(ii)(A)(*1*) to read as follows:

**§648.86  NE Multispecies possession restrictions.**

\*　　\*　　\*　　\*　　\*

(a) \* \* \*

(3) \* \* \*

(ii) \* \* \*

(A) \* \* \*

(*1*) 648.86(a)(3)(ii) *Haddock incidental catch cap.* (A)(*1*) When the Regional Administrator has determined that the incidental catch allowance for a given haddock stock, as specified in § 648.90(a)(4)(iii)(D), has been caught, no vessel issued an Atlantic herring permit and fishing with midwater trawl gear in the applicable stock area, *i.e.,* the Herring GOM Haddock Accountability Measure (AM) Area or Herring GB Haddock AM Area, as defined in paragraphs (a)(3)(ii)(A)(*2*) and (*3*) of this section, may fish for, possess, or land herring in excess of 2,000 lb (907.2 kg) per trip in or from that area, unless all herring possessed and landed by the vessel were caught outside the applicable AM Area and the vessel's gear is stowed and not available for immediate use as defined in § 648.2 while transiting the AM Area. Upon this determination, the haddock possession limit is reduced to 0 lb (0 kg) for a vessel issued a Federal Atlantic herring permit and fishing with midwater trawl gear or for a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, regardless of area fished or gear used, in the applicable AM area, unless the vessel also possesses a NE multispecies permit and is operating on a declared (consistent with § 648.10(g)) NE multispecies trip. In making this determination, the Regional Administrator shall use haddock catches observed by NMFS-certified observers or monitors by herring vessel trips using midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), expanded to an estimate of total haddock catch for all such trips in a given haddock stock area.

\*　　\*　　\*　　\*　　\*

**§§ 648.10, 648.14, 648.51, 648.59, 648.80, and 648.86  [Amended]**

■ 8. In the table below, for each section indicated in the left column, remove the text indicated in the middle column from wherever it appears in the section, and add the text indicated in the right column:

| Section | Remove | Add |
| --- | --- | --- |
| 648.10(f)(4) | NMFS-approved | NMFS-certified. |
| 648.14(i)(3)(ix) | NMFS-approved | NMFS-certified. |
| 648.14(i)(3)(ix)(C) | 648.11(g) | 648.11(k). |
| 648.14(k)(2)(iii) | 648.11(k) | 648.11(l). |
| 648.14(k)(2)(iv) | 648.11(k) | 648.11(l). |
| 648.51(c)(4) | 648.11(g) | 648.11(k). |
| 648.51(e)(3)(iii) | 648.11(g) | 648.11(k). |
| 648.59(b)(2) | 648.11(g) | 648.11(k). |
| 648.80(d)(3) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.80(e)(2)(ii) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.86(a)(3)(ii) | NMFS-approved | NMFS-certified. |
| 648.202(b)(4)(iv) | 648.11(m)(4)(iv) and (v) | 648.11(m)(4)(iv) and (vi). |

[FR Doc. 2018–24087 Filed 11–6–18; 8:45 am]

**BILLING CODE 3510–22–P**

A74

**7414**    **Federal Register** / Vol. 85, No. 26 / Friday, February 7, 2020 / Rules and Regulations

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 648

[Docket No. 200115–0017]

RIN 0648–BG91

### Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** This action implements the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment. This amendment allows the New England Council flexibility to increase monitoring in certain fishery management plans to assess the amount and type of catch and reduce uncertainty around catch estimates. This amendment establishes a process to standardize future industry-funded monitoring programs in New England fishery management plans and establishes industry-funded monitoring in the Atlantic herring fishery. This action helps ensure consistency in industry-funded monitoring programs across fisheries and increases monitoring in the Atlantic herring fishery.

**DATES:** Effective March 9, 2020, except for §§ 648.11(m) and 648.14(r) which are effective April 1, 2020.

**ADDRESSES:** Copies of the Industry-Funded Monitoring Omnibus Amendment, including the Environmental Assessment, the Regulatory Impact Review, and the Initial Regulatory Flexibility Analysis (EA/RIR/IRFA) prepared in support of this action are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http://www.nefmc.org.*

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this rule may be submitted to the Greater Atlantic Regional Fisheries Office and by email to *OIRA_Submission@omb.eop.gov* or fax to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:** Carrie Nordeen, Fishery Policy Analyst,

phone: (978) 282–9272 or email: *Carrie.Nordeen@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Background

The New England Fishery Management Council developed an amendment to allow industry-funded monitoring in its fishery management plans (FMPs), except those managed jointly with the Mid-Atlantic Fishery Management Council, and establish industry-funded monitoring in the Atlantic herring fishery. The amendment standardizes the development and administration of future industry-funded monitoring programs in New England Council FMPs and increases monitoring in the herring fishery to help provide increased accuracy in catch estimates.

The New England Industry-Funded Monitoring Omnibus Amendment provides a mechanism to allow the Council flexibility to increase monitoring in its FMPs to assess the amount and type of catch and reduce uncertainty around catch estimates. Industry-funded monitoring would be in addition to monitoring requirements associated with the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), and the Marine Mammal Protection Act (MMPA). This amendment remedies NMFS disapprovals of previous Council proposals for industry-funded monitoring that either required NMFS to spend money that was not yet appropriated or split monitoring costs between the fishing industry and NMFS in ways that were inconsistent with Federal law.

To remedy the disapproved measures, the amendment uses a monitoring coverage level, as opposed to a mandatory coverage level, to allow NMFS to approve new monitoring programs without committing to support coverage levels above appropriated funding or before funding is determined to be available. Using a coverage target instead of mandatory coverage level means the realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year. Industry-funded monitoring coverage targets are specified in individual FMPs and realized coverage for a fishery in a given year would be anywhere from no additional coverage above SBRM up to the specified coverage target. Additionally, the amendment defines cost responsibilities for industry-funded monitoring programs between the fishing industry and NMFS in a manner

that is consistent with legal requirements. Monitoring cost responsibilities may be divided between the industry and the government, provided government cost responsibilities are paid by the government and the government's costs are differentiated from the industry's cost responsibilities. This amendment specifies that industry-funded monitoring costs are delineated between NMFS administrative costs and industry sampling costs.

The Industry-Funded Monitoring Amendment was adopted by the Council on April 20, 2017. The Council refined its recommendations for industry-funded monitoring in the herring fishery on April 19, 2018. We published a notice of availability (NOA) for the amendment in the **Federal Register** on September 19, 2018 (83 FR47326), with a comment period ending November 19, 2018. We published a proposed rule for the amendment in the **Federal Register** on November 7, 2018 (83 FR 55665), with a comment period ending December 24, 2018. After considering public comment, we approved the Industry-Funded Monitoring Amendment, on behalf of the Secretary of Commerce, on December 18, 2018. We informed the Council of the amendment's approval in a letter dated December 18, 2018. This final rule implements the Industry-Funded Monitoring Amendment as approved.

### Approved Omnibus Measures

This amendment standardizes the development and administration of future industry-funded monitoring programs in New England Council FMPs, including the Atlantic Herring FMP, the Atlantic Salmon FMP, the Atlantic Sea Scallop FMP, the Deep-Sea Red Crab FMP, the Northeast Multispecies FMP, and the Northeast Skate FMP. In the future, if the Council develops an industry-funded monitoring programs, the Council would develop those programs consistent with the specifications and requirements for industry-funded programs established in this amendment. The existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs would not be affected by this amendment. While cost responsibilities and monitoring service provider requirements established in this amendment are consistent with the existing programs, the industry-funded monitoring programs in the Multispecies and Scallop FMPS would not be included in the proposed process to prioritize industry-funded monitoring programs for available Federal funding.

_0000017731

The Council may incorporate these existing industry-funded monitoring programs into the prioritization process in a future action. Additionally, future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the omnibus measures.

This amendment provides for industry-funded monitoring coverage targets in Council FMPs, noting that annual funding available to cover NMFS cost responsibilities would likely vary and dictate realized coverage levels. The realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

The standards for future industry-funded monitoring programs in New England fisheries apply to several types of monitoring, including observing, at-sea monitoring, electronic monitoring, portside sampling, and dockside monitoring. This rule establishes the following principles to guide the Council's consideration when developing future industry-funded monitoring programs:

• A clear need or reason for the data collection;
• Objective design criteria;
• Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;
• Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;
• Prioritize the use of modern technology to the extent practicable; and
• Incentives for reliable self-reporting.

All of this amendment's omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs and do not directly affect fishing effort or amounts of fish harvested. However, the omnibus measures may have indirect effects on Council FMPs. Standardizing the process for developing and administering future industry-funded monitoring programs may help reduce the administrative burden associated with implementing new programs and may lead to greater consistency in the information collected through industry-funded monitoring programs. Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources. The prioritization process is expected to help ensure that available Federal

funding is used to support industry-funded monitoring programs consistent with Council monitoring priorities. While industry-funded monitoring programs are expected to have an economic impact on the fishing industry, standard cost responsibilities may help the industry better understand and plan for their industry-funded monitoring cost responsibilities. Standard cost responsibilities may also aid the industry in negotiating coverage costs with service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Monitoring set-aside programs may also help minimize the economic burden on the fishing industry associated with paying for monitoring coverage.

*1. Standard Process To Implement and Revise Industry-Funded Monitoring Programs*

This amendment specifies that future industry-funded monitoring programs are implemented through an amendment to the relevant FMP. Because industry-funded monitoring programs have the potential to economically impact the fishing industry, the Council determined that implementing new industry-funded monitoring programs through an amendment would help ensure additional public notice and comment during the development of new programs. The details of any new industry-funded monitoring program implemented via amendment may include, but are not limited to:

• Level and type of coverage target;
• Rationale for level and type of coverage;
• Minimum level of coverage necessary to meet coverage goals;
• Consideration of waivers if coverage targets cannot be met;
• Process for vessel notification and selection;
• Cost collection and administration;
• Standards for monitoring service providers; and
• Any other measures necessary to implement the industry-funded monitoring program.

This amendment also specifies that future industry-funded monitoring programs, implemented through an amendment, may be revised through framework adjustments to the relevant FMP. Additional National Environmental Policy Act (NEPA) analysis would be required for any action implementing and/or modifying industry-funded monitoring programs, regardless if the vehicle is an amendment or framework adjustment.

*2. Standard Cost Responsibilities*

Cost responsibilities for industry-funded monitoring must be divided by cost category, rather than a dollar amount or percentage of total cost, between the fishing industry and NMFS. NMFS is obligated to pay any cost for which the benefit of the expenditure accrues to the government. This means that NMFS would be responsible for administrative costs to support industry-funded programs, but not the costs associated with sampling activities. Costs associated with sampling activities would be paid by the fishing industry. NMFS may offset industry cost responsibilities if Federal funding is available, but NMFS cannot be obligated to pay sampling costs in industry-funded sampling programs. Cost responsibilities dictated by legal requirements cannot be modified through this amendment. Instead, this amendment codifies NMFS cost responsibilities for industry-funded monitoring in New England FMPs to ensure consistency and compliance with legal requirements.

NMFS is responsible for paying costs associated with setting standards for, monitoring the performance of, and administering industry-funded monitoring programs. These program elements would include:

• The labor and facilities costs associated with training and debriefing of monitors;
• NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);
• Certification of monitoring providers and individual observers or monitors;
• Performance monitoring to maintain certificates;
• Developing and executing vessel selection;
• Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and
• Costs associated with liaison activities between service providers, NMFS, Coast Guard, Council, sector managers, and other partners.

NMFS costs to administer industry-funded monitoring for all monitoring types would be paid with Federal funds. The industry is responsible for funding all other monitoring program costs, including but not limited to:

• Costs to the service provider for deployments and sampling (*e.g.,* travel and salary for observer deployments and debriefing);
• Equipment, as specified by NMFS, to the extent not provided by NMFS (*e.g.,* electronic monitoring system);

_0000017732

• Costs to the service provider for observer or monitor time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time;

• Costs to the service provider for installation and maintenance of electronic monitoring systems;

• Provider overhead and project management costs (*e.g.*, provider office space, administrative and management staff, recruitment costs, salary and per diem for trainees); and

• Other costs of the service provider to meet performance standards laid out by an FMP.

The cost responsibilities described above are consistent with the existing scallop and multispecies industry-funded monitoring programs, although cost responsibilities are not explicitly defined in those FMPs. This amendment codifies NMFS cost responsibilities for industry-funded monitoring for all New England FMPs, but it does not alter other current requirements for existing industry-funded monitoring programs.

*3. Standard Requirements for Monitoring Service Providers and Observers/Monitors*

The SBRM Omnibus Amendment (80 FR 37182; June 30, 2015) adopted general industry-funded observer service provider and observer requirements (at 50 CFR 648.11(h) and (i), respectively) should a Council develop and implement a requirement or option for an industry-funded observer program to support SBRM in any New England or Mid-Atlantic Council FMP. However, the SBRM Amendment did not address requirements for other types of industry-funded monitoring programs or coverage in addition to SBRM.

This amendment modifies and expands existing observer and service provider requirements and allows those requirements to apply to coverage supplemental to SBRM, ESA, and MMPA coverage. Specifically, this rule modifies and expands existing observer service provider requirements at § 648.11(h) to apply to service providers for observers, at-sea monitors, portside samplers, and dockside monitors. Similarly, this rule modifies and expands existing observer requirements at § 648.11(i) to apply to observers, at-sea monitors, portside samplers, and dockside monitors, described collectively as observers/monitors. These observer/monitor requirements serve as the default requirements for any future industry-funded monitoring programs in New England FMPs. The Council may add new requirements or revise existing requirements for FMP-specific industry-funded monitoring programs as part of the amendment developing those programs or the framework adjustment revising those programs.

*4. Prioritization Process*

This amendment establishes a Council-led process to prioritize industry-funded monitoring programs for available Federal funding across New England FMPs. This prioritization process allows the Council to align industry-funded monitoring programs with its monitoring priorities by recommending priorities for available NMFS funding to pay NMFS cost responsibilities associated with industry-funded monitoring. Revising the prioritization process would be done in a framework adjustment. The existing scallop and multispecies industry-funded monitoring programs will not be included in the prioritization process, unless the Council takes action in the future to include those programs in the prioritization process or develops new industry-funded monitoring programs within those FMPs consistent with this amendment.

Available Federal funding refers to any funds in excess of those allocated to meet SBRM or other existing monitoring requirements that may be used to cover NMFS costs associated with supporting industry-funded monitoring programs. Funding for SBRM, ESA, and MMPA observer coverage is not affected by this prioritization process. Any industry-funded monitoring programs will be prioritized separately from and, in addition to, any SBRM coverage or other statutory coverage requirements. The realized industry-funded monitoring coverage in a given year will be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

When there is no Federal funding available to cover NMFS cost responsibilities above SBRM coverage in a given year, then no industry-funded monitoring programs would operate that year. If available funding in a given year is sufficient to support all industry-funded monitoring programs, the prioritization process would fully operationalize the industry-funded monitoring coverage targets specified in each FMP. If there is some available funding, but not enough to support all industry-funded monitoring programs, the Council will determine how to prioritize industry-funded monitoring coverage targets for available funding across FMPs.

As part of the Council-led prioritization process, this amendment establishes an equal weighting approach to prioritize industry-funded monitoring programs for available funding. An example of an equal weighting approach would be funding all industry-funded monitoring programs at 70 percent, if only 70 percent of the Federal funding needed to administer all the programs was available. Additionally, this rule specifies that the Council will adjust the equal weighting approach on an as-needed basis. This means that the equal weighting approach will be adjusted whenever a new industry-funded monitoring program consistent with this amendment is approved or whenever an existing industry-funded monitoring program consistent with this amendment is adjusted or terminated. The Council will revise the weighting approach for the Council-led prioritization process in a framework adjustment or by considering a new weighting approach at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the weighting approach, consistent with the Administrative Procedure Act (APA).

The SBRM coverage year begins in April and extends through March. SBRM coverage levels in a given year are determined by the variability of discard rates from the previous year and the availability of SBRM funding. During the spring, NMFS determines SBRM coverage for the upcoming year. Once NMFS finalizes SBRM coverage levels for the upcoming year, NMFS will then evaluate what Federal funding is available to cover its costs for meeting the industry-funded monitoring coverage targets for the upcoming year. NMFS will provide the Council, at the earliest practicable opportunity: (1) The estimated industry-funded monitoring coverage levels, incorporating the prioritization process and weighting approach, and based on available funding, for each FMP-specific monitoring program; and (2) the rationale for the industry-funded monitoring coverage levels, including the reason for any deviation from the Council's recommendations. NMFS will inform the Council of the estimated industry-funded coverage levels during a Council meeting. At that time, the Council may recommend revisions and additional considerations by the Regional Administrator and Science and Research Director. If NMFS costs associated with industry-funded coverage targets are fully funded in a given year, NMFS will also determine, in consultation with the Council, the allocation, if any, of any remaining available funding to offset industry costs. The earlier in the year that

_0000017733

industry-funded monitoring coverage targets are set for the following year, the more time the affected fishing industry would have to plan for industry-funded monitoring the following year. FMP-specific industry-funded monitoring programs would determine if industry-funded coverage targets were administered consistent with the FMP's fishing year or the SBRM year.

*5. Monitoring Set-Aside Programs*

This amendment standardizes the process to develop future monitoring set-aside programs and allows monitoring set-aside programs to be developed in a framework adjustment to the relevant FMP. A monitoring set-aside program would use a portion of the annual catch limit (ACL) from a fishery to help offset industry cost responsibilities associated with industry-funded monitoring coverage targets. There are many possible ways to structure a monitoring set-aside program, and the details of each program would be developed on an FMP-by-FMP basis. Monitoring set-aside programs are an option to help ease industry cost responsibilities associated with industry-funded monitoring, but they likely would only help offset a portion of the industry's cost responsibilities.

The details of monitoring set-aside programs may include, but are not limited to:

• The basis for the monitoring set-aside;

• The amount of the set-aside (*e.g.*, percentage of ACL, days-at-sea (DAS));

• How the set-aside is allocated to vessels required to pay for monitoring (*e.g.*, increased possession limit, differential DAS counting, additional trips against a percent of the ACL);

• The process for vessel notification;

• How funds are collected and administered to cover the industry's costs of monitoring coverage; and

• Any other measures necessary to develop and implement a monitoring set-aside.

**Approved Atlantic Herring Measures**

This amendment establishes an industry-funded monitoring program in the Atlantic herring fishery that is expected to provide increased accuracy in catch estimates. Increased monitoring in the herring fishery will address the following goals: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and (3) affordable monitoring for the herring fishery.

This amendment establishes a 50-percent industry-funded monitoring

coverage target on vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permits fishing on a declared herring trip. The Council considered other coverage targets, including 100 percent, 75 percent, and 25 percent, but determined that the 50-percent coverage target best balanced the benefits and costs of additional monitoring. When tracking catch against catch caps in the herring fishery, analyses in the EA supporting this amendment suggest that a 50-percent coverage target would reduce the uncertainty around catch estimates, and likely result in a coefficient of variation (CV) less than 30 percent for the majority of catch caps. Additionally, the industry's cost responsibilities associated with a 50-percent coverage target are substantially less than those associated with higher coverage targets. Vessels participating in the herring fishery also participate in the Atlantic mackerel fishery. Currently, the mackerel fishery does not have an industry-funded monitoring program. If the Mid-Atlantic Council develops industry-funded monitoring in the mackerel fishery and the coverage targets do not match for the herring and mackerel fisheries, then the higher coverage target would apply on all trips declared into the fishery with the higher coverage target.

Herring coverage targets would be calculated for the SBRM year, April through March, by combining SBRM and industry-funding monitoring coverage. NMFS will determine how to calculate the coverage target, in consultation with Council staff. For example, if there is an estimated 10-percent SBRM coverage in a given year (based on allocated sea days and anticipated effort), then 40-percent industry-funded monitoring coverage will be needed to achieve the 50-percent coverage target. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel will not have SBRM coverage and industry-funded coverage on the same trip. Any vessel selected for SBRM coverage on a particular trip will not have the option of industry-funded monitoring on that trip. Per the prioritization process in the proposed omnibus measures, the realized coverage level in a given year will be determined by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the herring fishery in a given year will fall somewhere between no additional coverage in addition to SBRM and the specified coverage target. Combined coverage

targets are intended to help reduce the cost of industry-funded coverage, but the level of SBRM coverage in the herring fishery varies by gear type and has the potential to vary year to year. The variability of SBRM coverage has the potential to make it difficult for the herring industry to plan for industry-funded monitoring year to year.

In addition to the standard monitoring and service provider requirements in the omnibus measures, this amendment specifies that requirements for industry-funded observers and at-sea monitors in the herring fishery include a high volume fishery (HVF) certification. Currently, NMFS's Northeast Fisheries Observer Program (NEFOP) observers must possess a HVF certification in order to observe the herring fishery. NMFS developed the HVF certification to more effectively train observers in high volume catch sampling and documentation. NEFOP determined that data quality on herring trips was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices, and fast-paced operations proved more demanding for observers. Having additional training to identify these practices improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Additionally, this amendment requires the Council to examine the results of any increased coverage in the herring fishery two years after implementation of this amendment, and consider if adjustments to the coverage targets are warranted. Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via a framework adjustment or an amendment to the Herring FMP, as appropriate. Measures implemented in this amendment would remain in place unless revised by the Council.

*1. Industry-Funded At-Sea Monitoring Coverage on Vessels Issued Category A or B Herring Permits*

This rule specifies that vessels issued Category A or B herring permits will carry an industry-funded at-sea monitor on declared herring trips that are selected for coverage by NMFS, unless NMFS issues the vessel a waiver for coverage on that trip. Vessels will be selected for coverage by NMFS to meet the 50-percent coverage target. Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits are required to notify NMFS for monitoring coverage. If an SBRM observer is not selected to

cover that trip, NMFS will notify the vessel representative whether an at-sea monitor must be procured through a monitoring service provider. Because the 50-percent coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel will not carry an SBRM observer on the same trip that carries an at-sea monitor. If NMFS informs the vessel representative that they need at-sea monitoring coverage, they will be required to obtain and pay for an at-sea monitor to carry on that trip. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on that trip. If NMFS informs the vessel representative that the vessel is not selected for at-sea monitoring coverage, NMFS will issue the vessel an at-sea monitoring coverage waiver for that trip.

This rule establishes three additional reasons for issuing vessels waivers for industry-funded monitoring requirements on a trip-by-trip basis. First, if an at-sea monitor is not available to cover a specific herring trip (either due to logistics or a lack of available Federal funding to cover NMFS cost responsibilities), NMFS will issue the vessel an at-sea monitoring coverage waiver for that trip. Second, if a vessel using midwater trawl gear intends to operate as a wing vessel on a trip, meaning that it would pair trawl with another midwater trawl vessel but would not pump or carry any fish onboard, then that vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the wing vessel trip, and NMFS would issue a waiver for industry-funded monitoring requirements for that trip. Wing vessels would be prohibited from carrying fish onboard during these trips. If a wing vessel did carry fish, the vessel would be out of compliance with industry-funded monitoring requirements on that trip. Third, if a vessel intended to land less than 50 mt of herring on a trip, then the vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels will notify NMFS in advance of the trip on which they intend to land less than 50 mt of herring, and NMFS will issue a waiver for industry-funded monitoring requirements for that trip. Vessels would be prohibited from landing 50 mt or more of herring on these trips. If the vessel landed 50 mt or more of herring, the vessel would be out of compliance with industry-funded monitoring requirements on that trip.

At-sea monitors will collect the following information on herring trips:

• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);

• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

• Species, weight, and disposition of all retained and discarded catch on observed hauls;

• Species, weight, and disposition of all retained catch on unobserved hauls;

• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

• Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

• Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

• Vessel trip costs (*i.e.,* operational costs for trips including food, fuel, oil, and ice).

The primary biological data that at-sea monitors will collect are length data on retained and discarded catch. However, to verify species identification, at-sea monitors may also collect whole specimens or photos. In the future, the Council may recommend that at-sea monitors collect additional biological information upon request. Revising what information an at-sea monitor collects could be done in a framework adjustment. Alternatively, the Council may recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors, consistent with the Administrative Procedure Act.

In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection.

Currently, vessels issued Category A or B herring permits are required to comply with all slippage restrictions, slippage reporting requirements, and slippage consequence measures when carrying an observer for SBRM coverage (§ 648.11(m)(4)). Because the purpose of slippage restrictions is to help ensure catch is made available for sampling, this rule ensures that existing slippage requirements also apply when vessels

are carrying an industry-funded at-sea monitor. Specifically, when vessels issued Category A or B herring permits are carrying either an SBRM observer or industry-funded at-sea monitor, vessels are required to bring catch aboard the vessel and make it available for sampling prior to discarding. If vessels slipped catch for any reason, they would be required to report that slippage event on the daily vessel monitoring catch report and complete a slipped catch affidavit. If vessels slip catch due to excess catch of spiny dogfish, mechanical failure, or safety, then vessels are required to move 15 nautical miles (27.78 km) following that slippage event and remain 15 nautical miles (27.78 km) away from that slippage event before making another haul and for the duration of that fishing trip. If vessels slip catch for any other reason, they are required to terminate that fishing trip and immediately return to port.

Industry-funded monitoring would have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery. The EA estimates the industry's cost responsibility associated with carrying an at-sea monitor at $710 per day. The EA uses returns-to-owner (RTO) to estimate the potential reduction in annual RTO associated with paying for monitoring coverage. RTO was calculated by subtracting annual operating costs from annual gross revenue and was used instead of net revenues to more accurately reflect fishing income. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of the proposed at-sea monitoring coverage may reduce the annual RTO for vessels with Category A or B herring permits up to approximately 20 percent. Waiving at-sea monitoring coverage requirements for wing vessel trips or trips that land less than 50 mt of herring would help reduce the cost of at-sea monitoring coverage on those trips, but those waivers are not an option for vessels that choose to land more than 50 mt of herring on a trip.

### 2. Industry-Funded Observer Coverage on Midwater Trawl Vessels Fishing in Groundfish Closed Areas

Midwater trawl vessels fishing in the Groundfish Closed Areas are required to carry an observer under the requirements at § 648.202(b). When Amendment 5 to the Herring FMP (79 FR 8786; February 13, 2014) established that requirement, the Groundfish Closed Areas included Closed Area I, Closed

_0000017735

Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Currently, the only mechanism for midwater trawl vessels to carry an observer is if an observer is assigned through the SBRM. As described previously, SBRM coverage for midwater trawl vessels has recently been variable (approximately 4 to 40 percent from 2012 through 2018). This rule maintains the requirement to carry an observer for midwater trawl vessels fishing in a Groundfish Closed Area, but allows midwater trawl vessels to purchase observer coverage in order to access Groundfish Closed Areas.

Prior to any trip declared into a Groundfish Closed Area, representatives for midwater trawl vessels are required to provide notice to NMFS for monitoring coverage. If neither an SBRM observer nor industry-funded monitoring is selected to cover that trip, NMFS will notify the vessel representative that an observer may be procured through a monitoring service provider. The vessel is prohibited from fishing in the Groundfish Closed Areas without carrying an observer. Observers will collect the following information on midwater trawl trips:

• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);

• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

• Species, weight, and disposition of all retained and discarded catch on observed hauls;

• Species, weight, and disposition of all retained catch on unobserved hauls;

• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

• Whole specimens, photos, length information, and biological samples (*i.e.,* scales, otoliths, and/or vertebrae);

• Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

• Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

The measure allowing midwater trawl vessels to purchase observer coverage to access Groundfish Closed Areas also has economic impacts on vessels participating in the herring fishery. The EA estimates the industry's cost responsibility associated with carrying an observer at $818 per day. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of observer

coverage may reduce the annual RTO for midwater trawl vessels up to 5 percent. That 5 percent reduction in RTO would be in addition to any reduction in RTO due to other types of industry-funded monitoring coverage. Coverage waivers for Groundfish Closed Area trips are not an option to reduce the cost of observer coverage because coverage waivers do not apply on midwater trawl vessels fishing in the Groundfish Closed Areas.

If the Groundfish Closed Areas are modified, eliminated, or added in the future, existing observer coverage requirements for midwater trawl vessels apply to the modified areas, except for areas that are eliminated as Groundfish Closed Areas. Anticipating changes to the Groundfish Closed Areas in the Omnibus Essential Fish Habitat Amendment 2 (Habitat Amendment) (83 FR 15240; April 9, 2018), the Industry-Funded Monitoring Amendment Development Team/Fishery Management Action Team (PDT/FMAT) recommended the Council clarify its intent regarding the requirement that midwater trawl vessels fishing in Groundfish Closed Areas must carry an observer. In a March 17, 2017, memorandum, the PDT/FMAT noted that the Habitat Amendment proposed changes to Groundfish Closed Areas, such as eliminating areas, boundary changes, and seasonality. That same memorandum proposed the Council clarify that this amendment maintains the 100-percent observer coverage requirement on midwater trawl vessels fishing in Groundfish Closed Areas, as modified by the Habitat Amendment. The Council accepted the FM PDT/FMAT's proposed clarification when it took final action on this amendment in April 2017.

In January 2018, NMFS partially approved the Habitat Amendment, including changes to Closed Area I, Nantucket Lightship Closed Area, and the Western Gulf of Maine Closure Area. Consistent with Council intent regarding observer coverage, the final rule for the Habitat Amendment maintained the 100-percent observer requirement for midwater trawl vessels fishing in Closed Area I North (February 1–April 15), Closed Area II, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Because the Habitat Amendment removed the Nantucket Lightship Closed Area and the southern portion of Closed Area 1 from the list of Groundfish Closed Areas, the 100-percent observer coverage requirement no longer applies to midwater trawl vessels fishing in the area previously known as the Nantucket Lightship Closed Area and the southern

portion of what was formerly Closed Area 1. A recent Court Order (*Conservation Law Found.* v. *Ross, No. CV 18–1087 (JEB), 2019 WL 5549814 (D.D.C. Oct. 28, 2019)* enjoined NMFS from allowing gillnet fishing in the Nantucket Lightship Closed Area and Closed Area I. This decision does not apply to fishing gears other than gillnet gear, and the rule implementing this order (84 FR 68799; December 17, 2019) is specific to gillnet gear and does not prohibit midwater trawl vessels from fishing in these areas.

Recognizing that it recommended multiple industry-funded monitoring types, including at-sea monitoring coverage and observer coverage in Groundfish Closed Areas for the herring fishery, the Council also recommended prioritizing coverage aboard Category A and B vessels because those vessels harvest the majority of the herring. Consistent with that recommendation, if available Federal funding is insufficient to cover NMFS cost responsibilities associated with administering multiple monitoring programs for the herring fishery, this rule prioritizes industry-funded monitoring coverage on Category A and B vessels before observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas.

**Atlantic Herring Exempted Fishing Permit**

On April 19, 2018, the Council considered whether electronic monitoring in conjunction with portside sampling, would be an adequate substitute for at-sea monitoring coverage aboard midwater trawl vessels. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to address monitoring goals for the herring fishery. The purpose of electronic monitoring would be to confirm catch retention and verify compliance with slippage restrictions, while the purpose of portside sampling would be to collect species composition data along with age and length information. After reviewing the midwater trawl electronic monitoring study, the Council approved electronic monitoring and portside sampling as a monitoring option for midwater trawl vessels, but did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program.

_0000017736

The EFP would exempt midwater vessels from the requirement for industry-funded at-sea monitoring coverage and allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent coverage target. The recent midwater trawl electronic monitoring study provides a good foundation for an electronic monitoring program. However, using an EFP would provide NMFS with further information about how to most effectively and efficiently administer the electronic monitoring and portside sampling program, while allowing NMFS the flexibility to respond quickly to emerging issues, helping to make the monitoring program more robust. An EFP would also enable NMFS to evaluate other monitoring issues in the herring fishery that are of interest to the Council and herring industry, such as evaluating the utility of electronic monitoring and portside sampling when midwater trawl vessels fish in Groundfish Closed Areas or for other gear types (*e.g.*, purse seine or bottom trawl) used in the herring fishery.

The supporting documentation for the EFP was developed concurrently with rulemakings for this amendment and midwater trawl vessels issued EFPs are allowed to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent coverage target. The Council recommended reconsidering herring industry-funded monitoring requirements two years after implementation. The Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

### Status of Industry-Funded Monitoring in 2020

Throughout the development of this amendment, we cautioned the Council that any additional coverage would be contingent upon us having sufficient funding to administer industry-funded monitoring. For 2020, we have sufficient Federal funding to pay NMFS cost responsibilities associated with fully implementing industry-funded monitoring in the herring fishery. We estimate industry-funded monitoring cost responsibilities for the herring fishery to total approximately $100,000 in 2020. Therefore, beginning April 1,

2020, vessels issued Category A or B herring permits will be required to pay for at-sea monitoring coverage on trips we select for industry-funded monitoring coverage. Alternatively, herring vessels will have the option of requesting an EFP to use electronic monitoring and portside sampling instead of at-sea monitoring coverage to satisfy industry-funded monitoring requirements in 2020. We cannot yet determine if we will have funding to administer industry-funded monitoring in the herring fishery in 2021. We will evaluate available Federal funding relative to the cost of administering industry-funded monitoring in the herring fishery during the upcoming year.

### Compliance With the National Environmental Policy Act

In light of recent catch reductions in the herring fishery, we evaluated whether the EA supporting the Industry-Funded Monitoring Amendment remained valid to support this amendment. In making a determination on the need for additional analysis under NEPA, we considered and were guided by the Council on Environmental Quality (CEQ) NEPA regulations and applicable case law. The CEQ's regulations state that ''[a]gencies shall prepare supplements to either draft or final environmental impact statements if: (i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts'' (40 Code of Federal Regulations (CFR) § 1502.09(c)). In addition, we considered the CEQ's significance criteria at 40 CFR 1508.27 to determine if any new circumstances or information are significant, which could require a new EA.

The EA describes the economic impacts of herring measures on fishery-related businesses and human communities and explained they result from paying for monitoring coverage. The economic impact of industry-funded monitoring coverage on the herring fishery is difficult to estimate because it varies with sampling costs, fishing effort, SBRM coverage, price of herring, and participation in other fisheries. The EA estimates industry's cost for at-sea monitoring

coverage at $710 per day and observer coverage at $818 per day, but cautioned those estimates would largely depend on negotiated costs between vessels and monitoring service providers. Less than half of the 50 vessels issued Category A or B herring permits are active in the herring fishery.

The impact of management measures on fishing-related businesses and communities is typically based on an analysis of revenue. But in an effort to better understand income from fishing trips, a survey of herring and mackerel vessels collected more detailed cost information for 2014, including payments to crew, repairs, maintenance, upgrades, and permitting costs. This additional information was used to calculate the vessel RTO for 2014 by subtracting fixed and operational costs from gross revenue, thereby providing a general framework for understanding the interaction between revenue and monitoring requirement costs.

Analysis in the EA estimates that at-sea monitoring coverage associated with the 50-percent coverage target has the potential to reduce annual RTO for vessels with Category A or B herring permits up to 20 percent and up to an additional 5 percent for midwater trawl access to Groundfish Closed Areas. Electronic monitoring and portside sampling may be a more cost effective way for herring vessels to satisfy industry-funded monitoring requirements. At the conclusion of our electronic monitoring project aboard midwater trawl vessels, we estimated industry's cost for electronic monitoring and portside sampling at $515 per day. Analysis in the EA estimates a reduction in annual RTO of up to 10 percent for electronic monitoring and portside sampling coverage.

At the Council's request, we reduced the herring ACL for 2018 (49,900 mt) on August 22, 2018, and reduced the herring ACL for 2019 (15,065 mt) on February 8, 2019, from the ACL that was in place during 2014 (104,088 mt).

To assess how a reduction in herring ACL may affect revenue, we compared herring revenue generated by Category A and B herring vessels from 2014 to 2018 (see Table 1). Even though the 2018 ACL was reduced by 52 percent (54,188 mt) from the 2014 ACL, the impact on 2018 revenue was not proportional to the reduction in ACL and differed by gear type.

_0000017737

TABLE 1—CHANGE IN CATEGORY A AND B HERRING REVENUE FROM 2014 TO 2018

| Gear type | 2014 herring revenue | 2018 herring revenue | Change in herring revenue |
|---|---|---|---|
| Midwater Trawl ............................................................................................ | $13,439,000 | $7,886,000 | −$5,553,000 |
| Purse Seine ................................................................................................ | 11,000,000 | 13,088,000 | +2,088,000 |
| Bottom Trawl ............................................................................................... | 1,508,000 | 1,017,000 | −491,000 |

*Source:* NMFS.

The change in herring revenue between 2014 may have been affected by several factors, such as the availability of herring relative to the demand and vessel participation in other fisheries. The price of herring increased almost 70 percent between 2014 and 2018 from approximately $310 per mt to $525 per mt. While the price of herring is not likely to increase every year, we expect that a herring price increase would mitigate the negative economic impact of lowering the ACL. Total revenue from all fisheries for small-mesh bottom trawl vessels increased by approximately $25,000,000 between 2014 and 2018 suggesting vessels are expanding their participation in other fisheries. We expect that increases in total revenue from other fisheries would also mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

At its September 2019 meeting, the Council recommended further reducing the herring ACL for 2020 and 2021 (11,621 mt). These catch levels are consistent with Council's new harvest policy for herring developed in Amendment 8 to the Herring FMP and recommendations from the Council's Scientific and Statistical Committee. If the 2020 herring stock assessment determines recruitment and biomass are higher than expected, the Council may request an increase to the 2021 ACL.

While the economic impact of industry-funded monitoring coverage on the herring fishery is affected by revenue, the level of fishing effort and SBRM coverage would also affect the economic impact of industry-funded

monitoring. Analyses in the EA estimate the coverage days to achieve the 50-percent coverage target in the herring fishery in 2014. In an effort to estimate the maximum number of coverage days, that particular analysis did not account for SBRM coverage or coverage waivers for trips landing less than 50 mt of herring. To assess how changes in the herring fishery may affect industry-funded monitoring coverage, we re-estimated the coverage days to achieve the 50-percent coverage target for 2020. Our updated analysis adjusts for recent vessel activity, low herring ACL, recent SBRM coverage, and coverage waivers for trips landing less than 50 mt of herring. The change in estimated average coverage days to achieve the 50-percent coverage target from 2014 to 2020 is shown in Table 2.

TABLE 2—ESTIMATED REDUCTION IN INDUSTRY-FUNDED MONITORING COVERAGE DAYS TO ACHIEVE A 50-PERCENT COVERAGE TARGET FROM 2014 TO 2020

| Gear type | 2014 | 2020 | Change in days |
|---|---|---|---|
| Midwater Trawl ......................................... | Up to 728 days (14 vessels) .................... | Up to 54 days (9–11 vessels) ................. | −674 |
| Purse Seine ............................................. | Up to 196 days (7 vessels) ..................... | Up to 67 days (5 vessels) ....................... | −129 |
| Bottom Trawl ............................................ | Up to 108 days (9 vessels) ..................... | Up to 29 days (2 vessels) ....................... | −79 |

*Source:* NMFS.

The reduction in expected industry-funded monitoring coverage days and vessels participating in the herring fishery from 2014 to 2020 is largely driven by changes in fishing behavior, likely linked to the availability of herring (distribution and seasonality) and a low herring ACL in 2020. Because the RTO analysis was, in part, based on economic data collected with a special cost survey that could not be repeated in a timely way for this action, it is not possible to update that analysis for 2020. However, fewer sea days required to achieve the 50-percent coverage target will result in lower industry costs in 2020 than what the EA estimated for 2014. Fewer coverage days and fewer active vessels in 2020 (and likely 2021) is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

We also expect midwater trawl fishing effort in Groundfish Closed Areas to be lower in 2020 than was estimated for 2014. Without considering SBRM coverage, the EA estimates midwater trawl vessels may purchase observer coverage for up to approximately 250 coverage days to access Groundfish Closed Areas in 2014. After adjusting for recent vessel activity and a low herring ACL and assuming recent SBRM coverage, we estimate that midwater trawl vessels may purchase coverage for up to 30 coverage days to access Groundfish Closed Areas in 2020 (and likely 2021). Even though purchasing observer coverage to access Groundfish Closed Areas is optional, few coverage days and fewer active vessels in 2020 is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

As recommended by the Council, we intend to offer an EFP in 2020 and 2021 to allow vessels to use electronic monitoring and portside sampling in lieu of at-sea monitoring coverage to achieve the 50-percent coverage target. Depending on vessel interest and sampling logistics, that same EFP may also allow midwater trawl vessels to access Groundfish Closed Areas or evaluate electronic monitoring for other gear types (*e.g.,* purse seine or bottom trawl) used in the herring fishery. Analyses in the EA and updated estimates at the conclusion of our electronic monitoring project aboard midwater trawl vessels, suggest that electronic monitoring and portside sampling is likely less expensive and more cost effective than either at-sea monitoring or observer coverage. Excluding the initial cost associated with purchasing and installing

**7422**    **Federal Register** / Vol. 85, No. 26 / Friday, February 7, 2020 / Rules and Regulations

electronic monitoring equipment, video review and storage are likely the most substantial ongoing industry costs associated with using electronic monitoring. A portion of our Federal funding to administer industry-funded monitoring in the herring fishery is designated to help offset industry's video review and storage costs. Federal funding helping offset industry's electronic monitoring sampling costs is expected to minimize the economic impact of industry-funded monitoring coverage on the herring fishery. Participating in the EFP is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

High herring prices and low coverage days to achieve the 50-percent coverage target are likely short-term influences on the economic impact of industry-funded monitoring coverage on the herring fishery associated with a low herring ACL. If herring recruitment and biomass return to average levels, the long-term economic impact of industry-funded monitoring coverage on the herring fishery is likely consistent with estimated impacts analyzed and described in the EA.

Additionally, the EA analyzes a range of coverage targets for at-sea monitoring and electronic monitoring and portside sampling aboard Category A and B vessels, including 100 percent, 75 percent, 50 percent, and 25 percent. The EA estimates the reduction in annual RTO associated with these coverage target alternatives ranged from 42 percent to less than 1 percent. Despite reductions in expected revenue for 2020 and 2021, we expect the reduction of annual RTO associated with implementing a 50-percent coverage target for at-sea monitoring aboard Category A and B vessels to be within this analyzed range.

After considering the action, new information, and new circumstances, we determined that the action and its impacts fall within the scope of the existing EA. It is not necessary to develop a new NEPA analysis because (1) the action is identical to the proposed action analyzed in the EA and (2) no new information or circumstances relevant to environmental concerns or impacts of the action are significantly different from when the EA's finding of no significant impact was signed on December 17, 2018. Thus, the FONSI for existing EA for the New England Industry-Funded Monitoring Omnibus Amendment remains valid to support implementing this amendment.

**Changes From the Proposed Rule**

This rule includes minor changes from the proposed rule to clarify requirements. First, it revises the definition for *slippage in the Atlantic herring fishery* to make it consistent with the definition for *slips* and *slipping catch in the Atlantic herring fishery* and clarifies that slippage applies when a NMFS-certified observer or monitor is aboard the vessel.

Second, this rule aligns the herring coverage target with the SBRM year (April–March) instead of the fishing year (January–December) and adjusts the date by which the herring industry selects a monitoring type for the following year (October instead of July). This change ensures the coverage target will be more predictable for the entire year rather than changing with the SBRM year. NMFS will determine how to calculate the coverage target in consultation with Council staff.

Third, this rule removes "on a declared herring trip" from the criteria described at § 648.11(m)(2)(i) and revises the list of required information at § 648.11(m)(2)(i) to clarify when and how the owner, operator, or manager of a herring vessel must notify NMFS of a herring trip. The existing notification requirement describes that vessels issued certain herring permits or acting as herring carriers must notify NMFS of trips on which a vessel may harvest, possess, or land herring. Because pre-trip notifications are required at least 48 hours in advance of a trip and trip declarations are required just prior to a vessel leaving port on a trip, the existing criteria absent the reference to "on a declared herring trip" is a more logical descriptor of when a vessel is required to notify NMFS of a herring trip. The list of required information is revised to support NMFS selecting vessels for industry-funded monitoring coverage.

Fourth, this rule corrects references to § 648.11 to reflect provisions implemented in this rule.

**Comments and Responses**

We received 20 comment letters on the NOA and proposed rule: 5 from participants in the herring fishery (Seafreeze, Lund's Fisheries, Providian, O'Hara Corporation); 3 from fishing industry organizations (CHOIR Coalition, New England Purse Seiner's Alliance (NEPSA), and Cape Cod Commercial Fishermen's Alliance (CCCFA); 3 from environmental advocacy groups (Conservation Law Foundation (CLF) and Cause of Action Institute (COA)); and 9 from members of the public.

*Comment 1:* COA and Seafreeze commented that the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) does not authorize an industry-funded monitoring program as envisioned by the Industry-Funded Monitoring Amendment. They cautioned that the amendment intends to standardize the development of industry-funded monitoring programs, yet it fails to identify any specific provision in the Magnuson-Stevens Act granting it such authority. COA also commented that the Council does not have explicit statutory authorization to require the industry to fund discretionary supplemental at-sea monitoring programs. COA and Seafreeze explained that the Magnuson-Stevens Act only explicitly authorizes industry-funded monitoring for foreign fishing, limited access privilege programs (LAPPs), and the North Pacific fisheries research plan. They cautioned that because the Magnuson-Steven Act caps industry fees related to LAPPs at 3 percent of ex-vessel revenue, the agency does not have the ability to require the fishing industry to pay data collection and monitoring costs without limit.

*Response:* We disagree. The Magnuson-Stevens Act expressly authorizes onboard human monitors to be carried on fishing vessels "for the purpose of collecting data necessary for the conservation and management of the fishery." 16 U.S.C. 1853(b)(8). The requirement to carry observers, along with many other requirements under the Magnuson-Stevens Act, includes compliance costs on industry participants. For example, NMFS regulations require fishing vessels to install vessel monitoring systems for monitoring vessel positions and fishing, report catch electronically, fish with certain gear types or mesh sizes, or ensure a vessel is safe before an observer may be carried on a vessel. Vessels pay costs to third-parties for services or goods in order to comply with these regulatory requirements that are authorized by the Magnuson-Stevens Act. There are also opportunity costs imposed by restrictions on vessel sizes, fish sizes, fishing areas, or fishing seasons. These industry costs are not "fees." A fee is a form of "funding" where the industry is assessed a payment by the agency, authorized by statute, to be deposited in the U.S. Treasury and disbursed for administrative costs otherwise borne by the agency. This amendment does not address administrative costs that are charged in LAPPs and are subject to the 3 percent cap.

The need for monitoring and the data it provides is discussed in the amendment. Section 1.1 of the amendment explains that the Council is

_0000017739

establishing the framework for industry-funded monitoring programs because of its interest in increasing monitoring and/or other types of data collection in some FMPs to assess the amount and type of catch, to more accurately monitor annual catch limits, and/or provide other information for management. The Council's goals for industry-funded monitoring in the herring fishery are described in Section 2.2 of the amendment and include: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species for which catch caps apply; and (3) affordable monitoring for the herring fishery. The Council's rationale for increased monitoring through industry-funded monitoring programs is consistent with the Magnuson-Stevens Act provision "for the purpose of collecting data appropriate for the conservation and management of the fishery."

*Comment 2:* COA and Seafreeze claim that the amendment is inconsistent with Federal appropriations laws and the U.S. Constitution. They commented that Congress decides how to finance any program it establishes, stating that a Federal agency cannot spend money on a program without authorization from Congress and cannot add to its appropriations from sources outside the government without permission from Congress. COA and Seafreeze caution that the type of industry-funded program set forth in the amendment imposes a "tax" on regulated parties. COA raised additional concerns that the industry funded program may violate the Anti-Deficiency Act and Miscellaneous Receipts Statute. Further, COA stated the amendment violates the Fourth Amendment to, and the Commerce Clause in, the U.S. Constitution. Last, Seafreeze expressed concern that the amendment violates the Fifth Amendment to the Constitution because data collected using industry funds could be used in enforcement actions.

*Response:* The Magnuson-Stevens Act expressly authorizes measures, including monitoring, "for the purpose of collecting data necessary for the conservation and management of the fishery." It also acknowledges such measures may result in costs to the fishing industry as evident by its requirement to, where practicable, minimize costs and adverse economic impacts on communities. The inherent cost of a requirement, like industry-funding monitoring, is not the same as a "tax." A hallmark of a tax is that the government receives some revenue. The government receives no revenue from industry-funded monitoring. Similar to arrangements between vessels and vessel monitoring system service providers, the payment for industry cost responsibilities associated with industry-funded monitoring would be made by the vessel to the monitoring service provider. Because the agency would not receive any payment from the vessel related to industry-funded monitoring, this amendment is consistent with the Anti-Deficiency Act and Miscellaneous Receipts Statue. Industry-funded monitoring in the herring fishery does not does not violate the Commerce Clause of the Constitution, which authorizes Congress to regulate commerce, because NMFS is regulating existing economic activity, which is permissible under the Commerce Clause. Industry-funded monitoring does not violate the Fourth Amendment protection against unreasonable searches and seizures because it is neither a search nor unreasonable if it was considered to be a search. At-sea monitors are not authorized officers conducting vessel searches for purposes of ensuring compliance with fisheries requirements. Further, the fishing industry is pervasively regulated, and monitoring is reasonable as authorized under the Magnuson-Stevens Act to receive critical fisheries data. Last, the amendment does not violate the Fifth Amendment to the Constitution because the monitoring requirement does not compel evidence that is testimonial in nature. An at-sea monitor simply records the results of the vessel's actions. An individual's participation in the fishery is voluntary, and an individual may choose to land less than the 50 mt of herring per trip threshold for requiring industry-funded monitoring. Further, monitoring is a regulatory reporting requirement, to which the Fifth Amendment privilege does not apply. Last, the information provided is not for purposes of discovering criminal violations. The herring fishery is a regulated industry under the Magnuson-Stevens Act, which provides for civil penalties for fisheries catch violations, not criminal sanctions. Any potentially incriminating evidence would be merely a byproduct of the requirement for industry-funded monitoring.

*Comment 3:* Seafreeze commented that because the amendment was initiated jointly by the New England and Mid-Atlantic Councils, it was led to believe that identical omnibus measures would need to be selected by both Councils. Seafreeze expressed concern that the potential of only one Council adopting the amendment was not considered during the development of the amendment and, therefore, recommended the omnibus measures be disapproved.

*Response:* When the New England Council took final action on the Industry-Funded Monitoring Amendment in April 2017, it considered whether to make its recommendations contingent upon a similar action by the Mid-Atlantic Council, but decided against it. Instead, the Council overwhelmingly approved the omnibus measures for its FMPs, with the exception of FMPs managed jointly with the Mid-Atlantic Council (*i.e.,* Monkfish and Spiny Dogfish FMPs) and the herring measures in the amendment and recommended the amendment be submitted to the agency for review and approval. The Mid-Atlantic Council considered industry-funded monitoring for its FMPs at its April 2017 and October 2018 meetings, but decided not to pursue it. Mid-Atlantic fishermen had an opportunity to participate and submit their concerns to the Mid-Atlantic Council during those meetings. Mid-Atlantic representatives to the New England Council also had an opportunity to present the Mid-Atlantic Council's concerns to the New England Council during the amendment's development. Further, while the omnibus measures, especially the prioritization process, were designed to be appropriate for both Councils, they were never intended to obligate a Council to establish provisions for industry-funded monitoring. Therefore, as explained in the proposed rule (83 FR 55665; November 7, 2018), the joint amendment initiated by both Councils to allow for industry-funded monitoring became the New England Industry-Funded Monitoring Amendment and, as such, omnibus measures only apply to New England Council FMPs. The omnibus measures do not impose any substantive burden on any Mid-Atlantic fishery. Rather, the amendment sets up the framework under which future potential monitoring programs for New England fisheries would be established. If the Mid-Atlantic Council reconsiders industry-funded monitoring it a future action, it may consider whether to adopt similar omnibus measures at that time.

*Comment 4:* COA commented that our publication of **Federal Register** notices for the Industry-Funded Monitoring Amendment caused confusion. It questioned why we published an NOA in September 2018 seeking public comment on the approval or disapproval of the amendment followed

by a proposed rule with implementing regulations in November 2018 prior to finalizing our decision on the amendment. COA suggested that by publishing the notices for the approval/disapproval of the amendment and implementing regulations concurrently, that we had already made a decision on the amendment and would view public comments with prejudice. Additionally, the O'Hara Corporation was concerned that we approved the amendment in December 2018, prior to the closing of the public comment period on the proposed rule. O'Hara Corporation was disappointed in our process for notice and comment and wondered how public comments received after the amendment approval were considered.

*Response:* It is our practice to publish an NOA and proposed rule concurrently. The NOA for the Industry-Funded Monitoring Amendment was published on September 19, 2018, with a comment period ending November 19, 2018. The proposed rule for the amendment was published on November 7, 2018, with a comment period ending December 24, 2018. The comment periods for the NOA and proposed rule overlapped for 13 days. Both the NOA and proposed rule explained that any public comments we received on the amendment or the proposed rule during the NOA comment period would be considered in our decision to approve/disapprove the amendment.

We received seven comment letters during the NOA comment period. Those commenters expressed diverse views on the Industry-Funded Monitoring Amendment and recommended we approve, disapprove, and re-consider the amendment. We carefully reviewed and considered all of those comments prior to approving the amendment on December 18, 2018. NMFS must approve/disapprove an amendment within 30 days of the end of the comment period on the amendment. The decision date for the Industry-Funded Monitoring Amendment was December 19, 2018. Therefore, it would not have been possible to consider all public comments received through December 24, 2018, in the decision to approve/disapprove the Industry-Funded Monitoring Amendment.

The proposed rule explained that we would consider any public comment received after the NOA comment period but during the proposed rule comment period in our decision to implement proposed measures. We reviewed and considered all additional comments received during the proposed rule comment period prior to publishing this final rule. Commenters did not provide

any new or additional information during the public comment period on the proposed rule that would have prevented us from approving the Industry-Funded Monitoring Amendment.

*Comment 5:* Seafreeze disagreed with the conclusions in the EA regarding impacts of the omnibus measures on fishery-related business and human communities. Specifically, it questioned assertions that omnibus measures would have no direct impacts, that costs are too speculative to analyze, and that standardized industry-funded monitoring requirements would have a positive impact. Seafreeze also commented that the impact of any future industry-funded monitoring program on fishery-related business and communities would be negative.

*Response:* The EA explains that omnibus measures are tools for the Council to use when developing future industry-funded monitoring programs. The omnibus measures have no direct biological impacts because they do not directly affect the level of fishing, fishing operations, amount of fish harvested, or area fished. Additionally, the omnibus measures do not have any direct economic impacts on fishery-related business or human communities because they do not require the development of industry-funded monitoring programs nor do they directly impose any costs. Categorizing and characterizing industry cost responsibilities in this action could provide the industry with information to better understand and plan for their industry-funded monitoring cost responsibilities as well negotiate better contracts with industry-funded monitoring service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Improved catch information that results from the opportunity to align funding with the most critical industry-funded monitoring programs may lead to better management of biological resources, which may eventually lead to higher harvest levels.

In the future, if the Council developed an industry-funded monitoring program for a particular FMP, the EA acknowledges there would be direct negative economic impacts to fishing vessels provided vessels were required to pay for increased monitoring. Future industry-funded monitoring programs would be developed to achieve specific goals. Without knowing the goals or the details of the measures to achieve those goals, attempting to quantify in this amendment the impact or the specific benefits of a future industry-funded

monitoring program is too speculative. The economic impacts to fishing vessels and benefits resulting from a future industry-funded monitoring program would be evaluated in the amendment to establish that industry-funded monitoring program and cannot considered in this amendment.

*Comment 6:* COA commented that the introduction of industry-funded monitoring across the Greater Atlantic Region would impose a tremendous economic burden on the fishing industry that could lead to the elimination of small-scale fishing. As an example, COA referenced a 2016 letter by the Long Island Commercial Fishing Association in which the Association states the $800 per day cost of monitoring would force more than half of its fleet out of business.

*Response:* Generalizing economic impacts associated with industry-funded monitoring programs is often inaccurate. Members of the Long Island Commercial Fishing Association participate in a variety of fisheries, including vessels using small-mesh bottom trawl gear in the herring fishery. The $800 cost per covered day is the estimated cost for observer coverage in the herring fishery. The Industry-Funded Monitoring Amendment does not require observer coverage on small-mesh bottom trawl vessels in the herring fishery, instead it establishes a 50-percent coverage for at-sea monitoring coverage on declared herring trips at an estimated cost of $710 per day of coverage. Additionally, the Industry-Funded Monitoring Amendment does not require industry-funded monitoring coverage on trips intending to land less than 50 mt of herring. For those trips, the vessel owner/operator would request a waiver for industry-funded monitoring coverage and would not be responsible for industry-funded monitoring costs on that trip. The amendment estimated that waiving coverage on trips that land less than 50 mt of herring would result in industry-funded monitoring coverage on only 19 percent of trips by small-mesh bottom trawl vessels. More recently, when we only considered small-mesh bottom trawl vessels with Category A or B permits that had been active in the herring fishery in the last two years, we found that industry-funded monitoring requirements would likely only apply to only two small-mesh bottom trawl vessels. For these reasons, we disagree that the implementation of industry-funded monitoring in the herring fishery would lead to the elimination of small-scale fishing in the Greater Atlantic Region.

_0000017741

*Comment 7:* Seafreeze expressed concern that vessels participating in New England and Mid-Atlantic fisheries on the same trip may be subject to industry-funded monitoring requirements, even though the Mid-Atlantic Council did not adopt the this amendment. COA commented the EA fails to address the possibility of overlapping requirements for industry-funded monitoring in multiple fisheries.

*Response:* Similar to other measures in FMPs (*e.g.,* possession limits, gear restrictions, or reporting requirements), vessels are subject to the most restrictive requirements when participating in multiple fisheries on a single trip. With the understanding that vessels participate in multiple fisheries, the EA explicitly considers revenue and operational costs associated with participation in the herring, Atlantic mackerel, and squid fisheries. Because herring and mackerel are often harvested together on the same trip, the amendment specifies that the higher coverage target applies on trips declared into both fisheries. If the Council considers industry-funded monitoring in other fisheries in the future, the impacts of those programs relative to existing industry-funded monitoring programs will be considered at that time.

*Comment 8:* Several commenters expressed opinions on the relative costs and benefits of industry-funded monitoring. CLF, CCCFA, and CHOIR generally support the industry-funded monitoring requirements for the herring fishery, but are concerned that anything less than 100-percent coverage, especially when combined with coverage waivers, may undermine the effectiveness of additional monitoring. In contrast, Lund's cautioned that the 50-percent coverage target for the herring fishery is higher than necessary and wastes scarce agency and industry resources by monitoring a fishery with a low bycatch rate. COA commented that the amendment is inconsistent with National Standards 7 and 8 because it fails to explain why increased monitoring is necessary, in light of the financial burden it will place on the fishing industry, or how the amendment would minimize adverse economic impacts and provide for the sustained participation of communities.

*Response:* This amendment establishes industry-funded monitoring in the herring fishery to help increase the accuracy of catch estimates, especially for species with incidental catch caps (*i.e.,* haddock and river herring/shad). Our decision to approve this amendment included weighing the benefits of the measures relative to the

costs, especially the industry's cost associated with additional monitoring. We concluded that the Council's measures minimize costs to the extent practicable and take into account the importance of fishery resources to fishing communities to provide for their sustained participation in the fishery and minimize the adverse economic impacts of these measures on those communities.

The 50-percent coverage target for vessels with Category A or B herring permits has the potential to reduce uncertainty around catch estimates in the herring fishery, thereby improving catch estimation for stock assessments and management. SBRM coverage on vessels participating in the herring fishery is variable. Recent coverage has ranged from 2 percent to 40 percent during 2012 to 2018. Analysis in the EA suggests a 50-percent coverage target would reduce the uncertainty around estimates of catch tracked against catch caps, likely resulting in a CV of less than 30 percent for the majority of catch caps. If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be more constrained by catch caps, thereby increasing accountability, or they may be less constrained by catch caps and better able to fully harvest herring sub-ACLs. Recent CVs associated with catch caps constraining the herring fishery have been as high as 86 percent. Improving our ability to track catch against catch limits is expected to support the herring fishery achieve optimum yield, minimize bycatch and incidental catch to the extent practicable, and support the sustained participation of fishing communities. Coverage waivers would only be issued under specific circumstances, when monitors are unavailable or trips have minimal to no catch, and are not expected to reduce the benefits of additional monitoring. This amendment does not require additional monitoring aboard herring vessels in Groundfish Closed Areas. Rather it maintains an existing requirement for 100-percent observer coverage on herring midwater trawl vessels fishing inside of Groundfish Closed Areas, but provides flexibility for vessels by allowing the purchase of observer coverage to access Groundfish Closed Areas.

While the economic impact of industry-funding monitoring on participants in the herring fishery may be substantial, we considered the nature and extent of these costs relative to the benefits of additional monitoring, such as reducing uncertainty around catch

estimates to improve management, and measures to mitigate costs.

Recognizing the potential economic impact of industry-funded monitoring on the herring industry, the Council recommended several measures to minimize the impact of paying for additional coverage. Setting the coverage target at 50 percent, instead of 75 or 100 percent, balances the benefit of additional monitoring with the costs associated with additional monitoring. Allowing SBRM coverage to contribute toward the 50-percent coverage target for at-sea monitoring is expected to reduce costs for the industry. Waiving industry-funded monitoring requirements on certain trips, including trips that land less than 50 mt of herring and pair trawl trips carrying no fish, would minimize the cost of additional monitoring. Trips that land less than 50 mt are common for small-mesh bottom trawl, single midwater trawl, and purse seine vessels. As such, the 50-mt exemption has the potential to result in a less than 5 percent reduction in annual RTO associated with at-sea monitoring coverage for those vessels. Electronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage.

The amendment also includes measures to ensure the Council considers the cost of additional monitoring relative to its effectiveness and provides the flexibility to adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous. Herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. Omnibus measures allow the Council to modify the weighting approach to recommend to us how to prioritize Federal funding across industry-funded monitoring programs. If the Council wants to recommend that we not prioritize Federal funding to administer industry-funded monitoring in herring fishery, essentially recommending no additional monitoring for the herring fishery, it would consider the new weighting approach at a public meeting and request us to publish a rulemaking modifying the weighting approach. Additionally, if we find that coverage waivers undermine the benefits of

additional monitoring, the Council could restrict waivers when it reviews the industry-funded monitoring requirements two years after implementation.

*Comment 9:* Seafreeze and COA commented that industry-funding monitoring in the herring fishery disproportionately affects Seafreeze vessels and any other vessels that make multi-day trips processing catch at sea in violation of National Standard 6's requirement to take into account and allow for variations among fisheries, fishery resources, and catch. Seafreeze explained that despite a relatively low daily production capacity (57 mt), its vessels would not qualify for a coverage waiver, like other small-mesh bottom trawl vessels, because its vessels make longer than average trips processing and freezing catch from multiple fisheries. Seafreeze also commented that, according to the EA, the 50-percent coverage target would cost it $80,000 per year ($40,000 per vessel) on trips that do not land herring.

*Response:* We disagree. In an effort to minimize the economic impact of industry-funded monitoring, the Council explicitly considered measures to address Seafreeze's concern about disproportional impacts on its vessels, including considering alternatives for coverage waivers for trips when landings would be less than 20-percent herring or less than 50 mt of herring per day. Ultimately, the Council determined that the potential for a relatively high herring catches per trip aboard those vessels warranted additional monitoring and chose the 50 mt per trip threshold. The EA estimates the effort and monitoring costs associated with declared herring trips that ultimately did not land herring. In 2014, there were 111 sea days for small-mesh bottom trawl vessels that had no herring landings. The cost of at-sea monitoring coverage on 50 percent of those trips was estimated at just under $40,000. That $40,000 is the total cost for monitoring all small-mesh bottom trawl vessels for the year. Therefore, it is highly unlikely that Seafreeze would be paying $80,000 per year for at-sea monitoring on trips that did not land herring. As described previously, the Council has the flexibility to recommend we not prioritize Federal funding for industry-funded monitoring in the herring fishery and/or adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous or do not allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

*Comment 10:* Several commenters (CLF, CCCFA, Lund's) support the option to allow midwater trawl vessels to purchase observers to access Groundfish Closed Areas. However, CLF and CCCFA object to midwater trawl vessels having any additional access to Groundfish Closed Areas, including access to areas maintained as Groundfish Closed Areas in the recent Omnibus Habitat Amendment.

*Response:* We acknowledge the commenters support for the measure allowing midwater trawl vessels to purchase an observer to access Groundfish Closed Areas. This amendment does not relax any restrictions for Groundfish Closed Areas implemented in the recent Omnibus Habitat Amendment.

*Comment 11:* Several commenters were concerned with recent catch limit reductions in the herring fishery and how that affects the economic impact of industry-funded monitoring. The specifics of their comments are as follows:

• COA, Providian, and Seafreeze noted that economic impacts for the herring fishery were analyzed based on revenue and operating costs from 2014 and do not reflect the recent reductions in ACLs;

• Providian acknowledges that lower ACLs means fewer fishing trips and recommends continued SBRM coverage in the herring fishery;

• Lund's recommends SBRM coverage, in conjunction with the existing state-administered portside sampling program, as the best investment to understand catch in herring fishery; and

• Lund's, Providian, and O'Hara request the amendment be delayed, at least until after 2021, in hopes that future increases in herring harvest and revenue would be able to support industry-funded monitoring.

*Response:* As discussed in the preamble, we acknowledge that herring effort, catch, and resulting revenue will likely be lower in 2020 and 2021 than in prior years, such that the cost of industry-funded monitoring relative to herring catch and revenue may be high in the short-term. However, the magnitude of that impact on individual vessels and businesses is likely variable and would be mitigated by several factors, which are discussed in the preamble section addressing our NEPA considerations.

*Comment 12:* Four members of the public supported this amendment and believe increased monitoring is necessary for sustainable FMPs. For two of those individuals, their support is conditional on the economic impact of the amendment, specifically that the amendment does not overburden an already struggling New England fishing industry.

*Response:* We appreciate the commenters' support for this amendment and note the amendment includes several measures to minimize the economic impact on the herring industry of paying for additional coverage.

*Comment 13:* Several commenters provided input on the EFP to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. The specifics of their comments are as follows:

• NEPSA, CLF, CCCFA, and CHOIR supported us using an EFP to initially administer electronic monitoring and portside sampling in the herring fishery and urged us to quickly transition to electronic monitoring in the herring fishery because electronic monitoring provides a more cost effective and accurate means to monitor the herring fishery than human monitors;

• CHOIR and NEPSA urged us to allow purse seine vessels to participate in the EFP and explained that lessons learned from the midwater trawl electronic monitoring study would apply to purse seine vessels as both gear types capture fish in nets and bring those nets alongside the vessels to pump fish aboard;

• NEPSA asserted that electronic monitoring is easier for vessel operators than at-sea monitoring coverage because it does not involve the logistics of carrying a human monitor and noted that allowing purse seine vessels to participate in the EFP would increase the number of participants and help decrease the per-vessel cost of using electronic monitoring;

• Lund's commented that it supports us using an EFP to further evaluate an electronic monitoring and portside sampling program, but at this time prefers human monitors to electronic monitoring;

• CLF and CHOIR advocated that net sensors be incorporated into the EFP to help quantify the amount of slipped catch and CHOIR hoped that electronic monitoring can be developed to identify the contents and estimate the amount of slipped catch; and

• CLF requested the EFP include documenting all discards, verifying compliance with slippage requirements and consequence measures, 100-percent video review, documenting interactions with protected species, and complementary coverage by SBRM observers.

*Response:* We acknowledge commenters' support for the EFP and will consider these recommendations as

the terms and conditions of the EFP are finalized.

*Comment 14:* One member of the public supported developing future industry-funded monitoring programs via amendment to allow for public input and standardizing industry-funded monitoring programs to help ensure fairness across fisheries.

*Response:* We acknowledge the commenter's support for omnibus measures in the amendment.

*Comment 15:* One individual commented that additional monitoring, especially industry-funded monitoring for herring, is unnecessary because herring are numerous and not at risk of extinction. The individual is not convinced the Council considered its own criteria for the development of an industry-funded monitoring program, such as a clear need for the data collection, cost of collection, less data intensive methods, prioritizing modern technology, and incentive for reliable self-reporting. Instead, the commenter recommended tracking catch by using fishing industry reporting to NMFS of the weight of fish sold.

*Response:* We disagree. The Council identified and supported the need for additional monitoring as reducing uncertainty around catch estimates in the herring fishery, thereby improving catch estimation for stock assessments and management, as noted in the response to Comment 8. The Council considered less data intensive methods, prioritizing modern technology, and incentives for self-reporting by allowing vessels to use either at-sea monitoring or electronic monitoring and portside sampling coverage to satisfy industry-funded monitoring requirements. In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection for at-sea monitors compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to

address monitoring goals for the herring fishery. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage.

We currently track catch in the herring fishery using the weight of fish purchased by dealers, but those data are not robust enough to track catch against catch caps and would not help reduce the uncertainty associated with catch tracked against catch caps.

*Comment 16:* Three members of the public provided comments on forest management, keeping marine mammals in captivity, and NEPA requirements for terrestrial businesses.

*Response:* Because those comments are outside the scope of this amendment, we are not providing responses to those comments in this final rule.

## Classification

The Administrator, Greater Atlantic Region, NMFS determined that this amendment is necessary for the conservation and management of New England Council FMPs and that it is consistent with the Magnuson-Stevens Act and other applicable law.

This final rule has been determined to be not significant for purposes of Executive Order 12866.

This final rule is not an E.O. 13771 regulatory action because this action is not significant under E.O. 12866.

NMFS prepared a final regulatory flexibility analysis (FRFA) in support of this action. The FRFA incorporates the initial RFA, a summary of the significant issues raised by the public comments in response to the initial RFA, NMFS responses to those comments, and a summary of the analyses completed in support of this action. A description of why this action was considered, the objectives of, and the legal basis for this rule is contained in in the preamble to the proposed and this final rule, and is not repeated here. All of the documents that constitute the FRFA and a copy of the EA/RIR/IRFA are available upon request (see **ADDRESSES**) or via the internet at: *http://www.nefmc.org.*

The omnibus measures are administrative, specifying a process to

develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested. Because the omnibus measures have no direct economic impacts, they will not be discussed in this section. The herring measures affect levels of monitoring, rather than harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities due to the costs associated with the industry-funded monitoring measures for the herring fishery.

*A Statement of the Significant Issues Raised by the Public in Response to the IRFA, a Statement of the Agency's Assessment of Such Issues, and a Statement of Any Changes Made in the Final Rule as a Result of Such Comments*

We received 18 comment letters on the NOA and proposed rule. Those comments, and our responses, are contained in the Comments and Responses section of this final rule and are not repeated here. Comments 1, 2, 5, 6, 8, 9, 11, and 12 discussed the economic impacts of the measures, but did not directly comment on the IRFA. All changes from the proposed rule, as well as the rationale for those changes, are described in the Changes from the Proposed Rule section of this final rule and are not repeated here.

*Description and Estimate of the Number of Small Entities To Which the Rule Would Apply*

Effective July 1, 2016, NMFS established a small business size standard of $11 million in annual gross receipts for all businesses primarily engaged in the commercial fishing industry for RFA compliance purposes only (80 FR 81194, December 29, 2015). The directly regulated entities are businesses that own at least one limited access Atlantic herring vessel. As of 2016, there are 66 businesses that own at least one limited access herring vessel. Four businesses are large entities (gross receipts greater than $11 million). The remaining 62 businesses are small entities. Gross receipts and gross receipts from herring fishing for the small entities are characterized in Table 3.

_0000017744

TABLE 3—GROSS REVENUES AND REVENUES FROM HERRING FOR THE DIRECTLY REGULATED SMALL ENTITIES

| | Gross receipts from all fishing by herring permitted small entities | Gross receipts from herring fishing by herring permitted small entities |
|---|---|---|
| Mean | $1,847,392 | $422,210 |
| Median | 1,076,172 | 0 |
| 25th Percentile | 656,965 | 0 |
| 75th Percentile | 2,684,753 | 95,218 |
| Permitted Small Entities | 62 | 62 |

*Source:* NMFS.

Many of the businesses that hold limited access herring permits are not actively fishing for herring. Of those businesses actively fishing for herring, there are 32 directly regulated entities with herring landings. Two businesses are large entities (gross receipts over $11 million). The remaining 30 businesses are small entities. Table 4 characterizes gross receipts and gross receipts from the herring fishery for the active small entities.

TABLE 4—GROSS REVENUES AND REVENUES FROM HERRING FOR THE ACTIVE DIRECTLY REGULATED SMALL ENTITIES

| | Gross receipts from all fishing by active herring permitted small entities | Gross receipts from active herring permitted fishing by small entities |
|---|---|---|
| Mean | $2,070,541 | $872,567 |
| Median | 1,030,411 | 95,558 |
| 25th Percentile | 554,628 | 6,570 |
| 75th Percentile | 2,955,883 | 1,696,758 |
| Active Small Entities | 30 | 30 |

*Source:* NMFS.

For the 30 small entities, herring represents an average of 36 percent of gross receipts. For 12 of the small entities, herring represents the single largest source of gross receipts. For eight of the small entities, longfin squid is the largest source of gross receipts and Atlantic sea scallops is the largest source of gross receipts for five of the small entities. The largest source of gross receipts for the remaining five small entities are mixed across different fisheries. Eight of the 30 small entities derived zero revenues from herring.

*Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements*

This final rule contains collection-of-information requirements subject to review and approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA). The new requirements, which are described in detail in the preamble, have been submitted to OMB for approval as a revised collection under control number 0648–0674. The action does not duplicate, overlap, or conflict with any other Federal rules.

The Industry-Funded Monitoring Amendment would replace the current phone-based observer pre-trip notification system with a new web-based pre-trip notification system. There would be no additional reporting burden associated with this measure because the new notification system would increase convenience and will require approximately the same time burden (5 minutes).

This amendment would implement a 50-percent industry-funded monitoring coverage target on vessels issued Category A or B herring permits. The herring industry would be required to pay for industry cost responsibilities associated with at-sea monitoring. There are an estimated 42 vessels with Category A or B permits in the herring fishery. After considering SBRM coverage, we estimate that each vessel would incur monitoring costs for an additional 19 days at sea per year, at an estimated maximum cost of $710 per sea day. The annual cost estimate for carrying an at-sea monitor for Category A and B vessels would be $566,580, with an average cost per vessel of $13,490.

In addition to the 50-percent industry-funded monitoring coverage target, midwater trawl vessels would have the option to purchase observer coverage to allow them to fish in Groundfish Closed Areas. This option would be available to the estimated 12 vessels that fish with midwater trawl gear. Because this option would be available on all trips not otherwise selected for SBRM or industry-funded coverage, it is estimated that each vessel may use this option for up to 21 days per year, at an estimated maximum cost of $818 per sea day. Therefore, the annual cost associated with industry-funded observer coverage for midwater trawl vessels fishing in Groundfish Closed Areas is estimated to be $206,136, with an average annual cost per vessel of $17,178.

To access Groundfish Closed Areas, owners/operators of the 12 affected midwater trawl vessels would request an observer by calling one of the approved monitoring service providers. The average midwater trawl vessel is estimated to take 7 of these trips per year, and each call would take an estimated 5 minutes at a rate of $0.10 per minute. Thus, the total annual burden estimate to the industry for calls to obtain industry-funded observer coverage would be 7 hours and $42 (Per vessel: 1 hr and $3.50). For each of the 7 estimated trips that the vessel calls in to request an industry-funded observer to access Groundfish Closed Areas, the vessel has the option to cancel that trip. The call to cancel the trip would take an estimated 1 minute at a rate of $0.10 per minute. The total annual burden

_0000017745

estimated to the industry for cancelling these trips would be 1 hour and $8 (Per vessel: 1 hr and $1).

We expect that some monitoring service providers would apply for approval under the service provider requirements at § 648.11(h), specifically that four out of six providers may apply for approval, and would be subject to these requirements. These providers would submit reports and information required of service providers as part of their application for approval. Service providers must comply with the following requirements, submitted via email, phone, web-portal, fax, or postal service: Submit applications for approval as a monitoring service provider; formally request industry-funded at-sea monitor training by the NEFOP; submit industry-funded at-sea monitor deployment and availability

reports; submit biological samples, safety refusal reports, and other reports; give notification of industry-funded at-sea monitor availability within 24 hours of the vessel owner's notification of a prospective trip; provide vessels with notification of industry-funded observer availability in advance of each trip; and maintain an updated contact list of all industry-funded at-sea monitors/ observers that includes the monitor's/ observer's identification number, name, mailing and email address, phone numbers, homeports or fisheries/trip types assigned, and whether or not the monitor/observer is "in service" (i.e., available to provide coverage services). Monitoring service providers would have to provide raw at-sea monitoring data to NMFS and make at-sea monitors available to NMFS for debriefing upon request. The regulations would also

require monitoring service providers to submit any outreach materials, such as informational pamphlets, payment notification, and descriptions of monitor duties, as well as all contracts between the service provider and entities requiring monitoring services for review to NMFS. Monitoring service providers also have the option to respond to application denials, and submit a rebuttal in response to a pending removal from the list of approved monitoring service providers. NMFS expects that all of these reporting requirements combined are expected to take 1,192 hours of response time per year for a total annual cost of $12,483 for all affected monitoring service providers ($3,121 per provider). The following table provides the detailed time and cost information for each response item.

TABLE 5—BURDEN ESTIMATE FOR MEASURES

| Monitoring service provider requirements | Number of respondents | Total number of annual responses | Response time per response (minutes) | Total annual burden (hours) | Cost per response | Total annual cost |
|---|---|---|---|---|---|---|
| Monitor deployment report | 4 | 444 | 10 | 74 | $0.00 | $0 |
| Monitor availability report | 4 | 216 | 20 | 72 | 0.00 | 0 |
| Safety refusals | 4 | 40 | 30 | 20 | 0.00 | 0 |
| Raw monitor data | 4 | 444 | 5 | 37 | 23.75 | 10,545 |
| Monitor debriefing | 4 | 124 | 120 | 248 | 12.00 | 1,488 |
| Other reports | 4 | 68 | 30 | 34 | 0.00 | 0 |
| Biological samples | 4 | 516 | 60 | 516 | 0.50 | 258 |
| New application to be a service provider | 4 | 4 | 600 | 40 | 0.55 | 2 |
| Applicant response to denial | 1 | 1 | 600 | 10 | 0.55 | 1 |
| Request for monitor training | 4 | 12 | 30 | 6 | 1.80 | 22 |
| Rebuttal of pending removal from list of approved service providers | 1 | 1 | 480 | 8 | 0.55 | 1 |
| Request to service provider to procure a monitor | 90 | 360 | 10 | 60 | 0.00 | 0 |
| Notification of unavailability of monitors | 90 | 360 | 5 | 30 | 0.00 | 0 |
| Call to service provider to procure an observer for Groundfish Closed Areas by phone | 21 | 84 | 10 | 14 | 1.00 | 84 |
| Notification of unavailability of observers for Groundfish Closed Areas | 21 | 84 | 5 | 7 | 0.50 | 42 |
| Monitor contact list updates | 4 | 48 | 5 | 4 | 0.00 | 0 |
| Monitor availability updates | 4 | 48 | 5 | 4 | 0.00 | 0 |
| Service provider material submissions | 4 | 8 | 30 | 4 | 2.50 | 20 |
| Service provider contracts | 4 | 8 | 30 | 4 | 2.50 | 20 |
| Total | | | | 1,192 | | 12,483 |

Public comment is sought regarding the following: Whether this proposed collection of information is necessary for the proper performance of agency functions, including whether the information shall have practical utility; the accuracy of the burden estimate; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the collection of information, including through the use of automated collection techniques or other forms of information technology. Send comments

on these or any other aspects of the collection of information to the Regional Administrator (see **ADDRESSES**) and email to *OIRA_Submission@ omb.eop.gov* or fax to 202–395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to penalty for failure to comply with, a collection of information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB Control Number.

*Federal Rules Which May Duplicate, Overlap, or Conflict With the Proposed Rule*

This action does not duplicate, overlap, or conflict with any other Federal rules.

*Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes*

Recognizing the potential economic impact of industry-funded monitoring

on the herring industry, this amendment contains several measures to minimize the impact of paying for additional coverage. Setting the coverage target at 50 percent, instead of 75 or 100 percent, balances the benefit of additional monitoring with the costs associated with additional monitoring. Allowing SBRM coverage to contribute toward the 50-percent coverage target for at-sea monitoring is expected to reduce costs for the industry. Waiving industry-funded monitoring requirements on certain trips, including trips that land less than 50 mt of herring and pair trawl trips carrying no fish, would minimize the cost of additional monitoring. Trips that land less than 50 mt are common for small-mesh bottom trawl, single midwater trawl vessel, and purse seine vessels. As such, the 50-mt exemption has the potential to result in a less than 5 percent reduction in annual RTO associated with at-sea monitoring coverage for those vessels. Electronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage. Herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. Omnibus measures allow the Council to modify the weighting approach to recommend to us how to prioritize Federal funding across industry-funded monitoring programs. If the Council wants to recommend that we not prioritize Federal funding to administer industry-funded monitoring in the herring fishery, essentially recommending no additional monitoring for the herring fishery, it would consider the new weighting approach at a public meeting and request us to publish a rulemaking modifying the weighting approach. These measures ensure the Council considers the cost of additional monitoring relative to its effectiveness and provides the flexibility to adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous. Section 212 of the Small Business Regulatory Enforcement Fairness Act of 1996 states that, for each rule or group of related rules for which an agency is required to prepare a FRFA, the agency shall publish one or more guides to assist small entities in complying with the rule, and shall

designate such publications as "small entity compliance guides." The agency shall explain the actions a small entity is required to take to comply with a rule or group of rules. As part of this rulemaking process, a letter to permit holders that also serves as small entity compliance guide was prepared. Copies of this final rule are available from the Greater Atlantic Regional Fisheries Office (GARFO), and the compliance guide (*i.e.*, fishery bulletin) will be sent to all holders of permits for the herring fishery. The guide and this final rule will be posted on the GARFO website.

## List of Subjects in 50 CFR Part 648

Fisheries, Fishing, Recordkeeping and reporting requirements.

Dated: January 15, 2020.

**Samuel D. Rauch III,**
*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons set out in the preamble, 50 CFR part 648 is amended as follows:

## PART 648—FISHERIES OF THE NORTHEASTERN UNITED STATES

■ 1. The authority citation for part 648 continues to read as follows:

**Authority:** 16 U.S.C. 1801 *et seq.*

■ 2. In § 648.2, revise the definitions for "Electronic monitoring," "Observer/sea sampler," "Slippage in the Atlantic herring fishery," and "Slip(s) or slipping catch in the Atlantic herring fishery" to read as follows:

### § 648.2   Definitions.

\*    \*    \*    \*    \*

*Electronic monitoring* means a network of equipment that uses a software operating system connected to one or more technology components, including, but not limited to, cameras and recording devices to collect data on catch and vessel operations. With respect to the NE multispecies fishery, electronic monitoring means any equipment that is used to monitor area fished and the amount and identity of species kept and discarded in lieu of at-sea monitors as part of an approved Sector at-sea monitoring program.

\*    \*    \*    \*    \*

*Observer or monitor* means any person certified by NMFS to collect operational fishing data, biological data, or economic data through direct observation and interaction with operators of commercial fishing vessels as part of NMFS' Northeast Fisheries Observer Program. Observers or monitors include NMFS-certified fisheries observers, at-sea monitors,

portside samplers, and dockside monitors.

\*    \*    \*    \*    \*

*Slippage in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-certified observer or monitor after the catch is on board. Slippage also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slippage includes releasing catch from a codend or seine prior to the completion of pumping the catch aboard and the release of catch from a codend or seine while the codend or seine is in the water. Fish that cannot be pumped and remain in the codend or seine at the end of pumping operations are not considered slippage. Discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor are also not considered slippage.

*Slip(s) or slipping catch in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-certified observer or monitor after the catch is on board. Slip(s) or slipping catch also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slip(s) or slipping catch includes releasing fish from a codend or seine prior to the completion of pumping the fish on board and the release of fish from a codend or seine while the codend or seine is in the water. Slippage or slipped catch refers to fish that are slipped. Slippage or slipped catch does not include operational discards, discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor, or fish that inadvertently fall out of or off fishing gear as gear is being brought on board the vessel.

\*    \*    \*    \*    \*

■ 3. In § 648.7, revise paragraph (b)(2)(i) to read as follows:

_0000017747

**§648.7  Record keeping and reporting requirements.**

\*  \*  \*  \*  \*

(b) \* \* \*

(2) \* \* \*

(i) *Atlantic herring owners or operators issued an All Areas open access permit.* The owner or operator of a vessel issued an All Areas open access permit to fish for herring must report catch (retained and discarded) of herring via an IVR system for each week herring was caught, unless exempted by the Regional Administrator. IVR reports are not required for weeks when no herring was caught. The report shall include at least the following information, and any other information required by the Regional Administrator: Vessel identification; week in which herring are caught; management areas fished; and pounds retained and pounds discarded of herring caught in each management area. The IVR reporting week begins on Sunday at 0001 hour (hr) (12:01 a.m.) local time and ends Saturday at 2400 hr (12 midnight). Weekly Atlantic herring catch reports must be submitted via the IVR system by midnight each Tuesday, eastern time, for the previous week. Reports are required even if herring caught during the week has not yet been landed. This report does not exempt the owner or operator from other applicable reporting requirements of this section.

\*  \*  \*  \*  \*

■ 4. Revise § 648.11 to read as follows:

**§648.11  Monitoring coverage.**

(a) *Coverage.* The Regional Administrator may request any vessel holding a permit for Atlantic sea scallops, NE multispecies, monkfish, skates, Atlantic mackerel, squid, butterfish, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, tilefish, Atlantic surfclam, ocean quahog, or Atlantic deep-sea red crab; or a moratorium permit for summer flounder; to carry a NMFS-certified fisheries observer. A vessel holding a permit for Atlantic sea scallops is subject to the additional requirements specified in paragraph (k) of this section. A vessel holding an All Areas or Areas ⅔ Limited Access Herring Permit is subject to the additional requirements specified in paragraph (m) of this section. Also, any vessel or vessel owner/operator that fishes for, catches or lands hagfish, or intends to fish for, catch, or land hagfish in or from the exclusive economic zone must carry a NMFS-certified fisheries observer when requested by the Regional Administrator in accordance with the requirements of this section.

(b) *Facilitating coverage.* If requested by the Regional Administrator or their designees, including NMFS-certified observers, monitors, and NMFS staff, to be sampled by an observer or monitor, it is the responsibility of the vessel owner or vessel operator to arrange for and facilitate observer or monitor placement. Owners or operators of vessels selected for observer or monitor coverage must notify the appropriate monitoring service provider before commencing any fishing trip that may result in the harvest of resources of the respective fishery. Notification procedures will be specified in selection letters to vessel owners or permit holder letters.

(c) *Safety waivers.* The Regional Administrator may waive the requirement to be sampled by an observer or monitor if the facilities on a vessel for housing the observer or monitor, or for carrying out observer or monitor functions, are so inadequate or unsafe that the health or safety of the observer or monitor, or the safe operation of the vessel, would be jeopardized.

(d) *Vessel requirements associated with coverage.* An owner or operator of a vessel on which a NMFS-certified observer or monitor is embarked must:

(1) Provide accommodations and food that are equivalent to those provided to the crew.

(2) Allow the observer or monitor access to and use of the vessel's communications equipment and personnel upon request for the transmission and receipt of messages related to the observer's or monitor's duties.

(3) Provide true vessel locations, by latitude and longitude or loran coordinates, as requested by the observer or monitor, and allow the observer or monitor access to and use of the vessel's navigation equipment and personnel upon request to determine the vessel's position.

(4) Notify the observer or monitor in a timely fashion of when fishing operations are to begin and end.

(5) Allow for the embarking and debarking of the observer or monitor, as specified by the Regional Administrator, ensuring that transfers of observers or monitors at sea are accomplished in a safe manner, via small boat or raft, during daylight hours as weather and sea conditions allow, and with the agreement of the observers or monitors involved.

(6) Allow the observer or monitor free and unobstructed access to the vessel's bridge, working decks, holding bins, weight scales, holds, and any other space used to hold, process, weigh, or store fish.

(7) Allow the observer or monitor to inspect and copy any the vessel's log, communications log, and records associated with the catch and distribution of fish for that trip.

(e) *Vessel requirements associated with protected species.* The owner or operator of a vessel issued a summer flounder moratorium permit, a scup moratorium permit, a black sea bass moratorium permit, a bluefish permit, a spiny dogfish permit, an Atlantic herring permit, an Atlantic deep-sea red crab permit, a skate permit, or a tilefish permit, if requested by the observer or monitor, also must:

(1) Notify the observer or monitor of any sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, tilefish, skates (including discards) or other specimens taken by the vessel.

(2) Provide the observer or monitor with sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, skates, tilefish, or other specimens taken by the vessel.

(f) *Coverage funded from outside sources.* NMFS may accept observer or monitor coverage funded by outside sources if:

(1) All coverage conducted by such observers or monitors is determined by NMFS to be in compliance with NMFS' observer or monitor guidelines and procedures.

(2) The owner or operator of the vessel complies with all other provisions of this part.

(3) The observer or monitor is approved by the Regional Administrator.

(g) *Industry-funded monitoring programs.* Fishery management plans (FMPs) managed by the New England Fishery Management Council (New England Council), including Atlantic Herring, Atlantic Salmon, Atlantic Sea Scallops, Deep-Sea Red Crab, Northeast Multispecies, and Northeast Skate Complex, may include industry-funded monitoring programs (IFM) to supplement existing monitoring required by the Standard Bycatch Reporting Methodology (SBRM), Endangered Species Act, and the Marine Mammal Protection Act. IFM programs may use observers, monitors, including at-sea monitors and portside samplers, and electronic monitoring to meet specified IFM coverage targets. The ability to meet IFM coverage targets may be constrained by the availability of

Federal funding to pay NMFS cost responsibilities associated with IFM.

(1) *Guiding principles for new IFM programs.* The Council's development of an IFM program must consider or include the following:

(i) A clear need or reason for the data collection;

(ii) Objective design criteria;

(iii) Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;

(iv) Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;

(v) Prioritize the use of modern technology to the extent practicable; and

(vi) Incentives for reliable self-reporting.

(2) *Process to implement and revise new IFM programs.* New IFM programs shall be developed via an amendment to a specific FMP. IFM programs implemented in an FMP may be revised via a framework adjustment. The details of an IFM program may include, but are not limited to:

(i) Level and type of coverage target;

(ii) Rationale for level and type of coverage;

(iii) Minimum level of coverage necessary to meet coverage goals;

(iv) Consideration of waivers if coverage targets cannot be met;

(v) Process for vessel notification and selection;

(vi) Cost collection and administration;

(vii) Standards for monitoring service providers; and

(viii) Any other measures necessary to implement the industry-funded monitoring program.

(3) *NMFS cost responsibilities.* IFM programs have two types of costs, NMFS and industry costs. Cost responsibilities are delineated by the type of cost. NMFS cost responsibilities include the following:

(i) The labor and facilities associated with training and debriefing of monitors;

(ii) NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);

(iii) Certification of monitoring service providers and individual observers or monitors; performance monitoring to maintain certificates;

(iv) Developing and executing vessel selection;

(v) Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and

(vi) Costs associated with liaison activities between service providers, and NMFS, Coast Guard, New England Council, sector managers, and other partners.

(vii) The industry is responsible for all other costs associated with IFM programs.

(4) *Prioritization process to cover NMFS IFM cost responsibilities.* (i) Available Federal funding refers to any funds in excess of those allocated to meet SBRM requirements or the existing IFM programs in the Atlantic Sea Scallop and Northeast Multispecies FMPs that may be used to cover NMFS cost responsibilities associated with IFM coverage targets. If there is no available Federal funding in a given year to cover NMFS IFM cost responsibilities, then there shall be no IFM coverage during that year. If there is some available Federal funding in a given year, but not enough to cover all of NMFS cost responsibilities associated with IFM coverage targets, then the New England Council will prioritize available Federal funding across IFM programs during that year. Existing IFM programs for Atlantic sea scallops and Northeast multispecies fisheries shall not be included in this prioritization process.

(ii) Programs with IFM coverage targets shall be prioritized using an equal weighting approach, such that any available Federal funding shall be divided equally among programs.

(iii) After NMFS determines the amount of available Federal funding for the next fishing year, NMFS shall provide the New England Council with the estimated IFM coverage levels for the next fishing year. The estimated IFM coverage levels would be based on the equal weighting approach and would include the rationale for any deviations from the equal weighting approach. The New England Council may recommend revisions and additional considerations to the Regional Administrator and Science and Research Director.

(A) If available Federal funding exceeds that needed to pay all of NMFS cost responsibilities for administering IFM programs, the New England Council may request NMFS to use available funding to help offset industry cost responsibilities through reimbursement.

(B) [Reserved]

(iv) Revisions to the prioritization process may be made via a framework adjustment to all New England FMPs.

(v) Revisions to the weighting approach for the New England Council-led prioritization process may be made via a framework adjustment to all New England FMPs or by the New England Council considering a new weighting approach at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the weighting approach. NMFS shall implement revisions to the weighting approach in a manner consistent with the Administrative Procedure Act.

(5) *IFM program monitoring service provider requirements.* IFM monitoring service provider requirements shall be consistent with requirements in paragraph (h) of this section and observer or monitor requirements shall be consistent with requirements in paragraph (i) of this section.

(6) *Monitoring set-aside.* The New England Council may develop a monitoring set-aside program for individual FMPs that would devote a portion of the annual catch limit for a fishery to help offset the industry cost responsibilities for monitoring coverage, including observers, at-sea monitors, portside samplers, and electronic monitoring.

(i) The details of a monitoring set-aside program may include, but are not limited to:

(A) The basis for the monitoring set-aside;

(B) The amount of the set-aside (*e.g.,* quota, days at sea);

(C) How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* an increased trip limit, differential days at sea counting, additional trips, an allocation of the quota);

(D) The process for vessel notification;

(E) How funds are collected and administered to cover the industry's costs of monitoring; and

(F) Any other measures necessary to develop and implement a monitoring set-aside.

(ii) The New England Council may develop new monitoring set-asides and revise those monitoring set-asides via a framework adjustment to the relevant FMP.

(h) *Monitoring service provider approval and responsibilities*—(1) *General.* An entity seeking to provide monitoring services, including services for IFM Programs described in paragraph (g) of this section, must apply for and obtain approval from NMFS following submission of a complete application. Monitoring services include providing NMFS-certified observers, monitors (at-sea monitors and portside samplers), and/or electronic monitoring. A list of approved monitoring service providers shall be distributed to vessel owners and shall be posted on the NMFS Fisheries Sampling Branch (FSB) website at: *https://www.nefsc.noaa.gov/femad/fsb/.*

(2) [Reserved]

_0000017749

(3) *Contents of application.* An application to become an approved monitoring service provider shall contain the following:

(i) Identification of the management, organizational structure, and ownership structure of the applicant's business, including identification by name and general function of all controlling management interests in the company, including but not limited to owners, board members, officers, authorized agents, and staff. If the applicant is a corporation, the articles of incorporation must be provided. If the applicant is a partnership, the partnership agreement must be provided.

(ii) The permanent mailing address, phone and fax numbers where the owner(s) can be contacted for official correspondence, and the current physical location, business mailing address, business telephone and fax numbers, and business email address for each office.

(iii) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, that they are free from a conflict of interest as described under paragraph (h)(6) of this section.

(iv) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, describing any criminal conviction(s), Federal contract(s) they have had and the performance rating they received on the contracts, and previous decertification action(s) while working as an observer or monitor or monitoring service provider.

(v) A description of any prior experience the applicant may have in placing individuals in remote field and/or marine work environments. This includes, but is not limited to, recruiting, hiring, deployment, and personnel administration.

(vi) A description of the applicant's ability to carry out the responsibilities and duties of a monitoring service provider as set out under paragraph (h)(5) of this section, and the arrangements to be used.

(vii) Evidence of holding adequate insurance to cover injury, liability, and accidental death for observers or monitors, whether contracted or employed by the service provider, during their period of employment (including during training). Workers' Compensation and Maritime Employer's Liability insurance must be provided to cover the observer or monitor, vessel owner, and observer provider. The minimum coverage required is $5 million. Monitoring service providers shall provide copies of the insurance policies to observers or monitors to display to the vessel owner, operator, or vessel manager, when requested.

(viii) Proof that its observers or monitors, whether contracted or employed by the service provider, are compensated with salaries that meet or exceed the U.S. Department of Labor (DOL) guidelines for observers. Observers shall be compensated as Fair Labor Standards Act (FLSA) non-exempt employees. Monitoring service providers shall provide any other benefits and personnel services in accordance with the terms of each observer's or monitor's contract or employment status.

(ix) The names of its fully equipped, NMFS/FSB certified, observers or monitors on staff or a list of its training candidates (with resumes) and a request for an appropriate NMFS/FSB Training class. All training classes have a minimum class size of eight individuals, which may be split among multiple vendors requesting training. Requests for training classes with fewer than eight individuals will be delayed until further requests make up the full training class size.

(x) An Emergency Action Plan (EAP) describing its response to an "at sea" emergency with an observer or monitor, including, but not limited to, personal injury, death, harassment, or intimidation. An EAP that details a monitoring service provider's responses to emergencies involving observers, monitors, or monitoring service provider personnel. The EAP shall include communications protocol and appropriate contact information in an emergency.

(4) *Application evaluation.* (i) NMFS shall review and evaluate each application submitted under paragraph (h)(3) of this section. Issuance of approval as a monitoring service provider shall be based on completeness of the application, and a determination by NMFS of the applicant's ability to perform the duties and responsibilities of a monitoring service provider, as demonstrated in the application information. A decision to approve or deny an application shall be made by NMFS within 15 business days of receipt of the application by NMFS.

(ii) If NMFS approves the application, the monitoring service provider's name will be added to the list of approved monitoring service providers found on the NMFS/FSB website specified in paragraph (h)(1) of this section, and in any outreach information to the industry. Approved monitoring service providers shall be notified in writing and provided with any information pertinent to its participation in the observer or monitor programs.

(iii) An application shall be denied if NMFS determines that the information provided in the application is not complete or the evaluation criteria are not met. NMFS shall notify the applicant in writing of any deficiencies in the application or information submitted in support of the application. An applicant who receives a denial of his or her application may present additional information to rectify the deficiencies specified in the written denial, provided such information is submitted to NMFS within 30 days of the applicant's receipt of the denial notification from NMFS. In the absence of additional information, and after 30 days from an applicant's receipt of a denial, a monitoring service provider is required to resubmit an application containing all of the information required under the application process specified in paragraph (h)(3) of this section to be re-considered for being added to the list of approved monitoring service providers.

(5) *Responsibilities of monitoring service providers*—(i) *Certified observers or monitors.* A monitoring service provider must provide observers or monitors certified by NMFS/FSB pursuant to paragraph (i) of this section for deployment in a fishery when contacted and contracted by the owner, operator, or vessel manager of a fishing vessel, unless the monitoring service provider refuses to deploy an observer or monitor on a requesting vessel for any of the reasons specified in paragraph (h)(5)(viii) of this section.

(ii) *Support for observers or monitors.* A monitoring service provider must provide to each of its observers or monitors:

(A) All necessary transportation, lodging costs and support for arrangements and logistics of travel for observers and monitors to and from the initial location of deployment, to all subsequent vessel assignments, to any debriefing locations, and for appearances in Court for monitoring-related trials as necessary;

(B) Lodging, per diem, and any other services necessary for observers or monitors assigned to a fishing vessel or to attend an appropriate NMFS/FSB training class;

(C) The required observer or monitor equipment, in accordance with equipment requirements listed on the NMFS/FSB website specified in paragraph (h)(1) of this section, prior to any deployment and/or prior to NMFS observer or monitor certification training; and

(D) Individually assigned communication equipment, in working order, such as a mobile phone, for all

_0000017750

necessary communication. A monitoring service provider may alternatively compensate observers or monitors for the use of the observer's or monitor's personal mobile phone, or other device, for communications made in support of, or necessary for, the observer's or monitor's duties.

(iii) *Observer and monitor deployment logistics.* Each approved monitoring service provider must assign an available certified observer or monitor to a vessel upon request. Each approved monitoring service provider must be accessible 24 hours per day, 7 days per week, to enable an owner, operator, or manager of a vessel to secure monitoring coverage when requested. The telephone or other notification system must be monitored a minimum of four times daily to ensure rapid response to industry requests. Monitoring service providers approved under this paragraph (h) are required to report observer or monitor deployments to NMFS for the purpose of determining whether the predetermined coverage levels are being achieved in the appropriate fishery.

(iv) *Observer deployment limitations.* (A) A candidate observer's first several deployments and the resulting data shall be immediately edited and approved after each trip by NMFS/FSB prior to any further deployments by that observer. If data quality is considered acceptable, the observer would be certified. For further information, see *https://www.nefsc.noaa.gov/fsb/training/*.

(B) For the purpose of coverage to meet SBRM requirements, unless alternative arrangements are approved by NMFS, a monitoring service provider must not deploy any NMFS-certified observer on the same vessel for more than two consecutive multi-day trips, and not more than twice in any given month for multi-day deployments.

(C) For the purpose of coverage to meet IFM requirements, a monitoring service provider may deploy any NMFS-certified observer or monitor on the same vessel for more than two consecutive multi-day trips and more than twice in any given month for multi-day deployments.

(v) *Communications with observers and monitors.* A monitoring service provider must have an employee responsible for observer or monitor activities on call 24 hours a day to handle emergencies involving observers or monitors or problems concerning observer or monitor logistics, whenever observers or monitors are at sea, stationed portside, in transit, or in port awaiting vessel assignment.

(vi) *Observer and monitor training requirements.* A request for a NMFS/FSB Observer or Monitor Training class must be submitted to NMFS/FSB 45 calendar days in advance of the requested training. The following information must be submitted to NMFS/FSB at least 15 business days prior to the beginning of the proposed training: A list of observer or monitor candidates; candidate resumes, cover letters and academic transcripts; and a statement signed by the candidate, under penalty of perjury, that discloses the candidate's criminal convictions, if any. A medical report certified by a physician for each candidate is required 7 business days prior to the first day of training. CPR/First Aid certificates and a final list of training candidates with candidate contact information (email, phone, number, mailing address and emergency contact information) are due 7 business days prior to the first day of training. NMFS may reject a candidate for training if the candidate does not meet the minimum qualification requirements as outlined by NMFS/FSB minimum eligibility standards for observers or monitors as described on the NMFS/FSB website.

(vii) *Reports and Requirements*—(A) *Deployment reports.* The monitoring service provider must report to NMFS/FSB when, where, to whom, and to what vessel an observer or monitor has been deployed, as soon as practicable, and according to requirements outlined on the NMFS/FSB website. The deployment report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week. The monitoring service provider must ensure that the observer or monitor reports to NMFS the required electronic data, as described in the NMFS/FSB training. Electronic data submission protocols will be outlined in training and may include accessing government websites via personal computers/ devices or submitting data through government issued electronics. The monitoring service provider shall provide the raw (unedited) data collected by the observer or monitor to NMFS at the specified time per program. For further information, see *https://www.nefsc.noaa.gov/fsb/scallop/*.

(B) *Safety refusals.* The monitoring service provider must report to NMFS any trip or landing that has been refused due to safety issues (*e.g.,* failure to hold a valid USCG Commercial Fishing Vessel Safety Examination Decal or to meet the safety requirements of the observer's or monitor's safety checklist) within 12 hours of the refusal.

(C) *Biological samples.* The monitoring service provider must ensure that biological samples, including whole marine mammals, sea turtles, sea birds, and fin clips or other DNA samples, are stored/handled properly and transported to NMFS within 5 days of landing. If transport to NMFS/FSB Observer Training Facility is not immediately available then whole animals requiring freezing shall be received by the nearest NMFS freezer facility within 24 hours of vessel landing.

(D) *Debriefing.* The monitoring service provider must ensure that the observer or monitor remains available to NMFS, either in-person or via phone, at NMFS' discretion, including NMFS Office for Law Enforcement, for debriefing for at least 2 weeks following any monitored trip. If requested by NMFS, an observer or monitor that is at sea during the 2-week period must contact NMFS upon his or her return. Monitoring service providers must pay for travel and land hours for any requested debriefings.

(E) *Availability report.* The monitoring service provider must report to NMFS any occurrence of inability to respond to an industry request for observer or monitor coverage due to the lack of available observers or monitors as soon as practicable if the provider is unable to respond to an industry request for monitoring coverage. Availability report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week.

(F) *Incident reports.* The monitoring service provider must report possible observer or monitor harassment, discrimination, concerns about vessel safety or marine casualty, or observer or monitor illness or injury; and any information, allegations, or reports regarding observer or monitor conflict of interest or breach of the standards of behavior, to NMFS/FSB within 12 hours of the event or within 12 hours of learning of the event.

(G) *Status report.* The monitoring service provider must provide NMFS/FSB with an updated list of contact information for all observers or monitors that includes the identification number, name, mailing address, email address, phone numbers, homeports or fisheries/ trip types assigned, and must include whether or not the observer or monitor is "in service," indicating when the observer or monitor has requested leave and/or is not currently working for an industry-funded program. Any Federally contracted NMFS-certified observer not actively deployed on a vessel for 30 days will be placed on Leave of Absence (LOA) status (or as specified by NMFS/FSB according to

most recent Information Technology Security Guidelines at *https://www.nefsc.noaa.gov/fsb/memos/*. Those Federally contracted NMFS-certified observers on LOA for 90 days or more will need to conduct an exit interview with NMFS/FSB and return any NMFS/FSB issued gear and Common Access Card (CAC), unless alternative arrangements are approved by NMFS/FSB. NMFS/FSB requires 2-week advance notification when a Federally contracted NMFS-certified observer is leaving the program so that an exit interview may be arranged and gear returned.

(H) *Vessel contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and those entities requiring monitoring services.

(I) *Observer and monitor contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and specific observers or monitors.

(J) *Additional information.* The monitoring service provider must submit to NMFS/FSB, if requested, copies of any information developed and/or used by the monitoring service provider and distributed to vessels, observers, or monitors, such as informational pamphlets, payment notification, daily rate of monitoring services, description of observer or monitor duties, etc.

(viii) *Refusal to deploy an observer or monitor.* (A) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider does not have an available observer or monitor within the required time and must report all refusals to NMFS/FSB.

(B) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider has determined that the requesting vessel is inadequate or unsafe pursuant to the reasons described at § 600.746.

(C) The monitoring service provider may refuse to deploy an observer or monitor on a fishing vessel that is otherwise eligible to carry an observer or monitor for any other reason, including failure to pay for previous monitoring deployments, provided the monitoring service provider has

received prior written confirmation from NMFS authorizing such refusal.

(6) *Limitations on conflict of interest.* A monitoring service provider:

(i) Must not have a direct or indirect interest in a fishery managed under Federal regulations, including, but not limited to, a fishing vessel, fish dealer, and/or fishery advocacy group (other than providing monitoring services);

(ii) Must assign observers or monitors without regard to any preference by representatives of vessels other than when an observer or monitor will be deployed for the trip that was selected for coverage; and

(iii) Must not solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who conducts fishing or fishing related activities that are regulated by NMFS, or who has interests that may be substantially affected by the performance or nonperformance of the official duties of monitoring service providers.

(7) *Removal of monitoring service provider from the list of approved service providers.* A monitoring service provider that fails to meet the requirements, conditions, and responsibilities specified in paragraphs (h)(5) and (6) of this section shall be notified by NMFS, in writing, that it is subject to removal from the list of approved monitoring service providers. Such notification shall specify the reasons for the pending removal. A monitoring service provider that has received notification that it is subject to removal from the list of approved monitoring service providers may submit written information to rebut the reasons for removal from the list. Such rebuttal must be submitted within 30 days of notification received by the monitoring service provider that the monitoring service provider is subject to removal and must be accompanied by written evidence rebutting the basis for removal. NMFS shall review information rebutting the pending removal and shall notify the monitoring service provider within 15 days of receipt of the rebuttal whether or not the removal is warranted. If no response to a pending removal is received by NMFS, the monitoring service provider shall be automatically removed from the list of approved monitoring service providers. The decision to remove the monitoring service provider from the list, either after reviewing a rebuttal, or if no rebuttal is submitted, shall be the final decision of NMFS and the Department of Commerce. Removal from the list of approved monitoring service providers does not necessarily prevent such

monitoring service provider from obtaining an approval in the future if a new application is submitted that demonstrates that the reasons for removal are remedied. Certified observers and monitors under contract with observer monitoring service provider that has been removed from the list of approved service providers must complete their assigned duties for any fishing trips on which the observers or monitors are deployed at the time the monitoring service provider is removed from the list of approved monitoring service providers. A monitoring service provider removed from the list of approved monitoring service providers is responsible for providing NMFS with the information required in paragraph (h)(5)(vii) of this section following completion of the trip. NMFS may consider, but is not limited to, the following in determining if a monitoring service provider may remain on the list of approved monitoring service providers:

(i) Failure to meet the requirements, conditions, and responsibilities of monitoring service providers specified in paragraphs (h)(5) and (6) of this section;

(ii) Evidence of conflict of interest as defined under paragraph (h)(6) of this section;

(iii) Evidence of criminal convictions related to:

(A) Embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; or

(B) The commission of any other crimes of dishonesty, as defined by state law or Federal law, that would seriously and directly affect the fitness of an applicant in providing monitoring services under this section; and

(iv) Unsatisfactory performance ratings on any Federal contracts held by the applicant; and

(v) Evidence of any history of decertification as either an observer, monitor, or monitoring service provider.

(i) *Observer or monitor certification—* (1) *Requirements.* To be certified, employees or sub-contractors operating as observers or monitors for monitoring service providers approved under paragraph (h) of this section. In addition, observers must meet NMFS National Minimum Eligibility Standards for observers specified at the National Observer Program website: *https://www.nmfs.noaa.gov/op/pds/categories/scienceandtechnology.html.* For further information, see *https://www.st.nmfs.noaa.gov/observer-home/.*

(2) *Observer or monitor training.* In order to be deployed on any fishing vessel, a candidate observer or monitor

_0000017752

**7436**    **Federal Register** / Vol. 85, No. 26 / Friday, February 7, 2020 / Rules and Regulations

must have passed an appropriate NMFS/FSB Observer Training course and must adhere to all NMFS/FSB program standards and policies (refer to website for program standards, *https://www.nefsc.noaa.gov/fsb/training/*). If a candidate fails training, the candidate and monitoring service provider shall be notified immediately by NMFS/FSB. Observer training may include an observer training trip, as part of the observer's training, aboard a fishing vessel with a trainer. Refer to the NMFS/FSB website for the required number of program specific observer and monitor training certification trips for full certification following training, *https://www.nefsc.noaa.gov/fsb/training/*.

(3) *Observer requirements.* All observers must:

(i) Have a valid NMFS/FSB fisheries observer certification pursuant to paragraph (i)(1) of this section;

(ii) Be physically and mentally capable of carrying out the responsibilities of an observer on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iii) Have successfully completed all NMFS-required training and briefings for observers before deployment, pursuant to paragraph (i)(2) of this section;

(iv) Hold a current Red Cross (or equivalence) CPR/First Aid certification;

(v) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vi) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(4) *Monitor requirements.* All monitors must:

(i) Hold a high school diploma or legal equivalent;

(ii) Have a valid NMFS/FSB certification pursuant to paragraph (i)(1) of this section;

(iii) Be physically and mentally capable of carrying out the responsibilities of a monitor on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iv) Have successfully completed all NMFS-required training and briefings for monitors before deployment, pursuant to paragraph (i)(2) of this section;

(v) Hold a current Red Cross (or equivalence) CPR/First Aid certification if the monitor is to be employed as an at-sea monitor;

(vi) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vii) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(5) *Probation and decertification.* NMFS may review observer and monitor certifications and issue observer and monitor certification probation and/or decertification as described in NMFS policy found on the NMFS/FSB website specified in paragraph (h)(1) of this section.

(6) *Issuance of decertification.* Upon determination that decertification is warranted under paragraph (i)(5) of this section, NMFS shall issue a written decision to decertify the observer or monitor to the observer or monitor and approved monitoring service providers via certified mail at the observer's or monitor's most current address provided to NMFS. The decision shall identify whether a certification is revoked and shall identify the specific reasons for the action taken. Decertification is effective immediately as of the date of issuance, unless the decertification official notes a compelling reason for maintaining certification for a specified period and under specified conditions. Decertification is the final decision of NMFS and the Department of Commerce and may not be appealed.

(j) *Coverage.* In the event that a vessel is requested by the Regional Administrator to carry a NMFS-certified fisheries observer pursuant to paragraph (a) of this section and is also selected to carry an at-sea monitor as part of an approved sector at-sea monitoring program specified in § 648.87(b)(1)(v) for the same trip, only the NMFS-certified fisheries observer is required to go on that particular trip.

(k) *Atlantic sea scallop observer program*—(1) *General.* Unless otherwise specified, owners, operators, and/or managers of vessels issued a Federal scallop permit under § 648.4(a)(2), and specified in paragraph (a) of this section, must comply with this section and are jointly and severally responsible for their vessel's compliance with this section. To facilitate the deployment of at-sea observers, all sea scallop vessels issued limited access and LAGC IFQ permits are required to comply with the additional notification requirements specified in paragraph (k)(2) of this section. When NMFS notifies the vessel owner, operator, and/or manager of any requirement to carry an observer on a specified trip in either an Access Area or Open Area as specified in paragraph (k)(3) of this section, the vessel may not fish for, take, retain, possess, or land any scallops without carrying an observer. Vessels may only embark on a scallop trip in open areas or Access Areas without an observer if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver of the observer requirement for that trip pursuant to paragraphs (k)(3) and (k)(4)(ii) of this section.

(2) *Vessel notification procedures*—(i) *Limited access vessels.* Limited access vessel owners, operators, or managers shall notify NMFS/FSB by telephone not more than 10 days prior to the beginning of any scallop trip of the time, port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl, or general category vessel.

(ii) *LAGC IFQ vessels.* LAGC IFQ vessel owners, operators, or managers must notify the NMFS/FSB by telephone by 0001 hr of the Thursday preceding the week (Sunday through Saturday) that they intend to start any open area or access area scallop trip and must include the port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl vessel. If selected, up to two trips that start during the specified week (Sunday through Saturday) can be selected to be covered by an observer. NMFS/FSB must be notified by the owner, operator, or vessel manager of any trip plan changes at least 48 hr prior to vessel departure.

(3) *Selection of scallop trips for observer coverage.* Based on predetermined coverage levels for various permit categories and areas of the scallop fishery that are provided by NMFS in writing to all observer service providers approved pursuant to paragraph (h) of this section, NMFS shall notify the vessel owner, operator, or vessel manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified scallop trip, within 24 hr of the vessel owner's, operator's, or vessel manager's notification of the prospective scallop trip, as specified in paragraph (k)(2) of this section. Any request to carry an observer may be waived by NMFS. All waivers for observer coverage shall be issued to the vessel by VMS so as to have on-board verification of the waiver. A vessel may not fish in an area with an observer waiver confirmation number that does not match the scallop

_0000017753

trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(4) *Procurement of observer services by scallop vessels.* (i) An owner of a scallop vessel required to carry an observer under paragraph (k)(3) of this section must arrange for carrying an observer certified through the observer training class operated by the NMFS/FSB from an observer service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected to carry an observer must contact the observer service provider and must provide at least 48-hr notice in advance of the fishing trip for the provider to arrange for observer deployment for the specified trip. The observer service provider will notify the vessel owner, operator, or manager within 18 hr whether they have an available observer. A list of approved observer service providers shall be posted on the NMFS/FSB website at *https:// www.nefsc.noaa.gov/femad/fsb/*. The observer service provider may take up to 48 hr to arrange for observer deployment for the specified scallop trip.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure a certified observer within 48 hr of the advance notification to the provider due to the unavailability of an observer may request a waiver from NMFS/FSB from the requirement for observer coverage for that trip, but only if the owner, operator, or vessel manager has contacted all of the available observer service providers to secure observer coverage and no observer is available. NMFS/FSB shall issue such a waiver within 24 hr, if the conditions of this paragraph (g)(4)(ii) are met. A vessel may not begin the trip without being issued a waiver.

(5) *Cost of coverage.* Owners of scallop vessels shall be responsible for paying the cost of the observer for all scallop trips on which an observer is carried onboard the vessel, regardless of whether the vessel lands or sells sea scallops on that trip, and regardless of the availability of set-aside for an increased possession limit or reduced DAS accrual rate. The owners of vessels that carry an observer may be compensated with a reduced DAS accrual rate for open area scallop trips or additional scallop catch per day in Sea Scallop Access Areas or additional catch per open area or access area trip for LAGC IFQ trips in order to help defray the cost of the observer, under the program specified in §§ 648.53 and 648.60.

(i) Observer service providers shall establish the daily rate for observer coverage on a scallop vessel on an Access Area trip or open area DAS or IFQ scallop trip consistent with paragraphs (k)(5)(i)(A) and (B), respectively, of this section.

(A) *Access Area trips.* (*1*) For purposes of determining the daily rate for an observed scallop trip on a limited access vessel in a Sea Scallop Access Area when that specific Access Area's observer set-aside specified in § 648.60(d)(1) has not been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, or any portion of a 24-hr period, regardless of the calendar day. For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time at sea equals 27 hr, which would equate to 2 full "days."

(*2*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for an observed scallop trip on a limited access vessel taken after NMFS has announced the industry-funded observer set-aside in that specific Access Area has been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(*3*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for observed scallop trips on an LAGC vessel, regardless of the status of the industry-funded observer set-aside, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(B) *Open area scallop trips.* For purposes of determining the daily rate for an observed scallop trip for DAS or LAGC IFQ open area trips, regardless of the status of the industry-funded

observer set-aside, a service provider shall charge dock to dock where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24. For example, if a vessel with an observer departs on the July 1st at 10 p.m. and lands on July 3rd at 1 a.m., the time at sea equals 27 hr, so the provider would charge 1 day and 3 hr.

(ii) NMFS shall determine any reduced DAS accrual rate and the amount of additional pounds of scallops per day fished in a Sea Scallop Access Area or on an open area LAGC IFQ trips for the applicable fishing year based on the economic conditions of the scallop fishery, as determined by best available information. Vessel owners and observer service providers shall be notified through the Small Entity Compliance Guide of any DAS accrual rate changes and any changes in additional pounds of scallops determined by the Regional Administrator to be necessary. NMFS shall notify vessel owners and observer providers of any adjustments.

(iii) Owners of scallop vessels shall pay observer service providers for observer services within 45 days of the end of a fishing trip on which an observer deployed.

(6) *Coverage and cost requirements.* When the available DAS or TAC set-aside for observer coverage is exhausted, vessels shall still be required to carry an observer as specified in this section, and shall be responsible for paying for the cost of the observer, but shall not be authorized to harvest additional pounds or fish at a reduced DAS accrual rate.

(l) *NE multispecies observer coverage*—(1) *Pre-trip notification.* Unless otherwise specified in this paragraph (l), or notified by the Regional Administrator, the owner, operator, or manager of a vessel (*i.e.*, vessel manager or sector manager) issued a limited access NE multispecies permit that is fishing under a NE multispecies DAS or on a sector trip, as defined in this part, must provide advanced notice to NMFS of the vessel name, permit number, and sector to which the vessel belongs, if applicable; contact name and telephone number for coordination of observer deployment; date, time, and port of departure; and the vessel's trip plan, including area to be fished, whether a monkfish DAS will be used, and gear type to be used at least 48 hr prior to departing port on any trip declared into the NE multispecies fishery pursuant to § 648.10 or § 648.85, as instructed by the Regional Administrator, for the purposes of selecting vessels for observer deployment. For trips lasting

_0000017754

**7438    Federal Register** / Vol. 85, No. 26 / Friday, February 7, 2020 / Rules and Regulations

48 hr or less in duration from the time the vessel leaves port to begin a fishing trip until the time the vessel returns to port upon the completion of the fishing trip, the vessel owner, operator, or manager may make a weekly notification rather than trip-by-trip calls. For weekly notifications, a vessel must notify NMFS by 0001 hr of the Friday preceding the week (Sunday through Saturday) that it intends to complete at least one NE multispecies DAS or sector trip during the following week and provide the date, time, port of departure, area to be fished, whether a monkfish DAS will be used, and gear type to be used for each trip during that week. Trip notification calls must be made no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS of any trip plan changes at least 24 hr prior to vessel departure from port. A vessel may not begin the trip without being issued an observer notification or a waiver by NMFS.

(2) *Vessel selection for observer coverage.* NMFS shall notify the vessel owner, operator, or manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified trip within 24 hr of the vessel owner's, operator's or manager's notification of the prospective trip, as specified in paragraph (l)(1) of this section. All trip notifications shall be issued a unique confirmation number. A vessel may not fish on a NE multispecies DAS or sector trip with an observer waiver confirmation number that does not match the trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are valid for 48 hr from the intended sail date. If a trip is interrupted and returns to port due to bad weather or other circumstance beyond the operator's control, and goes back out within 48 hr, the same confirmation number and observer status remains. If the layover time is greater than 48 hr, a new trip notification must be made by the operator, owner, or manager of the vessel.

(3) *NE multispecies monitoring program goals and objectives.* Monitoring programs established for the NE multispecies are to be designed and evaluated consistent with the following goals and objectives:

(i) Improve documentation of catch:

(A) Determine total catch and effort, for each sector and common pool, of target or regulated species; and

(B) Achieve coverage level sufficient to minimize effects of potential monitoring bias to the extent possible while maintaining as much flexibility as possible to enhance fleet viability.

(ii) Reduce the cost of monitoring:

(A) Streamline data management and eliminate redundancy;

(B) Explore options for cost-sharing and deferment of cost to industry; and

(C) Recognize opportunity costs of insufficient monitoring.

(iii) Incentivize reducing discards:

(A) Determine discard rate by smallest possible strata while maintaining cost-effectiveness; and

(B) Collect information by gear type to accurately calculate discard rates.

(iv) Provide additional data streams for stock assessments:

(A) Reduce management and/or biological uncertainty; and

(B) Perform biological sampling if it may be used to enhance accuracy of mortality or recruitment calculations.

(v) Enhance safety of monitoring program.

(vi) Perform periodic review of monitoring program for effectiveness.

(m) *Atlantic herring monitoring coverage*—(1) *Monitoring requirements.* (i) In addition to the requirement for any vessel holding an Atlantic herring permit to carry a NMFS-certified observer described in paragraph (a) of this section, vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to industry-funded monitoring (IFM) requirements on declared Atlantic herring trips, unless the vessel is carrying a NMFS-certified observer to fulfill Standard Bycatch Reporting Methodology requirements. An owner of a midwater trawl vessel, required to carry a NMFS-certified observer when fishing in Northeast Multispecies Closed Areas at § 648.202(b), may purchase an IFM high volume fisheries (HVF) observer to access Closed Areas on a trip-by-trip basis. General requirements for IFM programs in New England Council FMPs are specified in paragraph (g) of this section. Possible IFM monitoring for the Atlantic herring fishery includes NMFS-certified observers, at-sea monitors, and electronic monitoring and portside samplers, as defined in § 648.2.

(A) IFM HVF observers shall collect the following information:

(1) Fishing gear information (*e.g.*, size of nets, mesh sizes, and gear configurations);

(2) Tow-specific information (*e.g.*, depth, water temperature, wave height, and location and time when fishing begins and ends);

(3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(4) Species, weight, and disposition of all retained catch on unobserved hauls;

(5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(6) Whole specimens, photos, length information, and biological samples (*e.g.*, scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);

(7) Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(8) Vessel trip costs (*i.e.*, operational costs for trip including food, fuel, oil, and ice).

(B) IFM HVF at-sea monitors shall collect the following information:

(1) Fishing gear information (*e.g.*, size of nets, mesh sizes, and gear configurations);

(2) Tow-specific information (*e.g.*, depth, water temperature, wave height, and location and time when fishing begins and ends);

(3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(4) Species, weight, and disposition of all retained catch on unobserved hauls;

(5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(6) Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

(7) Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(8) Vessel trip costs (*i.e.*, operational costs for trip including food, fuel, oil, and ice).

(9) The New England Council may recommend that at-sea monitors collect additional biological information upon request. Revisions to the duties of an at-sea monitor, such that additional biological information would be collected, may be done via a framework adjustment. At-sea monitor duties may also be revised to collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the duties for at-sea monitors. NMFS shall implement revisions to at-sea monitor duties in accordance with the APA.

(C) IFM Portside samplers shall collect the following information:

(1) Species, weight, and disposition of all retained catch (fish, sharks, crustaceans, invertebrates, and debris) on sampled trips;

(2) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling; and

_0000017755

(*3*) Whole specimens, photos, length information, and biological samples (*i.e.*, scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes).

(ii) Vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to IFM at-sea monitoring coverage. If the New England Council determines that electronic monitoring, used in conjunction with portside sampling, is an adequate substitute for at-sea monitoring on vessels fishing with midwater trawl gear, and it is approved by the Regional Administrator as specified in (m)(1)(iii), then owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose either IFM at-sea monitoring coverage or IFM electronic monitoring and IFM portside sampling coverage, pursuant with requirements in paragraphs (h) and (i) of this section. Once owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose an IFM monitoring type, vessel owners must select one IFM monitoring type per fishing year and notify NMFS of their selected IFM monitoring type via selection form six months in advance (October 31) of the beginning of the SBRM year. NMFS will provide vessels owners with selection forms no later than September 1 in advance of the beginning of the SBRM year.

(A) In a future framework adjustment, the New England Council may consider if electronic monitoring and portside sampling coverage is an adequate substitute for at-sea monitoring coverage for Atlantic herring vessels that fish with purse seine and/or bottom trawl gear.

(B) IFM coverage targets for the Atlantic herring fishery are calculated by NMFS, in consultation with New England Council staff.

(C) If IFM coverage targets do not match for the Atlantic herring and Atlantic mackerel fisheries, then the higher IFM coverage target would apply on trips declared into both fisheries.

(D) Vessels intending to land less than 50 mt of Atlantic herring are exempt from IFM requirements, provided that the vessel requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(B) and (m)(3) of this section. Vessels issued a waiver must land less than 50 mt of Atlantic herring on that trip.

(E) A wing vessel (*i.e.*, midwater trawl vessel pair trawling with another midwater trawl vessel) is exempt from IFM requirements on a trip, provided the wing vessel does not possess or land any fish on that trip and requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(C) and (m)(3) of this section.

(F) Two years after implementation of IFM in the Atlantic herring fishery, the New England Council will examine the results of any increased coverage in the Atlantic herring fishery and consider if adjustments to the IFM coverage targets are warranted.

(iii) Electronic monitoring and portside sampling coverage may be used in place of at-sea monitoring coverage in the Atlantic herring fishery, if the electronic monitoring technology is deemed sufficient by the New England Council. The Regional Administrator, in consultation with the New England Council, may approve the use of electronic monitoring and portside sampling for the Atlantic herring fishery in a manner consistent with the Administrative Procedure Act, with final measures published in the **Federal Register**. A vessel electing to use electronic monitoring and portside sampling in lieu of at-sea monitoring must develop a vessel monitoring plan to implement an electronic monitoring and portside sampling program that NMFS determines is sufficient for monitoring catch, discards and slippage events. The electronic monitoring and portside sampling program shall be reviewed and approved by NMFS as part of a vessel's monitoring plan on a yearly basis in a manner consistent with the Administrative Procedure Act.

(iv) Owners, operators, or managers of vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit are responsible for their vessel's compliance with IFM requirements. When NMFS notifies a vessel owner, operator, or manager of the requirement to have monitoring coverage on a specific declared Atlantic herring trip, that vessel may not fish for, take, retain, possess, or land any Atlantic herring without the required monitoring coverage. Vessels may only embark on a declared Atlantic herring trip without the required monitoring coverage if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver for the required monitoring coverage for that trip, pursuant to paragraphs (m)(2)(iii)(B) and (C) and (m)(3) of this section.

(v) To provide the required IFM coverage aboard declared Atlantic herring trips, NMFS-certified observers and monitors must hold a high volume fisheries certification from NMFS/FSB. See details of high volume certification at *https://www.nefsc.noaa.gov/fsb/training/*.

(2) *Pre-trip notification.* (i) At least 48 hr prior to the beginning of any trip on which a vessel may harvest, possess, or land Atlantic herring, the owner, operator, or manager of a vessel issued a Limited Access Herring Permit, or a vessel issued an Areas 2/3 Open Access Herring Permit, or a vessel issued an All Areas Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), or a vessel acting as a herring carrier must notify NMFS/FSB of the trip.

(ii) The notification to NMFS/FSB must include the following information: Vessel name or permit number; email and telephone number for contact; the date, time, and port of departure; trip length; and gear type.

(iii) For vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit, the trip notification must also include the following requests, if appropriate:

(A) For IFM NMFS-certified observer coverage aboard vessels fishing with midwater trawl gear to access the Northeast Multispecies Closed Areas, consistent with requirements at § 648.202(b), at any point during the trip;

(B) For a waiver of IFM requirements on a trip that shall land less than 50 mt of Atlantic herring; and

(C) For a waiver of IFM requirements on trip by a wing vessel as described in paragraph (m)(ii)(E) of this section.

(iv) Trip notification must be provided no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS/FSB of any trip plan changes at least 12 hr prior to vessel departure from port.

(3) *Selection of trips for monitoring coverage.* NMFS shall notify the owner, operator, and/or manager of a vessel with an Atlantic herring permit whether a declared Atlantic herring trip requires coverage by a NMFS-funded observer or whether a trip requires IFM coverage. NMFS shall also notify the owner, operator, and/or manager of vessel if a waiver has been granted, either for the NMFS-funded observer or for IFM coverage, as specified in paragraph (m)(2) of this section. All waivers for monitoring coverage shall be issued to the vessel by VMS so that there is an on-board verification of the waiver. A waiver is invalid if the fishing behavior on that trip is inconsistent with the terms of the waiver.

(4) *Procurement of monitoring services by Atlantic herring vessels.* (i) An owner of an Atlantic herring vessel required to have monitoring under paragraph (m)(3) of this section must

_0000017756

arrange for monitoring by an individual certified through training classes operated by the NMFS/FSB and from a monitoring service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected for monitoring must contact a monitoring service provider prior to the beginning of the trip and the monitoring service provider will notify the vessel owner, operator, or manager whether monitoring is available. A list of approved monitoring service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/femad/fsb/*.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure monitoring due to the unavailability of monitoring may request a waiver from NMFS/FSB from the requirement for monitoring on that trip, but only if the owner, operator, or vessel manager has contacted all of the available monitoring service providers to secure monitoring and no monitoring is available. NMFS/FSB shall issue a waiver, if the conditions of this paragraph (m)(4)(ii) are met. A vessel without monitoring coverage may not begin a declared Atlantic herring trip without having been issued a waiver.

(iii) Vessel owners shall pay service providers for monitoring services within 45 days of the end of a fishing trip that was monitored.

(5) *Vessels working cooperatively.* When vessels issued limited access herring permits are working cooperatively in the Atlantic herring fishery, including pair trawling, purse seining, and transferring herring at-sea, each vessel must provide to observers or monitors, when requested, the estimated weight of each species brought on board and the estimated weight of each species released on each tow.

(6) *Sampling requirements for NMFS-certified observer and monitors.* In addition to the requirements at § 648.11(d)(1) through (7), an owner or operator of a vessel issued a limited access herring permit on which a NMFS-certified observer or monitor is embarked must provide observers or monitors:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers or monitors to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers or monitors; and collecting and carrying baskets of fish when requested by the observers or monitors.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(iv) Visual access to the net, the codend of the net, and the purse seine bunt and any of its contents after pumping has ended and before the pump is removed from the net. On trawl vessels, the codend including any remaining contents must be brought on board, unless bringing the codend on board is not possible. If bringing the codend on board is not possible, the vessel operator must ensure that the observer or monitor can see the codend and its contents as clearly as possible before releasing its contents.

(7) *Measures to address slippage.* (i) No vessel issued a limited access herring permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish which can be pumped from the net prior to release.

(ii) Vessels may make test tows without pumping catch on board if the net is re-set without releasing its contents provided that all catch from test tows is available to the observer to sample when the next tow is brought on board for sampling.

(iii) If a vessel issued any limited access herring permit slips catch, the vessel operator must report the slippage event on the Atlantic herring daily VMS catch report and indicate the reason for slipping catch. Additionally, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iv) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any of the reasons described in paragraph (m)(7)(i) of this section when an observer or monitor is aboard, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(v) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any reason on a trip selected by NMFS for portside sampling, pursuant to paragraph (m)(3) of this section, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(vi) If catch is slipped by a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit for any reason not described in paragraph (m)(7)(i) of this section when an observer or monitor is aboard, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

(n) *Atlantic mackerel, squid, and butterfish observer coverage*—(1) *Pre-trip notification.* (i) A vessel issued a limited access Atlantic mackerel permit, as specified at § 648.4(a)(5)(iii), must, for the purposes of observer deployment, have a representative provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, telephone number or email address for contact; and the date, time, port of departure, gear type, and approximate trip duration, at least 48 hr, but no more than 10 days, prior to beginning any fishing trip, unless it complies with the possession restrictions in paragraph (n)(1)(iii) of this section.

(ii) A vessel that has a representative provide notification to NMFS as described in paragraph (n)(1)(i) of this section may only embark on a mackerel trip without an observer if a vessel representative has been notified by NMFS that the vessel has received a waiver of the observer requirement for that trip. NMFS shall notify a vessel representative whether the vessel must carry an observer, or if a waiver has been granted, for the specific mackerel trip, within 24 hr of the vessel representative's notification of the prospective mackerel trip, as specified in paragraph (n)(1)(i) of this section. Any request to carry an observer may be waived by NMFS. A vessel that fishes

with an observer waiver confirmation number that does not match the mackerel trip plan that was called in to NMFS is prohibited from fishing for, possessing, harvesting, or landing mackerel except as specified in paragraph (n)(1)(iii) of this section. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(iii) A vessel issued a limited access mackerel permit, as specified in §648.4(a)(5)(iii), that does not have a representative provide the trip notification required in paragraph (n)(1)(i) of this section is prohibited from fishing for, possessing, harvesting, or landing more than 20,000 lb (9.07 mt) of mackerel per trip at any time, and may only land mackerel once on any calendar day, which is defined as the 24-hr period beginning at 0001 hours and ending at 2400 hours.

(iv) If a vessel issued a limited access Atlantic mackerel permit, as specified in §648.4(a)(5)(iii), intends to possess, harvest, or land more than 20,000 lb (9.07 mt) of mackerel per trip or per calendar day, and has a representative notify NMFS of an upcoming trip, is selected by NMFS to carry an observer, and then cancels that trip, the representative is required to provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, and telephone number or email address for contact, and the intended date, time, and port of departure for the cancelled trip prior to the planned departure time. In addition, if a trip selected for observer coverage is cancelled, then that vessel is required to carry an observer, provided an observer is available, on its next trip.

(2) *Sampling requirements for limited access Atlantic mackerel and longfin squid/butterfish moratorium permit holders.* In addition to the requirements in paragraphs (d)(1) through (7) of this section, an owner or operator of a vessel issued a limited access Atlantic mackerel or longfin squid/butterfish moratorium permit on which a NMFS-certified observer is embarked must provide observers:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers; and collecting and carrying baskets of fish when requested by the observers.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(3) *Measures to address slippage.* (i) No vessel issued a limited access Atlantic mackerel permit or a longfin squid/butterfish moratorium permit may slip catch, as defined at §648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for sampling and inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish that can be pumped from the net prior to release.

(ii) If a vessel issued any limited access Atlantic mackerel permit slips catch, the vessel operator must report the slippage event on the Atlantic mackerel and longfin squid daily VMS catch report and indicate the reason for slipping catch. Additionally, vessels issued a limited Atlantic mackerel permit or a longfin squid/butterfish moratorium permit, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iii) If a vessel issued a limited access Atlantic mackerel permit slips catch for any of the reasons described in paragraph (n)(3)(i) of this section, the vessel operator must move at least 15 nm (27.8 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.8 km) from the slippage event location for the remainder of the fishing trip.

(iv) If catch is slipped by a vessel issued a limited access Atlantic mackerel permit for any reason not described in paragraph (n)(3)(i) of this section, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

■ 5. In §648.14, revise paragraphs (e), (r)(1)(vi)(A), (r)(2)(v), and (r)(2)(viii)

through (xii) and add paragraphs (r)(2)(xiii) and (xiv) to read as follows:

### §648.14  Prohibitions.

\*    \*    \*    \*    \*

(e) *Observer program.* It is unlawful for any person to do any of the following:

(1) Assault, resist, oppose, impede, harass, intimidate, or interfere with or bar by command, impediment, threat, or coercion any NMFS-certified observer or monitor conducting his or her duties; any authorized officer conducting any search, inspection, investigation, or seizure in connection with enforcement of this part; any official designee of the Regional Administrator conducting his or her duties, including those duties authorized in §648.7(g).

(2) Refuse monitoring coverage by a NMFS-certified observer or monitor if selected for monitoring coverage by the Regional Administrator or the Regional Administrator's designee.

(3) Fail to provide information, notification, accommodations, access, or reasonable assistance to either a NMFS-certified observer or monitor conducting his or her duties as specified in §648.11.

(4) Submit false or inaccurate data, statements, or reports.

\*    \*    \*    \*    \*

(r) \*  \*  \*

(1) \*  \*  \*

(vi) \*  \*  \*

(A) For the purposes of observer deployment, fail to notify NMFS at least 48 hr prior to departing on a declared herring trip with a vessel issued an All Areas Limited Access Herring Permit and/or an Area 2 and 3 Limited Access Herring Permit and fishing with midwater trawl or purse seine gear, or on a trip with a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit that is fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in §648.200(f)(1) and (3), pursuant to the requirements in §648.80(d) and (e).

\*    \*    \*    \*    \*

(2) \*  \*  \*

(v) Fish with midwater trawl gear in any Northeast Multispecies Closed Area, as defined in §648.81(a)(3) through (5) and (c)(3) and (4), without a NMFS-certified observer on board, if the vessel has been issued an Atlantic herring permit.

\*    \*    \*    \*    \*

(viii) Slip catch, as defined at §648.2, unless for one of the reasons specified at §648.11(m)(7)(i).

(ix) For vessels with All Areas or Areas 2/3 Limited Access Herring

_0000017758

Permits, fail to move 15 nm (27.78 km), as required by §§ 648.11(m)(7)(iv) and (v) and 648.202(b)(4)(iv).

(x) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to immediately return to port, as required by §§ 648.11(m)(7)(vi) and 648.202(b)(4)(iv).

(xi) Fail to complete, sign, and submit a Released Catch Affidavit as required by §§ 648.11(m)(7)(iii) and 648.202(b)(4)(ii).

(xii) Fail to report or fail to accurately report a slippage event on the Atlantic herring daily VMS catch report, as required by §§ 648.11(m)(7)(iii) and 648.202(b)(4)(iii).

(xiii) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to comply with industry-funded monitoring requirements at § 648.11(m).

(xiv) For a vessel with All Areas or Areas 2/3 Limited Access Herring Permit, fail to comply with its NMFS-approved vessel monitoring plan requirements, as described at § 648.11(m).

*     *     *     *     *

■ 6. In § 648.80, revise paragraphs (d)(5) and (e)(5) to read as follows:

### § 648.80  NE Multispecies regulated mesh areas and restrictions on gear and methods of fishing.

*     *     *     *     *

(d) *     *     *

(5) To fish for herring under this exemption, a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, or a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), must provide notice of the following information to NMFS at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment: Vessel name; contact name for coordination of observer deployment; telephone number for contact; the date, time, and port of departure; and

*     *     *     *     *

(e) *     *     *

(5) To fish for herring under this exemption, vessels that have an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit must provide notice to NMFS of the vessel name; contact name for coordination of observer deployment; telephone number for contact; and the date, time, and port of departure, at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment; and

*     *     *     *     *

■ 7. In § 648.86, revise paragraph (a)(3)(ii)(A)(*1*) to read as follows:

### § 648.86  NE Multispecies possession restrictions.

*     *     *     *     *

(a) *     *     *

(3) *     *     *

(ii) *     *     *

(A) *     *     *

(*1*) *Haddock incidental catch cap.* When the Regional Administrator has determined that the incidental catch allowance for a given haddock stock, as specified in § 648.90(a)(4)(iii)(D), has been caught, no vessel issued an Atlantic herring permit and fishing with midwater trawl gear in the applicable stock area, *i.e.,* the Herring GOM Haddock Accountability Measure (AM)

Area or Herring GB Haddock AM Area, as defined in paragraphs (a)(3)(ii)(A)(*2*) and (*3*) of this section, may fish for, possess, or land herring in excess of 2,000 lb (907.2 kg) per trip in or from that area, unless all herring possessed and landed by the vessel were caught outside the applicable AM Area and the vessel's gear is stowed and not available for immediate use as defined in § 648.2 while transiting the AM Area. Upon this determination, the haddock possession limit is reduced to 0 lb (0 kg) for a vessel issued a Federal Atlantic herring permit and fishing with midwater trawl gear or for a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, regardless of area fished or gear used, in the applicable AM area, unless the vessel also possesses a NE multispecies permit and is operating on a declared (consistent with § 648.10(g)) NE multispecies trip. In making this determination, the Regional Administrator shall use haddock catches observed by NMFS-certified observers or monitors by herring vessel trips using midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), expanded to an estimate of total haddock catch for all such trips in a given haddock stock area.

*     *     *     *     *

### §§ 648.10, 648.14, 648.51, 648.59, 648.80, 648.86, and 648.202   [Amended]

■ 8. In the table below, for each section indicated in the left column, remove the text indicated in the middle column from wherever it appears in the section, and add the text indicated in the right column:

| Section | Remove | Add |
|---|---|---|
| 648.10(f)(4)(i) introductory text | NMFS-approved | NMFS-certified. |
| 648.14(i)(1)(ix)(B) | NMFS-approved | NMFS-certified. |
| 648.14(i)(1)(ix)(C) | 648.11(g) | 648.11(k). |
| 648.14(k)(2)(iii) | 648.11(k) | 648.11(l). |
| 648.14(k)(2)(iv) | 648.11(k) | 648.11(l). |
| 648.51(c)(4) | 648.11(g) | 648.11(k). |
| 648.51(e)(3)(iii) | 648.11(g) | 648.11(k). |
| 648.59(b)(2) | 648.11(g) | 648.11(k). |
| 648.80(d)(3) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.80(e)(2)(ii) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.86(a)(3)(ii)(A)(*1*) | NMFS-approved | NMFS-certified. |
| 648.202(b)(4)(iv) | 648.11(m)(4)(iv) and (v) | 648.11(m)(7)(iv) and (vi). |

[FR Doc. 2020–00881 Filed 2–6–20; 8:45 am]

**BILLING CODE 3510–22–P**

_0000017759



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

**DEC 1 8 2018**

Dr. John Quinn, Chairman
New England Fishery Management Council
50 Water Street
Newburyport, MA 01950

Dear John:

On behalf of the Secretary of Commerce, we approved the New England Industry-Funded Monitoring Omnibus Amendment, including all the management measures recommended by the Council in this amendment.

This amendment establishes a process to standardize future industry-funded monitoring programs for Council fishery management plans (FMPs) and establishes industry-funded monitoring in the Atlantic herring fishery.

### *Omnibus Measures*

The omnibus measures amend all Council FMPs to standardize the development and administration of future industry-funded monitoring programs.

The omnibus measures establish:
- A process for FMP-specific industry-funded monitoring to be implemented via amendment and revised via framework adjustment;
- Standard cost responsibilities for us and the fishing industry;
- Standard administrative requirements for industry-funded observers/monitors and monitoring service providers;
- A process to prioritize monitoring coverage that may be provided by available Federal funding across FMPs for new industry-funded monitoring programs; and
- A process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.

Standard cost responsibilities and administrative requirements would apply to the existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs, but the other omnibus measures would not apply to these existing programs. The Council may incorporate these existing industry-funded monitoring programs into the process to prioritize industry-funded monitoring programs for available Federal funding in a future action. Future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the omnibus measures.



A104

_0000017760

### *Atlantic Herring Measures*

The herring measures establish an industry-funded monitoring program in the herring fishery. Increased monitoring in the herring fishery is designed to address the following goals: 1) Accurate estimates of catch (retained and discarded); 2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and 3) affordable monitoring for the herring fishery. To achieve these goals, the measures require a 50-percent coverage target for at-sea monitoring coverage aboard vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permit. Approximately 40 vessels have Category A or B herring permits, but those vessels typically catch over 95 percent of the total herring harvest.

As recommended by the Council, the 50-percent coverage target includes a combination of Standardized Bycatch Reporting Methodology (SBRM) and industry-funded monitoring coverage. Industry participants would pay for any additional monitoring coverage above SBRM to meet the 50-percent coverage target. Coverage requirements may be waived on a trip-by-trip basis if monitoring coverage is unavailable. Trips that land less than 50 mt of herring and vessels carrying no fish on pair trawling trips would be exempt from the amendment's coverage requirements.

During 2016 and 2017, we conducted an electronic monitoring project aboard herring vessels using midwater trawl gear. The purpose of the project was to evaluate the feasibility of using electronic monitoring to verify catch retention and track discarded catch. In April 2018, the Council reviewed results from the project and approved electronic monitoring, in combination with portside sampling, as a monitoring option for midwater trawl vessels, instead of at-sea monitoring, to meet the 50-percent industry-funded monitoring coverage target. The Council did not recommend requiring electronic monitoring and portside sampling as part of this action; instead it recommended we use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. Additionally, the EFP would provide us with the flexibility to troubleshoot and react to problems, thus helping make the monitoring program more robust. Using the results of the EFP, the Council may consider establishing electronic monitoring and portside sampling requirements via a framework adjustment when it revisits industry-funded monitoring requirements two years after implementation.

The herring measures maintain the existing requirement that midwater trawl vessels fishing in the Groundfish Closed Areas must carry an observer, but would allow herring vessels to purchase observer coverage to access these closed areas. Herring midwater trawl vessels are currently only able to fish in the Groundfish Closed Areas if they are randomly selected to carry an observer to meet SBRM requirements.

As you are aware, industry-funded monitoring coverage in the herring fishery is contingent upon the availability of Federal funds to support our cost responsibilities. Without additional funding, we would be unable to administer industry-funded monitoring for the herring fishery in a given year. We were awarded funding to administer electronic monitoring for the herring fishery in 2020, but do not currently have funding to implement and administer the at-sea monitoring and portside sampling components. We continue working toward securing funding to administer

_0000017761

industry-funded monitoring in the herring fishery, but the earliest we could implement industry-funded monitoring in the herring fishery is 2020.

We appreciate the Council's and Council staff's efforts to develop this amendment and ongoing efforts to improve monitoring in New England fisheries. Please contact me if you have any questions.

Sincerely,

Michael Pentony
Regional Administrator

Cc: Thomas A. Nies, Executive Director, New England Fishery Management Council
    Michael Luisi, Chairman, Mid-Atlantic Fishery Management Council
    Dr. Christopher M. Moore, Executive Director, Mid-Atlantic Fishery Management Council
    Robert E. Beal, Executive Director, Atlantic States Marine Fisheries Commission

_0000017762

428

TESTIMONY OF

HENRY V.E. MITCHELL, ESQUIRE

ON BEHALF OF

THE BERING SEA FISHERMEN'S ASSOCIATION

BEFORE THE

HOUSE COMMITTEE ON MERCHANT MARINE AND FISHERIES

regarding

REAUTHORIZATION OF

THE

MAGNUSON FISHERY CONSERVATION MANAGEMENT ACT

ANCHORAGE, ALASKA

AUGUST 11, 1989


    I am Henry Mitchell, Executive Director of the Bering Sea
Fishermen's Association (BSFA), with headquarters located in
Anchorage, Alaska.  I am also on the Board of Directors and the
Executive Committee of the United Fishermen of Alaska (UFA), with
headquarters in Juneau, Alaska.  For the record, I am a member of
the North Pacific Fishery Management Council, the Advisory Panel of
the International North Pacific Fisheries Commission, the Advisory
Panel of the Yukon Salmon Treaty talks and the US/USSR North
Pacific and Bering Sea Fisheries Advisory Panel.  I am here to

429

testify today, on behalf of BSFA, on the reauthorization of the
Magnuson Act and on related points which continue to be problems
where fishery management is concerned.

BSFA is a commercial fishing organization representing some
1,500 Western Alaska residents who traditionally fish for salmon
and herring from small boats.  The region of Alaska that BSFA
represents consists of the coastline starting from the North with
Kotzebue and Nome and running south through Bristol Bay.  This area
includes the fisheries of the Kuskokwim, the Upper Yukon, the Lower
Yukon, Norton Sound and Kotzebue--all relatively small and
conducted primarily by Alaska Natives--as well as the valuable
fisheries of Bristol Bay.  Incomes throughout much of this area are
among the lowest in the nation.  Most of the commercial fishermen
of the area also conduct subsistence fisheries for salmon to
provide their families with food for the year.

Mr. Chairman, there have been substantial successes achieved
under the FCMA since the initiation of the council process.
Obviously, the major accomplishment has been the almost total
Americanization of the groundfish fishery, bringing about in the
EEZ off Alaska (the area served by the North Pacific Fishery
Management Council) some $1.52 billion dollars in capitalization--
some 50% of this within the last three years.  Now, over 60% of the
fish caught in the entire EEZ of the United States comes out of
these waters.  However, now that Americanization has been realized,

2

23-057 - 89 - 15

A108

430

our Council in particular is faced with some staggering problems that need attention in this year' reauthorization.

Rapid expansion of an Americanized fishery has put extreme pressure on our Council at a time that funding to support the councils nationwide has decreased. Substantial work on management plans and amendments has increased the amount of time the Council, its staff and the affiliated committees of the Council has to spend on managing the fisheries with fewer resources available. That includes less money available to NOAA to perform fundamental resource assessment work. Add to that the fact that with the elimination of the foreign fishing in the EEZ has come the elimination of the observer program, a significant source of scientific information vital to the conservation of the resource. In January, our Council went on record saying that the lack of domestic observer data available to us made it impossible for us to meet our responsibilities to manage the fishery appropriately.

Mr. Chairman, we need a recommitment to the conservation orientation originally intended by Congress. In order to meet our conservation responsibilities under the Act--our primary reason for existence--we need domestic observers and a method of paying for them. BSFA has pressed for some time for 100% domestic observer coverage on the groundfish fisheries as the only realistic method of meeting our conservation mandate, at least initially. Absent a compelling determination by the Council that an alternative to 100% still provides us with a realistic picture of our fisheries stocks,

3

431

true bycatch levels, the amount of "waste'" and the like -- or is otherwise appropriate-- full domestic observer coverage should be provided for in the Act. We had such a requirement with the foreign fleets as a cost of doing business. It should be treated accordingly for the domestic groundfish fleets.

In addition to addressing the observer needs statutorily, we need to address the problem of a funding mechanism statutorily. There is substantial question of how, legally, councils establishing observer programs can assure an equitable and fair method of paying for them. Currently, councils appear to be unable to charge fees to cover such costs, and appear merely to be left now to mandating their existence. What needs to be done is to authorize the creation of a fund and funding mechanism, establish qualitative criteria to set priorities for information, and deal with the continuing problem of observer data confidentiality. Such a conservation orientation on observer programs has been developed by a number of Washington and Alaska fishing groups, and is currently being circulated for wider review. I believe you have heard the Governor and others address this proposal. The proposal has substantial merit and should be included in your package of proposed FCMA amendments.

Further to the FCMA's conservation mandate, we need statutory clarification and acknowledgement that the groundfish fisheries in the US EEZ must not displace fully utilized, historic directed fisheries with bycatches that create conservation concerns. The

4

432

domestic trawl fleet takes as bycatch to their operations traditional species (halibut, crab, salmon, herring) that my fishermen depend on for directed harvest. There needs to be clarification of the national standards that these fisheries are to be protected. This, of course, does not mean elimination of the groundfish fisheries conducted by trawlers. It merely means that as a matter of conservation one species should not be permitted to threaten the health of the stocks of another or unduly burden directed fisheries conducted on those stocks. A domestic observer program will yield essential information on bycatch levels and rates.

The importance of and benefits from such an approach, coupled with a domestic observer program, can best be exemplified by our experience with the foreign fleets in the early 1980's. The Council imposed a five year sliding scale of bycatch for prohibited species on the foreign fleets, supported by 100% domestic observer coverage and fishing closures. Within one year, the fleets met their fifth year objective. BSFA believes that we should expect no less when dealing with the domestic fleets.

It is clear that conservation problems will continue to be the primary focus of the Council. BSFA has serious concerns about the staggering problems of waste evidenced by the roe-stripping issue and the bycatch of our traditional species, and urges the Committee to consider these matters seriously and address them with the appropriate statutory fixes.

5

433

One further matter deserves exploration. I have briefly described the villages from which the fishermen I represent come. The cash economy is based primarily on salmon and herring. Subsistence depends on these two fisheries as a personal food source. Dependent on migrating ocean resources, our fishermen have borne the conservation burden of foreign salmon interception, foreign longline fishing and foreign and domestic trawl fisheries, each of them creating a major impact on our fisheries.

Not only have the fishermen of our region suffered impacts from other fisheries through directed or indirect catch of our traditional species, we have been unable to participate in the expansion of the groundfish fisheries during the rapid Americanization. For one, my fishermen suffer a substantial capital deficiency. In addition, when these small inshore fisheries have attempted to expand to ocean ventures, they have met opposition. Efforts to develop a small boat cod fishery off Nunivak Island failed when the Council would not protect the fishery from catches by larger boats. The sad thing was that the 9000 ton catch of our local cod resource by the bigger boats was only bycatch to the yellow fin sole fishery. In any case, the cod have essentially disappeared from that area, obviously at the expense of any chance we had to develop a new fishery.

6

434

BSFA believes that a community development quota system needs to be available, on a council by council, basis to address this problem. There should be a set aside of any portion of a shoreside preference as a portion of the TAC for emergent shorebased fisheries which have demonstrated a historic interest in the harvesting but have been unable to demonstrate significant participation in the shoreside processing sector.

Our final critical problem with regard to the FCMA is the continued high seas interception of salmon by the foreign fleets of such nations as Taiwan, Korea, and Japan. Under the FCMA we have exclusive authority within the EEZ and over anadromous species outside of the EEZ. This being the case, we should have all the authority to board, inspect, and arrest vessels on the high seas that are illegally taking salmon. These authorities have been recognized by the nations conducting high seas drift gillnetting in GIFA's entered into under the authority of the FCMA. This should be the same authority that we have over continental shelf species and any fish species within the EEZ. Yet, negotiations with Japan and the Republic of China made under the authority of the Driftnet Act have resulted in generally poor agreements that do not fulfill all the requirements of the Driftnet Act and tend to undermine our authorities and conservation efforts under the FMCA.

Our authorities under the FMCA are quite clear, but exactly how conservation of our anadromous species should be enforced needs to be clarified. We need clarification, and in many instances

7

435

strengthening, of the language in the FCMA asserting U.S.
jurisdiction over U.S. origin anadromous species and we must
establish the basis for a defensible rebuttable presumption for
U.S. salmon and steelhead caught on the high seas.  We have all the
authority we need to address international fisheries concerns under
Magnuson, but this authority has to be fully recognized by State
and Commerce.  FCMA authority over anadromous species and the
applicability of FCMA penalties to violators was not recognized by
the State Department in the Japanese and Taiwanese negotiations,
and has led, as mention before, to our being bound by poor
agreements with sometimes conflicting provisions.

   Clarification and reauthorization of the FMCA will provide us
with:

1.  Exclusive authority of fishery species within the EEZ and
    beyond the EEZ for the case of anadromous species.  This
    restatement of our authority must be accompanied by a
    stronger enforcement presence both in the EEZ and in the
    areas of anadromous species' migration.  The only way
    to protect and conserve our fish species is to maintain
    strong enforcement.  The primary way to maintain strong
    enforcement is to assure adequate funding, which is not
    currently the case.  We are very disturbed by reports of
    major cuts in Coast Gaurd funding proposed through the
    House appropriations measures.

8

436

2. The responsiblity to provide funding for more research on the distribution of anadromous species. To conserve our anadromous species we must have more information on where they are at any particular time of the season. That entails additional scientific studies conducted by monitoring vessels near areas of suspected anadromous species distribution, as well as an enhanced foreign observer program of substantial levels of coverage.

3. The suitable negotiating clout that we lacked in the 1989 negotiations with Japan and Taiwan. We have made two agreements which do not satisfy all the requirements of the Driftnet Act--and the Driftnet Act was already deficient in not setting as a priority the rapid phase out of the foreign high seas driftnet fleets. Our negotiating stance did not include what we consider to be a full and complete understanding of our authorities under the FCMA. Frankly, the longer we espouse an inability to board vessels at sea in the face of flagrant violations of our salmon authorities and the foreign fishing nation's own fishing regulations, the less credibility our position retains.

Another major reason these negotiations were unsuccessful is that the certification and sanctions described in the Driftnet Act and the Fishermen's Protective Act have not seemed to pose a credible threat to the other

9

437

nations. The range of products eligible for sanctions under the Pelly Amendment needs to be expanded to include "all" products imported from offending nations.

It is the high seas interception of salmon that is currently causing the most damage to the Alaska fishing industry and creating the most severe policy crisis. BSFA members rely on salmon not only as a means of income, but also as a mainstay in their subsistence way of life. The annual income in the western Alaska regions of the Yukon and Kuskokwim River drainages is little more than $5000 to $6000. These people depend upon sensible fishery management of anadromous species. This management is provided for in the language of the FCMA Act, but if these provisions are not clarified and actively enforced, the economic losses caused by foreign interceptions will continue to have severe impacts upon our members.

High seas interception of salmon is piracy on the high seas, pure and simple. Reauthorization of the FCMA this year provides us with the forum to end this piracy--a forum that was initially created to provide jurisdiction and direction to this end, but has not been recognized by our government at crucial moments.

Reauthorization should include the necessary clarification and ammendments to establish our rights to board foreign vessels fishing for North American salmon (legally or illegally). This should include our rights to board vessels that have traditionally

10

438

harvested salmon in spite of claims to be targeting other species, such as squid. For enforcement purposes, we must establish a rebuttable presumption for enforcement purposes and mandate various enforcement, information-gathering, and observer requirements for the purpose of documenting and minimizing ending high seas interceptions.

Finally, in regards to high seas interception, let me state that BSFA will never be satisfied until foreign high seas driftnet fishing is completely eliminated. That is the position of the United Fishermen of Alaska as well. You have heard from our Governor. In addition the Alaska Legislature is on record to ban foreign high seas drift gillnetting and has asked Congress for a declaration calling for the end of foreign high seas gillnet fishing beyond the Exclusive Economic Zones of all nations by 1992. We are pleased and thankful for the action taken by Congresswoman Jolene Unsoeld, in introducing "The Marine Resources Protection and Driftnet Use Cessation Act" to pursue a complete ban on high seas driftnets. We fully support the concepts embodied in this measure and will work with the Congresswoman and other co-sponsors as the measure moves through Congress

Besides working on a national level through reauthorization of the FCMA and the passing of new legislation, we must pursue the end of high seas driftnets on an international level. The conference of South Pacific nations at Suva, Fiji, issued strong signals that these nations are ready to work on this matter. The Australians

11

**439**

and New Zealanders are strongly on record for achieving this end.
We must join together with the Soviets in their efforts to ban this
devastating and wasteful means of fishing. By seeking
international agreements on the policing of the seas, our
enforcement burden will be lessened and we can become more
effective in ending high seas interception of salmon as well as
protected migratory seabirds and marine mammals. As the Chairman
knows well, our western Alaskans are also very concerned about the
impact of these foreign activities on the stocks of marine mammals
and seabirds of vital importance to our residents.

   I thank you for this opportunity to provide these comments on
behalf of BSFA. I look forward to working with you and your staff
in the furtherance of proper additions to assure the continued
success of the FCMA and the health of the fisheries.

12

# Document Metadata: NOAA-NMFS-2018-0109-0005



## Document Details

**Docket ID:** NOAA-NMFS-2018-0109

**Docket Title:** New England Industry-Funded Monitoring Omnibus Amendment ✱

**Document File:** 🗎

**Docket Phase:** Proposed Rule

**Phase Sequence:** 1

**RIN:** 0648-BG91

**Original Document ID:** NOAA-NMFS-2018-0109-DRAFT-0006

**Current Document ID:** NOAA-NMFS-2018-0109-0005

**Title:** Comment from Anonymous Anonymous

**Number of Attachments:** 0

**Document Type:** PUBLIC SUBMISSIONS ✱

**Document Subtype:**

**Comment on Document ID:** NOAA-NMFS-2018-0109-0002

**Comment on Document Title:** Fisheries of the Northeastern United States: Industry-Funded Monitoring

**Status:** Posted

**Received Date:** 11/14/2018 ✱

**Date Posted:** 11/19/2018

**Posting Restriction:** No restrictions

**Submission Type:** Web

**Number of Submissions:** 1 ✱

## Document Optional Details

**Status Set Date:** 11/19/2018

**Current Assignee:** NA

**Status Set By:** Nordeen, Carrie (NOAA)

**DOC Docket No.:**

**XRIN:**

**Tracking Number:** 1k2-96k4-s4yi

_0000017647

| | |
|---|---|
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

# Submitter Info

| | |
|---|---|
| **Comment:** | I think monitoring areas where mammals are kept and trained is something that would benefit not only the animals but people too. I think there are so many places that mistreat animals that are used for entertainment. They are already being kept away from their environment, so they should be treated well and be provided with anything they need for survival. I think it is important to imitate the habitat where the animals came from for their safety. ★ |
| **First Name:** | Anonymous |
| **Middle Name:** | |
| **Last Name:** | Anonymous |
| **Mailing Address:** | |
| **Mailing Address 2:** | |
| **City:** | |
| **Country:** | |
| **State or Province:** | |
| **ZIP/Postal Code:** | |
| **Email Address:** | |
| **Phone Number:** | |
| **Fax Number:** | |
| **Organization Name:** | |
| **Government Agency Type:** | |
| **Government Agency:** | |
| **Cover Page:** | |

A120

# Document Metadata:NOAA-NMFS-2018-0109-DRAFT-0022

## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment |
| **Document File:** | |
| **Docket Phase:** | Notice |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA_FRDOC_0001-DRAFT-21102 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0022 |
| **Title:** | Comment from bhgy dfre |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0021 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Pending_Post |
| **Received Date:** | 09/22/2018 |
| **Date Posted:** | |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 05/21/2019 |
| **Current Assignee:** | Thompson, Tracey (NOAA) |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-95kf-4caf |

_0000017649

| | |
|---|---|
| **Page Count:** | 1 🔵 |
| **Total Page Count Including Attachments:** | 1 |

# Submitter Info

**Comment:**  This misguided NEPA is an economic assault on small businesses, timber harvest, rural America, manufacturing and agriculture, farming, ranching, and natural resource development, and threatens the very livelihood of our fellow states. Small businesses and rural America are the backbone of this country, especially in rural America. Taxpayers have signaled that Americans are ready for the last eight years of past administration power grabbing mentality to come to an end. In transmitting any draft final regulation that has federalism implications to the Office of Management and Budget pursuant to Executive Order 12866 of September 30, 1993, each agency shall include a certification from the official designated to ensure compliance with order stating that the requirements of this order have been met in a meaningful and timely manner. In transmitting proposed legislation that has federalism implications to the Office of Management and Budget, each agency shall include a certification from the official designated to ensure compliance with the order that all relevant requirements of the order have been met. NEPA does require from agencies recognition of the legislative history and intent of NEPA, and of the efforts to respond to concerns of the local American people for a sustainable and harmonious economic future. Legislative priorities may change with voting majorities in successive Congresses, but the printed record of the history of NEPA should make clear the intentions of its architects preceding Congresses. Nevertheless NEPA appear to have interpreted it from subjective premises without inquiry into the legislative history of the Act or into the assumptions and expectations of the persons responsible for its language and content. These past agencies have missed the implications of NEPAs broad and basic principles and goals. It sets an agenda to be implemented through legislative and administrative action but with the state and local communities involved with rule making. Agencies need to wake up from past administration poor natural resource management, by using the importance of both rational supply behavior and economic compliance on public lands . This new, more logical approach to Public lands should provide agencies solid support. States rights first. With the growing number of NEPA concerns and appeals surrounding the cumulative rules impacting small business, oil and gas mining, ranchers, and farms, agencies need to develop new ideas to protect local workers and tax payers from Federal regulations on public lands . This would be truly a remarkable effort of consensus building, bringing together a wide variety of local business interests and state people to reach agreement on those actions that the agencies could take to resolve existing resource conflicts on our public lands. The use of the National Environmental, Policy Act (NEPA) discussion should be reached consensus on everyone effected. Recommendations to improve the implementation of NEPA in the process of Natural resources like timber, mining, farming, ranching and oil and gas development, small business. Before a rule is made, ask

A122

_0000017650

the question who will be hurt the most and what can agencies do to help the ones most economically impacted. NEPA Streamlining Recommendations to change the common issues of concern like the lack of interagency coordination in the NEPA process. Recommended improving coordination and communication among project proponents, affected agencies and stakeholders to reduce adverse comments and time required. Specifically we all saw a need for Federal agencies to improve interagency coordination prior to and during the NEPA process. We all felt that there have been too many instances where one particular development project has resulted in two or more NEPA documents initiated by different Federal agencies. Such a lack of coordination results in unnecessary delays and an inadequate cumulative impacts analysis. One complaint is that the NEPA process results in significant delays. Many of these delays result from a lack of accurate field data detailing the status of existing wildlife and plant communities. We also recognized that industry and environmentalists alike are frustrated with the incompatibility of various Federal agency data bases, often precluding the sharing of key biological data. Federal agency data bases, often precluding the sharing of key biological data. Another recommendation addressed how to improve the format and content of the NEPA document while reducing its size. One way is to eliminate duplication in data requirements as well as consolidating and accessing existing data bases. To this end, recommend that Congress provide additional funding to Federal agencies with the purpose of consolidating various data bases to provide accurate and comprehensive biological data bases. Or allow the Forest Service to cut and sell more timber to finance operations for the public.   ✱ 🌐

**First Name:**           bhgy  🌐

**Middle Name:**

**Last Name:**            dfre  🌐

**Mailing Address:**

**Mailing Address 2:**

**City:**                          🌐

**Country:**                     🌐

**State or Province:**        🌐

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**     🌐

**Government Agency Type:**

A123

**Government Agency:**

**Cover Page:**

A124

**CAPE COD COMMERCIAL**

# FISHERMEN'S ALLIANCE

**Small Boats. Big Ideas.**

December 21, 2018

Michael Pentony, Regional Administrator
National Marine Fisheries Service
55 Great Republic Drive
Gloucester, MA 01930
Attn: Carrie Nordeen, Fishery Policy Specialist

Subject: Comments on Industry Funded Monitoring Amendment (NOAA-NMFS-2018-0109)

Dear Mr. Pentony-
Thank you for the opportunity to comment on the Omnibus Industry-Funded Monitoring omnibus amendment to the Atlantic Herring Fishery Management Plan (FMP).

The Cape Cod Commercial Fishermen's Alliance is a member-based non-profit organization which works to build lasting solutions to protect our ocean ecosystem and the future of our fisheries. The Fishermen's Alliance represents 150 fishing businesses and over 300 fishing families, making our organization the leading voice for commercial fishermen on Cape Cod.  We are supportive of the changes proposed in the IFM amendment and selected by the New England Fishery Management Council.

The proposed measure to increase observer coverage to 50% target levels is a significant improvement over previous monitoring target levels in the midwater trawl fishery, which were approximately 7.5% (75 sea days in 2018), 4.5% (45 sea days in 2017), and 44% (440 sea days in 2016). However, anything less than 100% coverage on midwater trawl vessels may result in inaccurate estimates of bycatch (river herring, shad, and haddock). Although we understand the agency's concern with the cost of administering 100% coverage targets, full coverage would allow the agency to entirely satisfy the purpose and need of the amendment, which are "to help improve estimates of catch, track against harvest limits and fishery catch caps and ensure that overfishing is not occurring." Additionally, we understand the justification for the issuing of a waiver, but are concerned that they may be too frequently issued given the number of provider issues that have arisen in other fisheries this year. NOAA recognizes that specially certified observes need to be placed on these vessels, which makes it even more difficult to supply the required observers for 50% of the trips.

Regarding the proposal to further evaluate the exempted fishing permit (EFP), we are supportive of the goals of the EFP and believe that the agency and council should work as quickly as possible to implement the transition from human observers to electronic monitoring (EM) coverage. The high-quality data provided by EM systems will help further achieve the purpose and need of the amendment without errors that could result from human coverage or lack thereof. Successful approval and implementation of this EFP into the fisheries monitoring plan will have important impact in developing and improving monitoring programs across other northeastern fisheries.

We also support the recommendation of allowing midwater trawl vessels to purchase observers in order to have 100% monitoring coverage in groundfish closed areas. This coverage supports the improvement in data needed to accurately estimate the amount of bycatch caught by these vessels, which make up the majority of the fleet and landings. Any additional midwater trawl access into closed areas, including those that were approved in the recent passage of the Omnibus Essential Fish Habitat Amendment 2, should not

---

**BOARD OF DIRECTORS**  Nick Muto, *Chairman* • Gwen Holden Kelly, *Treasurer* • Greg Connors, *Vice-Chairman* • Brian Sherin, *Clerk*
Gregory Bilezikian • Charles Borkoski • Beau Gribbin • Eric Hesse • Barry Labar • Tim Linnell

_0000017653

be considered. These areas were designated in order to protect critical groundfish spawning areas and allow for further recovery of depleted stocks such as Gulf of Maine Cod. The high volume tows of midwater trawl gear make it incompatible with protecting spawning areas.

Thank you for your consideration and we look forward to supporting the expeditious implementation of this amendment.

Sincerely,

Nick Muto
Chairman, Board of Directors
Cape Cod Commercial Fishermen's Alliance

A126

# CAUSE *of* ACTION
## I N S T I T U T E

Pursuing Freedom and Opportunity through Justice and Accountability

November 19, 2018

**VIA REGULATIONS.GOV**

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service
ATTN: Michael Pentony, Regional Administrator
55 Great Republic Drive
Gloucester, MA 01930

Re:    Industry-Funded Monitoring (IFM) Omnibus Amendment
         83 Fed. Reg. 47,326 (Sept. 19, 2018)
         Docket No. NOAA-NMFS-2018-0109 (RIN 0648-BG91)

Dear Administrator Pentony:

I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government-oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1] CoA Institute has represented clients in challenging past efforts to compel the regulated industry to pay for discretionary supplemental at-sea monitoring services.[2]

I appreciate the opportunity to submit the following comments on the National Marine Fisheries Service's ("NMFS") proposed rule adopting the New England Industry-Funded Monitoring ("IFM") Omnibus Amendment.[3] The Omnibus Amendment, which is sponsored by the New England Fishery Management Council ("NEFMC"),[4] would introduce provisions into all NEFMC-administered fishery management plans to allow for standardized implementation of industry-funded monitoring via plan-specific amendments and framework adjustments. The Omnibus Amendment also contains measures applicable only to the Atlantic herring fishery, which would create a new IFM program for the herring fleet. Importantly, these requirements would further extend to many other vessels across the Greater Atlantic region that declare herring when targeting other fish species.

In April 2017, prior to the final selection of preferred alternatives, CoA Institute advised the NEFMC that that the Omnibus Amendment raised serious legal questions concerning the authority of the federal government—by and through the NEFMC and NMFS—to compel regulated parties, *i.e.*, fishermen, to pay for supplemental at-sea monitoring outside of a formal fee system or limited access privilege program.[5] To date, CoA Institute's objections have been ignored. Neither the New England Council nor NMFS has made any effort in the final draft of the proposed Omnibus

---

[1] *About Us*, COA INST., https://causeofaction.org/about/ (last visited Nov. 19, 2018).
[2] *See generally Free the Fishermen*, COA INST., https://coainst.org/2Dp200f (last visited Nov. 19, 2018).
[3] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 47,326 (Sept. 19, 2018).
[4] NEW ENG. FISHERY MGMT. COUNCIL, INDUSTRY-FUNDED MONITORING OMNIBUS AMEND. (Aug. 2018) [hereinafter OMNIBUS AMEND.], *available at* http://bit.ly/2DGJils.
[5] Letter from CoA Inst. to New Eng. Fishery Mgmt. Council (Apr. 12, 2017), *available at* http://coainst.org/2pDsCnQ.

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 2

Amendment to address the concerns raised on the record by CoA Institute and other stakeholders. This failure, whether mere oversight or intentional avoidance, tends to demonstrate the prejudicial view of NMFS and the NEFMC towards fishermen.  It also reveals the government's unfortunate determination to impose unlawful and devastating costs on an already beleaguered heritage industry.

        As set forth in detail below, there is *no statutory authorization* under the Magnuson-Stevens Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, for industry-funding requirements in most of the Atlantic fisheries.  As such, the Omnibus Amendment—and any future attempts to implement industry-funded monitoring under the Omnibus Amendment's framework—will almost certainly face legal challenge.  CoA Institute respectfully requests that NMFS disapprove the Omnibus Amendment and work with the NEFMC to develop alternative means of achieving the Council's desired goals of increased data collection and expanded policing of annual catch totals.  For example, NMFS and the NEFMC could work to reallocate existing funds for such supplemental monitoring or petition Congress to appropriate funding specific to expanded at-sea monitoring.

I.    **The Magnuson-Stevens Act does not authorize the industry-funded monitoring programs envisioned by the Omnibus Amendment.**

        The stated purpose of the Omnibus Amendment is straightforward: the NEFMC is "interested in increasing monitoring . . . to assess the amount and type of catch, to more precisely monitor annual catch limits, and/or provide other information for management."[6]  But the NEFMC's ability to fund that increased monitoring is limited.[7]  The Council's proposed solution is to design a standardized mechanism that would permit the government to order fishermen to cover a substantial portion of monitoring costs.[8]  Yet the Council fails to point to any specific provision in the MSA that grants it authority to implement such a plan.  The proposed rule adopting the Omnibus Amendment instead ambiguously points to the entirety of the MSA as the source of requisite authority.[9]

        a.    **The NEFMC must have explicit statutory authorization to force the regulated industry to fund discretionary supplemental at-sea monitoring programs.**

        Federal agencies do not enjoy unbridled power in choosing which programs to pursue; they cannot impose new fees or taxes, nor can they simply demand that citizens pay for programs that the government ought to be financing in the first place.  In this sense, the basic presumption in the

---

[6] *See, e.g.*, OMNIBUS AMEND. at 28, 31.
[7] *See id.* at 31 ("NMFS has limited funding for monitoring, so the Council is considering requiring industry to contribute to the cost of the monitoring."); *see also* Greater Atl. Reg'l Fisheries Office, Nat'l Marine Fisheries Serv., Press Release: Industry-Funded Monitoring Omnibus Amendment, Public Hearings and Comment Period (Sept. 20, 2016) ("The amount of available Federal funding to support additional monitoring is limited[.]"), *available at* http://bit.ly/2nHNpl1.
[8] *See, e.g.*, OMNIBUS AMEND. at 51 ("Under Omnibus Alternative 2, there would be a standardized structure for new industry-funded monitoring programs in New England fisheries, including at-sea monitoring, portside monitoring, and electronic monitoring. . . .  This industry-funded monitoring program structure would include . . . (1) [s]tandard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry; (2) a process for FMP-specific industry-funded monitoring to be implemented via amendment and revised framework adjustment; (3) standard administrative requirements for industry-funded monitoring service providers; (4) [a] process to prioritize available Federal resources for industry-funded monitoring across FMPs; and (5) a process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.).
[9] 83 Fed. Reg. at 47,327 ("Authority: 16 U.S.C. 1801 *et seq.*").

_0000017656

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 3

Omnibus Amendment—that the NEFMC can require the industry by fiat to fund a non-essential supplemental monitoring program—is gravely mistaken and runs afoul of a fundamental principle of administrative law: "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."[10]  The NEFMC acknowledges as much, but fails to give the principle due credit:

> Congress must decide how to finance any program, project, or activity . . . it establishes. Typically, programs are funded by appropriating funds from the U.S. Treasury.  In addition to designating the funds necessary for a program, a congressional appropriation sets a maximum authorized program level.  The maximum authorized program level functions as a cap on funding for a program.  A Federal agency cannot spend money on a program beyond the maximum authorized program level without authorization from Congress.  A Federal agency also cannot get around the maximum authorized program level by adding to its appropriations from sources outside the government without permission from Congress.[11]

The MSA does not authorize the NEFMC to redesign fishery management plans to introduce the sort of industry-funding requirement envisioned by the Omnibus Amendment.  At most, the MSA authorizes the *placement* of observers and monitors.[12]  Regional councils, however, are not at liberty to design particular or novel *funding* mechanisms for monitoring programs they choose to create.

The plain meaning of the MSA is clear and unambiguous.[13]  The statute only authorizes IFM in a few specific regions and circumstances: (1) foreign fishing,[14] (2) limited access privilege programs,[15] and (3) the North Pacific fisheries research plan.[16]  Congress's decision to permit NMFS and the councils to require industry-funded monitoring or observing in *only* these three situations clearly manifests Congress's intent not to allow mandatory industry funding in other scenarios.[17]  To read the MSA otherwise would render provisions discussing industry funding mere surplusage;[18] it would offend other important cannons of statutory construction;[19] and it would contradict the well-established legislative history of the MSA.

Indeed, with respect to the legislative history of the MSA, there is no evidence of congressional recognition for any sort of pre-existing, implied authority to impose monitoring costs on the regulated

---

[10] *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986); *see Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 134 S. Ct. 2427, 2466 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law.").

[11] OMNIBUS AMEND. at 32.

[12] 16 U.S.C. § 1853(b)(8); 50 C.F.R. § 648.2.

[13] *See generally Palmieri v. Nynex Long Distance Co.*, 437 F.3d 111, 115 (1st Cir. 2006); *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 n.2 (1st Cir. 1999).

[14] 16 U.S.C. § 1821(h)(4).

[15] *Id.* § 1853a(e).  The Greater Atlantic Region contains two fisheries that permit cost recovery through a fee system: the Atlantic sea scallop individual fishing quota and golden tilefish individual fishing quota limited access privilege programs.

[16] *Id.* § 1862(a).

[17] *Cf. Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.9 (D.D.C. 2015) ("'[C]ost sharing' programs with industry participants in other fisheries in order to provide higher observer coverage levels . . . were expressly authorized by statute *for particular fisheries only*.") (emphasis added) (citing 16 U.S.C. § 1862).

[18] *Nat'l Credit Union Admin v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998).

[19] *See Duncan v. Walker*, 533 U.S. 167, 173 (2001); *see also EchoStar Satellite L.L.C. v. Fed. Commc'ns Comm'n*, 704 F.3d 992, 999 (D.C. Cir. 2013); *Ry. Labor Execs.' Ass'n v. Natl' Mediation Bd.*, 29 F.3d 655 (D.C. Cir. 1994)

_0000017657

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 4

industry.  Congress has, in fact, *repeatedly declined* the opportunity to permit IFM nationwide.  Each time that Congress has reauthorized the MSA, it has considered and rejected bills that would have created blanket authority for mandatory IFM programs.[20]  The IFM regime that the NEFMC now seeks to impose on the herring fishery—and the future IFM programs it envisions for the remaining New England fisheries—runs afoul of this legislative history.

The case of the groundfish monitoring program is instructive.  CoA Institute represented David Goethel, a New Hampshire-based fisherman, and the members of Northeast Fishery Sector XIII in a lawsuit challenging the legality of the Northeast multispecies sector at-sea monitoring program.[21]  Due to procedural technicalities, our clients were unable to obtain a decision on the merits that addressed the statutory authority concerns addressed in the foregoing paragraphs.  Congress subsequently appropriated funds to continue covering industry costs, which had been expected to exceed $700 per sea day and put nearly 60% of the fleet out of business.[22]  But the U.S. Court of Appeals for the First Circuit still commented on the underlying ambiguity of the government's position, particularly in light of a NEFMC-commissioned study that predicted the unsustainable burden of IFM:

> [G]iven [the government's] own study which indicated that the groundfish sector could face serious difficulties as a result of the industry funding requirement, . . . this may be a situation where further clarification from Congress would be helpful for the regulated fisheries and the agency itself as it balances the competing goals of conservation and the economic vitality of the fishery.[23]

The Omnibus Amendment, as discussed below, presents the herring fishery—and, ultimately, other fisheries under the purview of the NEFMC and other adjoining councils—with the same sort of threat to economic viability.  And the NEFMC and NMFS have yet again failed to point to any specific provision of the MSA that authorizes them to require the regulated industry to shoulder the cost of discretionary at-sea monitoring programs that the government cannot itself fund.  The Omnibus Amendment must be rejected on these grounds.

### b. The Omnibus Amendment's IFM scheme would violate the National Standards and other important legal principles.

Notwithstanding the NEFMC's lack of legal authority, the introduction of IFM across the Greater Atlantic region also would impose a tremendous economic burden on the fishing industry that could lead to the elimination of small-scale fishing.  This result would violate National Standards 7 and 8.[24]  Congress never intended to grant the regional fishery management councils the authority

---

[20] H.R. 5018, 109th Cong. § 9(b) (2006); H.R. 39, 104th Cong. § 9(b)(4) (1995); H.R. 1554, 101st Cong. § 2(a)(3) (1989).

[21] *See generally Oversight Hearing on "Exploring the Successes and Challenges of the Magnuson-Stevens Act": Hearing Before the U.S. H.R. Comm. on Nat. Resources, Subcomm. on Water, Power, & Oceans*, 115th Cong. (July 19, 2017) (statement for the record of Ryan P. Mulvey, Counsel, Cause of Action Inst.), *available at* https://coainst.org/2FqgO10.

[22] *See* Eric Bolinder, *Congress Throws Fishermen a Lifeline*, COA INST. (Mar. 27, 2018), https://coainst.org/2zg1wqb.

[23] *Goethel v. Dep't of Commerce*, 854 F.3d 106, 116 (1st. Cir. 2017), *cert. denied*, 138 S. Ct. 221 (2017).

[24] *See* 16 U.S.C. § 1851(a)(7)–(8).  One should not lightly conclude that Congress intend to grant authority for the Council and NMFS to take actions that would put fishermen out of business.  *See Arctic Sole Seafoods v. Gutierrez*, 622 F. Supp. 2d 1050, 1061 (W.D. Wash. 2008) (rejecting agency interpretation because it "leads to absurd results—the inevitable

_0000017658

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 5

to regulate a substantial portion of the fleet out of existence.[25]  As the Supreme Court has held, "Congress . . . does not alter the fundamental details of a regulatory scheme [such as the one intended by the MSA] in vague terms or ancillary provisions,"[26] nor does it "delegate a decision of such economic and political significance [as the introduction of industry-funded monitoring] in so cryptic a fashion."[27]  IFM represents a shift of tremendous economic and political significance.

In the absence of authorization for the sort of IFM programs set forth in the Omnibus Amendment, the NEFMC and NMFS can only be described as preparing to impose a "tax" to extract money from regulated parties to fund desired regulatory programs.  This cannot stand: "only Congress has the power to levy taxes."[28]  The Omnibus Amendment, as applied in the herring fishery and other future fishery management plan amendments, also may violate numerous statutes governing agency finance, such as the Anti-Deficiency Act[29] and Miscellaneous Receipts Statute.[30]  For example, the Government Accountability Office has rejected the proposition that an agency can avoid the Miscellaneous Receipts Statute "by authorizing a contractor to charge fees to outside parties and keep the payments in order to offset costs that would otherwise be borne by agency appropriations."[31]  Yet this sort of rearrangement of financial obligations and receipts is exactly what would occur under the IFM programs envisioned under the Omnibus Amendment.  Instead of charging a "fee" to fishermen as a form of cost recovery, the NEFMC instead would order fishermen to pay monitoring service providers directly as a condition of retaining and using a permit.  Finally, IFM programs would impermissibly compel fishermen into commercial transactions in violation of the Commerce Clause[32] and violate other parts of the Constitution, including the Fourth Amendment.[33]

## II.    The expected economic impact of the Omnibus Amendment, including measures specific to the Atlantic herring fishery, and stakeholder feedback expose other important deficiencies.

In line with the National Standards, the Omnibus Amendment and future industry-funded monitoring programs must "minimize costs,"[34] "provide for the sustained participation of [fishing] communities,"[35] and "minimize adverse economic impacts."[36]  The Omnibus Amendment fails to

---

elimination of the fishery); *W. Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 140 (D. Mass. 2010) ("[The MSA] creates a duty to allow for harvesting at optimum yield in the present, while . . . [also] protecting fishery output for the future[.]").
[25] The NEFMC could certainly repeal or revoke any of its fishery management plans, but it must do so explicitly and by three-quarters majority approval of its voting members.  16 U.S.C. § 1854(h).
[26] *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).
[27] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *see Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (rejecting argument that Congress would permit "broad and unusual authority through an implicit delegation").
[28] *Thomas v. Network Solutions*, 2 F. Supp. 2d 22, 29 (D.D.C. 1998); *see* U.S. Const., art. I., § 8, cl. 1; *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes[.]").
[29] *See* 31 U.S.C. § 1341(a)(1)(A)–(B); *see also Envtl. Def. Ctr. v. Babbitt*, 73 F.3d 867, 872 (9th Cir. 1995).
[30] *See* 31 U.S.C. § 3302(b); *see also Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996).
[31] GOV'T ACCOUNTABILITY OFFICE, 2 PRINCIPLES OF FED. APPROPRIATIONS L. at 6-177 (3d ed. 2006).
[32] *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2587 (2012) (The government cannot "compel[] individuals to become active in commerce by purchasing a product.").
[33] *See City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2452 (2015).
[34] 16 U.S.C. § 1851(a)(7).
[35] *Id.* § 1851(a)(8).
[36] *Id.*

_0000017659

Case: 21-1886    Document: 00118392332    Page: 134    Date Filed: 01/16/2026    Entry ID: 6779569

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 6

meet these standards, both generally and with respect to the herring alternatives, because it will have a severe and adverse impact on the fishing industry.

With respect to the omnibus measures, the NEFMC attempts to mask the inevitable negative economic consequences of its amendment by suggesting that its measures "do not require the development of IFM programs nor do they directly impose any costs."[37] Although technically true, this claim is misleading. As the NEFMC itself recognizes, once future fishery-specific IFM programs are approved under the Omnibus Amendment's "streamlined" procedures, the expected economic impact on fishery-related business and communities will be uniformly negative: "[T]here would be *direct negative economic impacts to fishing vessels*[.]"[38]

As for the herring fishery, monitoring costs will likely exceed $710 per sea day for an at-sea monitor and $818 per sea day for a NEFOP-level observer.[39] Such costs are probably higher than the daily landings revenue of the typical small-scale vessel, particularly given the latest reduction in quota. This is certainly the case in the Northeast multispecies fishery. Under the groundfish sector at-sea monitoring program, up to 60% of the fleet was expected to "see negative returns to owner when full" monitoring costs were "factored in."[40] Although devastating economic impacts have been somewhat mitigated by congressional action,[41] a recent report from the Northeast Fisheries Science Center confirms the continued decline of the groundfish fishery, which will only accelerate once monitoring costs fully shift to sector fishermen.[42] The NEFMC cannot ignore the devastating economic effects of industry funding in the herring fishery, just as it cannot ignore the costs associated with the omnibus alternatives that it has deemed too "speculative" to analyze.[43]

In a previous draft of the Omnibus Amendment, the NEFMC suggested that monitoring costs could rise even further due to overlapping requirements for IFM in multiple fisheries. Specifically, the Council indicated that "[m]any of the vessels that would be impacted by [IFM] costs in the herring fishery would also be impacted by [IFM] costs in the mackerel fishery."[44] When the Mid-Atlantic Council decided to withdraw from the Omnibus Amendment, and thus concurrently tabled its proposed IFM regime for the mackerel fishery, it did so in large part because of its concern for overlapping IFM requirements: "The Council had originally considered IFM due to observer coverage concerns in the mackerel fishery, but *most mackerel catches will be subject to additional monitoring through a recent New England Council IFM action for the Atlantic herring fishery*."[45] Damningly, the NEFMC has not

---

[37] OMNIBUS AMEND. at 180.

[38] *See, e.g.*, *id.* (emphasis added); *see also id.* at 9, 304.

[39] *Id.* at 243 (Table 73).

[40] NEW ENG. FISHERY MGMT. COUNCIL, DRAFT REPORT: PRELIMINARY EVALUATION OF THE IMPACT OF GROUNDFISH-SECTOR FUNDED AT SEA MONITORING ON GROUNDFISH FISHERY PROFITS at 10 (June 19, 2015), *available at* http://bit.ly/28QUXwT. These costs were predicted to be heaviest for small vessels. *Id.* at 13 (Table 12). NMFS recognized these prospects, describing them as a "restructuring of the fleet." *Id.* at 10.

[41] *See supra* note 22.

[42] *See generally* NAT'L OCEANIC & ATMOSPHERIC ADMIN., 2015 FINAL REPORT ON THE PERFORMANCE OF THE NORTHEAST MULTISPECIES (GROUNDFISH) FISHERY (MAY 2007 – APRIL 2016), Ref. Doc. 18-13 (Nov. 2018).

[43] OMNIBUS AMEND. at 183 ("[P]otential downstream effects (e.g., subsequent management measures to address bycatch issues) of this action are considered too remote and speculative to be appropriate for consideration[.]").

[44] NEW ENG. FISHERY MGMT. COUNCIL & MID-ATL. FISHERY MGMT. COUNCIL, INDUSTRY-FUNDED MONITORING OMNIBUS AMEND. at 301 (Sept. 2016), *available at* http://bit.ly/2mQxrtn.

[45] Mid-Atl. Fishery Mgmt. Council, October 2018 Council Meeting Summary at 1–2 (Oct. 2018) (emphasis added), *available at* http://bit.ly/2PYRMdA.

A132

_0000017660

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 7

undertaken any detailed analysis exploring the potential economic impact of IFM in a future scenario where multiple fisheries require such monitoring. It is reasonable to assume that some vessels, which declare into multiple fisheries for any given trip, could be continually subject to monitoring requirements. Further, the Council has made only meager efforts to consider how its preferred herring alternatives will impact the mackerel fleet and other vessels that incidentally declare herring yet may still be subject to IFM requirements.[46]

The NEFMC and NMFS have received overwhelmingly negative feedback in pursuing the Omnibus Amendment. Of the eighty-three submissions posted to the electronic docket during the last round of public comment in the *Federal Register* in 2016, only six stakeholders voiced various levels of support for IFM; the vast majority—93%—opposed it.[47] The reasons for this opposition are straightforward enough. Many small-scale fishermen cannot remain profitable if they must assume monitoring costs.[48] The Long Island Commercial Fishing Association, for example, expects that the Omnibus Amendment's approximately $800 per sea day cost will force more than half of the entire New York-based fleet out of business.[49] Stakeholders also are skeptical that increased monitoring has any connection to conservation or maintaining the sustainability of the fisheries, and they question the quality of the data collected. Most importantly, however, the public recognizes that the MSA does not authorize industry-funded monitoring simply because the Council or NMFS wishes it to do so,[50] and they acknowledge the potential constitutional problems.[51]

Apart from their lack of authority under the MSA to impose monitoring costs on vessels, the NEFMC and NMFS also have failed to provide an adequate explanation for why increased monitoring is even necessary in light of the extreme financial burden it will put on fishermen. As proposed, IFM could destroy multi-generational, small-business fishermen up and down the East Coast while benefitting industrial fishing firms. That result is unacceptable.

---

[46] *See, e.g.*, OMNIBUS AMEND. at 250–51.

[47] Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin., 81 Fed. Reg. 64,426 (Sept. 20, 2016), Docket No. NOAA-NMFS-2016-0139-0001, *available at* http://bit.ly/2p5NO1s.

[48] *See* Comment of Meghan Lapp, Seafreeze Ltd., on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0009, *available at* http://bit.ly/2nUf8Ph (discussing impact of herring and mackerel alternatives).

[49] *See* Comment of Long Island Commercial Fishing Ass'n on Omnibus Amend. (Nov. 8, 2016), Docket No. NOAA-NMFS-2016-0139-0084, *available at* http://bit.ly/2odOrsX ("The onus for NMFS required observer coverage should be on NMFS, not industry. It is cost prohibitive.").

[50] *See, e.g.*, Comment of David Goethel on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0010, *available at* http://bit.ly/2o04Mye ("Monitoring is a function of government and should be funded at levels Congress deems appropriate through NOAA line items in the budget. . . . [The MSA] allows for the placement of observers on fishing boats but is silent on cost recovery except in specific fisheries in the North Pacific Region."); *see also* Comment of Gregg Morris on Omnibus Amend. (Nov. 8, 2016), Docket No. NOAA-NMFS-2016-0139-0080, *available at* http://bit.ly/2o09hJp (same).

[51] *E.g.*, Comment of N.C. Fisheries Ass'n on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0082, *available at* http://bit.ly/2oXBtAa (raising due process concerns) ("There was no reasonable opportunity for [public hearings] down in the affected states of Maryland, Virginia, and North Carolina. Their involvement in the public hearings process was substantially truncate. [Those] whose stand to be severely impacted . . . have not been given a single public hearing reasonably close enough for them to be expected to attend."); *cf.* Brooke Constance White, *Stonington fishermen, first selectman: Camera proposal violates Fourth Amendment rights*, THE WESTERLY SUN (Apr. 7, 2017), http://bit.ly/2o00maB.

_0000017661

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 8

**III.    Conclusion**

      Thank you for your consideration of the foregoing comments.  CoA Institute respectfully requests that NMFS disapprove the Omnibus Amendment.  NMFS should instead work with the NEFMC to pursue alternative means of achieving the Council's monitoring goals.  If you have any questions, please do not hesitate to contact me at ryan.mulvey@causeofaction.org or (202) 499-4232.

      Sincerely,

RYAN P. MULVEY
COUNSEL
CAUSE OF ACTION INSTITUTE

A134

# CAUSE *of* ACTION
## I N S T I T U T E

Pursuing Freedom and Opportunity through Justice and Accountability

December 24, 2018

**VIA REGULATIONS.GOV**

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service
ATTN: Michael Pentony, Regional Administrator
55 Great Republic Drive
Gloucester, MA 01930

Re:    Industry-Funded Monitoring (IFM) Omnibus Amendment
          83 Fed. Reg. 55,665 (Nov. 7, 2018)
          Docket No. NOAA-NMFS-2018-0109 (RIN 0648-BG91)

Dear Administrator Pentony:

I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government-oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1] CoA Institute has represented clients in challenging past efforts to compel the regulated industry to pay for discretionary supplemental at-sea monitoring services.[2]

This comment concerns the National Marine Fisheries Service's ("NMFS") proposed rule for regulations implementing the New England Industry-Funded Monitoring ("IFM") Omnibus Amendment.[3] Earlier this fall, NMFS published a separate notice of availability concerning the Omnibus Amendment.[4] The agency has yet to finalize its action with respect to this earlier rulemaking, which would either approve or disapprove, in whole or in part, the Omnibus Amendment.[5]

In April 2017, prior to its final selection of preferred alternatives, CoA Institute advised the New England Fishery Management Council ("NEFMC") of serious legal questions concerning the authority of the federal government to compel regulated parties, *i.e.*, fishermen, to pay for supplemental at-sea monitoring outside of a formal fee system or limited access privilege program.[6] More recently, CoA Institute reiterated its concerns in a regulatory comment[7] on NMFS's notice of availability and in public statements before the NEFMC and Mid-Atlantic Fishery Management Council.[8] To date, these objections have been ignored.

---

[1] *About Us*, COA INST., https://causeofaction.org/about/ (last visited Dec. 24, 2018).
[2] *See generally Free the Fishermen*, COA INST., https://coainst.org/2Dp200f (last visited Dec. 24, 2018).
[3] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 55,665 (Nov. 7, 2018).
[4] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 47,326 (Sept. 19, 2018).
[5] NEW ENG. FISHERY MGMT. COUNCIL, INDUSTRY-FUNDED MONITORING OMNIBUS AMEND. (Aug. 2018) [hereinafter OMNIBUS AMEND.], *available at* http://bit.ly/2DGJils.
[6] Letter from CoA Inst. to New Eng. Fishery Mgmt. Council (Apr. 12, 2017), *available at* http://coainst.org/2pDsCnQ.
[7] Comment of CoA Inst. on 83 Fed. Reg. 47,326 (Nov. 19, 2018), *available at* https://coainst.org/2zWMBkW.
[8] *See, e.g.*, Pub. Statement of Ryan P. Mulvey, CoA Inst. (Dec. 13, 2018), *available at* https://coainst.org/2EkB7e5.

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 2

## Discussion

CoA Institute offers the following comments on the proposed implementing regulations:

1. **The Magnuson-Stevens Act does not authorize the industry-funded monitoring programs envisioned by the Omnibus Amendment.**

By reference, CoA Institute incorporates and reiterates the concerns raised in its November 19, 2018 comment on the Omnibus Amendment. There is no statutory authorization under the Magnuson-Stevens Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, for industry-funding requirements in most of the Atlantic fisheries. At most, the MSA authorizes the placement of observers and monitors.[9] But the NEFMC cannot design novel funding mechanisms for monitoring programs. The plain meaning of the MSA is clear and unambiguous.[10] IFM is authorized in a few specific regions and circumstances: (1) foreign fishing,[11] (2) limited access privilege programs,[12] and (3) the North Pacific fisheries research plan.[13] Congress's decision to permit NMFS and the regional councils to require IFM or observing in *only* these three situations clearly manifests Congress's intent not to authorize mandatory industry funding in other scenarios.[14] To read the MSA otherwise would render provisions discussing industry funding mere surplusage;[15] it would offend other important cannons of statutory construction;[16] and it would contradict the well-established legislative history of the MSA.

2. **The Omnibus Amendment violates the MSA's National Standards.**

As described in detail in CoA Institute's previous comment, the introduction of IFM across the Greater Atlantic region would impose a tremendous economic burden on the fishing industry that could lead to the elimination of small-scale fishing. This result would violate National Standards 7 and 8.[17] Congress never intended to grant the regional fishery management councils the authority to regulate a substantial portion of the fleet out of existence.[18] As the Supreme Court has held, "Congress . . . does not alter the fundamental details of a regulatory scheme [such as the one intended by the

---

[9] 16 U.S.C. § 1853(b)(8); 50 C.F.R. § 648.2.

[10] *See generally Palmieri v. Nynex Long Distance Co.*, 437 F.3d 111, 115 (1st Cir. 2006); *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 n.2 (1st Cir. 1999).

[11] 16 U.S.C. § 1821(h)(4).

[12] *Id.* § 1853(e). The Greater Atlantic Region contains two fisheries that permit cost recovery through a fee system: the Atlantic sea scallop individual fishing quota and golden tilefish individual fishing quota limited access privilege programs.

[13] 16 U.S.C. § 1862(a).

[14] *Cf. Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.9 (D.D.C. 2015) ("'[C]ost sharing' programs with industry participants in other fisheries in order to provide higher observer coverage levels . . . were expressly authorized by statute *for particular fisheries only.*") (emphasis added) (citing 16 U.S.C. § 1862).

[15] *Nat'l Credit Union Admin v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998).

[16] *See Duncan v. Walker*, 533 U.S. 167, 173 (2001); *see also EchoStar Satellite L.L.C. v. Fed. Commc'ns Comm'n*, 704 F.3d 992, 999 (D.C. Cir. 2013); *Ry. Labor Execs.' Ass'n v. Natl' Mediation Bd.*, 29 F.3d 655 (D.C. Cir. 1994)

[17] *See* 16 U.S.C. § 1851(a)(7)–(8). One should not lightly conclude that Congress intend to grant authority for the Council and NMFS to take actions that would put fishermen out of business. *See Arctic Sole Seafoods v. Gutierrez*, 622 F. Supp. 2d 1050, 1061 (W.D. Wash. 2008) (rejecting agency interpretation because it "leads to absurd results—the inevitable elimination of the fishery); *W. Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 140 (D. Mass. 2010) ("[The MSA] creates a duty to allow for harvesting at optimum yield in the present, while . . . [also] protecting fishery output for the future[.]").

[18] The NEFMC could certainly repeal or revoke any of its fishery management plans, but it must do so explicitly and by three-quarters majority approval of its voting members. 16 U.S.C. § 1854(h).

_0000017664

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 3

MSA] in vague terms or ancillary provisions,"[19] nor does it "delegate a decision of such economic and political significance [as the introduction of IFM in so cryptic a fashion."[20] IFM represents a shift of tremendous economic and political significance.

With respect to the omnibus measures, the NEFMC attempts to mask the inevitable negative economic consequences of the Omnibus Amendment by suggesting that its measures "do not require the development of IFM programs nor do they directly impose any costs."[21] Although technically true, this claim is misleading. As the Council itself recognized, once future fishery-specific IFM programs are approved under the Omnibus Amendment's "streamlined" procedures, the expected economic impact on fishery-related business and communities will be uniformly negative: "[T]here would be *direct negative economic impacts to fishing vessels*[.]"[22]

As for the herring fishery, monitoring costs will likely exceed $710 per sea day for an at-sea monitor and $818 per sea day for a NEFOP-level observer.[23] Such costs are probably higher than the daily landings revenue of the typical small-scale vessel, particularly given the latest reduction in quota. Indeed, NMFS's proposed rule recognizes that the herring measures alone could result in an "approximately 20 percent" reduction in annual return-to-owner for Category A and B permit holders.[24] The Council—and NMFS—cannot ignore the devastating economic effects of industry funding in the herring fishery, just as it cannot ignore the costs associated with the omnibus alternatives that it has deemed too "speculative" to analyze.[25]

### 3. The Environmental Assessment for the Omnibus Amendment is fatally flawed given recent developments and expected future action in the herring fishery.

Two other commenters have impliedly suggested yet another problem for the Omnibus Amendment, namely, the fatal flaws in the accompanying Environmental Assessment ("EA"), which fails to account for recent developments in the herring fishery, as well as expected future management measures.[26] There are at least two such issues that NMFS should consider.

*First*, as CoA Institute previously explained, the Omnibus EA fails, at a general level, to account for possible overlapping requirements for IFM in multiple fisheries. It is reasonable to assume that some vessels, which declare into multiple fisheries for any given trip, could be continually subject to monitoring requirements. The NEFMC made only meager efforts to consider how its preferred

---

[19] *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

[20] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *see Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (rejecting argument that Congress would permit "broad and unusual authority through an implicit delegation").

[21] OMNIBUS AMEND. at 180.

[22] *See, e.g., id.* (emphasis added); *see also id.* at 9, 304.

[23] *Id.* at 243 (Table 73).

[24] 83 Fed. Reg. at 55,671.

[25] OMNIBUS AMEND. at 183 ("[P]otential downstream effects (e.g., subsequent management measures to address bycatch issues) of this action are considered too remote and speculative to be appropriate for consideration[.]").

[26] *See* Comment of Lund's Fisheries Inc. on Omnibus Amend. (Nov. 19, 2018), Docket No. NOAA-NMFS-2018-0109-0009, *available at* http://bit.ly/2LtTgId; *see also* Comment of F/V Ocean Spray P'ship. on Omnibus Amend. (Dec. 18, 2019), Docket No. NOAA-NMFS-2018-0109-0012, *available at* http://bit.ly/2Cuz71B.

_0000017665

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 4

herring alternatives would impact the mackerel fleet and other vessels that incidentally declare herring yet would still be subject to IFM requirements.[27]

     *Second*, and more importantly, the Omnibus EA fails to address the interplay between IFM and recent in-season adjustments in the herring fishery. This past summer, NMFS and the NEFMC reduced the annual catch limit for herring by over 50%.[28] The Council and NMFS now seek again to lower the annual quota for calendar year 2019,[29] with an eye to further reductions in 2020 and 2021. Although there is some uncertainty as to the precise level of reduction, all the possible specification adjustments will be economically devastating. According to a report provided to the NEFMC at its December 2018 meeting, these alternatives will reduce herring revenue by between 80–87%.[30] That, in turn, will result in a 20–22% reduction in total revenue for all vessels declaring into the fishery.[31] Such a loss in profitability on top of the costs associated with IFM will cripple the fleet. The EA for the Omnibus Amendment must be amended to consider the foregoing numbers.[32]

    **4. NMFS's *Federal Register* actions have caused confusion and suggest prejudice.**

    Stakeholders in the Greater Atlantic region already have raised concerns over the NEFMC's decision to move forward with the Omnibus Amendment, despite the lack of final action on the part of the Mid-Atlantic Council. NMFS's unexpected publication of the September 19, 2018 "notice of availability" only added to this surprise and confusion. It is unclear why the agency published a rule in September, seeking comment on the approval or disapproval of the Omnibus Amendment, and then subsequently published a proposed rule for implementing regulations in November before any action on the Omnibus Amendment was finalized. To the extent rulemakings for the approval of the Omnibus Amendment and the introduction of implementing regulations are being done concurrently, it would seem to suggest that NMFS has already determined its course of action and will view public comments with prejudice.

    **5. There are other inequities in the Omnibus Amendment's herring measures**

    Beyond the foregoing deficiencies, there also appears to be some inequity in the design of the herring measures. For example, vessels that intend to land less than fifty (50) metric tons (mt) of herring *on any given trip* are provided a waiver from IFM requirements. Yet there are vessels in the fishery that have unique fishing behavior and daily capacity, including those that process at sea and return to port after extended multi-day trips. Because the 50 mt exemption is provided *per trip*, rather than *per day*, the IFM program will favor small capacity vessels that make short, daily trips and land fresh fish. Other vessels, which do not otherwise harvest at a higher daily rate, will be disproportionately impacted and likely subject to a higher monitoring coverage rate. The inequity of

---

[27] *See, e.g.*, OMNIBUS AMEND. at 250–51.

[28] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Adjustment to 2018 Atlantic Herring Management Area Sub-Annual Catch Limits, 83 Fed. Reg. 42,450 (Aug. 22, 2018).

[29] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 83 Fed. Reg. 61,593 (Nov. 30, 2018).

[30] Presentation: In-Season Adjustment to Atlantic Herring Specifications for 2019, N. Eng. Fishery Mgmt. Council (Dec. 5, 2018), *available at* http://bit.ly/2V3w4Vk.

[31] *Id.*

[32] The EA should also more closely consider the impact of Atlantic herring Amendment 8, which is still in development but would create new cost burdens for fishermen, including the creation of new buffer zones.

_0000017686

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 5

this outcome is only heightened by the fact that these same vessels may declare into herring only incidentally, or without any real intention of primarily targeting herring.  They will nevertheless be required to carry a herring monitor for one- or two-week trips at a time.  The Omnibus EA does not adequately address these unique cost factors, and that raises questions about compliance with National Standard 6, which requires fishery management plans to attend to variations in fishing habits.[33]

### I.    Conclusion

Thank you for your consideration of these comments.  CoA Institute respectfully requests that NMFS disapprove the Omnibus Amendment and decline final action on the proposed implementing regulations.    If you have any questions, please do not hesitate to contact me at ryan.mulvey@causeofaction.org or (202) 499-4232.

Sincerely,

RYAN P. MULVEY
COUNSEL
CAUSE OF ACTION INSTITUTE

---

[33] 16 U.S.C. § 1851(a)(6).

_0000017667



**For a thriving New England**

**CLF Massachusetts**    62 Summer Street
Boston MA 02110
P: 617.350.0990
F: 617.350.4030
www.clf.org

November 19, 2018

Mr. Michael Pentony, Regional Administrator
NOAA Fisheries - GARFO
55 Greater Republic Drive
Gloucester, MA 01930

RE:    **Comments on the Industry-Funded Monitoring Amendment and the Proposed Rule
for the Industry-Funded Monitoring Amendment (NOAA-NMFS-2018-0109)**

Dear Mr. Pentony:

Conservation Law Foundation (CLF) thanks you for the opportunity to provide comments on the
New England Industry-Funded Monitoring Omnibus Amendment ("IFM Amendment" or
"Amendment") and Proposed Rule as published in the Federal Register. See 83 Fed. Reg. 47326
(Sept. 19, 2018); 83 Fed. Reg. 55665 (Nov. 7, 2018), respectively. Our comments focus on the
proposed Atlantic herring measures, and we do not offer any comments on the omnibus
measures at this time. While the proposed measures – developed in response to NOAA Fisheries'
partial disapproval of Amendment 5 to the Atlantic Herring FMP, where the New England
Fishery Management Council (Council) voted to require 100-percent observer coverage of this
fleet – are an improvement over status quo if implemented, we remain concerned that the agency
may not have secured sufficient federal funding to cover its costs and responsibilities as outlined
in the IFM Amendment.

Founded in 1966, CLF is a non-profit member-supported organization that works to solve
environmental problems threatening the people, natural environment, and communities of New
England. We have a long history of advocating for sustainable fisheries management in New
England, including the protection of forage fish populations like Atlantic herring and the need
for adequate accountability to "protect, restore, and promote the long-term health and stability"
of our fisheries.[1] To this end, CLF is generally supportive of the principles embodied in the IFM
Amendment but believe the Amendment does not go far enough to achieve the accountability
that is needed in the fishery. Taking action to improve accountability in the Atlantic herring
fishery in order to collect accurate and reliable data that can be used to better manage the fishery
is increasingly important given that recent stocks assessments indicate recruitment in the herring
fishery is at a historic low, increasing the chances for overfishing.[2]

---

[1] 16 U.S.C. § 1853(a)(1)(A).
[2] *See* 65th Northeast Regional Stock Assessment Workshop Assessment Summary Report by the Northeast Fisheries
Science Center (August 2018). Available at: https://s3.amazonaws.com/nefmc.org/3.2018-SARC65-summary-
report_herring-only.pdf



Atlantic Herring Measures

1. Industry-Funding Monitoring Coverage Target

The IFM Amendment proposes implementing a 50-percent coverage target for industry-funded at-sea monitoring on vessels issued Category A and B Limited Access Herring Permits. 83 Fed. Reg. at 55669. While this represents significant progress for the fishery over the current approximately 4-percent observer coverage on all midwater trawl vessels operating in the herring fishery, it may still not provide accurate estimates of retained and discarded catch.[3] The nets used by midwater trawl vessels are capable of catching millions of pounds of Atlantic herring and unintended catch – largely river herring, shad, and haddock – in a single tow, resulting in impacts to other fisheries and the ecosystem as a whole. Further, without 100-percent monitoring, neither NOAA Fisheries nor the fishery can guarantee that midwater trawlers do not slip unwanted catch or ensure that all catch is made available for sampling. Only the alternative with a 100-percent monitoring coverage target would have fully achieved the purpose and need of the Amendment, which was "to help improve estimates of catch tracked against harvest limits and fishery catch caps"[4] necessary to obtain accurate catch data of both intentional and unintentional catch (retained and discarded) and ensure that overfishing is not occurring.

Additionally, the Proposed Rule specifies three reasons for issuing a vessel waiver: (1) if an at-sea monitor is not available due to logistics or federal funding issues; (2) if a vessel is operating as a wing vessel and does not intend to pump or carry fish; and (3) if a vessel intends to land less than 50 metric tons of herring on a trip. 83 Fed. Reg. at 55670. CLF strongly urges NOAA Fisheries to keep a close watch on the allowance of waivers for midwater trawl vessels even if vessels do not intend to carry fish or land over 50 metric tons on a trip. These vessels are prone to large bycatch events and must be held accountable. In addition, NOAA Fisheries must ensure that all vessels are operating on a level playing field. Finally, CLF has concerns that waivers may be issued too frequently given the recent provider-related issues in the groundfish fishery contributing to sectors not meeting monitoring requirements for the 2018 fishing year.[5] NOAA Fisheries must act quickly to remedy these issues so that they do not bleed into the herring fishery.

2. Atlantic Herring Exempted Fishing Permit

The Proposed Rule describes the use of an exempted fishing permit (EFP) "to further evaluate how best to permanently administer an electronic monitoring program and portside sampling

---

[3] CLF and other ENGOs consistently advocated for 100-percent observer coverage for the largest vessels in the fleet. See the Herring Alliance public comment on the Industry-Funded Monitoring Omnibus Amendment (NOAA-NMFS-2016-0139) submitted November 7, 2016.

[4] See Industry-Funded Monitoring Omnibus Amendment Public Hearing Document (September 2016) at pg. 5.

[5] See letters to 14 groundfish sectors dated September 25, 2018, from Michael Pentony, Regional Administrator for NOAA Fisheries Greater Atlantic Regional Fisheries Office.

_0000017669



program" for midwater trawl vessels. 83 Fed. Reg. 55672. CLF is generally supportive of this path and requests that the EFP goals include: (1) evaluate the efficacy of electronic monitoring to detect all discarding activity and compliance with slippage; (2) review – at least initially – 100-percent of all fishing activity to identify all discards, contents of the net at the end of pumping (i.e. operational discards), and interactions with protected species; (3) require slippage reporting and consequence measures to apply; (4) ensure that operational discards are documented; (5) ensure redundancy with NEFOP observers; and (6) ensure that participating vessels with net sensors document the weight of slipped catch.

To better achieve the goals of the Amendment, CLF encourages a transition as quickly as possible to an electronic monitoring and portside sampling program as opposed to reliance on human at-sea observers to achieve monitoring coverage requirements in the herring fishery. Given that NOAA Fisheries and the New England Fishery Management Council have already determined electronic monitoring to be "suitable for detecting discarding events aboard midwater trawls" and economically feasible, 83 Fed. Reg. at 55667, it is our view that a one year EFP, as opposed to the proposed two years, should be enough time to evaluate the best way to administer the program.

### 3. Midwater Trawls in Groundfish Closed Areas

As proposed in the IFM Amendment, CLF supports allowing midwater trawl vessels to purchase observers to access groundfish closed areas at 100-percent monitoring coverage as is required in Amendment 5 to the Atlantic Herring FMP.[6] These vessels are already exempted from other closure restrictions because of assumptions that the midwater trawl gear does not usually contact the seafloor or catch significant amounts of groundfish;[7] however, an observer is required to ensure accountability on both assumptions. Additionally, "the majority of groundfish catch by midwater trawl vessels is haddock, and the catch of haddock by midwater trawl vessels is already managed through a haddock catch cap for the herring fishery."[8] By allowing midwater trawl vessels to purchase observer coverage to access groundfish closed areas, the data needed to understand the "extent and nature of bycatch in the herring fishery"[9] can be collected without sacrificing fishing opportunities for the fleet.

CLF is strongly opposed, however, to allowing any increased fishing pressure in the Cashes Ledge (Groundfish) Closure Area under an EFP or by purchasing observer coverage. The Council and NOAA Fisheries recently maintained the Cashes Ledge Closure Area in the Omnibus Essential Fish Habitat Amendment 2 to protect critical groundfish life stages and

---

[6] *See* IFM Amendment Draft Environmental Assessment as submitted to NOAA Fisheries (August 2018) at pg. 71. Available at: https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf
[7] Id.
[8] Id.
[9] Id.

_0000017670



facilitate the recovery of Gulf of Maine cod and other important groundfish stocks.[10] To allow vessels with a propensity for high bycatch rates into this area would simply be irresponsible.

Lastly, NOAA Fisheries should ensure that it has available funding to pay for the agency's cost responsibilities associated with the IFM Amendment. Thank you for considering these comments.

Sincerely,

*Allison Lorenc*

Allison Lorenc
Policy Analyst
Conservation Law Foundation

*Erica Fuller*

Erica Fuller
Senior Attorney
Conservation Law Foundation

---

[10] 83 Fed. Reg. 15253 (April 9, 2018). Available at: https://www.gpo.gov/fdsys/pkg/FR-2018-04-09/pdf/2018-06760.pdf

_0000017671

# Document Metadata: NOAA-NMFS-2018-0109-0006



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109  ⓘ |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment  \* ⓘ |
| **Document File:** | 📄 |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91  ⓘ |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0007 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0006 |
| **Title:** | Comment from Justin Leonard  ⓘ |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS  \* ⓘ |
| **Document Subtype:** | ⓘ |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002  ⓘ |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring  ⓘ |
| **Status:** | Posted  ⓘ |
| **Received Date:** | 11/15/2018  \* ⓘ |
| **Date Posted:** | 11/19/2018  ⓘ |
| **Posting Restriction:** | No restrictions  ⓘ |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1  \* |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/19/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | ⓘ |
| **Tracking Number:** | 1k2-96k6-vcn7  ⓘ |

_0000017672

**Page Count:** 1 🔵

**Total Page Count Including Attachments:** 1

# Submitter Info

**Comment:** I think that it is very important that this proposed rule passes. Too often, we see overfishing happen in bodies of water. An example of this would be the rapid decline in the tuna population that we have seen in the last few decades. This proposal would be important because it would provide oversight to the industry. If more fisheries know exactly what is happening and how much fish they are taking out, then it will be beneficial in the long run because they won't overfish. I strongly urge that this passes. ★🔵

**First Name:** Justin 🔵

**Middle Name:**

**Last Name:** Leonard 🔵

**Mailing Address:**

**Mailing Address 2:**

**City:** 🔵

**Country:** 🔵

**State or Province:** 🔵

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:** 🔵

**Government Agency Type:**

**Government Agency:**

**Cover Page:** 📄

_0000017673

# Document Metadata:NOAA-NMFS-2018-0109-0004



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment ✻ |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0005 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0004 |
| **Title:** | Comment from Kasey Fagin |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS ✻ |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 11/12/2018 ✻ |
| **Date Posted:** | 11/14/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 ✻ |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/14/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-96in-9h3i |

A146

| | |
|---|---|
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

**Comment:** The heightened monitoring associated with the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), and the Marine Mammal Protection Act (MMPA) take more money away from fishermen and funnel it into unnecessary federal positions. The New England Council thinks catch estimates are too inaccurate, but in fact, this is a result of herring being so numerous and equally small. It would take commercial fishermen and private fishermen much longer in preparing paperwork for this count to submit to the monitors. The heightened monitoring being enacted for the purpose of monitoring species is superfluous. The New England Council alludes to the Atlantic herring fishery population. However, herring is the most populous fish in the Atlantic Ocean, in no way are they at risk for extinction. This rule just seems like another attempt to create unnecessary office jobs and take money away from hardworking New England fishermen. At the very least, any of the above-mentioned agencies could choose to use their own federal funds or apply for grants instead of using the fishing industry itself for all funds. The Councils development of an industry-funded monitoring program must consider the following: a clear need or reason for the data collection, objective design criteria, cost of collection, less data intensive methods, prioritize modern technology, and incentives for reliable self-reporting. It does not appear to convince me of any of these factors. Perhaps a better idea would be to regulate and count on the business side of the fishing industry. It would be easy to regulate small, numerous fish by the pound upon sale. This way, when fishermen make a sale, they can record the weight and report to NOAA. However, due to the characteristics of the species, I think this rule is unnecessary.  *

**First Name:** Kasey

**Middle Name:**

**Last Name:** Fagin

**Mailing Address:** 2858 E. 8th Street

**Mailing Address 2:** Apartment 3821

**City:** Tulsa

**Country:** United States

**State or Province:** Oklahoma

**ZIP/Postal Code:** 74104

**Email Address:** kkf3900@utulsa.edu

**Phone Number:**

_0000017675

**Fax Number:**

**Organization Name:**

**Government Agency Type:**

**Government Agency:**

**Cover Page:**

_0000017676

# Document Metadata:NOAA-NMFS-2018-0109-0003

## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment * |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0004 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0003 |
| **Title:** | Comment from kljh yhgfd |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS * |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 11/11/2018 * |
| **Date Posted:** | 11/14/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 * |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/14/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-96hv-3oig |

_0000017677

**Page Count:** 1

**Total Page Count Including Attachments:** 1

# Submitter Info

**Comment:**

A Nature Conservancy report found that thinning forests to make them healthier could increase downstream water yields by up to 6 percent. The loss of diverse habitat under current management practices includes the loss of valuable meadows. Meadows absorb and hold water and release it. Overgrown forests also trap more of the annual snowpack in their higher branches, causing it to evaporate rather than reach the ground and flow downhill to water storage facilities later in the year when its most needed. Property damage and firefighting costs for local, state and federal governments run into the billions of dollars annually. Forest service mismanaging of our national forests has brought an unprecedented environmental catastrophe that impacts all taxpayers and with it, a rare opportunity for transform a culture change in forest management practices. rebuild healthy high-country forests by building upfront dams for storing water, Investing upfront to create these healthier forests will pay dividends in the long run by curbing the spiraling costs of state firefighting and tree removal while building stronger recreational and sporting economies . Shame on California, Agency needs to step in an protect, Wildfire was not even in the GHG rules and regulations as a cause of greenhouse gas emissions.. Agencies need to re examine all emission reports. California should be part of Cross-State Air Pollution Rule (CSAPR). Forests are reaching a breaking point. Poor management policies that interrupted the natural and historical cycle of fire. Needed to change a culture focused almost solely on emergency firefighting to one that supports long-term forest restoration and management. Forests largely restored to the less crowded natural conditions of through greater use of prescribed burning to replace unilateral policies of fire suppression and mechanical thinning to remove buildup of forest fuels, also will improve wildlife habitat, enhance environmental quality and add to the resilience of mountain landscapes, immediate crisis is visible to anyone who recently has traveled in the forest, where entire mountainsides are brown from wildfires with dying and dead forests. Dead trees threaten public safety. Rural homeowners are having to tap their life savings to take down dead trees near homes and buildings. Government agencies need to remove dead trees in National Forest, near highways and other public infrastructure. Costs have risen year by year to battle as catastrophic wildfires during a lengthening fire season on millions of acres of the states dense, overgrown forests. energy providers are budgeting emergency funds to remove dead and dying trees near power lines. Water districts are spending their reserves to remove soils from reservoirs in the wake of catastrophic mountain wildfires. symptoms of a larger problem of forest mismanagement and neglect giving us a environmental disaster and communities need to see encouraging developing consensus around policy changes that will begin to resolve it. If forest service does not take appropriate action soon, National forest risk losing the priceless benefits provided by forests.

A150

healthier, less overgrown forests that enhance watersheds and wildlife, reduce the scale of catastrophic wildfires. Need to provide immediate, emergency consequences of its long-neglected forests. Forest are overrun with fire-intolerant trees and thick carpets of forest fuels that can turn even the smallest camp fire or sparking power line into a raging firestorm. Spending heavily to remove hazard trees as a result wildfires is a must. The costs of long neglecting and mismanaging forests have become an unsustainable burden on national forests. ★ⓢ

**First Name:** kljh ⓢ

**Middle Name:**

**Last Name:** yhgfd ⓢ

**Mailing Address:**

**Mailing Address 2:**

**City:** ⓢ

**Country:** ⓢ

**State or Province:** ⓢ

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:** ⓢ

**Government Agency Type:**

**Government Agency:**

**Cover Page:** 📄

A151

# Document Metadata:NOAA-NMFS-2018-0109-0010

## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0011 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0010 |
| **Title:** | Comment from lpijh xsde |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 11/25/2018 |
| **Date Posted:** | 11/26/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 11/26/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-96rc-rkri |

A152

**Page Count:**     1

**Total Page Count**     1
**Including Attachments:**

# Submitter Info

**Comment:**     People placed global warming at the bottom of the list in terms of our planets priorities in a poll which ranked the worlds most pressing problems . Less than two percent of the climate studies in the survey actually endorsed the so-called consensus view that human activity is driving global warming and some of the studies actually opposed that view. Redistribute de facto the world's wealth by climate policy, Setting up illusion that international climate policy is environmental policy but in reality nothing to do with environmental policy. Despite a manufactured consensus, the elites and leaders continued to ignore any attempt to question the orthodoxy of climate alarmism. Each such alarmist article is larded with words such as if, might, could, probably, perhaps, expected, projected or modeled - and many involve such deep dreaming, or ignorance of scientific facts and principles, that they are akin to nonsense. Global warming is about power for billionaires and elite against the poor and work class. Was never really about science or data or climate; Man-made global warming is a powerful justification for a massive expansion of government controls over human activities. The United Nations sees global warming and the nations ( many hate USA), that make up the UN, as the ticket to attaining the power of a world government and control of its money . That is why the UN doctors the reports of its science panels. massive increase in government power would mean is a dramatic loss of freedom and prosperity for average working people the world over. Global warming regulation, in fact, would involve a massive assault on the standard of living of the middle class, particularly in America. Man-made global warming is a hoax developed to serve powerful special interests. historical and geological evidence exist indicating extreme weather events have been occurring for hundreds, thousands, or even millions of years. NOAAs data on sea level rise from 2005-2012, Accordingly, at the current rate of sea level rise, it would take approximately 25,000 years (around the year 27013) for the oceans to reach Hansens 2006 prediction levels rather than something we expect to reach by the year 2100. 2014 IPCC meeting : Surface temperature reconstructions show, with high confidence, multi-decadal periods during the Medieval Climate Anomaly (year 950 to 1250) that were in some regions as warm as in the late 20th century. ( a Non industrial period with fewer Humans) 2014 IPCC Thousands of cities are undertaking climate action plans, but their aggregate impact on urban emissions is.. uncertain. England ; Margert Thatcher; found climate science , has an ugly anti-growth, anti-capitalistic, anti-American political agenda had emerged around the issue. Anti-progress, , anti-poor is not the Answer to Humans on Earth, she called Gores a doomist predictions. Albert Einstein When the number of factors coming into play in a phenomenological complex is too large scientific method in most cases fails. One need only think of the weather, in which case the prediction even for a few days ahead is impossible. Reporting doomsday story with

_0000017681

straight-faced , no one trusts the science anymore. There were dozens of theories. scientific literature from 1965 to 1979 found 7 articles predicting cooling and 44 predicting warming many other articles on climate made no prediction; Since Earth has not warmed for the past 15 years, we see the term global warming abandoned and replaced in its entirety by climate change This is an example of why no one trusts.1995 IPCC meeting There are inadequate data to determine whether consistent global changes in climate variability or weather extremes have occurred over the 20th century. to date it has not been possible to firmly establish a clear connection between these regional changes and human activities. Professor Judith Curry, chair of the School of Earth and Atmospheric Sciences concern that past climate models have not proven true. public debate seems to be moving away from the 15-17 year pause to the cooling since 2002.   ★ ◉

**First Name:**            lpijh  ◉

**Middle Name:**

**Last Name:**             xsde  ◉

**Mailing Address:**

**Mailing Address 2:**

**City:**                            ◉

**Country:**                       ◉

**State or Province:**           ◉

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**           ◉

**Government Agency Type:**

**Government Agency:**

**Cover Page:**               🖹

_0000017682



Phone: (609) 884 - 7600  Fax: (609) 884 - 0664  lundsfish@lundsfish.com
997 Ocean Drive, Cape May, New Jersey 08204, U.S.A.
Email to: wreichle@lundsfish.com

November 19, 2018

Michael Pentony, Regional Administrator
National Marine Fisheries Service
55 Great Republic Drive
Gloucester, MA 01930; www.regulations.gov

**Industry Funded Monitoring (IFM) Amendment NOA – NOAA-NMFS – 2018-0109**

Dear Administrator Pentony:

On behalf of our family-owned seafood harvesting and processing company and the 200 plant and vessel employees who assist us in producing sustainable seafood from the Atlantic Ocean, thank you for the opportunity to comment on the Notice of Availability of the NEFMC IFM Amendment. We may provide additional comments prior to the end of the comment period on the proposed rule, next month.

Much has changed since the Councils first initiated IFM amendments and this one, approved by the NEFMC, has the potential to add an impossible financial burden on those herring vessels that may survive the coming, required 70% reduction in catch that we understand will be imposed in each of the next 3 fishing years.

For this reason and those outlined below, we ask that you set this amendment aside until at least the end of the 2021 fishing year, or until a new benchmark assessment of the herring resource takes place, in the hope that catches will increase in the future to a level to afford some level of IFM in the herring fishery, if determined to be necessary. In the meantime, consider allowing the SBRM process to continue to allocate NEFOP observers, given the fishery's very low bycatch rate and limited impact on bycatch species normally encountered. A 50% observer coverage target is excessive and statistically unnecessary in this fishery or, apparently, any other under Council management and represents a waste of scarce agency and industry resources particularly in a fishery with low bycatch rates as occur in the herring fishery.

We do appreciate the amendment allowing midwater trawl vessels to purchase fishery monitors, rather than have no NEFOP observer available, if a vessel intends to access a Groundfish Closed Area during a trip. We hope this can be accomplished through your discretion, rather than through this amendment. We also appreciate the suggestion to use an EFP to further evaluate a future EM and shoreside monitoring program, rather than proposing to implement such a program at this time. We know that a 'critical mass' of vessel participants would be needed to fund such a combined program, however, which will likely now be lost for some time, with the significant loss of fishing opportunities ahead for the fleet. At this time, our company and our fishermen prefer observers over cameras, if any additional monitoring is required in the future.

1

_0000017683

**Administrator Pentony on NEFMC IFM Amendment NOA; November 16, 2018**

As you know, a shoreside monitoring program has been operated by SMAST and MADMF for several years, with the financial support of the herring midwater trawl fleet through the purchase of Area 1A RSA fish, in recent years.  Prior to our knowledge of the coming, disastrous quota cuts in the fishery, we had been working with these researchers to continue the shoreside monitoring program through Calendar Year 2021, using Area 1A RSA funds.

Now that the RSA quota in Area 1A may either not be available (the Council has yet to make this decision for fishing years 2020 & 2021) or too small to be of value as a result of the quota cuts, some other source of funding is needed to keep this program alive, even for fishing year 2019.  Bycatch data CVs are very low in this program, and comparable if not lower than those in the observer program.  We believe its continuation should be our first regional priority.  We do not go to sea to dump fish, as I believe the EM pilot project demonstrated, so it would seem that shoreside monitoring, combined with SBRM coverage that can still be prioritized to some degree by the Councils, is the best combined investment in learning more about what is taking place in the fishery although we know the biological implications of the bycatch in this fishery is limited.

It is our understanding that EM grant funds may be coming into the region.  We suggest that those dollars be used in the herring fishery to support the ongoing shoreside monitoring program during the next 3 years and, as requested above, set this amendment aside, or disapprove it, with reconsideration at a future period, perhaps, when the fishery may return to its recent level of productivity and profitability.

Thank you for your attention to and your consideration of our comments and concerns.  Please don't hesitate to contact me if I can provide you with any additional information.

With best regards,

*Wayne Reichle*

Wayne Reichle
President
Lund's Fisheries, Inc.
Cape May, NJ 08204

2

_0000017684

# Document Metadata:NOAA-NMFS-2018-0109-0013

## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0014 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0013 |
| **Title:** | Comment from Matthew Walls |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 12/20/2018 |
| **Date Posted:** | 12/20/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 12/20/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-977w-rwqz |

_0000017685

| | | |
|---|---|---|
| **Page Count:** | 1 | |
| **Total Page Count Including Attachments:** | 1 | |

## Submitter Info

| | |
|---|---|
| **Comment:** | I agree with the increase in regulations as it will help keep commercial fish from being overfished and becoming endangered. Whatever we can do to keep species off of the endangered species list should be done. As long as appropriate steps are being taken to ensure that peoples jobs will not be threatened by these new regulations. ✲ |
| **First Name:** | Matthew |
| **Middle Name:** | |
| **Last Name:** | Walls |
| **Mailing Address:** | |
| **Mailing Address 2:** | |
| **City:** | |
| **Country:** | |
| **State or Province:** | |
| **ZIP/Postal Code:** | |
| **Email Address:** | |
| **Phone Number:** | |
| **Fax Number:** | |
| **Organization Name:** | |
| **Government Agency Type:** | |
| **Government Agency:** | |
| **Cover Page:** | |

_0000017686

# *New England Purse Seiner's Alliance*

December 24th, 2018

Michael Pentony
Regional Administrator
55 Great Republic Drive
Gloucester, MA 01930

Re: Comments on the Proposed Rule for the IFM Amendment

Dear Mike,

We are writing today to comment on the Proposed Rule for the Industry-Funded Monitoring Amendment (IFM Amendment). The New England Purse Seiner's Alliance (NEPSA) is an industry group consisting of purse seine vessels that fish the inshore Gulf of Maine. Our vessels supply fresh herring exclusively to U.S. lobstermen during times of peak bait demand. We are long-time participants in the fishery and have a vested interest in the future health of the herring resource.

Our sole purpose for writing today is to strongly urge the agency to ensure that Category A purse seine vessels are allowed the choice to take part in the exempted herring fishing permit (EFP) project that will be used to implement the use of Electronic Monitoring (EM) in the herring fishery. There is no reason that the EFP should be limited to midwater trawl vessels. The fact that only midwater trawl vessels were allowed into the pilot project does not mean that seiners should be excluded from the EFP. There are many basic similarities between the actual vessels: both midwater trawlers and purse seiners are relatively large steel vessels, both use nets to harvest herring, and both use pumps to bring the fish aboard from nets alongside the vessel. While the scale of the vessels may be different, the lessons learned in the pilot project will apply just as effectively to EM use on purse seine vessels as on midwater trawl vessel. The bottom line is that if the pilot project showed promise for EM use on midwater trawl vessels than the same promise exists for EM use on purse seiners.

On the one hand, this issues is one of fairness. It is patently unfair for midwater trawl vessels to be given the choice to use EM without extending the same choice to purse seiners. Not only are cameras easier for vessel operators to use—they do not take up valuable space on deck and in the can, and they do not require the captains to deal with difficult logistics of acquiring a human at-sea monitor (ASM)—but they are likely to prove cheaper in the long run. This forces seiners to choose a more difficult and expensive option, despite the fact that the main impetus for the IFM Amendment was to increase monitoring on the midwater trawl fleet. In this sense, the seiners are being punished for no apparent reason. While we understand the reasoning for the pilot project only including midwater vessels, there is no doubt that many purse seine vessels would have

_0000017687

# *New England Purse Seiner's Alliance*

chosen to be in the pilot project had they known exclusion from the project would somehow hurt them in the future.

Additionally, the inclusion of purse seine vessels in the EFP will help ensure that the EM project succeeds in the end. NMFS has put a tremendous amount of time, money, and effort into crafting the foundation of an EM program in this fishery. But looking ahead, this entire EM program is in jeopardy due to the apparent lack of interest in the midwater trawl fishery. Allowing purse seine vessels to take part in the EFP will increase the participants and allow this critical program to succeed. Not only is it important to have a critical mass of vessels to let the program even exist, but there also needs to be enough boats involved to drive the per-vessel costs down to levels that make sense. For these and others reasons, it benefits all involved if purse seiners are allowed in if they choose.

The bottom line is that EM is the future of monitoring. NMFS has made a lot of good progress in making it a reality in the herring fishery and we commend the agency for its leadership on this front. But we hope the agency will find a way to give seiners the option to take part in this EFP moving forward so that the program can succeed and that all can benefit from it.

Thanks for your time and consideration,

Chris Weiner
NEPSA

# F/V Ocean Spray Partnership

Deake's Wharf
446 Commercial St.
Portland, ME 04101



December 18, 2018

Michael Pentony,
Regional Administrator, National Marine Fisheries Service
55 Great Republic Drive, Gloucester, MA 01930

Michael Pentony,

I am writing to provide comments on behalf of the F/V Providian. The F/V Providian fishes for Atlantic Herring throughout the range of the fishery using both midwater trawl and purse seine gear. The F/V Providian harvests herring for the lobster bait markets in Maine, New Hampshire and Massachusetts.

**New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment**

Considering the significant quota cut, this amendment needs to be put on hold until we can understand the full effect the cuts will have on the fishing industry. Boats are going to struggle just to stay in business. We cannot weather the added burden of paying for our own observers. The economic and environmental impact study was based on a much higher overall quota, not the pending significant reduction of quota predicted for the 2019-21 specification. The impact study needs to be reevaluated and updated to reflect current events before any decisions can be made on this amendment.

These cuts will also significant reduce the number of fishing trips. Hopefully allowing, agency observers to requirements associated with the Standardized Bycatch Reporting Methodology (SBRM).

Sincerely,

John-Paul Bilodeau
Regulations and Compliance







(207) 253-5626 Telephone          (207) 253-5622 Fax       jp@fvprovidian.net



A162

# Document Metadata:NOAA-NMFS-2018-0109-0019

## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0020 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0019 |
| **Title:** | Comment from Mary Beth Tooley |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 12/24/2018 |
| **Date Posted:** | 01/30/2019 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 01/30/2019 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-97al-qs0t |

_0000017691

| | |
|---|---|
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

# Submitter Info

| | |
|---|---|
| **Comment:** | Michael Pentony, Regional Administrator National Marine Fisheries Service 55 Great Republic Drive Gloucester, MA 01930 December 24, 2018 Re: Comments on the Proposed Rule for the Industry- Funded Monitoring Amendment Dear Mr. Pentony: I am writing on behalf of the OHara Corporation, which operates the Atlantic herring F/V vessels Starlight and Sunlight, on the Proposed Rule for the Industry-Funded Monitoring Amendment that would implement a process to standardize future industry-funded monitoring programs in New England Council fishery management plans and industry- funded monitoring in the Atlantic herring fishery. It has come to my attention that the Secretary of Commerce has approved this amendment prior to the closing of the Public Comment period. It is disappointing to see the process proceed in this manner. How are public comments considered when the amendment has already been approved? As such, I will limit my comment to the intended date of implementation. As you are aware, the Atlantic herring fishery is facing a significant cute in quota in the near term. Few, if any herring fishermen will be operating profitable businesses. I am requesting that the date of implementation be delayed until 2021. If herring fishermen do not have enough income to pay the mortgage, they certainly will have not funds for a monitoring program. Thank you for the opportunity to comment, Mary Beth Tooley ✳ |
| **First Name:** | Mary Beth |
| **Middle Name:** | |
| **Last Name:** | Tooley |
| **Mailing Address:** | 120 Tillson Ave |
| **Mailing Address 2:** | |
| **City:** | Rockland |
| **Country:** | United States |
| **State or Province:** | Maine |
| **ZIP/Postal Code:** | 04841 |
| **Email Address:** | |
| **Phone Number:** | |
| **Fax Number:** | |
| **Organization Name:** | |
| **Government Agency Type:** | |

**Government Agency:**

**Cover Page:**

_0000017693



# Document Metadata: NOAA-NMFS-2018-0109-0011

## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment ✱ |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0012 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0011 |
| **Title:** | Comment from Patrick Byrne |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS ✱ |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 12/07/2018 ✱ |
| **Date Posted:** | 12/10/2018 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 ✱ |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 12/10/2018 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-96z7-tl7t |

_0000017694

**Page Count:**                1  ⓘ

**Total Page Count**           1
**Including Attachments:**

# Submitter Info

**Comment:**    To whom it may concern: I am writing today in support of 50 CFR Part 648, or the New England Industry-Funded Monitoring Omnibus Amendment. I believe that monitoring actions are necessary to perpetuate the accurate fulfillment of sustainable fishery management plans (FMPs). This has become even more vital as of late, as the combination of climate change and past overfishing have led to depletion of fish stocks in North Atlantic fisheries, fisheries which are a key part of the economy of coastal New England. The past several years have shown a decline in the catches of many common fish species, including cod, herring, and flounder. Besides the obvious ecological nature of this problem, this also hurts fishing communities in the Northeast US. As such, it is critical that FMPs be created with a high degree of nuance, having the least ecological impact possible while still providing sufficient economic support to local fishing industries. However, nuance in planning is meaningless without the ability to execute the same degree of nuance in the field. The ecological and economic models used to develop the FMPs will only be as accurate as the data they are given. Increased monitoring of catches is therefore necessary to improve the quality and quantity of the data for these models. Additionally, having this modeling be industry funded makes sense. Doing so will free up federal funding for other sectors of this industry that may need it more and will be more difficult to pre-allocate funding, such as economic support of the industry in years of reduced catch. Finally, standardizing the process by which industry-funded monitoring agreements may be created is sound logic. Doing so will ensure a fairer playing field in a competitive industry, and the interdependent nature of marine systems highlights the importance of correct fishing practices across a range of geographic locations. My only reservation about this proposed amendment is the cost to industry. While having industry input in the development of an industry-funded monitoring program stands a higher chance of optimal allocation of funding, care should be taken to not overburden an already struggling industry. For example, the proposed plan for the Atlantic herring fishery affects 66 businesses, all but four of which are small entities. As such, it is a responsible aspect of the proposed rule that the industry-funded monitoring programs be implemented via amendment to the relevant FMP to allow for public notice and comment during their development, and I urge that public input be carefully considered at the time to best protect the industry.  ✶ⓘ

**First Name:**    Patrick  ⓘ

**Middle Name:**

**Last Name:**     Byrne  ⓘ

**Mailing Address:**

_0000017695

**Mailing Address 2:**

**City:**

**Country:**

**State or Province:**

**ZIP/Postal Code:**

**Email Address:**

**Phone Number:**

**Fax Number:**

**Organization Name:**

**Government Agency Type:**

**Government Agency:**

**Cover Page:**

_0000017696

# Document Metadata:NOAA-NMFS-2018-0109-0017



## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment * |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0018 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0017 |
| **Title:** | Comment from russ stoller |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS * |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 12/24/2018 * |
| **Date Posted:** | 01/30/2019 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 * |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 01/30/2019 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-97ag-j07n |

_0000017697

| | |
|---|---|
| **Page Count:** | 1 |
| **Total Page Count Including Attachments:** | 1 |

## Submitter Info

| | |
|---|---|
| **Comment:** | I support this proposed rule as I believe it would be a good thing to increase the accuracy of fish count estimates. |
| **First Name:** | russ |
| **Middle Name:** | |
| **Last Name:** | stoller |
| **Mailing Address:** | 15906 cedar circle |
| **Mailing Address 2:** | |
| **City:** | omaha |
| **Country:** | United States |
| **State or Province:** | Nebraska |
| **ZIP/Postal Code:** | 68130 |
| **Email Address:** | treeman14@hotmail.com |
| **Phone Number:** | 0208803938 |
| **Fax Number:** | |
| **Organization Name:** | |
| **Government Agency Type:** | |
| **Government Agency:** | |
| **Cover Page:** | |

_0000017698



*Seafreeze Ltd.*

November 4, 2016

100 Davisville Pier
North Kingstown, R.I. 02852 U.S.A.
Tel: (401)295-2585

<u>Re: Comments on Industry-Funded Monitoring Omnibus Amendment Public Hearing Document</u>
<u>September 2016</u>

1. **Omnibus Alternatives**.

According to the document, the purpose of this omnibus amendment is to "allow the NEFMC and MAFMC to develop industry funded monitoring programs for the collection of information in addition to SBRM", because the "amount of available Federal funding to support additional monitoring" has been a constraint in the past and "this action is needed for the Councils to prioritize industry-funded monitoring programs across fishery management plans when available Federal funding falls short of the total needed to fully fund all monitoring programs." (Page 5). Discussions surrounding this document have highlighted the desire by Councils and other groups for more collection of management-related and even scientific information, as well as information related to enforcement of management measures and regulations. We do not agree that programs for collection of information or monitoring/enforcement of regulations are a cost that should be financially borne by industry, particularly when the Federal government is at a loss for finances to do so.

The Magnuson Stevens Act (MSA) specifically addresses the purpose/need for the amendment as specified on page 5 of the public information document "for the collection of information in addition to SBRM". Section 402 of the Act,"Information Collection", reads as follows:
   (a)  COLLECTION PROGRAMS.-
      (1)  COUNCIL REQUESTS.- If a Council determines that additional information would be beneficial for developing, implementing, or revising a fishery management plan….the Council may request that the Secretary implement an information collection program which would provide the types of information specified by the Council……
      (2)  SECRETARIAL INITIATION.-If the Secretary determines that additional information is necessary for developing, implementing, revising **or monitoring** a fishery management plan…the Secretary may, by regulation, **implement an information collection or observer program requiring submission of such additional information for the fishery."** (emphasis ours).

Therefore, the MSA is clear how additional Council desired information collection programs for fishery management plans, including monitoring or observer programs, are to be implemented. Section 402(d) details how the Secretary may provide grants, contracts, or other financial assistance for the purposes of carrying out information collection programs. Should the Council or NMFS wish to see observers involved in the "collection of information in addition to

1

_0000017699

SBRM" (page 5), evident considering that IFM documents prepared during the development of this amendment provided breakdowns of monitor/observer training costs sought to be shared between the agency and the industry,[1] the MSA also provides for sharing of observer training costs, but not with industry. Section 403 OBSERVERS reads as follows:

> (b)  TRAINING.- The Secretary, in cooperation with the appropriate states and the National Sea Grant College Program, shall- ....
>
> > (3)  make use of university and any appropriate private nonprofit organization training facilities and resources, where possible, in carrying out this subsection.

Therefore, it appears that universities or nonprofit organizations concerned with specific observer data collection in an FMP may share cost responsibilities of observer training for those programs or observer information collection programs. However, the section says nothing about industry sharing these costs.

Furthermore, management bodies are continually searching for more and better information, and public pressure can and will direct their searches both in magnitude and specificity. In fact, the initial basis for this amendment- the herring and mackerel alternatives- were created in response to various special interest groups and allegations with regards to those fisheries resulting from what was described at a Joint Observer/Herring Committee Meeting on July 1, 2015 as a "public perception problem". At that meeting, the Joint Committees approved a motion recommending that the problem statement for the herring and mackerel components of the IFM amendment be: "The public questions the accuracy of catch (landings and discards) estimates in the fishery....".[2] Private individuals should not be required to foot the bill to address a public perception problem. This is inequitable, and leaves the door open for uninformed public media campaigns to pressure Councils into forcing fishing vessels to pay for all publicly desired information in the future at personal financial loss. Public funds should be used for public purposes. However, as previously mentioned, the MSA does allow for observer training costs to be shared with universities and non-profit organizations should those organizations desire to make facilities and resources available for so doing.

Because the amendment does not address or acknowledge any of these issues, we can only support Omnibus Alternative 1, No Action.

2.  **Herring Alternatives**.

Two of the major goals and objectives identified by the NEFMC for increasing monitoring in the herring fishery are "accurate catch estimates for incidental species for which catch caps apply", and "affordable monitoring for the herring fishery". The catch cap species being discussed with relation to small mesh bottom trawl vessels, which include our vessels, are river herring and shad. According to analysis of small mesh bottom trawl observer data (all fisheries), approximately 5%-22% coverage is needed to obtain a 30% CV for river herring and shad catch in that gear type.[3] These coverage levels are

---

[1] See Industry Funded Monitoring Omnibus Amendment July 1, 2015 Discussion Document Appendix, http://s3.amazonaws.com/nefmc.org/150701-Discussion-Document-Appendix.pdf, page 10-11, which lists NMFS annual training costs for monitors and a cost per observed sea day of $61 per day to industry vessels for training.

[2] See http://s3.amazonaws.com/nefmc.org/7_July-1-final-mtg-summary-observer_herring.pdf.

[3] Industry Funded Monitoring Omnibus Amendment Discussion Document, Mackerel Alternatives, Mid Atlantic Fishery Management Council, April 12-14, 2016. See

2

_0000017700

already being covered by SBRM[4] and the associated CV is already below 30%. In fact the small mesh bottom trawl herring fishery RH/S catch cap CV was 28.4% in 2014, and 24.5% in 2015.[5] Additionally, due to the fact that the small mesh bottom trawl fleet includes vessels with permits other than A and B permits, which are targeted by this amendment, the herring alternatives presented would never achieve a 0% CV, even at 100% coverage rates (which is why even 100% observer coverage on small mesh bottom trawl would only have a "Low Positive" on tracking catch caps)[6]. Even staff documents developed during this amendment process have indicated that even Alternative 2.2, up to 100% ASM coverage on small mesh bottom trawl, will have "Negligible" effect on catch tracked against catch caps.[7] But it will not have a negligible economic effect, on small mesh bottom trawl vessels in general but particularly Seafreeze vessels.

Coverage target considerations, according to the development of this amendment, should ensure that "Benefits of increased monitoring should equal or outweigh the costs of monitoring".[8] However, the amendment does not consider the daily catch capacity of vessels in its analysis or alternatives. Small mesh bottom trawl vessels, including Seafreeze vessels, are limited in daily harvesting capacity compared to other herring fishery gear types. Therefore, the daily financial burden on smaller capacity vessels is higher than on large capacity vessels. We have repeatedly raised this issue with the Councils.[9] The "Negligible" benefits of potential additional catch cap tracking do not outweigh the costs of monitoring for our lesser-daily-capacity small mesh bottom trawl vessels.

None of the additional monitoring alternatives in the document provide for "affordable monitoring for the herring fishery", especially Seafreeze vessels. Our vessels do not operate solely in the herring/mackerel fisheries; we have multiple permits. We do not always know what species will be available when we leave the dock, so we complete the regulatory call in/declaration process for all appropriate fisheries. We do not fish like other "herring" vessels. If the availability of one species changes, or is not what we had anticipated, we then have the flexibility to cover our operating costs by switching over to a different species. Because our vessels freeze at sea and have limited daily capacity, our trips are also of extended duration, so any daily at sea monitoring costs would impact us disproportionately to all other herring vessels.

To demonstrate this dynamic, several trips are highlighted below. Pre-trip declaration combined with length of trip is what will determine coverage and cost, not herring landed.

---

[4] According to the Herring PDT Meeting Summary Dec 10, 2015, revised Jan 15, 2016, in 2014 observers covered 26.2% of all small mesh bottom trawl trips targeting herring, and preliminary estimates indicated 31% coverage on trips from January-June 2015. See http://s3.amazonaws.com/nefmc.org/3.151210-Herring-PDT-mtg-summary-REVISED.pdf.

https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/56fec92c04426225f77234f4/1459538223368/Tab02_MSB-RHS-Committees.pdf, page 28.

[5] Industry Funded Monitoring Amendment Document, Mid Atlantic Fishery Management Council, May 2016. See https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57504cae746fb9ccc234ba75/14648803089 12/Tab09_IFM-Amendment.pdf, page 88.

[6] See http://s3.amazonaws.com/nefmc.org/3D_Staff-Presentation-on-Herring-Alternatives.pdf, slide 35.

[7] Ibid.

[8] Ibid, slide 38.

[9] See for example, our letter to the Councils at https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/551edc4ae4b0576112dc4bf3/14280858346 69/Tab+06_Industry+Funded+Observer+Amendment.pdf and http://s3.amazonaws.com/nefmc.org/5.-Council-Letter-Observer-Concerns.Seafreeze.pdf.

3

_0000017701

For example, on this 10 day trip below, our primary pre-trip declaration was herring, but the trip consists of no herring and is primarily loligo squid. A per day monitoring cost would be very expensive on a trip of that length. And all of the cost would be borne by squid revenue. This is not unusual. The following 5 day trip was also a declared "herring" trip, but landed no herring. These types of "herring" trips, if they were to incur an at sea monitoring cost would have to be paid for not by herring revenue, but other revenue:

1/15/14-1/24/14; 10 Days
Bluefish - .03%
Butterfish - .36%
Loligo - 97.67%
Illex - 1.45%

12/20/14-12/24/14; 5 Days (Shortened trip because of Christmas)
Butterfish - 88.92%
Loligo - 11.08%

Conversely, we have trips where we expect to find other species but do not, therefore relying on the flexibility to catch herring as a way to cover our costs.  For example, these two trips, during which the primary pre-trip declaration was squid, herring was the primary species landed:

12/11/14-12/18/14; 8 Days
Herring - 100%

12/27/14-1/3/15; 8 Days
Butterfish - 1.2%
Mackerel - .26%
Herring - 98.1%
Loligo - .44%

Sub Option 5 would exempt trips landing less than 25 mt from industry funded monitoring requirements, and has been suggested at meetings of a way to address this issue. However, that option will still not account for the fact that the decision whether or not to catch more significant amounts herring will still need to be made prior to leaving the dock. As the information above demonstrates, our primary declaration/intent is not always what determines what species our vessels land, which is why we ensure that we appropriately declare into all possible fisheries in order to maintain flexibility of operations. If that flexibility were taken away, not only would our entire style of fishing would be nullified, but could result in the above trips losing rather than making money.  A 25 mt landing will not cover the cost of an 8 day trip.

Pages 301-302 of the EA (attached) illustrate this dynamic. Out of declared herring days in 2014 that did not land herring, 111 are attributed to small mesh bottom trawl, as compared to only 6 single midwater trawl and 4 paired midwater trawl. That would be 111 days of industry funded monitoring on small mesh bottom trawl vessels that would have to be covered by income from other fisheries. Small mesh bottom trawl costs for declared herring trips not landing herring range from $90,586 compared to $3,212 at paired midwater trawl and $5,217 at single midwater trawl for the same monitoring option. This is a function of the type of fishing style described above. Industry funded monitoring costs in this amendment are significantly heavier on small mesh bottom trawl vessels than other vessel types. This is

4

combined with the fact that even on declared herring trips landing herring, small mesh bottom trawl (i.e. "squid" vessels), have a 7% RTO compared to typical "herring and mackerel" vessels, which have a 15% RTO (page 299 of the EA ,attached). This is also a function of what has been previously mentioned due to daily capacity. Even at 25% ASM coverage, the cheapest cost estimate for small mesh bottom trawl, there is still a $19,657 annual cost burden for trips that do not even land herring. This amendment is about the erosion of profitability for our vessels.

The herring and mackerel alternatives in the IFM amendment were primarily initiated to address low observer coverage in the midwater trawl herring fishery due to changes with SBRM. It was not to make an entire style of fishing economically or operationally nonviable.  It is also not equitable that revenue from other fisheries be siphoned off to pay for herring/mackerel monitoring. If our vessels are required to pay for a per day monitoring cost, we could be required to raise the prices on all our products to cover that expenditure.  Compounding that, we compete on and against a world market with all of our products, including herring. All of our products are food grade, which means that we have developed and rely on markets that solicit international competition. We are also competing price-wise with companies and vessels from nations where the fishing industry is subsidized by their national government. If forced to raise our prices to pay for an IFM cost, Seafreeze, as well as the United States, will be put at a competitive disadvantage internationally. If we do not increase our prices and the cost were to be paid for by the vessels and crew, the per day monitoring cost may outweigh daily crew compensation, and crews would be forced to pay for "benefits (vacation and sick leave)"[10] afforded to observers that crew themselves do not receive, all while receiving a smaller paycheck. This is inequitable.

Regardless, the industry funded monitoring amendment saddles Seafreeze vessels in particular with more economic harm than any other "herring" vessels due to the nature of our operations. This is unacceptable. Therefore, the only alternatives that we can support would be Alternative 1, No Action, or Alternatives 2.4-2.6, which would keep our vessels at SBRM coverage.

3. **Mackerel Alternatives**.

All of the comments above pertaining to the herring alternatives also apply to the mackerel alternatives. However, mackerel itself deserves special comment. The current state of the mackerel fishery is less of a directed fishery than in years past. Requiring an industry funded monitoring requirement for mackerel will discourage any directed fishing, including looking for mackerel on any part of a trip fishing for other species. The cost for monitors would without a doubt outweigh the benefits of any coverage in this fishery at this time. Many vessels at this time catch mackerel as an incidental species in the herring fishery, and herring fishery coverage would therefore cover these trips. However, Seafreeze vessels occasionally target mackerel on trips of squid or butterfish. See for example, the composition of these trips:

2/17/14-2/27/14; 11 Days
Butterfish- 72.55%
Mackerel - 27.32%
Loligo - .13%

3/4/14-3/12/14; 9 Days

---

[10] See http://s3.amazonaws.com/nefmc.org/150701-Discussion-Document-Appendix.pdf, page 11.

5

_0000017703

Butterfish- 8.72%
Mackerel - 23.03%
Loligo - 67.97%
Illex - .25%

The trips are of extended duration, which would require considerable cost to the vessels, and the monitoring cost would undoubtedly need to be covered from revenue other than mackerel. Due to the sporadic/diminished state of the mackerel fishery, a requirement to pay for monitoring would discourage trips like these, and would therefore essentially reduce the mackerel fishery to a bycatch fishery in the herring fishery only. This cannot be consistent with the requirement to achieve optimum yield.

Therefore, for the reasons above as well as those detailed for the herring alternatives, we can only support Mackerel Alternative 1, No Action.

4. **Outstanding Issues**.

There are still several outstanding issues associated with this amendment:

A. <u>ASM</u>: At its June 2015 meeting, the NEFMC voted 13/2/2 to "evaluate the ASM program for its effectiveness in support of stock assessments, its total costs to the groundfish fishery (e.g. returns to owner vs ASM costs), data precision and accuracy, and whether it is actually ensuring catch accountability."[11] This was due to concerns raised at both the Groundfish Committee and Council levels of the cost/benefit of the program, the quality of the data produced, the utility and effectiveness of the program.[12] While these motions pertained to the groundfish ASM program, this is all the industry has to compare any future ASM programs to. This evaluation has never been completed, but the Councils are seeking to expand the program to other fisheries. All evaluations should be completed prior to a future action concerning ASM.

B. <u>Unforeseen circumstances/Industry Profitability</u>: The IFM amendment does not take into account any changes in fishery profitability over time, and industry's future ability to afford IFM. Sub Option 4 allows the Councils to examine the results of increased herring/mackerel coverage two years after implementation, and allows adjustments via framework or amendment. However, it does not specifically state that industry's ability to pay should be a driving factor in industry funded monitoring programs. Although costs to industry as a result of the groundfish ASM program represented a large portion of total revenue of the fishery, causing significant numbers of vessels to become unprofitable or face bankruptcy,[13] and although the Council voted subsequently to request emergency action of NMFS to suspend the groundfish ASM program,[14] this request was rejected by the agency. There is no safeguard for industry in the IFM amendment document to ensure a similar situation would not occur with future industry funded monitoring programs. There is only assurance that the programs would not be activated if the agency did not have the finances for its administration costs. This is unacceptable. It is also something that would not occur should the Councils follow the Magnuson Stevens Act requirements for Information Collection Programs.

---

[11] See http://s3.amazonaws.com/nefmc.org/150615-18_final_motions2.pdf.
[12] See http://s3.amazonaws.com/nefmc.org/11_150604_GF_CTE_Draft_Summary-2.pdf.
[13] Ibid.
[14] See http://s3.amazonaws.com/nefmc.org/150615-18_final_motions2.pdf

6

_0000017704

C. <u>Equality of Trip Selection</u>: The IFM document contains no provisions to ensure equal allocation of observer or monitoring coverage among vessels. This would result in certain vessels being required to individually pay for monitoring costs for the whole fleet's coverage target. For example, below is a log detailing how one Seafreeze vessel received 50% observer coverage for the herring/mackerel fishing year, while the fleet as a whole had a much lower average of coverage:

**Observer Coverage for Herring/Mackerel Season, Nov. 2014-April 2015, F/V Relentless**
Trip 655 11/21/14-11/25/14; Observer (forced to come in in middle of trip for weather/mechanical problems, but did not offload; counts as one trip for dealer report; counts as two trips for NEFOP purposes)
Trip 656 11/28/14-12/8/14; Observer
Trip 657 12/12/14-12/18/14; No Observer
Trip 658 12/21/14-12/24/14; Observer
Trip 659 12/27/14- 1/3/15; No Observer
Trip 660 (660 A) 1/10/15-1/13/15; Observer (For trip 660, weather problems, had to come to dock, but did not offload; counts as one trip for dealer report; counts as multiple trips for NEFOP purposes)
Trip (660 B) 1/19/15-1/24/15; Observer
Trip (660 C) 1/28/15-2/8/15; No Observer
Trip 661 2/16/15-2/24/15; No Observer
Trip 662 3/6/15-3/17/15; No Observer
Trip 663 3/21/15-3/30/15; No Observer
Trip 664 4/4/15-4/15/15; Observer

Should this occur under an industry funded monitoring program, our vessel would have been significantly and unfairly burdened with costs that other vessels were not.

D. <u>Discrepancies in Coverage Calculation:</u> The IFM document does not detail how coverage would be calculated. After observing discrepancies in various Council documents as to the level of observer coverage on catch cap trips in 2014 on small mesh bottom trawl vessels,[15] we discovered that coverage levels can be calculated in multiple ways. The amendment does not specify how IFM coverage would be calculated, and therefore we have not been given the opportunity to comment effectively, and the Council has not been given the opportunity to effectively discuss or weigh the options presented.

E. <u>Limited Public Input:</u> Due to the fact that the initial focus of this amendment was herring and mackerel, the majority of public input has only been through those venues. No other Council Advisory Panels, which are bodies designed to give industry input to the Councils and Committees, were given opportunities to discuss the Omnibus portions of the amendment, and public hearings were not held south of New Jersey, although the Omnibus has the potential to apply to every FMP in the Greater Atlantic Region.

---

[15] According to the Herring PDT Meeting Summary Dec 10, 2015, revised Jan 15, 2016, in 2014 observers covered approximately 26 % of herring catch cap trips; see http://s3.amazonaws.com/nefmc.org/3.151210-Herring-PDT-mtg-summary-REVISED.pdf. However, similar analysis in the MAFMC Supplement to IFM Draft Environmental Assessment document, the same coverage was calculated to be approximately 17%; see https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57504cae746fb9ccc234ba75/14648803089 12/Tab09_IFM-Amendment.pdf, page 88. Upon further investigation, this was discovered to be due to differences in calculation parameters.

7

_0000017705

Thank you for the opportunity to comment.

Sincerely,
Meghan Lapp
Fisheries Liaison, Seafreeze Ltd.

8

_0000017706

TABLE 95. SUMMARY OF TOTAL TRIP COSTS FOR HERRING AND MACKEREL VESSELS IN 2014

| Cost Category | Description | Average Percent of 2014 Gross Revenue for Herring and Mackerel Vessels | Average Percent of 2014 Gross Revenue for Squid Vessels |
|---|---|---|---|
| Variable Costs | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| Crew Share | Total annual payments to crew | 28% | 26% |
| Repair, Maintenance, Upgrades, Haulout (RMUH) | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, safety equipment, upgrades and haulout. Because these costs vary considerably from year to year and are typically spread out over several years, only a portion of these costs were applied to 2014 revenue | 13% | 11% |
| Fixed Costs | Annual mooring, dockage, permits and licenses, insurance, quota and DAS lease, crew benefits, vessel monitoring, workshop and storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs Note: depreciation expense of the vessel is not included in fixed costs. | 19% | 21% |
| Return to Owner | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

The NEFMC is considering four types of industry-funded monitoring for the herring fishery, including NEFOP-level observers, at-sea monitors, EM, and portside sampling coverage. NEFOP-level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

Industry-Funded Monitoring Omnibus Amendment

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811,000 to $75,000 – a 91% reduction. However, Herring Alternative 2.5 only provides increased monitoring in the Groundfish Closed Areas.

Initial industry cost assumptions for Herring Alternative 2.4 estimated $325 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected for the duration of the trip, 100% vide review) and $5.12 per mt for portside sampling (administration and sampling cost) on close to 100% of trips. Revised industry cost assumptions for Herring Alternative 2.4 estimated $187 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected around haulback, 50% video review) and $3.84 per mt for portside sampling (only sampling costs) on close to 50% of trips. Using the revised cost assumptions rather than the initial cost assumption for Herring Alternative 2.4 reduces total industry monitoring costs by 51% ($457,595 to $222,958) in Year 2 for paired midwater trawl vessels and reduces costs by 54% ($134,165 to $61,067) in Year 2 for single midwater trawl vessels.

Many of the vessels that would be impacted by industry-funded monitoring costs in the herring fishery would also be impacted by industry-funded monitoring costs in the mackerel fishery. For example, all the vessels impacted by Herring Alternative 2.1 would also be impacted by Mackerel Alternative 2.1.

A trip must be a declared herring trip in order to land 1 lb or more of herring. The economic analysis focused on trips that landed 1 lb or more of herring because those are the trips that would be subject to industry-funded monitoring. However, industry participants also requested consideration of the economic impacts associated with declared herring trips that did not land any herring.

In 2014, there were 121 sea days for 22 trips that had no herring landings. If 100% NEFOP-level observer coverage was required on those trips, then $98,978 would have been spent monitoring those trips. If 100% at-sea monitoring coverage was required on those trips, then $85,910 would have been spent monitoring those trips. The breakdowns of these costs by gear type as well as other coverage levels and monitoring types are provided in Table 96.

TABLE 96. MONITORING COSTS ASSOCIATED WITH DECLARED HERRING TRIPS THAT DID NOT LAND HERRING IN 2014.

|  | Small Mesh Bottom Trawl | Single Midwater Trawl | Paired Midwater Trawl | Total |
|---|---|---|---|---|
| Permit Category | A | A | A |  |
| Total Number of Days | 111 | 6 | 4 | 121 |
| Total NEFOP Cost – 100% Coverage | $90,586 | $5,217 | $3,212 | $99,015 |
| Total ASM Cost – | $78,626 | $4,528 | $2,788 | $85,943 |

_0000017708

Industry-Funded Monitoring Omnibus Amendment

| | | | | |
|---|---|---|---|---|
| **100% Coverage** | | | | |
| **Total ASM Cost – 75% Coverage** | $58,970 | $3,396 | $2,091 | $64,457 |
| **Total ASM Cost – 50% Coverage** | $39,313 | $2,264 | $1,394 | $42,971 |
| **Total ASM Cost – 25% Coverage** | $19,657 | $1,132 | $697 | $21,486 |
| **Total EM Cost, Year 2 – $325 per day** | | $2,073 | $1,276 | $3,349 |
| **Total EM Cost, Year 2 – $187 per day** | | $1,193 | $734 | $1,927 |

The tables and box plots on the following pages provide summarized economic data for each of the herring coverage target alternatives. The economic impact on vessels associated with paying for monitoring coverage is described as a percentage of RTO for each herring coverage target alternative in the following figures. The tables provide the mean and median number of sea days per vessel that would result from each of the alternatives, as well as the mean and median RTO that would ultimately be reduced by the industry-funded monitoring costs. Additionally, fleet level effort, revenue, and monitoring cost information for each herring coverage target alternative are also provided. Additional economic analysis is available in Appendix 8.

### 4.2.5.1  Impacts of Herring Alternatives 1 and 2 on Fishery-Related Businesses

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP. Monitoring for herring vessels would be allocated according to SBRM. If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis. Under Herring Alternative 1, additional costs to vessels participating in the herring fishery associated with monitoring coverage, if there were any, would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM. The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries. The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species. Although management measures are typically developed and implemented on an FMP-by-FMP basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

Currently, the herring resource is not overfished, and overfishing is not occurring. Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs. Selection of Herring Alternative 1 will not likely affect the setting of

_0000017709



100 Davisville Pier
North Kingstown, R.I. 02852 U.S.A.
Tel: (401)295-2585

**December 24, 2018**

**Comments on NOAA-NMFS-2018-0109**

1. **Omnibus Alternatives**

    **a.** As the Proposed Rule notes, the Omnibus amendment was a joint amendment initiated by both the New England And Mid Atlantic Fishery Management Councils. The entire development of the Omnibus portion of the amendment was joint between both Councils. We, as well as others in the industry, were led to believe that identical action on this portion of the amendment needed to be taken by both Councils in order to go forward. We were surprised that, without that possibility being made clear to the public, the Omnibus section was announced as part of this Proposed Rule.

    As a joint amendment, both Councils would be required to take the same course of action. The significant overlap of permits of species managed by both the New England and Mid Atlantic on the same vessels which operate in the Greater Atlantic Region make this issue of utmost importance. We are unaware of any other regions whose vessels experience this significant an overlap between Councils, managed species and associated permits. In the GARFO region, 3,673 vessels hold both MAFMC and NEFMC commercial permits, compared to 111 vessel who only hold a MAFMC commercial permit and 1, 585 vessels which hold only a NEFMC commercial permit..[1] By moving forward with New England Omnibus alternatives alone, we foresee that, although the Mid Atlantic Council chose not to move forward with the joint amendment, Mid Atlantic fisheries may be forced into industry funded monitoring by default, should vessels be engaged in multiple New England/Mid Atlantic fisheries on the same trip. This, in fact, is the very reason why an undue and disproportionate burden is placed on Seafreeze vessels alone as part of the Herring Alternatives. No analysis nor even discussion took place during development of the amendment regarding the potential crossovers should one Council choose to move forward with the Omnibus portion of the Amendment and one Council decline to move forward. Considering that one of the central points of discussion and action in the Mid Atlantic Council's April 2017 meeting was the question of Mid Atlantic managed fisheries being able to sustain the costs of industry funded monitoring, we believe that the Omnibus portion of the Proposed Rule should be disapproved.

    Amendment documents state that "there are no direct impacts on….fishery-related businesses and human communities associated with the preferred Omnibus Alternatives because they are administrative, specifying a process to develop and administer future industry-

---

[1] See https://s3.amazonaws.com/nefmc.org/10_NEFMC-FDDI-update-2018-12.pdf, slide 11.

1

_0000017710

funded monitoring " .[2] We disagree.  As clearly delineated, the future foreseeable impact of an IFM Omnibus amendment is future IFM programs, which is in fact the intent of the action. We understand that specific impacts cannot be quantified at this time; however, from a business perspective a "greasing of the skids" of IFM programs initiates uncertainty for the future and business plans moving forward. We also disagree with the EA assertions that standardized IFM requirements have any type of positive impacts on the fishing industry. While we understand that even in the absence of action, the Council has the ability to initiate IFM programs in the fisheries that it manages, the Omnibus Alternatives chosen indicate a clear path of intent. No IFM program has positive benefits on the fishing industry. In fact, the impacts of every Herring IFM Alternative in the amendment other than No Action are "Negative" for fishery-related businesses and communities.[3] This will be the same for any future IFM program.

**b.** We disagree with NMFS that there is any substantive difference between "cost-sharing agreements" with NMFS for monitoring and direct payment of such monitoring.[4] Both require the fishing industry to pay for data collection used for monitoring and management, which is inherently a government function, except where legislatively exempted by the Magnuson Stevens Act in the case of limited access privilege programs.[5] Only in this specific legislative exemption is the fishing industry responsible for "data collection", or "costs related to …management [and] data collection" which is the express purpose of the Omnibus Amendment. According to the amendment's purpose and need, it was developed "for the collection of information"[6] for management.  There is no difference between "data collection" per the Magnuson Act and "collection of information" per the Omnibus Amendment. For fishery management plans that do not specifically fall under the limited access privilege program exemption, The Magnuson Stevens Act specifically provides for "Information Collection" programs which can be initiated at the request of a Fishery Management Council, upon Secretarial approval, for "monitoring a fishery management plan" which may by regulation "implement an information collection or observer program requiring submission of such additional information for the fishery."[7] Congress would not have had to create these specific legislative exemptions and provisions if the agency were given blanket authority to extract costs for data collection, monitoring and management from the fishing industry across all fishery management plans.

Additionally, for those exemptions created by Congress, there is a specified cap on costs that can be required of the fishing industry, to ensure industry economic viability. According to Section 304(d)(2)(B), the fees which industry can be required to pay cannot exceed 3% of ex-vessel revenue. This is critically important, as even in full cost recovery, the requirements for data collection for monitoring and management cannot be allowed to become so burdensome

---

[2] Draft EA for IFM Amendment, p. vii; at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf.
[3] See page 308-309
[4] See https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf, p. 37-38.
[5] MSA Section 303A (9)(e). "program of fees paid by limited access privilege holders that will cover the costs of…data collection… See also Section 304(d)(2)(A) "the Secretary is authorized and shall collect a fee to recover the actual **costs related to the management, data collection**, and enforcement of any- (i) limited access privilege program"
[6] See Draft EA, p. 46.
[7] MSA Section 402(a).

on the fishing industry that it becomes financially infeasible to continue to participate in the fishery itself. In fact, the Draft EA itself states that "Vessels that…derive less revenue from herring…may be *more likely* to exit the fishery if the cost of monitoring is perceived as too expensive."[8] The fact that this is already identified and documented as a possibility resulting from the action is troubling, as is the fact that according to the alternatives in the action, there is no limit to the agency's discretion on requiring financial burdens on the fishing industry. Throughout the development of the Omnibus and Herring IFM Amendment, we have consistently argued that there is no provision in the document that would account for the event that industry would not be able to pay the costs. Clearly, if Congress places a limit on financial burdens that can be placed on industry under limited access privilege program provisions, the agency does not have blanket approval to require the fishing industry to pay for data collection and monitoring costs without limit. During the development of the Omnibus and Herring IFM Amendment, it was made very clear that if NMFS does not have the funding to cover its portion of the IFM costs, the IFM program would not be available for that time. However, there are no similar restrictions that would apply if the fishing industry were unable to pay its portion of an IFM program, or even to cap costs at a financially reasonable level. We do not believe that Congress would intend to eliminate participants from a fishery due to their inability to cover data collection and monitoring costs that elsewhere, for other fishery management plans, are explicitly capped.

This is especially concerning given the details of this amendment and its development. *Full* cost recovery that exists in North Pacific limited access privilege programs are in the estimated range of $360-$420 per sea day, according to the Draft EA,[9] as compared with the estimates in this action of *shared* industry costs of $818 per sea day for observers and $710 per sea day for at sea monitors.[10] And even of this estimated cost, NMFS states, "Monitoring program costs include a variety of administrative and sampling costs that vary substantially within and between years."[11] Not only are costs not capped to ensure economic viability of the fishing industry, but estimated costs may increase due to factors such as high monitor turnover and the experience rates of the monitors themselves.[12] This leaves the door open for monitoring costs to skyrocket, or to become so burdensome as to render vessels unprofitable, with no recourse for the fishing industry. This situation has already occurred with the New England groundfish fishery, as noted in our previous comments to the Council.[13]

This amendment also raises other questionable legal issues. Being required to enter into a contractual agreement with a monitoring provider is similar to being required to enter into a contractual agreement with a healthcare provider, which the Supreme Court has ruled is a form of taxation. However, only Congress has the authority to tax, which is why cost recovery for monitoring and data collection has been mandated by Congress in only specific circumstances. An agency does not have the authority to extend that tax indefinitely, further than what

---

[8] See EA at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf, p. 343, 345.
[9] Ibid, p. 44.
[10] Ibid, p. 243.
[11] Ibid, p. 39.
[12] Ibid.
[13] See Seafreeze Comments on Industry Funded Monitoring Omnibus Amendment Public Hearing Document September 2016, submitted November 4, 2016, p. 6. Also attached.

Congress has specified. Another question is how information and data collected through industry funds could be used in enforcement actions against that industry member, by essentially compelling him to be a witness against himself, violating the 5th Amendment of the U.S. Constitution. For example, during the exit interviews of the electronic monitoring pilot study (EM) developed as a part of this amendment to determine if EM could be an option for monitoring/data collection requirements, the participants commented on "the criminal case that was built around EM video data" collected during the course of the study.[14] While the pilot study was funded by the agency and no individual was required to pay for the monitoring in this case, the fact that data collected as part of the monitoring was used in a criminal action raises questions as to whether data paid for by fishing industry members as a requirement of industry funded monitoring could be thus used.

We therefore support Omnibus Alternative 1: No Action.

2. **Herring Alternatives**

**a.** Following on from the points above regarding economic impacts which have no boundaries, the herring portion of the amendment relies solely on cost analysis and potential reductions to vessel return to owner (RTO) which are expected to result from the various industry funding alternatives using harvest levels and vessel income/expenditures from 2014. In 2014, the herring quota was 104, 088 mt, and industry harvested 95,037 mt- 91.3% of the total quota.[15] However, in 2018, a herring stock assessment was completed that will result in reductions to the quota by approximately 70%. In 2019, the quota levels are expected to be between 21,266 and 30,668 mt, and in 2020 quota levels are expected to be between 12,672 and 16,131 mt.[16] This significant reduction in quota will result in major economic impacts to the herring fishery. No economic impacts analysis was conducted as part of the amendment to demonstrate impacts to the commercial herring fishery at harvest levels drastically below those of 2014. In fact, the projected reduction in herring revenue from 2017 to 2019 is 80-87%.[17] Again, we raised these types of issues during amendment development but were never given satisfactory answers. The fixed costs of vessel operation (acknowledged in the RTO analysis)[18] do not change with vessel income, so economic impacts to herring vessels under 2019-2021 quotas will be much different than projected by the amendment analysis. Overall reduction in herring income will also result in lower RTO.

**b.** The two Seafreeze freezer vessels are disproportionately impacted by the herring portion of the amendment. For further details see our attached letter to the Council dated November 4, 2016. During the development of the amendment the "public perception problem" that initiated the action, as well as development of alternatives, all focused on midwater trawl vessels. We repeatedly commented that our freezer vessels, which are small mesh bottom trawl, do not have the same daily capacity or fishing behavior as the midwater trawl fleet. The Council adopted a 50 mt exemption from IFM requirements for other small daily capacity small mesh

---

[14] See https://s3.amazonaws.com/nefmc.org/2_Herring-and-Mackerel-Fishery-Electronic-Monitoring-Project_Final-Report.pdf, p. 83.

[15] See https://www.greateratlantic.fisheries.noaa.gov/aps/monitoring/atlanticherring.html.

[16] See Herring Presentation at December 2018 New England Council Meeting at https://s3.amazonaws.com/nefmc.org/181205-Herring-Presentation-for-NEFMC-Meeting-post.pdf,

[17] Ibid.

[18] See EA at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf. , p. 249.

4

_0000017713

bottom trawl vessels, which is appropriate due to the undue economic burden that would result if those vessels were required to comply with herring IFM. However, our vessels are now unduly burdened for three reasons:

1. Midwater trawl vessels for which this amendment was designed, can harvest in excess of 500,000 lbs of herring a day, because they do not process at sea and simply pump herring into a refrigerated seawater tank upon harvest and return to port. Our vessels, because they are freezing at sea, are limited to approximately 125,000 lbs a day production, essentially the same as the vessels with the 50 mt exemption. Not only are we limited in daily production, but we incur much greater daily operating costs than midwater vessels due to larger crew size and fuel needed to hand pack and freeze our product. This is why the annual "RTO" related to "squid" (i.e., small mesh bottom trawl- which includes our vessels) vessels in the analysis is averaged at 7% as compared to the RTO of "herring and mackerel vessels" at 15%. As payment for industry funded monitoring is a daily cost, and our vessels have lower daily harvest capabilities and higher daily overheads than the midwater vessels for which this amendment was designed, we would incur disproportionate financial burdens as the result of any action. Seafreeze vessels are the only such A or B herring permit holders who will be thus affected. Because the 50 mt exemption is a per trip exemption, and not a daily harvest level exemption, it still does not help our vessels. It will only address the needs of small daily capacity vessels with short trips landing fresh product.

2. Seafreeze freezer vessels require much longer fishing trips than fresh herring vessels, i.e., midwater vessels or other small mesh bottom trawl vessels, due to our unique operations. Seafreeze fishing trips are typically 7-14 days long, as opposed to typical 1-3 day long trips for fresh herring vessels. Therefore, the cost of a daily monitoring fee would be much higher per trip for Seafreeze than any other herring fishery participants.

3. Out of all affected permit holders, Seafreeze vessels are the only vessels which participate in the other fisheries in addition to herring/mackerel fishery on the same trip. This is by design and this flexibility to fish multiple species on the same trip has been the key to our success as a company over the past 30 years. We are the only vessels which operate in this manner, due to our unique setup. As such, we declare into all fisheries in which we may potentially fish prior to leaving on a trip. We may or may not harvest each one of those species-including herring- on a given trip, depending on the unique characteristics of each given trip, but require the need to reserve the right to do so to ensure profitability.[19] As we have continually pointed out during the development of the IFM amendment, the cost of herring monitoring is not a function of herring harvest, it is a function of VMS trip/species declaration. As part of the amendment development, we requested an analysis on the monitoring costs associated with declared "herring" trips that did not land herring, to demonstrate these impacts to our freezer vessels. Although our freezer vessels were not the only small mesh bottom trawl vessels analyzed (but are the only small mesh bottom trawl vessels which fish in this "multispecies" manner), the average cost for "herring" monitoring on trips that did not land herring in 2014 for small mesh

---

[19] For a more detailed explanation, broken down by actual trips, actual species composition, and actual length of trip, please refer to pages 4-6 of our Comments on Industry Funded Monitoring Omnibus Amendment Public Hearing Document September 2016, submitted November 4, 2016, attached. This detailed information, although confidential business information, was provided publicly to the Council to prove our points made here. However, it went unrecognized.

bottom trawl vessels associated with the Council's preferred alternative of 50% ASM coverage is $39,313 per vessel.[20] This means that the actual costs to our vessels would have been higher than this average. By comparison, the same costs associated with single midwater and paired midwater trawls were $2,264 and $1,394, respectively.[21] Therefore, the disproportionate economic impacts to our vessels have been documented by the agency itself, as NMFS is the lead role in developing the amendment. Seafreeze vessels should not be forced to pay approximately $80,000 a year or more for herring monitoring on trips that do not land herring. Furthermore, our entire unique business plan on which our company and vessels were founded and has been in operation since 1986, should not be made unviable due to an action designed to address issues arising from other segments of the fishery.

The Herring Alternatives put forward by the IFM Amendment do not prevent or take into account these disproportionate economic impacts to Seafreeze vessels. As such, they violate National Standard 6 of the Magnuson Stevens Act, which states, "Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches."[22] Therefore we can only support Herring Alternative 1: No Action.

Thank you for the opportunity to comment.

Sincerely,

Meghan Lapp
Fisheries Liaison, Seafreeze Ltd.

---

[20] See EA at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf, p. 250.
[21] Ibid.
[22] MSA, Section 301(a)(6).

6

A187

# Document Metadata:NOAA-NMFS-2018-0109-0015

## Document Details

| | |
|---|---|
| **Docket ID:** | NOAA-NMFS-2018-0109 |
| **Docket Title:** | New England Industry-Funded Monitoring Omnibus Amendment |
| **Document File:** | |
| **Docket Phase:** | Proposed Rule |
| **Phase Sequence:** | 1 |
| **RIN:** | 0648-BG91 |
| **Original Document ID:** | NOAA-NMFS-2018-0109-DRAFT-0016 |
| **Current Document ID:** | NOAA-NMFS-2018-0109-0015 |
| **Title:** | Comment from Stephen Weiner |
| **Number of Attachments:** | 0 |
| **Document Type:** | PUBLIC SUBMISSIONS |
| **Document Subtype:** | |
| **Comment on Document ID:** | NOAA-NMFS-2018-0109-0002 |
| **Comment on Document Title:** | Fisheries of the Northeastern United States: Industry-Funded Monitoring |
| **Status:** | Posted |
| **Received Date:** | 12/24/2018 |
| **Date Posted:** | 01/30/2019 |
| **Posting Restriction:** | No restrictions |
| **Submission Type:** | Web |
| **Number of Submissions:** | 1 |

## Document Optional Details

| | |
|---|---|
| **Status Set Date:** | 01/30/2019 |
| **Current Assignee:** | NA |
| **Status Set By:** | Nordeen, Carrie (NOAA) |
| **DOC Docket No.:** | |
| **XRIN:** | |
| **Tracking Number:** | 1k2-97ac-j17r |

_0000017716

**Page Count:** 1

**Total Page Count Including Attachments:** 1

# Submitter Info

**Comment:**

We are writing today to comment on the proposed rule regarding Industry-Funded Monitoring. CHOIR is an industry coalition made up of commercial, charter, and recreational fishing organizations, fishing and shore-side businesses, researchers and ecotourism companies that all rely on herring as a key forage stock. CHOIR was formed in 2002 as a result of the general and localized depletion of herring caused by midwater trawlers. To this day our diverse and large membership sees midwater trawling as the biggest threat to the health of our fisheries and marine resources. While CHOIR would prefer 100% monitoring of the herring and mackerel mid-water trawlers 50% is an important first step. Clearly the current monitoring levels are too low and ineffective. The mid-water trawl fleet has made a mockery of the current system. CHOIR also believes that electronic monitoring (EM) should be mandatory as it provides a more cost effective and accurate means by which to monitor this fleet. At Sea Monitors (ASM) are too costly and much less reliable. Clearly the long term success to monitor this fleet depends on EM. NOAA needs to put all its time and resources on just one method of monitoring this fleet. The goal is to document slippage and discard events. If no discarding/slippage occurs on a trip then the ensuing shoreside monitoring can be believed. If slippage does occur then the Agency knows the shoreside data is incomplete. At least the slippage/discarding is documented and hopefully the EM program can develop means by which to identify what has been slipped/discarded and how much. It is CHOIR's belief that the requirement of net sensors for the vessels and the incorporation of the net sensor data into the monitoring program will at help quantify the amount of catch slipped. CHOIR also believes that the use of an Exempted Fishing Permit (EFP) is a good way to proceed with the program. It gives NOAA the necessary leeway to be able to develop the new program and to do so more expeditiously. To the degree that this program can be developed without the interference of the NEFMC it will be all the better. CHOIR also believes that if purse seiners are to be included in the program then they too should be able to choose EM. While the previous pilot program focussed on mid-water trawlers the lessons learned should be easily adaptable to a purse seine operation. If anything a purse seine operation should be easier to adapt to EM. Purse seiners should be allowed the same opportunity as mid-water trawlers. There is no need to spend money on a NEW Pilot and there is nothing so unique to seining that would require another pilot. CHOIR believes that the single most important tool to he proper management of herring and mackerel is an effective monitoring program. Had such a program been implemented years ago the herring and mackerel resources would not be in the mess they are today. CHOIR supports the approval of this Amendment and the rapid development of EM in both the herring and mackerel fishery.  *

**First Name:** Stephen

A189

_0000017717

**Middle Name:**

**Last Name:**           Weiner  ⊙

**Mailing Address:**      PO Box 465

**Mailing Address 2:**

**City:**                Ogunquit  ⊙

**Country:**             United States  ⊙

**State or Province:**   Maine  ⊙

**ZIP/Postal Code:**     03907

**Email Address:**       weinersb@gmail.com

**Phone Number:**        978-764-3637

**Fax Number:**

**Organization Name:**              ⊙

**Government Agency Type:**

**Government Agency:**

**Cover Page:**          📄

_0000017718