No. 25-1845

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

RELENTLESS, INC.; HUNTRESS, INC.; SEAFREEZE FLEET LLC,

*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in the official capacity as Secretary of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; LAURA GRIMM, in the official capacity as Administrator of NOAA; NATIONAL MARINE FISHERIES SERVICE, a/k/a NOAA Fisheries; EUGENIO PIÑEIRO SOLER, in the official capacity as Assistant Administrator for NOAA Fisheries,

*Defendants-Appellees.*

————————————

On Appeal from the United States District Court
for the District of Rhode Island
Case No. 1:20-cv-00108-WES (Hon. William E. Smith)

## BRIEF OF *AMICUS CURIAE*
## AMERICANS FOR PROSPERITY FOUNDATION IN SUPPORT
## OF PLAINTIFFS-APPELLANTS AND REVERSAL

Ryan P. Mulvey
    First Circuit Bar No. 1174492
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Boulevard, Suite 1000
Arlington, VA 22203
(571) 444-2841
rmulvey@afphq.org

January 23, 2026          *Attorney for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1(a) and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *amicus curiae* Americans for Prosperity Foundation states that it is a not-for-profit corporation, does not have a corporate parent, does not issue stock, and no publicly held corporation owns 10 percent or more of it.

# TABLE OF CONTENTS

Corporate Disclosure Statement.................................................................ii

Table of Authorities.............................................................................iv

Identity and Interest of *Amicus Curiae*....................................................1

Summary of Argument..........................................................................2

Argument............................................................................................5

    I.    This Court must resolve all legal questions *de novo*, which the district court failed to do. ...........................................5

    II.   The Magnuson-Stevens Act does not give Appellees the discretionary authority to impose industry funding.................17

        A.    The authority to place monitors on vessels does not entail the power to require fishermen to pay those monitors' salaries.............................................19

        B.    Industry-funded monitoring is not a "necessary and appropriate" regulatory measure. ............................24

Conclusion..........................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v.*
*Department of Health & Human Services,*
594 U.S. 758 (2021) ................................................................... 26

*American Petroleum Institute v.*
*Environmental Protection Agency,*
52 F.3d 1113 (D.C. Cir. 1995) ..................................................... 8

*Bartenwerfer v. Buckley,*
598 U.S. 69 (2023) ..................................................................... 27

*Bondi v. VanDerStok,*
604 U.S. 458 (2025) ................................................................... 11

*Buffington v. McDonough,*
143 S. Ct. 14 (2022) .................................................................... 8

*Graham County & Water Conservation District v.*
*U.S. ex rel. Wilson,*
559 U.S. 280 (2010) ................................................................... 27

*Gulf Fishermens Ass'n v. National Marine Fisheries Service,*
968 F.3d 454 (5th Cir. 2020) ..................................................... 24

*Harrington v. Purdue Pharma L.P.,*
603 U.S. 204 (2024) ............................................................ 25, 26

*Kennedy v. Braidwood Management, Inc.,*
606 U.S. 748 (2025) ................................................................... 11

*Loper Bright Enterprises v. Raimondo,*
45 F.4th 359 (D.C. Cir. 2022) .................. 8, 20, 21, 23, 27, 28

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024) ........................ 5, 6, 7, 8, 9, 17, 18, 19, 24

*Lopez v. Bondi*,
　151 F.4th 1196 (9th Cir. 2025) ...................................................... 10, 11

*Lopez v. Garland*,
　116 F.4th 1032 (9th Cir. 2024) ........................................................ 9, 10

*Maine Lobstermen's Ass'n v.*
*National Marine Fisheries Service*,
　70 F.4th 582 (D.C. Cir. 2023) ............................................................... 24

*McGonigle v. Pure Green Franchise Corp.*,
　No. 25-61164, 2026 WL 111338 (S.D. Fla. Jan. 15, 2026) .................. 18

*McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*,
　606 U.S. 146 (2025) ................................................................................ 15

*Medina v. Planned Parenthood South Atlantic*,
　606 U.S. 357 (2025) ................................................................................ 14

*Mexican Gulf Fishing Co. v. Department of Commerce*,
　60 F.4th 956 (5th Cir. 2023) ................................................................. 24

*Michigan v. Environmental Protection Agency*,
　576 U.S. 743 (2015) ................................................................................ 18

*Moctezuma-Reyes v. Garland*,
　124 F.4th 416 (6th Cir. 2024) ............................................................... 17

*New York Stock Exchange LLC v.*
*Securities & Exchange Commission*,
　962 F.3d 541 (D.C. Cir. 2020) ............................................................... 25

*Perrin v. United States*,
　444 U.S. 37 (1979) .................................................................................. 20

*Relentless, Inc. v. Department of Commerce*,
　62 F.4th 621 (1st Cir. 2023) ........................................................ 8, 15, 21

*Relentless, Inc. v. Department of Commerce*,
　561 F. Supp. 3d 226 (D.R.I. 2021) ....................................................... 16

*Relentless, Inc. v. Department of Commerce*,
  No. 20-0108, 2025 WL 1939025 (D.R.I. July 15, 2025) .......... 14, 15, 16

*SAS Institute Inc. v. Iancu*,
  584 U.S. 357 (2018) ................................................................ 8

*Seven County Infrastructure Coalition v. Eagle County*,
  605 U.S. 168 (2025) ............................................................ 9, 12

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ........................................................ 6, 9, 10

*United Natural Foods, Inc. v.
  National Labor Relations Board*,
  138 F.4th 937 (5th Cir. 2025) .......................................... 14

*Valent v. Commissioner of Social Security*,
  918 F.3d 516 (6th Cir. 2019) ............................................ 7

*Virginia Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019) .......................................................... 20

**Statutes**

5 U.S.C. § 706 .......................................................................... 6

11 U.S.C. § 1123(b)(6) ............................................................ 25

16 U.S.C. § 1821(h)(4) ............................................................ 27

16 U.S.C. § 1821(h)(6) ............................................................ 27

16 U.S.C. § 1827(d) ................................................................ 27

16 U.S.C. § 1853(a)(3) ............................................................ 27

16 U.S.C. § 1853(a)(5) ............................................................ 27

16 U.S.C. § 1853(a)(6) ............................................................ 27

16 U.S.C. § 1853(a)(9)(A) ........................................................ 28

16 U.S.C. § 1853(a)(15) .......................................................... 27

16 U.S.C. § 1853(b)(1)......................................................22, 27, 28

16 U.S.C. § 1853(b)(3)......................................................27

16 U.S.C. § 1853(b)(4)......................................................23, 27

16 U.S.C. § 1853(b)(8)......................................................15, 19, 23

16 U.S.C. § 1853(b)(14)....................................................15

16 U.S.C. § 1853a(c)(1)(H)...............................................27

16 U.S.C. § 1853a(e)(2).....................................................27

16 U.S.C. § 1862(a)............................................................27

## Regulations

50 C.F.R. § 648.11(d)(1)....................................................21

50 C.F.R. § 648.11(d)(2)....................................................21

50 C.F.R. § 648.11(d)(3)....................................................21

50 C.F.R. § 648.11(d)(6)....................................................21

50 C.F.R. § 648.11(d)(7)....................................................21

50 C.F.R. § 648.11(m)(4)...................................................22

50 C.F.R. § 648.87(b)(2)(xi) .............................................22

50 C.F.R. § 648.11(k)(4)(i) ...............................................22

## Other Authorities

Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L. J. 908 (2017) ...........................6

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012)..................................27

Black's Law Dictionary (6th ed. 1990).....................................21

Brett M. Kavanaugh, *Fixing Statutory Interpretation*,
129 Harvard L. Rev. 2118 (2016) ........................................................ 18

Eric R. Bolinder, *Dodging* Chevron's *Redux: The Proper
Place for* State Farm *Arbitrary & Capricious Review*, 24-1
Georgetown J. of L. & Pub. Pol'y (forthcoming Jan. 2026) ............... 13

Henry Monoghan, Marbury *and the Administrative State*,
83 Colum. L. Rev. 1 (1983) .................................................. 18

Merriam-Webster (1990 ed.) ...................................................... 21

Ryan P. Mulvey, "No Signs of a *Skidmore* Revival,"
Ams. for Prosperity Found., July 17, 2025 ......................................... 11

# BRIEF OF *AMICUS CURIAE*
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

Pursuant to Rule 29 of the Federal Rules of Appellate Procedure, Americans for Prosperity Foundation ("AFPF") respectfully submits this *amicus curiae* brief in support of Plaintiffs-Appellants.[1]

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

AFPF is a 501(c)(3) nonprofit organization committed to educating and training Americans to be courageous advocates for the ideas, principles, and policies of a free and open society. Those ideas include the importance of constitutionally limited government and rightsizing the federal administrative state. As part of its mission, AFPF regularly appears as *amicus curiae* before state and federal courts. Of special relevance here, AFPF maintains a blog, "Recasting Regulations," which publishes commentary, news, and other coverage about developments related to the historic overturning of *Chevron* deference in *Loper Bright Enterprises v. Raimondo*. *See Recasting Regulations*, Ams. for Prosperity

---

[1] Consistent with Federal Rule of Appellate Procedure 29(a)(2), this brief is filed with the consent of all parties. In compliance with Federal Rule of Appellate Procedure Rule 29(a)(4)(E), AFPF affirms that no counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae* or its counsel made any monetary contributions intended to fund the preparation or submission of this brief.

Found., https://americansforprosperityfoundation.org/legal/loper-bright (last visited Jan. 23, 2026).

## SUMMARY OF ARGUMENT

This case arrives at a pivotal moment in administrative law—one in which the Supreme Court has reminded lower courts that judges, not agencies, interpret statutes, and that judicial review of the law requires serious engagement with its text. *Chevron* is gone. *Loper Bright* has restored the federal courts to their proper constitutional role of exercising independent judgment over disputed legal meaning. With *Loper Bright*'s course correction in place, the district court's decision here—still mired in the throes of the reflexive deference of the *Chevron* era—cannot stand.

The district court's first error was its failure to undertake meaningful *de novo* review. Rather than engage in textual analysis of relevant provisions of the Magnuson–Stevens Act, it relied on vestiges of *Chevron* "reasonableness," and citations to its own (and this Court's) vacated opinions. Yet *Loper Bright* requires courts to determine not what might constitute a "permissible" reading of the law, but the *best* reading. This must be done without special solicitude for the government's position. The Supreme Court underscored that principle last year in

*Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025), explaining the important difference between *de novo* and hard-look review. But the district court missed the distinction and relied on an impermissibly deferential approach.

This appeal should be easy to resolve. Neither of the statutory provisions examined by the district court—Sections 1853(b)(8) and 1853(b)(14)—delegates authority to Appellees to force fishermen to bankroll the government's desired supplemental monitoring programs. To be sure, Section 1853(b)(8) permits regulators to require that observers "be carried" on fishing vessels. But that phrase means exactly what it says: vessels may be compelled to *carry* monitors and cover certain incidental expenses; they cannot be forced to pay the monitors' salaries. The ordinary meaning of "carry," confirmed by dictionaries published contemporaneous with this provision's enactment, speaks to physical conveyance—not the imposition of significant, ongoing financial liabilities that can consume up to 20 percent of a vessel's returns. Treating the payment of a government monitor's salary as a "compliance cost" is a category error of the highest order, especially since Congress

knows how to authorize mandatory payments—which it has done elsewhere in the same statute for other fisheries.

Section 1853(b)(14)'s residual "necessary and appropriate" clause is just as unavailing. A catchall clause is not a blank check. The Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), confirms that courts must read such a clause in context, constrained by surrounding statutory provisions. Nothing in Section 1853(b) resembles the funding mechanism imposed by Appellees. And none of the familiar regulatory tools mentioned in the statute—such as fishing quotas, gear restrictions, or permit requirements—are analogous to conscripting regulated vessels to finance Appellees' discretionary at-sea monitoring programs. To accept the district court's unbounded reading of Section 1853(b)(14) would mean eliminating any principled limit on regulatory authority and inviting the sort of delegation concerns the Supreme Court has repeatedly warned against.

The district court's opinion, in short, has no textual foothold, no limiting principle, and fails to follow the interpretive framework set out in *Loper Bright*. It relies on ambiguities and silence as if *Chevron* were still good law. This Court should interpret the statute as written,

providing a meaningful construction of relevant provisions, and reject the idea that Appellees may expand their budget by fiat. The Magnuson–Stevens Act does not authorize industry-funded monitoring, and proper *de novo* review confirms as much.

## ARGUMENT

### I. This Court must resolve all legal questions *de novo*, which the district court failed to do.

"*Chevron* is overruled." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024). With these historic words, the Supreme Court ended its forty-year failed experiment in judicial deference to agencies' legal interpretations. *Loper Bright* marks the beginning of a return to a proper ordering of our constitutional system—where legislators write the law, and judges construe it. The end of *Chevron* deference reorients the balance of power between federal agencies and courts, confirming judicial responsibility for resolving cases involving disputes over legal meaning.

The Framers "envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts,'" and that such judgment would proceed "independent of influence from the political branches." *Id.* at 385. Although federal courts have always afforded "respect" to the Executive Branch's construction of a statute, especially

when its constructions were "issued roughly contemporaneously with enactment" of the law at issue and "remained consistent over time," *id.* at 386, this "respect" was never meant to displace a court's independent, best reading of the law. *Id.* at 386–87; *see Skidmore v. Swift & Co.*, 323 U.S. 134 (1944); *see generally* Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L. J. 908, 987–88 (2017) ("[T]he *contemporanea expositio* and *interpres consuetudo* canons were considered part and parcel of de novo review."). Nor was such "respect" supposed to be an invitation for judges to focus on the identification of statutory ambiguities, such that cases escape meaningful review.

Congress hardly intended to disrupt the traditional understanding of the judicial role when it enacted the Administrative Procedure Act ("APA"). Section 706 commands that a "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. *Loper Bright* confirms "[t]he text of the APA means what it says." 603 U.S. at 393. Deference is incompatible with *de novo* review. *Chevron*, by contrast, "triggered a marked departure from the traditional approach" to legal interpretation, as well

as the plain meaning of Section 706. *Id.* at 396; *see id.* at 398 ("*Chevron* . . . [never] attempted to reconcile its framework with the APA.").

One of the most serious problems with *Chevron* deference was that it involved abdication of the judiciary's interpretive role. Prioritizing the identification of "ambiguity" or "silence" in statutory text, many courts would "mechanically afford *binding* deference to agency interpretations." *Id.* at 372–73. This occurred even when those interpretations conflicted with a judge's best reading of the law, such as he or she might reach in a case involving private parties. *See id.* at 408; *see also Valent v. Comm'r of Soc. Sec.*, 918 F.3d 516, 525 (6th Cir. 2019) (Kethledge, J., dissenting) ("[F]ederal courts have become habituated to defer to the interpretive views of executive agencies, not as a matter of last resort but first . . . as if doing so were somehow a virtue, or an act of judicial restraint[.]"). *Chevron* deference thus "turn[ed] the statutory scheme for judicial review . . . upside down." *Loper Bright*, 603 U.S. at 399.

Again, this focus on ambiguity created perverse incentives. Judges neglected the traditional starting points for statutory interpretation, focusing instead on convoluted inquiries into whether statutes were ambiguous enough to find implied delegations triggering deference to the

government. *See id.* at 407–08.[2] The D.C. Circuit in *Loper Bright* did just that when it concluded that deference to the government was appropriate because there was "some question as to Congress's intent" regarding industry funding. *Loper Bright Enters. v. Raimondo*, 45 F.4th 359, 369 (D.C. Cir. 2022); *see id.* at 368 (the Magnuson-Stevens Act, "though its silence, leaves room for agency discretion"). Rather than do the hard work of resolving ostensible ambiguity in the law, the Circuit narrowed its review to whether the government's position was reasonable enough. This Court was no different with its now-vacated pre-*Loper Bright* decision in this case, in which it even neglected to clarify whether its decision was based on *Chevron* Step One or Step Two. *See Relentless, Inc. v. Dep't of Commerce*, 62 F.4th 621, 634 (1st Cir. 2023).

---

[2] Of course, even during the *ancien régime* of *Chevron*, courts never really "owe[d] an agency's interpretation . . . deference unless, after 'employing traditional tools of statutory construction,'" they found themselves "unable to discern Congress's meaning." *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 369 (2018). And they were never supposed to treat statutory silence as an "ambiguity" that functioned as an implicit delegation of "gap-filling" authority. *See Am. Petroleum Inst. v. Envtl. Prot. Agency*, 52 F.3d 1113, 1120 (D.C. Cir. 1995). Still, the pull of deference—whether because of prior jurisprudential commitments to the administrative state or merely out of a desire to clear busy dockets—led courts to too-readily locate deference-triggering ambiguity. *Cf. Buffington v. McDonough*, 143 S. Ct. 14, 21 (2022) (Gorsuch, J., dissenting from denial of certiorari) (bemoaning "*Chevron* maximalism").

If any doubt remained about what the new *Loper Bright* standard of review now entails, *see* 603 U.S. at 392 n.4 ("Section 706 does not say expressly that courts are to decide legal questions using 'a *de novo* standard of review,' . . . [but] some things 'go without saying[.]'"), the Supreme Court has clarified the matter. Last term, in *Seven County Infrastructure Coalition v. Eagle County*, the Court explained that, "[a]s a general matter, when an agency interprets a statute, judicial review of the agency's interpretation is *de novo*." 605 U.S. 168, 179 (2025) (citing *Loper Bright*, 603 U.S. at 391–92). *De novo* review is *exactly* what is required under *Loper Bright*'s independent, best-judgment standard.

*Seven County*'s clarification (and its confirmation of *Loper Bright*) could not have come sooner. For example, *Loper Bright*'s unelaborated, passing suggestion that *Skidmore* deference might have new relevance in the wake of overruling *Chevron*, had unfortunate consequences in a handful of lower courts.[3] Most notably, in *Lopez v. Garland*, a Ninth

---

[3] In *Skidmore*, the Supreme Court identified several factors that warrant judges giving agency interpretations "weight" when deciding questions of law. The Court explained "interpretations and opinions," when "made in pursuance of official duty" and "based upon . . . specialized experience," might "constitute[] a body of experience and informed judgment to which courts . . . [can] properly resort for guidance." 323 U.S. at 139–40. The force of those interpretations, in turn, depends on "the validity of [the

Circuit panel took the view that "*Skidmore* deference" was the intended replacement for *Chevron*. The *Lopez* court accordingly characterized the judicial "task . . . [as] evaluat[ing] [a] statute independently under *Skidmore*, giving 'due respect,' but not binding deference to the agency[.]" 116 F.4th 1032, 1039 (9th Cir. 2024).

On this view, *Chevron*'s two-step methodology is replaced with *Skidmore*'s multi-factor approach, which considers the "thoroughness, persuasive reasoning, and consistency" of an agency's interpretation. *Id.* at 1041. But it is hard to see how that framing could entail "independent evaluation of the statute," as the *Lopez* court maintained, when it does not prioritize a court's own textual analysis over extra-textual considerations like the logic and procedural force of an agency's position.

Judge Bumatay made this point well in dissent from the Ninth Circuit's denial of rehearing *en banc*. *See Lopez v. Bondi*, 151 F.4th 1196 (9th Cir. 2025). As he explained it, the *Lopez* court "took the extraordinary step of resurrecting *Chevron* under the alias of '*Skidmore* deference," and "violated *Loper Bright*" by "favor[ing] agency deference"

---

agency's] reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 140.

over the "best reading of the statute." *Id.* at 1202 (Bumatay, J., dissenting from denial of reh'g *en banc*). His objection might be succinctly reformulated as "asking the wrong question":

> [T]he panel "asked the wrong question" by starting with whether the [agency's] interpretation was "entitled to respect." . . . Rather, the right question is, and always is, "what's the best reading of the statute?" Even if an interpretation is thorough, well-reasoned, and consistent with some authorities, that doesn't mean it's the best one . . . . So the [*Lopez*] panel abdicated the judicial role and just applied *Chevron* deference by another name. Whatever "respect" we give executive agencies under *Loper Bright*, it can't be a deference indistinguishable from *Chevron*.

*Id.* at 1198 (Bumatay, J., dissenting from denial of reh'g *en banc*) (internal citations omitted).[4]

Even more importantly, the *Seven County* court clarified when *de novo* review under *Loper Bright* might give way to a more deferential type of hard-look review. Justice Kavanaugh, writing for the majority,

---

[4] The Supreme Court appears to have clarified this past term that, if *Skidmore* deference has any relevance post-*Loper Bright*, it is limited to those factors that coincide with the canons of contemporaneity and consistent usage, which are anyway valuable only so far as they are probative of original public meaning. *See Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 783 (2025); *see also Bondi v. VanDerStok*, 604 U.S. 458, 481 (2025); *see generally* Ryan P. Mulvey, "No Signs of a *Skidmore* Revival," Ams. for Prosperity Found., July 17, 2025, https://americansforprosperityfoundation.org/loper-bright/no-signs-of-a-skidmore-revival-at-the-supreme-court.

emphasized that the statute at issue in *Seven County*—the National Environmental Policy Act ("NEPA")—was a "purely procedural statute," which "simply requires an agency to prepare an [environmental impact statement ("EIS")]" but otherwise erects no "substantive roadblock" to "infrastructure projects . . . built, funded, or approved by the [f]ederal [g]overnment." 605 U.S. at 172. When a party challenges the legal adequacy of an EIS, a court should shift from *de novo* review to an examination of whether the EIS "was reasonable and reasonably explained"—a move that involves "substantial deference to the agency." *Id.* at 180.

> In practice, judicial deference in NEPA cases can take several forms. . . . NEPA says that the EIS should be "detailed." Of course, the meaning of "detailed" is a question of law to be decided by a court. But what details need to be included in any given EIS? For the most part, that question does not turn on the meaning of "detailed"—instead "it involves primarily issues of fact." The agency is better equipped to assess what facts are relevant to the agency's own decision than a court is. As a result, "agencies determine whether *and to what extent* to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." So the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court.

*Id.* at 180–81 (internal citations omitted).

While the meaning of a statutory term—for example, "detailed" in NEPA—is still a legal question left to the independent, best judgment of a court, disputes over the *kinds* of "details" included in any discrete EIS should be left to the discretion of the responsible agency, subject to arbitrary-and-capricious review. The inclusion or omission of particular "details"—or the emphasis given to those "details" in a rulemaking— normally presents a *fact-bound* inquiry that does not depend on legal meaning and goes beyond the interpretive ken of the judge.

It is easy enough to state this rule; the difficulty lies in ensuring that courts properly distinguish between pure questions of law—or questions about the scope of an agency's regulatory authority that depend on the construction of a seemingly ambiguous statutory term—and questions about whether an agency has in fact stayed within the bounds of its discretionary authority. *See* Eric R. Bolinder, *Dodging* Chevron's *Redux: The Proper Place for* State Farm *Arbitrary & Capricious Review*, 24-1 Georgetown J. of L. & Pub. Pol'y at 28 (forthcoming Jan. 2026) ("Courts must resist the urge to merge their *de novo* analysis of lawfulness with their deferential analysis or arbitrariness. These are two different steps, happen at two different points in the analysis, and have

wildly different standards."). Here, unfortunately, the district court failed to heed the import of *Seven County*.

Rather than engage in text-based analysis of the bounds of Appellees' supposed authority to impose an industry-funding requirement in the Atlantic herring fishery, the district court held, in conclusory fashion, that Section 1853(b) of the Magnuson-Stevens Act, "in no uncertain terms, delegates . . . a large degree of discretionary authority." *Relentless, Inc. v. Dep't of Commerce*, No. 20-0108, 2025 WL 1939025, at *4 (D.R.I. July 15, 2025). The district court further insisted it had "already reviewed the Final Rule and found it reflects reasoned decisionmaking[.]" *Id.* None of this, however, reflects meaningful *de novo* review. It rather suggests that reconsideration on remand was nothing but an "empty formality." *United Nat. Foods, Inc. v. Nat'l Labor Relations Bd.*, 138 F.4th 937, 953 (5th Cir. 2025) (Oldham, J., dissenting).

The district court failed to apply the traditional canons of interpretation and provide an independent judgment of the relevant statutory provisions.[5] Instead of explaining what it means for a vessel to

---

[5] This has become the standard approach for *de novo* review under *Loper Bright*, as confirmed by the Supreme Court this past term. *See Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 395 (2025) ("[W]e interpret

"carry" an observer, *see* 16 U.S.C. § 1853(b)(8), the court blithely repeated the still-as-yet unsupported proposition that administrative agencies can fund their desired programs by foisting compliance costs on business entities by regulatory fiat. *See Relentless, Inc.*, 2025 WL 1939025, at *4; *see also Relentless, Inc.*, 62 F.4th at 629–30. This was error.

The district court also offered no explanation for what regulatory measures might qualify, in the abstract, as "necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(14). It failed to define the bounds of this delegation of discretionary authority and thus neglected to provide a meaningful interpretation of the terms "necessary" and "appropriate." The district court instead faulted Appellants for "ask[ing] the Court to read Subsection (b)(14) out of the statute," while conceding Appellees could not "'do whatever [they] want[].'" *Relentless, Inc.*, 2025 WL 1939025, at *5. Insofar as the district court suggested *any* limits to the "residual and broad delegation" in Section 1853(b)(14), it jumped straight to deferential

---

statutes at the time of their enactment[.]"); *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155 (2025) ("District courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation[.]").

review and cross-referenced its prior analysis under *Chevron* Step Two, *see Relentless, Inc. v. Dep't of Commerce*, 561 F. Supp. 3d 226, 237–38 (D.R.I. 2021) (concluding Appellees' interpretation was "reasonable" because of the "integral nature of catch estimates" and "the agency's financial incapacity to fully fund a monitoring program" on its own), as well as this Court's "arbitrary and capricious" analysis from its now-vacated 2023 panel opinion. *See Relentless, Inc.*, 62 F.4th at 634–39.

In the end, the district court erred by failing to engage in meaningful *de novo* review. It assumed, without explanation, that an industry-funding requirement was the *kind* of regulatory measure that fell within the range of discretion intended to be given to Appellees when Congress wrote Section 1853(b). That error led the district court to resurrect its old *Chevron* Step Two reasoning. This Court should take the opportunity to provide its own independent, best reading of relevant portions of the Magnuson-Stevens Act, which should focus on the original public meaning of the text, as well as the proper limits of Appellees' discretionary authority over domestic fisheries. *See infra* at pp. 24–28.

**II.    The Magnuson-Stevens Act does not give Appellees the discretionary authority to impose industry funding.**

Although it made clear that *Chevron* deference was dead, the *Loper Bright* court explained that, sometimes, a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." 603 U.S. at 394. Congress can expressly direct an agency, for example, to "exercise a degree of discretion" by defining a "particular statutory term," "prescrib[ing] rules to fill up the details of a statutory scheme," or even regulating "subject to the limits imposed by a term or phrase," such as "reasonable" or "appropriate." *Id.* at 394–95; *see id.* at 395 nn. 5 & 6 (listing examples). In such cases, judicial review is less searching. *Id.* at 395 (citing *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983)). But recognizing an delegation of policymaking authority should not be done lightly, *see Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024) (capacious terms must be accompanied by "words that expressly empower the agency to exercise judgment" to constitute a delegation), and it cannot allow room for deference to legal determinations made during a rulemaking, as underscored by *Seven County*. *See supra* at pp. 9–14. This is particularly true if an agency tries—as Appellees did here—

17

to delineate the "scope of [its] own power—perhaps the occasion on which abdication in favor of the agency is *least* appropriate." *Loper Bright*, 603 U.S. at 401; *see generally* Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harvard L. Rev. 2118, 2154 (2016).

Courts must police the "outer statutory boundaries" of Congress's delegations to "ensure that agencies exercise their discretion consistent with the APA." *Loper Bright*, 603 U.S. at 404.[6]  It is not enough for an agency to claim it is engaged in policymaking or fact-finding.  This is the inherent danger of *Loper Bright*'s "oft-misquoted passage" on delegation. *McGonigle v. Pure Green Franchise Corp.*, No. 25-61164, 2026 WL 111338, at *2 (S.D. Fla. Jan. 15, 2026).  A court must ensure an agency's assertion of power conforms with the best reading of the law, especially if that assertion is novel or far-reaching.  "It makes no sense to speak of

---

[6] This involves a four-fold interpretative paradigm.  *First*, judges determine whether a delegation exists.  *Loper Bright*, 603 U.S. at 395. *Second*, they ensure the constitutionality of the delegation.  *See id.* *Third*, they "fix[] the boundaries of [the] delegated authority" and "defin[e] the range of permissible criteria" by which the agency can act. *See id.*; *see also* Henry Monoghan, Marbury *and the Administrative State*, 83 Colum. L. Rev. 1, 27 (1983).  *Fourth*, they ensure the agency has "engaged in reasoned decision making" within the judicially defined bounds of the delegation.  *Loper Bright*, 603 at 395; *cf. Michigan v. Envtl. Prot. Agency*, 576 U.S. 743, 750 (2015).

a 'permissible' interpretation that is not the one the court, after applying all relevant interpretative tools, concludes is best." *Loper Bright*, 603 U.S. at 400. "In the business of statutory interpretation, if it is not the best, it is not permissible." *Id.*

In this case, the district court did not meaningfully set the bounds of Appellees' discretionary authority under Sections 1853(b)(8) or (b)(14). Congress's use of the words "carry," "necessary," and "appropriate" do not delegate the authority to force fishermen in the Atlantic herring fishery to pay for at-sea monitors.

### A. The authority to place monitors on vessels does not entail the power to require fishermen to pay those monitors' salaries.

In the Final Rule implementing the New England Industry-Funded Monitoring Omnibus Amendment ("Omnibus Amendment"), Appellees cited a single provision as the basis for their power to impose industry-funded monitoring: Section 1853(b)(8). *See* A83. But Section 1853(b)(8) does not mention industry funding. It only grants the government the option of designing fishery management plans that "require . . . observers *be carried on board* a vessel [.]" 16 U.S.C. § 1853(b)(8) (emphasis added).

The lack of reference in Section 1853(b)(8) to any kind of funding mechanism is hardly trivial.  Courts have a "duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019).  The power to mandate *carriage* cannot be broadened beyond its plain meaning.  Congress's decision to authorize fishery management plans requiring monitors to "be carried" on boats does not imply an "authority to make the fishermen pay the monitors' wages." *Loper Bright*, 45 F.4th at 375–76 (Walker, J., dissenting) ("[T]here is no inherent, or even intuitive, connection between paying a monitor's wage and providing him passage.").

The most natural reading of Section 1853(b)(8) is that it authorizes the *placement* of monitors, something none of the fishermen in *Loper Bright* or *Relentless* has ever challenged.  It is a "fundamental canon of statutory construction" that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979).  Section 1853(b)(8) was part of the 1990 Magnuson-Stevens Act Amendments, and because it is not defined by statute, this Court must look to the public meaning of "carry" at that time of enactment.  To "carry," in relevant part, meant

"[t]o bear, bear about, sustain, transport, remove, or convey."  Black's Law Dictionary (6th ed. 1990); *accord* Merriam-Webster (1990 ed.) (defining "carry" as "to move while supporting: transport, convey, take"). These dictionary senses do not suggest anything about the payment of non-incidental costs, such as observer salaries.

Section 1853(b)(8) is therefore relevant as a potential delegation of authority *if and only if* industry funding can be fairly characterized as a compliance cost.  But contrary to this Court's prior suggestion, *see Relentless, Inc.*, 62 F.4th at 629–30, it cannot.  Paying a monitor's salary is altogether different from covering the costs inherent to carrying one. Appellees concede as much in their own regulations, which describe compliance with a monitoring program to include things like "[p]roviding accommodations and food"; granting the monitor "access to and use of the vessel's communications equipment and personnel"; allowing the monitor to use "navigation equipment"; and providing the monitor with "free and unobstructed access" to the bridge, holds, and communications logs. 50 C.F.R. § 648.11(d)(1)–(3), (6)–(7); *see Loper Bright*, 45 F.4th at 376 (Walker, J., dissenting) ("A cost incidental to *carrying* an observer might include the additional fuel costs of a marginally heavier boat or the

opportunity cost of giving to the monitor a bunk that would otherwise be occupied by a working fisherman.").[7] This Court, and the district court below, have persistently made a category error by describing industry funding as a compliance cost to be borne by regulated vessels.

There are two more reasons to doubt industry funding is defensible as a compliance cost. *First*, the design of other provisions in Section 1853 undermines the district court's decision and Appellees' position. Section 1853(b)(1), for example, allows for a fishery management plan to "require a permit to be obtained from, *and fees to be paid to*, the Secretary, with respect to" any vessel, operator, or processor. 16 U.S.C. § 1853(b)(1) (emphasis added). That language shows that Congress knows how to delegate authority to require payment for something non-incidental—*i.e.*, a stand-alone permit fee—and distinct from the reasonably expected costs of regulatory compliance—*e.g.*, the time and effort spent filling out a permit application. Similarly, that Section 1853(b)(8) only mandates

---

[7] When the regulations do address industry cost obligations, they use clear language. *See* 50 C.F.R. § 648.11(k)(4)(i) ("scallop vessels shall be responsible for paying the cost of the observer"); *id.* § 648.11(m)(4) ("[p]rocurement" and "arrange[ment]" of herring monitors); *id.* § 648.87(b)(2)(xi) ("third-party service providers employed by the [groundfish] sector to provide at-sea/electronic monitoring").

monitors "be carried," *id.* § 1853(b)(8), severely undercuts any analogy to the government's authority to "require the use" of equipment or services, including "devices . . . to facilitate enforcement," which then become the property of the regulated party. *Id.* § 1853(b)(4).

*Second*, despite years of litigating this issue in both *Loper Bright* and *Relentless*, Appellees still cannot point to a *single context* anywhere across the entire federal regulatory environment where "an agency, without express direction from Congress, requires an industry to fund its inspection regime." *Loper Bright*, 45 F.4th at 376 (Walker, J., dissenting). More to the point, "[n]othing in the record definitively establishes whether at-sea monitors are the type of regulatory cost that might fall on fishing vessels by default or whether Congress would have legislated with that assumption." *Id.* at 366.

In truth, the costs associated with industry-funded monitoring are staggering. By the government's own estimates—which are several years old and likely too conservative—monitors will cost upwards of "$710 per day" and could "reduce the annual [returns-to-owner] for vessels . . . by up to 20 percent." A79; *see* A79–80 (describing other impacts). These costs are qualitatively different from the more static costs of compliance.

The best reading of the Magnuson-Stevens Act is that any delegation of authority to impose debilitating costs on an already beleaguered fleet would have been expressly provided by Congress—and, here, such power was withheld. *Cf. Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 600 (D.C. Cir. 2023) ("We may reasonably expect the Congress at least to speak, not to be silent, when it delegates this power to destroy.").

### B.   Industry-funded monitoring is not a "necessary and appropriate" regulatory measure.

The district court concluded that Section 1853's "necessary and appropriate" clause also provides Appellees with the authority to require industry funding.   That line of reasoning fares no better than the "compliance cost" theory under Section 1853(b)(8).   Such a catchall provision cannot be stretched as far as the district court or the government wishes.   More troublingly, the district court failed to apply *Loper Bright* and police the boundaries of this delegation by defining its outer limits.   603 U.S. at 395; *cf. Mexican Gulf Fishing Co. v. Dep't of Commerce*, 60 F.4th 956, 965–66 (5th Cir. 2023); *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 468 (5th Cir. 2020).

At first glance, the words "necessary" or "appropriate" seem quite expansive, even to the point of allowing an agency to pursue its own policy preferences without much restriction. But when faced with such capacious terms, the importance of the canons of interpretation, as well as a court's duty to definitively construe legal text, reaches its apex. Why? Because the judicially determined meaning of a statute sets the boundaries of what an agency may do, subject to reasoned and explained decision-making. Broad terms cannot escape construction and meaningful review, lest they create nondelegation and void-for-vagueness concerns. *See N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 554 (D.C. Cir. 2020).

The Supreme Court recently reiterated the proper approach to understanding catchall provisions. In *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), the Court considered language that authorized a bankruptcy reorganization plan to "include any other appropriate provisions not inconsistent with the applicable provisions" of the bankruptcy code. 11 U.S.C. § 1123(b)(6). Proponents of an almost unbounded reading of the provision argued that, so long as a possible term of reorganization was "not 'expressly forbid[den]'" by Congress, then

it was impliedly authorized, subject only to a judge's determination that it was "appropriate." *Harrington*, 603 U.S. at 217. The Court rejected that view. Applying the same logic here, Appellants should win.

*Harrington* emphasizes that, "[w]hen faced with a catchall phrase," "courts do not necessarily afford it the broadest possible construction it can bear." *Id.* (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018)). On the contrary, they "generally appreciate that the catchall must be interpreted in light of its surrounding context and read to 'embrace only objects similar in nature' to the specific examples preceding it." *Id.* (citation omitted); *accord Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 763–64 (2021). *Harrington* moreover underlines the importance of avoiding interpretations so broad as to permit anything not expressly forbidden. If "Congress set[s] out a detailed list of powers, followed by a catchall that is qualified with the term 'appropriate,'" that phrase needs to "draw[] its meaning from surrounding provisions." *Harrington*, 603 U.S. at 218 (citation omitted). Congress would otherwise have written the statute differently.[8]

---

[8] "When resolving a dispute about a statute's meaning," courts also may "look for guidance not just in its immediate terms but in related provisions as well." *Harrington*, 603 U.S. at 221. That makes sense,

Read in context, Section 1853(b)(14)'s "necessary and appropriate" clause does not empower Appellees to impose industry-funded monitoring. So far as other provisions in Section 1853 speak to regulatory obligations that can be imposed on fishermen, they include things like quotas, catch-limits, or other capacity restrictions, 16 U.S.C. § 1853(a)(3), (a)(15), (b)(3); mandatory data submissions, *id.* § 1853(a)(5); weather-based access restrictions to a fishery, *id.* § 1853(a)(6); permitting requirements, *id.* § 1853(b)(1); and rules about the "types and quantities of fishing gear, fishing vessels, or equipment" that can be used. *Id.* § 1853(b)(4). "[N]one of the[se] measures . . . look anything like the funding scheme" in the Final Rule and the Omnibus Amendment. *Loper Bright*, 45 F.4th at 377 (Walker, J., dissenting). In fact, apart from

_____

because courts "'construe statutes and not isolated provisions.'" *Graham Cty. & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (citation omitted). As Appellants argue, Congress's decision to authorize industry funding in three *specific* contexts, and not in the Atlantic herring fishery, *see* 16 U.S.C. §§ 1821(h)(4), (6) & 1827(d) (foreign vessels); 1853a(c)(1)(H), (e)(2) (limited access privilege programs); 1862(a) (North Pacific Council), cuts against any implied *general* authorization. When "Congress includes particular language in one section of a statute but omits it in another . . . [courts] generally take the choice to be deliberate." *Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023) (cleaned up and citation omitted); *see, e.g.*, Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107–111 (2012) (describing *expressio unius* canon).

permit fees, *see* 16 U.S.C. § 1853(b)(1), the only express reference (though indirect) to stand-alone costs in the statute is the requirement that "mitigation measures" be adopted to *limit* the economic impact of regulations on fishermen and their communities. *Id.* § 1853(a)(9)(A).

One final point. As Judge Walker observed in *Loper Bright*, "the logic of the Fisheries Service's argument could lead to strange results." *Loper Bright*, 45 F. 4th at 377 (Walker, J., dissenting). Appellees' position (and the district court's opinion) invites an absurdity where there are *no* limits to the government's ability to compel action by regulated parties. If fishermen can be forced to pay for monitors that ride their boats, what else can they be ordered to do or to pay for? What feasible check is there for such a "generous interpretation of 'necessary and appropriate,'" especially when it "undermine[s] Congress's power of the purse"? *Id.* (Walker, J., dissenting) (citations omitted). The government has never offered any limiting principle for its reading of the law. And the district court's refusal to define the boundaries of Section 1853(b)(14)'s delegation of discretionary regulatory authority leaves this all-important question unanswered. That is an intolerable result.

## CONCLUSION

For these reasons, the Court should reverse the district court and set aside the Final Rule and the Omnibus Amendment.

January 23, 2026            Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
   First Circuit Bar No. 1174492
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Boulevard, Suite 1000
Arlington, VA 22201
571-444-2841
rmulvey@afphq.org

*Attorney for* Amicus Curiae

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because, excluding the parts of the document exempted by Rule 32(f), this brief contains 5,988 words.

This brief also complies with the typeface requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: January 23, 2026                    */s/ Ryan P. Mulvey*
                                           Ryan P. Mulvey

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2026, I electronically filed the above Brief of *Amicus Curiae* Americans for Prosperity Foundation in Support of Plaintiffs-Appellants with the Clerk of the Court by using the appellate CM/ECF system. I further certify that service will be accomplished by the appellate CM/ECF system.

Dated: January 23, 2026                    */s/ Ryan P. Mulvey*
                                            Ryan P. Mulvey