No. 25-1845

$\blacklozenge$

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

$\blacklozenge$

RELENTLESS INC., et al.,
*Plaintiffs–Appellants*,

v.

U.S. DEPARTMENT OF COMMERCE, et al.,
*Defendants–Appellees*.

$\blacklozenge$

On Appeal from the United States District Court
for the District of Rhode Island,
Case No. 1:20-cv-00108-WES (Hon. William E. Smith)

$\blacklozenge$

# AMICUS CURIAE BRIEF OF THE BUCKEYE INSTITUTE
# IN SUPPORT OF APPELLANTS & REVERSAL

$\blacklozenge$

David C. Tryon
  *Counsel of Record*
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

*Attorney for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29(a)(4)(A) and 26.1 of the Federal Rules of Appellate Procedure, amicus states that it has no parent corporation and issues no stock; thus, no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................... i

TABLE OF AUTHORITIES ................................................ iii

INTEREST OF AMICUS CURIAE .......................................... 1

SUMMARY OF THE ARGUMENT ........................................ 2

ARGUMENT ...................................................................... 4

I. The MSA's statutory "silence" did not empower the NMFS to force the regulated parties to pay the salaries of government-mandated bureaucrats living on the boats ..................................... 4

II. If allowed to stand, the NMFS's final rule promises constitutional confusion .................................................. 7

A. The NMFS's final rule is inconsistent with federal appropriations law ................................................... 7

B. The NMFS's final rule borders on an unconstitutional quartering of federal agents on private property ..................... 11

C. The NMFS's final rule infringes on rights protected by the Fourth Amendment ................................................. 19

CONCLUSION ...................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ............................................................... 4

Case of Proclamations
(1611) 77 Eng. Rep. 1352 (K.B.) ........................................11

*Collins v. Virginia,*
584 U.S. 586 (2018) .............................................................19

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
596 U.S. 212 (2022) ............................................................. 9

*Engblom v. Carey,*
677 F.2d 957 (2d Cir. 1982) ......................................15, 16

*Florida v. Jardines,*
569 U.S. 1 (2013) .................................................................19

*INS v. Chadha,*
462 U.S. 919 (1983) ............................................................. 9

*Kyllo v. United States,*
533 U.S. 31 (2001) ..............................................................19

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ................................................8, 10, 11

*Loper Bright Enters., Inc. v. Raimondo,*
45 F.4th 359 (D.C. Cir. 2022) .........................................8, 10

*Louisiana Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986) ............................................................. 4

*Morrison v. Olson,*
487 U.S. 654 (1988) ............................................................. 9

*United States v. Giordano,*
416 U.S. 505 (1974) ............................................................. 5

*United States v. Jones*,
   565 U.S. 400 (2012) .......................................................................19, 20

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ................................................................................ 4

**Statutes**

15 U.S.C. § 1821(h)(4) ............................................................................... 5

16 U.S.C. § 1853(b)(8) ............................................................................... 6

16 U.S.C. § 1862(a)(1) ............................................................................... 5

16 U.S.C. § 1862(a)(2) ............................................................................... 5

31 U.S.C. § 1341(a)(1) ............................................................................... 8

31 U.S.C. § 3002(b) ................................................................................... 8

**Other Authorities**

3 Joseph Story, *Commentaries on the Constitution of the United*
   *States* § 1893 (1833) ..............................................................................15

Aaron Till & Fredrick Hernandez, *Who Is Missing Paychecks in*
   *the 2025 Shutdown—When and Where?*, Bipartisan Policy
   Center (Nov. 21, 2025), https://tinyurl.com/3z9y7w5r .........................18

Antonin Scalia & Bryan A. Garner, *Reading Law: The*
   *Interpretation of Legal Texts* (2012) ...................................................... 5

Benjamin Franklin, *Causes of the American Discontents before*
   *1768* (c. 1768), *reprinted by* Nat'l Archives: Founders Online,
   https://tinyurl.com/2e52m66p .............................................................13

Charles Tansill, *Documents Illustrative of the Formation of the*
   *Union of American States* (1927) ..........................................................14

Fisheries of the Northeastern United States Atlantic Mackerel,
   Squid, and Butterfish Fisheries: Amendment 14, 79 Fed. Reg.
   10,029 (Feb. 24, 2014) ............................................................................ 7

James P. Rogers, *Third Amendment Protections in Domestic Disasters*, 17 Cornell J.L. & Pub. Pol'y 747 (2008) ..............................13

John Dickinson, *Federal Farmer 1* (Dec. 3, 1767), *reprinted in Letters from a Farmer in Pennsylvania to the Inhabitants of the British Colonies* https://tinyurl.com/4rjjuu9h ...................................... 2

Josh Dugan, Note, *When is a Search Not a Search? When It's a Quarter: The Third Amendment Originalism, and NSA Wiretapping*, 97 Geo. L. J. 555 (2009)...................................................17

Office of Law Enforcement, Nat'l Oceanic & Atmospheric Admin., *About Us*, NOAA Fisheries, https://tinyurl.com/NOAAabout (last visited Jan. 20, 2026) ....................................................................3, 16

Philip Hamburger, *Law and Judicial Duty* (2008) ................................11

Samantha A. Lovin, *Everyone Forgets About the Third Amendment: Exploring the Implications of Third Amendment Case Law of Extending its Prohibitions to Include Actions by State Police Officers,* 23 Wm. & Mary Bill Rts. J. 529 (2014)........14, 17

The Declaration of Independence (U.S. 1776) .......................................14

The Federalist No. 47, at 322 (James Madison) (Easton Press ed., 1979)........................................................................................................ 9

*The Quartering Act: Igniting the Powder Keg of War*, American Battlefield Trust (Mar. 21, 2025), https://tinyurl.com/y5cxd6xn.........13

William Sutton Fields, *The Third Amendment: Constitutional Protection from the Involuntary Quartering of Soldiers*, 124 Mil. L. Rev. 195 (1989) ....................................................................12, 14

**Constitutional Provisions**

U.S. Const. amend. III............................................................................11

U.S. Const. amend. IV ...........................................................................19

U.S. Const. art. 2, § 7, cl. 1 ................................................................... 7

U.S. Const. art. I, § 7 ............................................................ 9

U.S. Const. art. I, § 9 ............................................................ 9

## INTEREST OF AMICUS CURIAE[1]

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—to formulate and promote free-market policy in the states. The Buckeye Institute accomplishes its mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policies, and marketing those policy solutions for implementation in Ohio and replication across the country. The Buckeye Institute also files lawsuits and submits amicus briefs to fulfill its mission. The Buckeye Institute is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. section 501(c)(3).

---

[1] As required by Rule 29(a), The Buckeye Institute states that all parties have given consent to file this amicus brief. Further, no counsel for any party has authored this brief in whole or in part and no person other than the amicus has made any monetary contribution to this brief's preparation or submission.

# SUMMARY OF THE ARGUMENT

In his First Letter from a Farmer in Pennsylvania, John Dickinson wrote:

> If the British Parliament has a legal authority to issue an order that we shall furnish a single article for the troops here, and to compel obedience to that order, they have the same right to issue an order for us to supply those troops with arms, clothes, and every necessary, and to compel obedience to that order also; in short, to lay any burdens they please upon us. What is this but the taxing of a certain sum and leaving us only the manner of raising it?

John Dickinson, *Federal Farmer 1* (Dec. 3, 1767), *reprinted in Letters from a Farmer in Pennsylvania to the Inhabitants of the British Colonies* https://tinyurl.com/4rjjuu9h. What the British sought to do to the American colonists, the National Marine Fisheries Service ("NMFS") now seeks to do to Atlantic herring fishing vessels and the owners.

This case presents a paradigmatic and problematic example of agency aggrandizement. The NMFS is part of the National Oceanic and Atmospheric Administration and has an Office of Law Enforcement, which "conducts enforcement activities through patrols both on and off the water as well as monitoring vessels electronically; [and] criminal and civil investigations . . . ." Office of Law Enforcement, Nat'l Oceanic & Atmospheric Admin., *About Us*, NOAA Fisheries,

https://tinyurl.com/NOAAabout (last visited Jan. 20, 2026). As part of a law enforcement body, NMFS claims the power to require herring fishing boats in the Atlantic Ocean to carry, berth, *and pay* monitors to insure, among other things, that catch limits are observed. The Magnuson-Stevens Act ("MSA") does not expressly covey such a power, so the first question that must be answered is whether the agency has the power at all. There is no basis for such a conclusion in the statute.

Moreover, the NMFS's claimed power raises a number of serious constitutional concerns. First, the NMFS's action end runs the appropriations process. Second, it raises Third Amendment concerns because the small business herring fishermen must carry, berth, and feed the monitor on a small boat over a period of several days. Finally, the agency action raises Fourth Amendment concerns. These constitutional considerations counsel against allowing one agency to open the door for other federal agencies to follow.

# ARGUMENT

The NMFS's action creates significant issues for the fishing fleets that must bear the costs and interferes with the federal budgeting and appropriations process.

## I. The MSA's statutory "silence" did not empower the NMFS to force the regulated parties to pay the salaries of government-mandated bureaucrats living on the boats.

Where a case involves statutory silence regarding claimed agency authority, the first question must be whether Congress intended to empower the agency to act in the first place. After all, "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001); *see also Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

Nowhere in the Magnuson-Stevens Act does Congress explicitly allow the NMFS to require the Atlantic herring fishermen to fund an at-sea monitoring program. The absence of specific statutory authority alone is dispositive. Although the Court has noted that congressional delegation can be shown "in a variety of ways," *see United States v. Mead Corp.*, 533 U.S. 218, 227 (2001), nothing indicating such a delegation appears in the MSA.

Congress did not empower the NMFS to require Atlantic herring fishery vessels to carry, berth, and feed monitors. To the extent that the MSA allows the North Pacific Council to "require[ ] that observers be stationed on fishing vessels" and to "establish[ ] a system . . . of fees . . . to pay for the cost of implementing the plan," the statute expressly covers only the Pacific Ocean. 16 U.S.C. § 1862(a)(1)–(2). Another statutory provision that creates a funding monitoring program applies by its terms only to foreign fishing vessels. 15 U.S.C. § 1821(h)(4).

The maxim *expressio unius est exclusio alterius* controls. *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012) (discussing the negative-implication canon). The doctrine is based on the principle that the specification of one thing implies the exclusion of the others. The "doctrine properly applies only when the [thing specified] can reasonably thought to be an expression of *all* that shares in the grant or prohibition involved." *Id.* at 107 (emphasis in original). For example, "[w]hen a car dealer promises a low financing rate to 'purchasers with good credit,' it is entirely clear that the rate is not available to purchasers with spotty credit." *Id. See also United States v. Giordano*, 416 U.S. 505 (1974) (unanimously concluding that a statute

expressly stating only "the Attorney General, or any Assistant Attorney general specifically designated by the Attorney General" could authorize a wiretap application excluded the Attorney General's executive assistant from doing so).

The doctrine properly applies here. The specification of North Pacific in § 1862 means just that. It does not mean the North Atlantic or Gulf of Mexico. Without a more direct authorization from Congress, NMFS cannot go as far as it has here.

Reliance on broader grants of agency authority cannot make up for the lack of specific authorization. The NMFS is authorized to:

> require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery; except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized.

16 U.S.C. § 1853(b)(8). Carrying an observer is one thing; paying for the privilege of doing so is another entirely.

## II. If allowed to stand, the NMFS's final rule promises constitutional confusion.

If allowed to stand, the NMFS's final rule will only encourage other federal agencies to cure their financial woes by requiring regulated entities to fund their oversight—even if Congress did not specifically authorize them to do so. In addition, the agencies could require regulated entities to house and feed regulators on the premises of regulated entities.

### A. The NMFS's final rule is inconsistent with federal appropriations law.

The Constitution provides, "All bills for raising Revenue shall originate in the House of Representatives." U.S. Const. art. 2, § 7, cl. 1. It is beyond cavil that the NMFS is engaged in raising money to fund its program. In doing so, it is circumventing the appropriations process. *See* Fisheries of the Northeastern United States Atlantic Mackerel, Squid, and Butterfish Fisheries: Amendment 14, 79 Fed. Reg. 10,029, 10,038 (Feb. 24, 2014) (noting that without industry funding, "increased observer coverage levels would amount to an unfunded mandate, meaning regulations would obligate [the NMFS] to implement something it cannot pay for."). That end run around the appropriations process will cost the fisheries "more than $700 per day and could reduce financial

returns to the fishermen by twenty percent." *Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359, 373 (D.C. Cir. 2022) (Walker, J., dissenting), *vacated and remanded sub nom.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

Moreover, the NMFS is not simply laying its hands on private funds; it is putting them to use without the oversight of a congressional appropriation. That violates federal fiscal law: "[A] officer or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3002(b). Further, agencies are limited to spending the funds that Congress appropriates for them. 31 U.S.C. § 1341(a)(1) ("[A]n officer or employee of the United States Government . . . may not—(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation.").

Agencies attempting to appropriate money without regard to Congress's appropriation powers set forth in the Constitution threaten to upend the separation of powers. "The accumulation of all powers, legislative, executive, and judiciary, in the very same hands . . . may

justly be pronounced the very definition of tyranny." The Federalist No. 47, at 322 (James Madison) (Easton Press ed., 1979). The separation of powers is "not simply an abstract generalization" but is instead "woven throughout the Constitution." *INS v. Chadha*, 462 U.S. 919, 946 (1983) (citation omitted). Moreover, it has been said that without the separation of powers, our Bill of Rights would be "worthless." *Morrison v. Olson*, 487 U.S. 654, 698 (1988) (Scalia, J., dissenting).

Congress must not only approve the raising of revenue, but also the spending of funds raised. *See* U.S. Const. art. I, §§ 7, 9. Under the final rule, the NMFS is both raising and spending funds by requiring the fisheries to pay the costs and salaries of the required monitors. If agencies can raise and spend funds without congressional approval, Congress's ability to restrain their activities will suffer. And the people will lose their ability to hold members of Congress responsible for their use of the exclusive appropriation and spending power vested in them. *See Morrison*, 487 U.S. at 711 (Scalia, J., dissenting). This court should affirm that it is Congress, not agencies, that approves the raising and spending of public monies. See *Cummings v. Premier Rehab Keller, P.L.L.C.,* 596 U.S. 212, 230–231 (2022) (Kavanaugh, J., concurring)

(using the Constitution's separation of powers to prevent one branch of government from intruding on Congress's lawmaking powers).

The $700+ per day wage charge, which causes reduced net revenues, is different from the incidental compliance costs imposed by a federal regulation, such as giving a government "monitor" a bunk that would otherwise be occupied by a working fisherman. But there is no obvious or apparent connection between paying a monitor's wage and providing him with access. Regulatory costs are generally internalized as part of the cost of doing business. But "costs" do not include paying the salaries of federal regulators. Moreover, the NMFS "has identified no other context in which an agency, without express direction from Congress, requires an agency to fund its inspection regime." *Loper Bright Enters., Inc.*, 45 F.4th at 376 (Walker, J. dissenting), *vacated and remanded sub nom.*, *Loper Bright Enters.*, 603 U.S. 369 (2024).

The NMFS requires herring fishery vessels to bear the cost because it cannot afford to do so out of its appropriated funds. In the 17th century, King James I sought to raise revenue without the participation of Parliament. The King's representative, Lord Chancellor Ellesmere, invoked royal prerogative and suggested that "in cases in which there is

no authority and precedent," the judiciary should "leave it to the King to order it according to his wisdom." Case of Proclamations (1611) 77 Eng. Rep. 1352, 1353 (K.B.). Chief Justice Coke rejected that argument, explaining, "[T]he King cannot change any part of the common law, nor create any offense by his proclamation, which was not an offense before, without Parliament." *Id.* So, too, the NMFS cannot act without Congress, and its effort to do so should be declared "against Law and Reason, and for that void." Philip Hamburger, *Law and Judicial Duty* 202 (2008).

### B. The NMFS's final rule borders on an unconstitutional quartering of federal agents on private property.

Herring fishing boats, like Relentless, remain at sea for seven to 14 days, utilizing an "at-sea fish freezing technique," while other Atlantic herring fishing boats remain at sea as long as 2–3 days. *See Loper Bright Enters.*, 603 U.S. at 383. This is the fishermen's floating home for days or weeks at a time.

The Third Amendment to the Constitution states, "No soldier shall, in time of peace, be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner prescribed by law." U.S. Const. amend. III. The Appellants have not explicitly pled a violation of this

amendment, but the NMFS violates all the principles upon which the amendment rests.

The forcible billeting or quartering of government agents has long been a civilian concern. King Henry II's London Charter of 1155 provided "that within the walls no one shall be forcibly billeted, or by assignment of the marshal." William Sutton Fields, *The Third Amendment: Constitutional Protection from the Involuntary Quartering of Soldiers*, 124 Mil. L. Rev. 195, 196 (1989). The New York Assembly's 1683 Charter of Libertyes and Priviledges read, "Noe freedman shall be compelled to receive any Marriners or Souldiers into his house and there suffer them to Sojourne, against their willes provided Alwayes it be not in time of Actuall Warr within this province." *Id.* at 200 (errors in original) (citation omitted).

Contrary to popular belief, the concern of the Framers of the Third Amendment was not limited to, as the text of the amendment suggests, quartering soldiers inside one's private living quarters. Instead, the issue was having soldiers stationed in American cities and living amongst the people in various properties. Two acts—the Quartering Act of 1765 and the Quartering Act of 1774—enflamed the Framers' complaints about

quartering soldiers. *See* James P. Rogers, *Third Amendment Protections in Domestic Disasters*, 17 Cornell J.L. & Pub. Pol'y 747, 752 (2008); *see also The Quartering Act: Igniting the Powder Keg of War*, American Battlefield Trust (Mar. 21, 2025), https://tinyurl.com/y5cxd6xn. In 1765, rather than appropriating sufficient funds to pay for housing troops in the American colonies, "Parliament passed a quartering act requiring the colonists to bear the costs of quartering and supplying British troops for the French and Indian War." Rogers, *supra*, at 752. The 1765 Act obligated "the several Assemblies to provide quarters for the soldiers, furnishing them with firing, bedding, candles, small beer or rum, and sundry other articles, at the expence of the several Provinces." Benjamin Franklin, *Causes of the American Discontents before 1768* (c. 1768), *reprinted by* Nat'l Archives: Founders Online, https://tinyurl.com/2e52m66p.

The 1774 Act, which clarified the 1765 Act, "stated upfront that 'doubts have been entertained whether troops can be quartered otherwise than in barracks' and the Royal governor had the right to use 'uninhabited houses, outhouses, barns, or other buildings' to quarter soldiers." *The Quartering Act: Igniting the Powder Keg of War*, *supra*.

The colonists deeply resented the financial burden of maintaining the British Army and the abuses to their persons, properties, and liberties that had resulted from the presence of British soldiers in their homes and cities. At the onset of the Revolution this popular resentment found expression in the first Continental Congress's Declaration and Resolves of 1774 . . . .

Fields, *supra*, at 201 (citing Charles Tansill, *Documents Illustrative of the Formation of the Union of American States* 1 (1927)). Subsequently, in the Declaration of Independence, the colonists declared as two of the causes of their separation from the British Crown, the King's practice of "send[ing] hither swarms of Officers to harass our people and eat out their substance" and "Quartering large bodies of armed troops among us." The Declaration of Independence paras. 12, 16 (U.S. 1776).

While "many scholars have questioned whether the Third Amendment is largely 'obsolete,' in regard to modern-day concerns," this case shows that the courts still need to be vigilant against infringement upon the values underlying the amendment. Samantha A. Lovin, *Everyone Forgets About the Third Amendment: Exploring the Implications of Third Amendment Case Law of Extending its Prohibitions to Include Actions by State Police Officers,* 23 Wm. & Mary Bill Rts. J. 529, 530 (2014).

As Joseph Story noted, the Third Amendment's "plain object is to secure the perfect enjoyment of that great right of the common law, that a man's house shall be his own castle, privileged against all *civil* and military intrusion." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1893 (1833) (emphasis added). He explained, "the billeting of soldiers in time of peace upon the people has been a common resort of arbitrary princes, and is full of inconvenience and peril." *Id.*

In 1982, the Second Circuit found that the Third Amendment is incorporated against the states through the Fourteenth Amendment. *Engblom v. Carey*, 677 F.2d 957, 961 (2d Cir. 1982). The case involved the housing of National Guard members, serving under a state call, in a state prison's staff housing building after the prison guards went on strike. *Id.* at 958–61. The court grounded the Third Amendment in the assurance of "a fundamental right to privacy." *Id.* at 962. In addition, the court held that the "property-based privacy interests protected by the Third Amendment are not limited solely to those arising out of fee simple ownership but extend to those recognized and permitted by society as

founded on lawful occupation or possession with a legal right to exclude others." *Id.*[2]

Appellants' boats may not be land-based houses, but they are the fishing crews' houses nonetheless. Their fishing trips can last days or weeks at a time. The fishermen eat and sleep in the boats' close living quarters.

While the Third Amendment speaks of "soldiers," its underlying principles are not so limited. Here, the NMFS's federal law enforcement officers have the authority to pursue criminal matters. They "enforce[ ] domestic laws and support[ ] international treaty requirements . . . ." Office of Law Enforcement, Nat'l Oceanic & Atmospheric Admin., *supra*. The Office of Law Enforcement uses information gathered from NMFS "observers" in its prosecutions.

Furthermore, one might be tempted to regard the Third Amendment as useless because of the Fourth Amendment. It is true that the Fourth

---

[2] In a separate opinion, Judge Kaufman explained, "The Third Amendment embraces aspects of liberty and privacy that have justified the application of the Fourth Amendment's prohibition against unreasonable searches and seizures to the states." *Id.* at 967 (Kaufman, J., concurring in part and dissenting in part).

Amendment's ban on "unreasonable searches and seizures" could "render the Third Amendment's proscription redundant were it merely protecting individuals against having their homes seized by soldiers." Lovin, *supra*, at 543–44 (citation omitted). But quartering is fundamentally different from a mere seizure. "[T]he Founders used the word 'quartering' to expansively refer to a practical and substantial intrusion that threatened the legitimacy of government and the rule of law . . . soldiers [were] being used to escort the 'exciseman' or the 'Sheriff or Constable' into homes to enforce the law. Josh Dugan, Note, *When is a Search Not a Search? When It's a Quarter: The Third Amendment Originalism, and NSA Wiretapping*, 97 Geo. L. J. 555, 558 (2009). In the instant case, not only have the federal officers seized a portion of Appellants' boats, but they have also forced Appellants to feed, house, and pay the wages of the federal officers.

Appellants have not asked this Court to determine that the NMFS has violated the Third Amendment, but the Court should consider the values and principles underlying the Third Amendment as it addresses the NMFS's unprecedented federal quartering of its officers in the narrow confines of Appellants' floating houses. If the NMFS can require

fishermen to house, feed, and pay monitors for several days, what stops any other federal agency from doing so? Indeed, in 2025, the federal government shut down. Aaron Till & Fredrick Hernandez, *Who Is Missing Paychecks in the 2025 Shutdown—When and Where?*, Bipartisan Policy Center (Nov. 21, 2025), https://tinyurl.com/3z9y7w5r. For 43 days, agencies could not pay many of their regulators' salaries or travel expenses. *Id.* And like the NMFS, these agencies were still legally required to carry out federal programs even though the appropriations did not exist. Why not order the regulated parties to house the traveling bureaucrats and pay their salaries during the shutdown? There is scant difference between this and the NMFS's rule.

To the extent that the interests protected by the Third Amendment are grounded in a right to privacy in one's home, whether at land or sea, it should make little difference whether the government functionary being quartered is a soldier, an NMFS enforcement officer, observer or monitor, or another bureaucrat. All are equally intrusive. The NMFS's final rule offends and undermines the fundamental values undergirding the Third Amendment.

## C. The NMFS's final rule infringes on rights protected by the Fourth Amendment.

The Fourth Amendment to the Constitution states, in part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. A constitutional inspection generally does not continue for several days, much less call for berthing, feeding, and payment. The final rule is unreasonable.

"[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). The protection given to the home extends to the curtilage surrounding the home. *Collins v. Virginia*, 584 U.S. 586, 592 (2018). That protection is intended to "assure[] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo v. United States*, 533 U.S. 31, 34 (2001).

Similarly, the Court has held that when police attached a GPS tracking device to a private automobile without a warrant and used that device to monitor the vehicle's movements, they conducted a search. *United States v. Jones*, 565 U.S. 400 (2012). The Court explained that the

Government's physical occupation of "private property for the purpose of obtaining information" was a search. *Id*. at 404.

Viewed in that light, the NMFS's final rule intrudes into a space that deserves protection. The fishing boats are the homes of the fishermen for the time they are out. The NMFS final rule "attaches" people to the boat without any showing of suspicion.

## CONCLUSION

When establishing the NMFS's authority, Congress did not explicitly grant it the authority to charge boat operators the cost of quartering observers. By self-granting the power to charge, the NMFS has exceeded its statutory power, invaded on Congress's appropriation power, and has created a regime repugnant to the Third and Fourth Amendments. For these reasons, this Court should reverse the lower court's decision.

Respectfully submitted,

 /s/ David C. Tryon 
David C. Tryon
  *Counsel of Record*
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

Jan 23, 2026

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 29(a)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,889 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Century Schoolbook.

　/s/ David C. Tryon　　
David C. Tryon
*Attorney of record for*
*The Buckeye Institute*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the above amicus brief was served on counsel for all parties via the Court's electronic filing system this 23rd day of January 2026.

/s/ David C. Tryon
David C. Tryon
*Attorney of record for*
*The Buckeye Institute*
