No. 25-1845

## United States Court of Appeals
## for the First Circuit

RELENTLESS INC.; HUNTRESS INC.; SEAFREEZE FLEET LLC,
*Plaintiffs - Appellants*,

v.

US DEPARTMENT OF COMMERCE; HOWARD W. LUTNICK, in the
official capacity as Secretary of Commerce; NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION; LAURA GRIMM, in the official
capacity as Acting Administrator of NOAA; NATIONAL MARINE
FISHERIES SERVICE, a/k/a NOAA Fisheries; EUGENIO PIÑEIRO
SOLER, in the official capacity as Assistant Administrator for NOAA
Fisheries,
*Defendants - Appellees.*

On Appeal from the U.S. District Court for the District of Rhode Island
Civil Action No. 1:20-cv-00108
The Honorable William E. Smith, U.S. District Judge

## BRIEF OF *AMICI CURIAE*
## NATIONAL FEDERATION OF INDEPENDENT BUSINESS
## SMALL BUSINESS LEGAL CENTER, INC.
## AND THE MANHATTAN INSTITUTE
## IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Elizabeth Milito
Rob Smith
**NFIB SMALL BUSINESS
LEGAL CENTER, INC.**
555 12th Street NW, Suite 1001
Washington, DC 20004

Joel S. Nolette (1209712)
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Telephone: (202) 719-4741
jnolette@wiley.law

(cont. on next page)

*Attorneys for* Amici Curiae

Ilya Shapiro
Trevor Burrus
**MANHATTAN INSTITUTE**
52 Vanderbilt Avenue
New York, NY 10017

## RULE 29(a)(4)(A) DISCLOSURE STATEMENT

National Federation of Independent Business Small Business Legal Center, Inc., a nonprofit corporation, has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

The Manhattan Institute for Policy Research is a nonpartisan public policy research foundation organized under Section 501(c)(3) of the Internal Revenue Code. It has no parent corporation and does not issue stock.

# TABLE OF CONTENTS

RULE 29(a)(4)(A) DISCLOSURE STATEMENT .................................. iii

IDENTITY AND INTEREST OF *AMICI CURIAE* .................................. 1

SUMMARY OF ARGUMENT ................................................. 2

ARGUMENT ........................................................... 5

   I.   *Loper* Requires Courts to Perform Both an Independent and Thorough Review to Determine the Best Reading of a Statute ............ 5

   II.   The District Court's Analysis Failed to Comply with the Obligation of Courts Under the APA to Provide Both an Independent and Thorough Judgment. ................................... 8

     A.   Relying on Previous Deference-Based Reasoning to Uphold the Same Agency Action Is Not Exercising Independent Judgment. ..... 8

     B.   A Scant Statutory Analysis Does Not Reflect a Thorough Judgment. ...................................................... 11

   III.   The "Default Norm" That Regulated Entities Must Pay the Costs of Being Regulated Lacks a Legal Foundation and Harms Small Businesses. ........................................................ 16

CONCLUSION ....................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
794 F. Supp. 3d 610 (D.N.D. 2025)..............................................4, 12–13

*Goethel v. Dep't of Com.*,
854 F.3d 106 (1st. Cir. 2017) ...........................................................17–18

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ....................................2, 5–8, 10–11, 13

*Relentless Inc. v. Dep't of Com.*,
561 F. Supp. 3d 226 (D.R.I. 2021) ...............................................10, 14

*Relentless Inc. v. Dep't of Com.*,
No. 1:20-cv-00108, 2025 WL 1939025
(D.R.I. July 15, 2025) ....................................9–12, 14–16, 18

*Relentless Inc. v. Dep't of Com.*,
No. 21-1886, 2024 WL 3647769 (1st Cir. July 31, 2024)...............9, 17

*Relentless, Inc. v. Dep't of Com.*,
62 F.4th 621 (1st Cir. 2023).........................................9–10, 15, 17–18

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ...............................................................6

**Statutes**

15 U.S.C. § 1693o-2.....................................................................12

16 U.S.C. §§ 1801–84.....................................................................3

16 U.S.C. § 1801.........................................................................15

16 U.S.C. § 1853.....................................................................14–15

16 U.S.C. § 1858.....................................................................14–15

29 U.S.C. § 154................................................................. 19

**Other Authorities**

Bryan A. Garner *et al.*, *The Law of Judicial Precedent* (2016) .............. 16

Fed. R. App. P. 29 .............................................................. 1

Industry-Funded Monitoring Rule, 85 Fed. Reg. 7414 (Feb. 7, 2020) ........................................................................... 8

# IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The National Federation of Independent Business Small Business Legal Center, Inc. (NFIB Legal Center) is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. It is an affiliate of the National Federation of Independent Business, Inc. (NFIB), which is the nation's leading small business association. NFIB's mission is to promote and protect the rights of its members to own, operate, and grow their businesses. NFIB represents the interests of its members in Washington, D.C., and all fifty state capitals.

The businesses that the NFIB Legal Center advocates for are subject to daily regulation by administrative agencies and are influenced by how these agencies interpret laws to support their actions. The NFIB Legal Center files in this case to emphasize the critical need for courts to

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici Curiae* state that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *Amici Curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation of this brief. *Amici Curiae* notified counsel for all parties of their intention to file this brief, and all consented to a timely filing.

rigorously and independently interpret statutes under the Administrative Procedure Act (APA), as recently directed by the Supreme Court.

The Manhattan Institute for Policy Research (MI) is a nonpartisan public policy research foundation whose mission is to develop and disseminate ideas that foster greater economic choice and individual responsibility. To that end, MI has historically sponsored scholarship and filed briefs protecting the rule of law and constitutionally limited government. This case interests MI because, post-*Chevron*, courts are constitutionally obligated to faithfully interpret statutes.

## SUMMARY OF ARGUMENT

On remand from the Supreme Court's watershed decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (*Loper*), this case presents an opportunity for this Court to ensure faithful compliance with that decision and provide guidance for the district courts within the First Circuit. The analysis below failed to properly apply the two post-*Loper* obligations.

*Loper* imposes two distinct obligations on courts reviewing a challenge to agency action and the interpretation of a statute by administrative agencies justifying that action. First, courts must independently

assess whether an agency has acted within the confines of the authority granted by Congress. Providing this independent judgment means that courts can no longer rely on deferring to or rubber-stamping agency interpretations of a statute. Second, while exercising independent judgment, courts must conduct a thorough review of the statute to determine its meaning. Engaging in a thorough review means that courts use all relevant interpretive tools to determine that statute's single and best meaning.

The district court's decision was not an independent judgment because it did not start from a clean slate in determining whether the Magnuson-Stevens Fishery Conservation and Management Act (MSA), 16 U.S.C. §§ 1801–84, granted the National Marine Fisheries Service (NMFS) authority to require that vessels pay for the mandated sea monitors. By repeatedly relying on its previous decision giving *Chevron* deference to the agency, and this Court's decision doing the same, the district court's recent decision was poisoned with what *Loper* prohibits. Even if not giving *Chevron* deference explicitly, a court relying on a previous decision where *Chevron* deference was given in order to bolster its statutory analysis places a thumb on the scale in favor of the agency.

Nor was the court's judgment thorough. The substantive statutory analysis spanned fewer than ten paragraphs, used almost no interpretive tools of construction to determine the statute's meaning, and relied on now-vacated precedent. By itself, that reliance on vacated precedent was erroneous and must be corrected. Comparing the district court's statutory analysis with another post-*Loper* district court decision that provided a thorough review of a statute shows the inadequacy of the analysis below. *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 794 F. Supp. 3d 610 (D.N.D. 2025).

This Court must also correct the district court's reliance on a misguided "default norm," which requires regulated entities to pay the costs of implementing regulations that apply to them. The rule lacks a legal basis, originating in a concurring opinion by one member of this Court. That concurring opinion cited no legal authority in support of the rule. In addition to lacking a legal foundation, the claimed rule would impose significant costs on regulated entities. If small businesses must pay the salaries of the regulators who oversee them, as the district court held here, then there is no stopping a number of federal agencies—OSHA, the EEOC, the EPA, the FTC, and more, each of which regulates small

businesses—from imposing enormous costs on small businesses to pay agency employees. This Court should reject a "default norm" that lacks a legal basis and is harmful to small businesses.

The Court should reverse the decision below.

## ARGUMENT

### I. *Loper* Requires Courts to Perform Both an Independent and Thorough Review to Determine the Best Reading of a Statute.

The Supreme Court's decision in *Loper* marked a transformative shift in how courts should review the interpretations of statutes by administrative agencies. While some may minimize the import of the decision, the Court's words speak for themselves. Those words make clear that courts have two related, but distinct, obligations in a post-*Chevron* deference world.

*Loper*'s most obvious takeaway is that *Chevron* deference is dead. *Loper*, 603 U.S. at 412 ("*Chevron* is overruled."). Without *Chevron*, the first obligation of courts reviewing agency interpretations of statutes is to provide "independent judgment in deciding whether an agency has acted within its statutory authority." *Id.*; *see also id.* at 394, 399–401, 406 (repeatedly referring to the obligation to provide "independent judgment" under the APA). This "independent judgment" may be aided by those

responsible for implementing statutes, so long as the aid is merely informative and not serving as deference by another name. *Id.* at 394–95 (explaining that courts "may . . . seek aid" from the interpretations of those responsible for implementing a particular statute, which can be "guidance" or "useful" to determining the statute's meaning). While exercising independent judgment, courts reviewing these Executive Branch or expert interpretations treat them the same as evidence or interpretations offered by any nongovernmental party—for their persuasive value. *Id.* at 388, 402 (discussing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) and assessing an Executive Branch interpretation of a statute).

The second, and less obvious, obligation of courts after *Loper* is to conduct a thorough review of the statute to determine its meaning. Countering the Government and dissent's argument that statutory ambiguities are implicit delegations of authority, the *Loper* majority made clear that courts faced with statutory ambiguities in the context of agency action are to handle them no differently than any other case involving an ambiguous statute. *Id.* at 400. That is, courts must "use every tool at their disposal to determine the best reading of [a] statute." *Id.* Determining the best reading of a statute means "applying all relevant interpretive

tools." *Id.* No longer may courts resort to rubber-stamping agency action as "permissible," because every statute has "a single, best meaning." *Id.*

Pronouncing that courts are to use "every tool at their disposal" and "apply[] all relevant interpretive tools" demonstrates the second post-*Chevron* obligation that courts perform a thorough review of a statute's meaning. That is so because picking and choosing a few select interpretive tools while ignoring others would not lead to "the best reading of the statute." *Id.* (requiring courts to determine the statute's best meaning). It follows that where a court is giving short shrift to the statutory analysis, or being selective in its use of interpretive tools, it is not performing its *Loper* obligation to determine the best reading of a statute.

Thus, under *Loper*, courts have two separate obligations when determining whether an agency acted within the confines of its statutory authority. First, a court must exercise "independent judgment" without deference to determine whether the agency's action was proper. Second, during this independent judgment, it must perform a thorough review to determine the best meaning of the statute at issue.

## II. The District Court's Analysis Failed to Comply with the Obligation of Courts Under the APA to Provide Both an Independent and Thorough Judgment.

The district court's statutory analysis of whether the NMFS's Industry-Funded Monitoring Rule, 85 Fed. Reg. 7414 (Feb. 7, 2020) (Final Rule), is authorized by the MSA was neither independent nor thorough. The court's review was not independent because it used, as a jumping-off point for its statutory analysis, a previous deference-based analysis. Nor was the review thorough—it gave short-shrift to the statutory analysis and hardly used any relevant tools of statutory interpretation to determine the best reading of the statute. Because of these deficiencies, the court's analysis cannot be sustained under *Loper*.

### A. Relying on Previous Deference-Based Reasoning to Uphold the Same Agency Action Is Not Exercising Independent Judgment.

*Loper*'s requirement that courts provide "independent judgment" when analyzing claims of agency authority means doing so without the thumb-on-the-scale type of deference that was *Chevron*. *Loper*, 603 U.S. at 396 ("The deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA."). But the district court relied on this type of deference nonetheless.

While the district court did not claim to be applying *Chevron* deference in its decision below, and included citations to *Loper* with the review it was obligated to apply, *see Relentless Inc. v. Dep't of Com.*, No. 1:20-cv-00108, 2025 WL 1939025, at *4 (D.R.I. July 15, 2025), it did not follow through in applying that standard. In its short analysis to support its decision that the MSA authorized the Final Rule, the district court reasoned that "[t]his Court and the *Relentless I*[2] court have already reviewed the Final Rule and found it reflects reasoned decisionmaking and does not cross the boundaries specified by the MSA . . . . This Court now reaffirms that conclusion." *Id.* The problem? Both the previous district court order and the *Relentless I* decision in this Court relied on *Chevron* deference to uphold the Final Rule. Thus, the district court did not operate from a clean slate in reviewing the statute to make an "independent judgment" as *Loper* requires.

Previously, the district court upheld the Final Rule because it concluded "that Congress has not spoken unambiguously on the subject, and

---

[2] In this brief, *Relentless I* refers to this Court's now-vacated decision in *Relentless, Inc. v. Department of Commerce*, 62 F.4th 621 (1st Cir. 2023), *vacated by Relentless, Inc. v. Department of Commerce*, No. 21-1886, 2024 WL 3647769 (1st Cir. July 31, 2024).

that the Secretary's interpretation satisfies *Chevron*'s deferential review." *Relentless Inc. v. Dep't of Com.*, 561 F. Supp. 3d 226, 234 (D.R.I. 2021). Under *Chevron*'s step two, the court concluded that the "Secretary reasonably interpreted the MSA[.]" *Id.* at 238. Likewise, this Court affirmed the district court's previous conclusion using the *Chevron* deference framework. *Relentless, Inc. v. Dep't of Com.*, 62 F.4th 621, 628, 633–34 (1st Cir. 2023) ("employ[ing] the familiar *Chevron* two-step analysis" to determine "that the Agency's interpretation of its authority to require at-sea monitors who are paid for by owners of regulated vessels does not 'exceed[] the bounds of the permissible'" (cleaned up)). *But see Loper*, 603 U.S. at 400 ("In the business of statutory interpretation, if it is not the best, it is not permissible.").

Because the district court relied on its previous order using the *Chevron* framework, and this Court's decision using *Chevron* to affirm that order, it failed to make the "independent judgment" that *Loper* requires. Instead of starting from a clean slate to determine the "best reading of the statute," *Loper*, 603 U.S. at 400, the court used as a baseline a situation where the thumb was on the scales in favor of the agency and looked for ways to "reaffirm[] that conclusion," *Relentless Inc.*, 2025 WL

1939025, at *4. If courts "under the APA may not defer to an agency interpretation of the law," *Loper*, 603 U.S. at 413, then it follows that a court may not rely on such decisions where deference was given to an agency interpretation of law when undertaking their now-obligation to render an "independent judgment" on whether the same statute grants the agency the authority to undertake the same action under the APA.[3]

## B. A Scant Statutory Analysis Does Not Reflect a Thorough Judgment.

Even if this Court were to conclude that the district court rendered an "independent judgment" on whether the MSA authorized the Final Rule, the decision below was not a thorough judgment as described in *Loper*.

The district court's statutory analysis was fleeting. It comprised only ten paragraphs, two that were introductory paragraphs noting the

---

[3] This is not to say that the holdings of past cases utilizing *Chevron* deference are invalid. *See Loper*, 603 U.S. at 412 ("[W]e do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology."). Respecting a past decision based on statutory *stare decisis* is one thing, but it is quite another to say that a court making an "independent judgment" about whether an agency's interpretation of a statute is correct may use a previous analysis relying on *Chevron* as evidence that such interpretation is indeed correct. The former is permitted; the latter is not.

issue before the court, the standard it must apply, and its conclusion, and one of which was a two-sentence transition. The remaining seven were substantive analysis. These seven paragraphs utilized no interpretive canons of construction, did not meaningfully grapple with the statute's terms and their meaning, and side-stepped Plaintiffs' arguments about legislative history. Instead, the district court cited to some precedent (mainly vacated decisions), referenced a made-up default rule, and quickly nodded to context and legislative purpose.

An example of a thorough review and judgment after *Loper*, in stark contrast to the opinion below, is *Corner Post*, 794 F. Supp. 3d 610. The issue in *Corner Post* was whether Congress, through the Durbin Amendment,[4] permitted the Federal Reserve Board to consider certain costs in establishing a debit card interchange fee cap. After determining that the Board's statutory interpretation was not entitled to deference, *Corner Post* involved forty-one paragraphs of detailed statutory analysis. *Compare Relentless Inc.*, 2025 WL 1939025, at *4–5 (*seven* paragraphs of substantive analysis). The breadth of the analysis proves that the district court followed the Supreme Court's command to use "every tool at [its]

---

[4] 15 U.S.C. § 1693o-2.

disposal" and "apply[] all relevant interpretive tools" in determining the statute's "best meaning." *Loper*, 603 U.S. at 400. The interpretive tools used in *Corner Post* included a restrictive-versus-descriptive grammar analysis, 794 F. Supp. 3d at 627–28; discussion of the statute's purpose and how it cannot contradict the text, *id.* at 628–30; use of the elephants-in-mouseholes, surplusage, and supremacy-of-text canons of interpretation, *id.* at 631–32; a look to legislative history, *id.* at 632–33; a review of the statute's terms and their ordinary definitions to ascertain its meaning, *id.* at 633–37; and citation to precedent, *e.g.*, *id.* The glaring difference between the statutory analysis in *Corner Post* and that of the district court in this case highlights the shortcomings of the decision below.[5]

In addition to its brief analysis, the district court failed to explain, let alone account for, its opposite conclusions regarding the clarity of unaltered statutory text. Initially, the court determined that there were

---

[5] To be clear, *Amici Curiae* do not suggest that every statutory analysis need be forty-plus paragraphs to be a thorough judgment. One cannot draw an arbitrary line at how long each analysis must be. It is the quality of the analysis, not its length, that renders it a thorough review. However, there will be some cases, such as this one, where a statutory analysis is so brief (such as a few paragraphs) that the length, by itself, suggests the reviewing court failed to utilize "every tool at [its] disposal" or "apply[] all relevant interpretive tools." *Loper*, 603 U.S. at 400.

"statutory currents flowing in all directions" rendering "Congress's intent regarding industry-funded monitoring [] ambiguous." *Relentless Inc.*, 561 F. Supp. 3d at 236. Just a few years later, with no change in the statutory text, the court claimed that "to the extent that the Act is ambiguous . . . the Court concludes that the Final Rule is consistent with the MSA[.]" *Relentless Inc.*, 2025 WL 1939025, at *4.

Other than utilizing the *Chevron* two-step framework, the district court's analysis of the statutory text was largely similar in both opinions. For example, its 2021 opinion started by analyzing 16 U.S.C. § 1853(b)(8), then reviewed the Secretary's reliance on § 1853(a)'s "necessary and appropriate" language, continued with § 1858(g)(1)(D), and ended by determining there were differences between the MSA and statutes cited by Plaintiffs that expressly authorized fee collection. *Relentless Inc.*, 561 F. Supp. 3d at 234–36. In its most recent opinion, the district court again started with § 1853(b)(8), then looked to 1853(b)(14)'s "necessary and appropriate" language,[6] continued with § 1858(g)(1)(D), before referencing

---

[6] The district court's change in reference from § 1853(a)'s "necessary and appropriate" language to 1853(b)(14)'s "necessary and appropriate" language appears to lack any meaning. Although the provisions refer to different types of vessels and one provision is mandatory while the other is discretionary, in both analyses, the court relied on the "necessary and

the purpose and policy of the MSA in § 1801. *Relentless Inc.*, 2025 WL 1939025, at *4–5. The latter opinion failed to make clear what changed about the "statutory currents flowing in all directions" or why many of the same statutory provisions, without the fallback of *Chevron* deference, now authorize the Final Rule.

Moreover, the court repeatedly relied on the now-vacated *Relentless I* opinion to bolster its analysis. *See Relentless Inc.*, 2025 WL 1939025, at *4–5 (relying on *Relentless I* to rebut Plaintiffs' argument that Subsection (b)(8) does not allow costs to be placed on them; relying on *Relentless I* regarding Subsection (b)(14)'s "necessary and appropriate" language; and relying on *Relentless I* to conclude that Section 1858(g)(1)(D) supports the Government's reading). Doing so was improper. "When an appellate court

---

appropriate" language as conferring authority on the Secretary to require industry-funded monitoring.

Section 1853(a), labeled "Required provisions," mandates that a fishery plan "shall" contain measures, "applicable to foreign fishing and fishing by vessels of the United States, which are—(A) necessary and appropriate for the conservation and management of the fishery."

Section 1853(b)(14), labeled "Discretionary provisions," says that a fishery plan, "with respect to any fishery, may . . . (14) prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery."

reverses a lower court's judgment, it nullifies whatever precedential effect the lower court's judgment bore. . . . [T]he earlier opinion explaining the reversed or overruled judgment can't any longer be cited as good authority in courts of the same jurisdiction." Bryan A. Garner *et al.*, *The Law of Judicial Precedent* 308 (2016) (treatise on judicial precedent co-authored by federal and state appellate judges across the country, including two now-Supreme Court Justices).

The district court's short analysis was not the thorough review required by *Loper* because it failed to utilize many relevant interpretive tools, was largely identical to its previous order, and repeatedly relied on vacated precedent.

### III. The "Default Norm" That Regulated Entities Must Pay the Costs of Being Regulated Lacks a Legal Foundation and Harms Small Businesses.

The district court cited this Court for a "default norm" that the "government does not reimburse regulated entities for the cost of complying with properly enacted regulations" absent a taking. *See Relentless Inc.*, 2025 WL 1939025, at *4. In other words, regulated entities must follow regulations and pay for the costs of their implementation. Such a "default

norm" is made from whole cloth and would allow agencies to impose costs on small businesses by fiat.

There is no legal basis for this "default norm." This Court's discussion of the norm in *Relentless I* is now nonexistent. *Relentless Inc. v. Dep't of Com.*, No. 21-1886, 2024 WL 3647769 (1st Cir. July 31, 2024) (vacating *Relentless I*). It was wrong for the district court to cite to a vacated opinion. And *Relentless I* cited no binding precedent for the norm's existence, referencing only a single-judge concurrence. *See Relentless I*, 62 F.4th at 629 (quoting *Goethel v. Dep't of Com.*, 854 F.3d 106, 117–18 (1st. Cir. 2017) (Kayatta, J., concurring)). The majority in *Goethel* made no mention of a default norm, and the concurrence cited no legal authority for the norm's existence. *Goethel*, 854 F.3d at 108–18. Quite the contrary to this supposed default norm, the *Goethel* majority noted that "further clarification from Congress" related to the industry-funding requirement "would be helpful." *Id.* at 116. A single judge's claim in a concurrence that a "default norm" exists, without any legal support, is hardly proof of such norm's existence.[7]

---

[7] According to Westlaw's headnotes for *Relentless I*, only one opinion since 2023 has cited the case for the existence of the default norm—the district court below. If such a norm existed, one would think that more cases

Not only does the claimed norm lack a legal foundation, but it is harmful for small businesses. If regulated entities, like small businesses, must foot the bill for regulatory implementation, agencies have *carte blanche* to impose enormous financial strain. Both the *Goethel* concurrence and the district court asserted that the claimed norm required businesses to pay the salaries of statutorily required fishing monitors. *See Relentless I*, 62 F.4th at 629 (citing the *Goethel* concurrence); *Relentless Inc.*, 2025 WL 1939025, at *4.[8] The claimed "default norm" lacks any limiting principle. If the cost of compliance for regulated entities includes paying the salaries of their regulators, i.e., the sea monitors in this case, then what prevents the norm from mandating this application in other contexts?

Under this supposed "default norm," if a fishery must pay the cost of required sea monitors, it is not clear what prevents OSHA from requiring businesses to pay the salary of inspectors while the inspector is on

---

would have referenced *Relentless I* for the norm's existence prior to its being vacated.

[8] The now-vacated *Relentless I* opinion put it another way: "When Congress says that an agency may require a business to do 'X,' and is silent as to who pays for 'X,' one expects that the regulated parties will cover the cost of 'X.'" 62 F.4th at 629.

the business's property. Or take the NLRB as another example. Like the MSA, the National Labor Relations Act is silent as to who pays the salaries of the Board, General Counsel, and those of the "executive secretary, and such attorneys, examiners, and regional directors, and such other employees as [the Board] may from time to time find necessary for the proper performance of its duties." *See* 29 U.S.C. § 154(a).[9] But there is no NLRB tax on businesses to fund the salaries of the Board or General Counsel, nor has the NLRB tasked local businesses with paying the salaries and expenses of regional NLRB directors and offices.

A default norm that requires regulated entities to pay the salaries of government regulators opens Pandora's box for agencies to regulate and impose devastating financial obligations on small businesses. Any number of agencies, from the NMFS, the NLRB, and OSHA, to the EEOC, the EPA, the FTC, and more, each of which regulate small businesses in some fashion, could use the made-up default norm in robbing Peter to pay Paul. This Court should firmly repudiate such a default

---

[9] Section 154(b) simply states that "[a]ll expenses of the Board, including all necessary traveling and subsistence expenses outside the District of Columbia incurred by the members or employees of the Board under its orders, shall be allowed and paid" by the Board under its approval. 29 U.S.C. § 154(b).

norm that lacks any legal basis, would allow federal agencies to circumvent the congressional appropriations process, and would significantly harm small businesses.

## CONCLUSION

The Court should reverse the decision below.

DATED: January 23, 2026                    Respectfully submitted,

                                           */s/ Joel S. Nolette*
Elizabeth Milito                           Joel S. Nolette (1209712)
Rob Smith                                  **WILEY REIN LLP**
**NFIB SMALL BUSINESS**                    2050 M Street NW
**LEGAL CENTER, INC.**                     Washington, DC 20036
555 12th Street NW, Suite 1001             Telephone: (202) 719-4741
Washington, DC 20004                       jnolette@wiley.law


Ilya Shapiro
Trevor Burrus
**MANHATTAN INSTITUTE**
52 Vanderbilt Avenue
New York, NY 10017

                                           *Attorneys for* Amici Curiae

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the length limits permitted by Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 4,077 words.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Century Schoolbook type.


DATED: January 23, 2026          */s/ Joel S. Nolette*_____
                                 Joel S. Nolette

                                 *Attorney for* Amici Curiae

# CERTIFICATE OF SERVICE

I, Joel S. Nolette, certify that on January 23, 2026, I caused the foregoing to be filed with the Clerk of Court of the U.S. Court of Appeals for the First Circuit by using the Court's CM/ECF system. I further certify that all counsel of record will be served by the CM/ECF system.


DATED: January 23, 2026       */s/ Joel S. Nolette*
                              Joel S. Nolette

                              *Attorney for* Amici Curiae