CASE NO. 25-1845

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

RELENTLESS INC., ET AL.,
    *Appellants*,

v.

U.S. DEPARTMENT OF COMMERCE, ET AL.,
    *Appellees*.

———————————

On Appeal from the United States District Court for the District of Rhode Island
No. 20-108 WES
The Honorable William E. Smith, U.S. District Judge, Presiding

———————————

**BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE*
IN SUPPORT OF APPELLANTS AND REVERSAL**

———————————

Matthew P. Cavedon
  *Counsel of Record*
Thomas A. Berry
Brent Skorup
Alexander Xenos
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(706) 309-2859
mcavedon@cato.org

January 23, 2026

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to the *amicus*'s participation.

/s/ Matthew P. Cavedon

## TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT..........................................i

TABLE OF AUTHORITIES ............................................................................. iii

INTEREST OF *AMICUS CURIAE*..........................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...............................1

ARGUMENT ..........................................................................................................4

    I.    THE POWER TO IMPOSE TAXES OR FEES IS A CORE LEGISLATIVE POWER. ..........................................................................4

    II.    A CLEAR STATEMENT OF STATUTORY AUTHORITY IS REQUIRED WHEN AN AGENCY CLAIMS THE POWER TO SET TAXES OR FEES. ....................................................................................6

    III.    THE MSA'S BROAD AND OPEN-ENDED LANGUAGE DOES NOT AUTHORIZE TAXES OR FEES. ..................................................11

CONCLUSION .....................................................................................................13

CERTIFICATE OF COMPLIANCE .....................................................................14

CERTIFICATE OF SERVICE ..............................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) .................................................. 9

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ..................... 7, 8

*Brown v. Gardner*, 513 U.S. 115 (1994) .................................................................. 8

*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992) ................................................ 9

*Dep't of Navy v. Egan*, 484 U.S. 518 (1988) ......................................................... 8, 9

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ................................................ 8

*Goethel v. U.S. Dep't of Com.*, 854 F.3d 106 (1st Cir. 2017) ................................... 3

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) ............................................................ 8

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ............................................................... 7

*Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197 (1991) ........................................... 8

*Landgraf v. Usi Film Prods.*, 511 U.S. 244 (1994) ................................................... 8

*Loper Bright Enters. v. Raimondo,* 603 U.S. 369 (2024) ......................................... 3

*Loving v. United States*, 517 U.S. 748 (1996) ........................................................ 10

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ......................................... 5

*Pub. Citizen v. United States Dep't of Just.*, 491 U.S. 440 (1989) ........................... 9

*Relentless, Inc. v. U.S. Dep't of Com.*, 62 F.4th 621 (1st Cir. 2023) ........................ 3

*Russello v. United States*, 464 U.S. 16 (1983) ....................................................... 12

*United States v. Bass*, 404 U.S. 336 (1971) ............................................................. 7

*United States v. Campos-Serrano*, 404 U.S. 293 (1971) .......................................... 8

*United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218 (1952) ...................... 8

*Utah Div. of State Lands v. United States*, 482 U.S. 193 (1987) .............................. 8

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............................................................. 7

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ........................................... 7

*Wilkins v. United States*, 598 U.S. 152 (2023) ......................................................... 8

**Statutes & Legislative Materials**

16 U.S.C. § 1821(h) ................................................................................................. 12

16 U.S.C. § 1827(d) ................................................................................................. 12

16 U.S.C. § 1853(b)(14) ............................................................................ 2, 6, 12

16 U.S.C. § 1853(c) ........................................................................................12

16 U.S.C. § 1854(d) ........................................................................................12

16 U.S.C. § 1858(g)(1)(D) ................................................................................6

16 U.S.C. § 1862 .............................................................................................12

16 U.S.C. § 1881b(c) ........................................................................................1

**Other Authorities**

John C. Nagle, *Waiving Sovereign Immunity in an Age of Clear Statement Rules*, 1995 WIS. L. REV. 772 (1995) ..........................................................8

John F. Manning, *Clear Statement Rules and the Constitution*, 110 COLUM. L. REV. 399 (2010) .....................................................................................7, 9

Kevin R. Kosar, *Fees, Fines and Penalties: Has Congress Lost Control of the Purse?*, C. BOYDEN GRAY CTR. FOR THE STUDY OF THE ADMIN. STATE, WORKING PAPER NO. 21-26 (May 4, 2021) .....................................................5, 6

Legal Information Institute, Search Results ........................................................10

THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT: PERSPECTIVES ON THE NONDELEGATION DOCTRINE (Peter J. Wallison & John Yoo eds. 2022)..................................................................................................................5

THE FEDERALIST NO. 51 (James Madison) .........................................................2

THE FEDERALIST NO. 56 (James Madison) .........................................................6

THE FEDERALIST NO. 57 (James Madison) .........................................................4

THE FEDERALIST NO. 58 (James Madison) ......................................................4, 6

THOMAS PAINE, COMMON SENSE (Richard Beerman ed. 1776) ..........................2

WILLIAM BLACKSTONE, COMMENTARIES (1768) ................................................5

**Constitutional Provisions**

U.S. CONST. art. I, § 8, cl. 1 ..............................................................................4

U.S. CONST., art I, § 7, cl. 1 ..............................................................................4

U.S. CONST., art I, § 9, cl. 7 ............................................................................11

U.S. CONST., art I, § 9, cl. 7 ..............................................................................4

# INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs in constitutional law cases. This case interests Cato because it concerns the U.S. Constitution's separation of powers, which guards individual liberty.

# INTRODUCTION AND SUMMARY OF THE ARGUMENT

This case presents a fundamental question of constitutional structure: whether a federal agency may compel private parties to fund the government's own regulatory program and employees absent clear authorization from Congress.

The Appellants are Atlantic herring fishermen. In 2020, the National Marine Fisheries Service ("NMFS"), citing its authority under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), implemented a rule requiring them to pay for government-mandated, at-sea "observers." *See* Dist. Ct. Op. 5. These trained observers collect data about fishing stocks and monitor regulatory compliance, and they are government employees. 16 U.S.C. § 1881b(c). But the

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in any part. No person or entity other than *amicus* made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

statute nowhere clearly grants the agency authority to compel regulated parties to fund such government personnel. Allowing agencies to require parties to pay for regulatory programs and salaries by statutory implication would transfer a quintessential legislative function to the Executive, undermining Congress's role and the separation of powers.

One of the Founders' core aims after independence was to ensure government officials remained accountable to the American people. As Thomas Paine observed, "the constitution of England [was] so exceedingly complex, that the nation may suffer for years together without being able to discover in which part the fault lies." THOMAS PAINE, COMMON SENSE 12 (Richard Beerman ed. 1776). To avoid that defect, the Founders designed three branches of government, each with distinct powers, responsibilities, and ambitions. *See* THE FEDERALIST NO. 51 (James Madison). This separation is "essential to the preservation of liberty." *Id*.

The court below identified the government's authority to require fishermen to pay for their mandated monitors in what it called "a residual and broad delegation" to the agency to impose fishery management regulations the agency deems "necessary and appropriate." Dist. Ct. Op. 13 (citing 16 U.S.C. § 1853(b)(14)). But that language cannot bear the weight the government places on it. The Constitution vests the power of the purse in Congress alone, and ambiguity and implication cannot sustain a statutory reading that undermines the separation of powers.

The district court further buttressed its dubious statutory interpretation by relying on a purported "default norm" that regulated parties must bear the costs of regulation. Dist. Ct. Op. 10. But the court's only support for such a rule is a decision vacated by the Supreme Court, quoting a concurrence in a prior First Circuit case.[2] *Id*. And although regulated parties often bear their own *private* compliance costs, that does not mean they must bear the costs the *government itself incurs*—including employee salaries—in enforcing its regulations.

The court below erred in relying on this supposed default rule and in deriving such a novel premise—that parties must pay the salaries of their monitors—from vague statutory language. The best reading of the MSA is that Congress withheld authority to require herring fishermen to pay for government-mandated monitors. To hold otherwise would invite agencies to finance their own regulatory ambitions without express congressional approval, circumventing the power of the purse and dissolving a critical separation-of-powers constraint. The decision below should be reversed.

---

[2] The decision below cites *Relentless, Inc. v. U.S. Dep't of Com.*, 62 F.4th 621, 629 (1st Cir. 2023) (quoting *Goethel v. U.S. Dep't of Com.*, 854 F.3d 106, 117–18 (1st Cir. 2017) (Kayatta, J., concurring)), *vacated*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). The quoted concurrence provides no authority for its claim.

# ARGUMENT

## I. THE POWER TO IMPOSE TAXES OR FEES IS A CORE LEGISLATIVE POWER.

The authority to compel private parties to make payments is among the most fundamental powers the Constitution vests in Congress alone. Article I grants Congress the exclusive power to "lay and collect Taxes, Duties, Imposts and Excises." U.S. CONST. art. I, § 8, cl. 1. It further requires that revenue bills originate in the House of Representatives. U.S. CONST., art I, § 7, cl. 1. The House was chosen for this role because it was the federal body closest to the people in their communities, "so constituted as to support in [its] members an habitual recollection of their dependence on the people." THE FEDERALIST NO. 57 (James Madison). Thus, only the House may propose funding to support federal regulation. *See* THE FEDERALIST NO. 58 (James Madison) ("The House of Representatives cannot only refuse, but they alone can propose, the supplies requisite for the support of government.").

Article I also provides that no federal funds should be spent without congressional approval: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." U.S. CONST., art. I, § 9, cl. 7. Together, these provisions reflect the Framers' understanding that the power to extract money from the public and industry

4

is a quintessential legislative function, which promotes political accountability and the separation of powers.

That understanding was shaped by historical experience. In the late seventeenth century, Parliament stripped the Crown of nearly all its revenue-raising power. *See* Kevin R. Kosar, *Fees, Fines and Penalties: Has Congress Lost Control of the Purse?*, C. BOYDEN GRAY CTR. FOR THE STUDY OF THE ADMIN. STATE 4, WORKING PAPER NO. 21-26 (May 4, 2021).[3] The Framers went even further. *Id*. at 5. Whereas the King retained the power to raise "ordinary revenue," including various fines and claims on property based on ancient hereditary rights and ecclesiastical perquisites,[4] the U.S. Constitution deliberately withheld from the Executive the power to raise funds of any kind, whether labeled as fees, taxes, duties, excises, assessments, contributions, or otherwise. *Id*.

The Framers understood that the power to raise revenue is "the power to destroy," *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819), and is uniquely susceptible to abuse. Mark Chenoweth & Richard Samp, *Reinvigorating Nondelegation with Core Legislative Power*, in THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT: PERSPECTIVES ON THE NONDELEGATION DOCTRINE 98 (Peter J. Wallison & John Yoo eds. 2022). With the oppressions of a distant and unfamiliar

---

[3] Available at https://tinyurl.com/y5jmazj3.
[4] 1 WILLIAM BLACKSTONE, COMMENTARIES 281–337 (1768).

legislature fresh in mind, the Framers recognized revenue collection as a legislative object "of most importance, and which seems most to require local knowledge." THE FEDERALIST NO. 56 (James Madison).

Keeping this power in the hands of Congress gives the people a means to check executive abuse. Indeed, "[t]his power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." THE FEDERALIST NO. 58 (James Madison). Accordingly, the Framers saw the danger in giving the Executive any revenue-raising power. Kosar, *supra*, at 4. They didn't want the Executive to be able to fund itself, potentially freeing itself from Congress's oversight.

## II. A CLEAR STATEMENT OF STATUTORY AUTHORITY IS REQUIRED WHEN AN AGENCY CLAIMS THE POWER TO SET TAXES OR FEES.

The court below located the government's authority to require fishermen to pay for their mandated monitors in what it described as "a residual and broad delegation" to impose regulations the agency deems "necessary and appropriate." Dist. Ct. Op. 13 (citing 16 U.S.C. § 1853(b)(14)). That delegation, however, cannot support the power the agency asserts. The court also relied on suggestive language in another provision of the MSA, *id*. at 11–12 (citing 16 U.S.C. § 1858(g)(1)(D)),

but that inference is undermined by the statute as a whole. Congress expressly required foreign fishermen to pay for their observers, yet remained silent as to domestic fishermen. That contrast counsels against treating silence as a delegation of legislative, program-funding power to the Executive. Rather than inferring sweeping fiscal authority from ambiguity, the court below should have applied a clear statement rule, which applies "to the protection of weighty and constant values." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). When dealing with such "sensitive" matters, a rule of clarity "assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *United States v. Bass*, 404 U.S. 336, 349 (1971).

The Supreme Court has required clear statutory language in many contexts,[5] including:

- When statutes alter foundational constitutional arrangements. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991).

- When an agency "alter[s] the fundamental details of a regulatory scheme." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

- When an agency claims broad, transformative power with vast economic and political significance. *West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022).

---

[5] *See* John F. Manning, *Clear Statement Rules and the Constitution*, 110 COLUM. L. REV. 399, 401 (2010) ("[T]he Court has built an extensive regime of clear statement rules, which insist that Congress express itself clearly when it wishes to adopt a policy that presses against a favored constitutional value.").

7

- When a procedural requirement is alleged to be jurisdictional. *Wilkins v. United States*, 598 U.S. 152, 158–59 (2023).

- When abrogating state Eleventh Amendment immunity. *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 204 (1991).

- When determining the extraterritorial effect of a statute. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).

- When Congress interferes with presidential authority in the realms of foreign policy and national security. *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988).

- When an agency seeks to deny benefits to a veteran of the Armed Services. *See, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 117–18 (1994).

- When Congress waives sovereign immunity. *See* John C. Nagle, *Waiving Sovereign Immunity in an Age of Clear Statement Rules*, 1995 WIS. L. REV. 772 (1995).

- When a statute applies retroactively. *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 280 (1994).

- When it is alleged that legislation has been repealed. *Astoria Fed. Sav. & Loan*, 501 U.S. at 109.

- When the government applies criminal statutes against defendants ("the Rule of Lenity").[6]

- When Congress conveys "title to the bed of a navigable water." *Utah Div. of State Lands v. United States*, 482 U.S. 193, 197–98 (1987).

- Before finding a right of action enforceable under 42 U.S.C. § 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 290 (2002).

---

[6] *United States v. Campos-Serrano*, 404 U.S. 293, 297 (1971) (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22 (1952)) ("[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.").

In short, the Supreme Court has long applied rules of clarity to safeguard fundamental constitutional values from erosion through ambiguity. As Justice Scalia explained, the Court's "jurisprudence abounds with rules of 'plain statement,' 'clear statement,' and 'narrow construction' designed variously to ensure that . . . extraordinary constitutional powers are not invoked, or important constitutional protections eliminated," without clear congressional authorization. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 546 (1992) (Scalia, J., concurring in the judgment in part and dissenting in part). Courts should not resolve statutory ambiguity in ways that raise weighty constitutional interests. When Congress intends to authorize actions with profound constitutional implications, it must say so plainly.

That principle applies with full force here. Clear statutory authority is required before an agency can set and collect fees or taxes. Indeed, the Supreme Court has long held that Congress must be clear when using its taxing power. *See* Manning, *supra*, at 425–26 n.136 (citing cases). And the Court has required clarity when a law encroaches on the Constitution's separation of powers. *See, e.g., Pub. Citizen v. United States Dep't of Just.*, 491 U.S. 440 (1989); *Egan*, 484 U.S. at 530.[7]

---

[7] Accordingly, the D.C. Circuit, for example, has applied a clear statement rule to "statutes that significantly alter the balance between Congress and the President." *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991).

The Framers carefully crafted a tripartite federal government to best preserve liberty. The authority to demand money from citizens and their businesses is not ancillary; it is a critical legislative power of Congress. When the Executive claims that authority, the separation of powers is directly implicated. *See Loving v. United States*, 517 U.S. 748, 758 (1996) ("The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress . . . and may not be conveyed to another branch or entity."). To protect the separation of powers, courts should be especially reluctant to find taxing or salary-making authority absent unmistakably clear statutory language.

Indeed, if generalized provisions authorizing "necessary and appropriate" measures sufficed to confer revenue-taking power, there would be little left of Congress's exclusive authority over revenue. That phrase is used in hundreds of statutes in the U.S. Code.[8] Many agencies could independently finance new and existing programs simply by recharacterizing them as regulatory "necessities." The Constitution does not permit that result. Just as Congress must speak clearly before displacing state authority or waiving sovereign immunity, it must speak clearly before authorizing the Executive to compel regulated parties to fund federal programs and employees.

---

[8] *See* Legal Information Institute, Search Results, https://tinyurl.com/b399rsb3 (a search for the phrase "necessary and appropriate" within the U.S. Code returns 476 results).

It is Congress's responsibility to exercise that fiscal power openly and accountably. Absent a clear statement, imputing taxing or salary-making authority to an agency would disrupt the Constitution's calibrated allocation of fiscal power. Agencies would be able to usurp Congress's power of the purse by funding programs directly through compelled payments rather than through funds drawn from the Treasury "in Consequence of Appropriations made by Law." U.S. CONST., art I, § 9, cl. 7. It would shift the great power of raising revenue, imposed on the people, from their elected representatives to the Executive and his delegates. Moreover, the lack of a clear statement rule would enable agencies to increase regulatory and financial burdens without political accountability, insulating controversial fiscal decisions from the legislative process.

### III. THE MSA'S BROAD AND OPEN-ENDED LANGUAGE DOES NOT AUTHORIZE TAXES OR FEES.

The power to raise revenue for a regulatory purpose belongs with Congress. Yet the government would treat the power to impose payments as a mere incident of regulatory administration, capable of arising by implication. That is wrong; monetary mandates are not incidental to the regulation of conduct. Such mandates implicate the core legislative power over the purse—historically and constitutionally reserved to Congress.

The government rests its claim of authority on the MSA's most general and open-ended provisions, authorizing fishery management plans and other measures

that are "necessary and appropriate" for conservation and management. 16 U.S.C. § 1853(b)(14), (c). But broad regulatory language of that sort cannot bear the weight the agency places upon it. An agency may not transform silence or general "necessary and appropriate" language into a sweeping power to impose uncapped taxes, fees, or salary payments.

The provisions invoked under the MSA do not mention fees, charges, payments, cost recovery, or industry funding, let alone compel regulated entities to pay monitors. And where Congress has not spoken clearly, courts may not infer revenue-taking authority from ambiguity. Reading such authority from silence would transform a capacious regulatory clause into an *de facto* revenue statute. An authorization to regulate *conduct* cannot be read to include authority to impose *payments* by merely tacking on a "necessary and appropriate" provision.

The structure of the MSA only further confirms this lack of clear authority. When Congress has authorized industry-funded observers or cost-recovery programs, it has done so expressly, with detailed conditions, limitations, and caps. *See id.* §§ 1862, 1854(d), 1821(h), 1827(d). Under basic principles of statutory interpretation, where Congress includes particular language in one section of a statute but omits it in another, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted). Congress

knew how to authorize industry-funded monitoring, and it did so selectively and deliberately in other parts of the MSA that do not apply here. Courts may not treat that deliberate choice as a drafting oversight or as otherwise inconsequential.

At most, the government's argument establishes ambiguity. And legislative silence or ambiguity should be fatal when agencies claim authority to impose taxes or fees. The power to require private parties to fund government programs is a core legislative function. Allowing agencies to "discover" such authority from vague or open-ended statutory language would invert the separation of powers, permitting executive officials to assume fiscal authority without clear authorization from Congress.

## CONCLUSION

For the foregoing reasons, and for the reasons given by Appellants, this Court should reverse the district court decision.

Respectfully submitted,

*/s/ Matthew P. Cavedon*

Matthew P. Cavedon
  *Counsel of Record*
Thomas A. Berry
Brent Skorup
Alexander Xenos
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(706) 309-2859
mcavedon@cato.org

Dated: January 23, 2026

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains 2,924 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Times New Roman, 14-point font.

January 23, 2026

*/s/ Matthew P. Cavedon*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court, who will enter it into the CM/ECF system, which will send a notification of such filing to the appropriate counsel.

January 23, 2026

/s/ *Matthew P. Cavedon*