# United States Court of Appeals

*for the*

# First Circuit

---

Case No. 25-1845

RELENTLESS INC.; HUNTRESS INC.; SEAFREEZE FLEET LLC,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE DISTRICT COURT OF RHODE ISLAND, PROVIDENCE, IN CASE NO. 1:20-CV-00108-WES, WILLIAM E. SMITH, U.S. DISTRICT JUDGE

---

**BRIEF OF *AMICI CURIAE* ADVANCING AMERICAN FREEDOM; AMERICAN CONSERVATIVE UNION FOUNDATION; AMERICAN ENCORE; AMERICAN ENERGY INSTITUTE; AMERICAN FAMILY ASSOCIATION; AFA ACTION; AMERICAN HINDU COALITION; AMERICAN VALUES; AMERICANS FOR FAIR TREATMENT; E. CALVIN BEISNER, PH.D., PRESIDENT, CORNWALL ALLIANCE FOR THE STEWARDSHIP OF CREATION; CENTER FOR POLITICAL RENEWAL; CENTER OF THE AMERICAN EXPERIMENT; CONSTITUTIONAL GOVERNMENT DEFENSE FUND; EAGLE FORUM; FRONTLINE POLICY COUNCIL; CHARLIE GEROW; INTERNATIONAL CONFERENCE OF EVANGELICAL CHAPLAIN ENDORSERS; JCCWATCH.ORG; TIM JONES, FORMER SPEAKER, MISSOURI HOUSE, FOUNDER, LEADERSHIP FOR AMERICA INSTITUTE; JOSIAH BARTLETT CENTER FOR PUBLIC POLICY; JENNY BETH MARTIN, HONORARY CHAIRMAN, TEA PARTY PATRIOTS ACTION; NATIONAL CENTER FOR PUBLIC POLICY RESEARCH; NEVADA POLICY; PROJECT 21 BLACK LEADERSHIP NETWORK; RIO GRANDE FOUNDATION; SETTING THINGS RIGHT; PAUL STAM, FORMER SPEAKER PRO TEM, NC HOUSE OF REPRESENTATIVES; STUDENTS FOR LIFE ACTION; STUDENTS FOR LIFE OF AMERICA; THE FAMILY ACTION COUNCIL OF TENNESSEE, INC.; THE FAMILY FOUNDATION OF VIRGINIA; UPPER MIDWEST LAW CENTER; YANKEE INSTITUTE; AND YOUNG AMERICA'S FOUNDATION IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

---

J. MARC WHEAT
   *Counsel of Record*
TIMOTHY HARPER (Admitted in DC)
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue NW
Washington, DC 20004
(202) 780-4848
mwheat@advancingamericanfreedom.com
*Counsel for Amici Curiae*

v.

US DEPARTMENT OF COMMERCE; HOWARD W. LUTNICK, in the official capacity as Secretary of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; LAURA GRIMM, in the official capacity as Acting Administrator of NOAA; NATIONAL MARINE FISHERIES SERVICE, a/k/a NOAA Fisheries; EUGENIO PINEIRO SOLER, in the official capacity as Assistant Administrator for NOAA Fisheries,

*Defendants-Appellees.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The amici curiae Advancing American Freedom, Inc.; American Conservative Union Foundation; American Encore; American Energy Institute; American Family Association; AFA Action; American Hindu Coalition; American Values; Americans For Fair Treatment; E. Calvin Beisner, Ph.D., President, Cornwall Alliance for the Stewardship of Creation; Center for Political Renewal; Center of the American Experiment; Constitutional Government Defense Fund; Eagle Forum; Frontline Policy Council; Charlie Gerow; International Conference of Evangelical Chaplain Endorsers; JCCWatch.org; Tim Jones, Former Speaker, Missouri House, Founder, Leadership for America Institute; Josiah Bartlett Center for Public Policy; Jenny Beth Martin, Honorary Chairman, Tea Party Patriots Action; National Center for Public Policy Research; Nevada Policy; Project 21 Black Leadership Network; Rio Grande Foundation; Setting Things Right; Paul Stam, Former Speaker Pro Tem, NC House of Representatives; Students for Life Action; Students for Life of America; The Family Action Council of Tennessee, Inc.; The Family Foundation of Virginia; Upper Midwest Law Center; Yankee Institute; and Young America's Foundation are nonprofit corporations. They do not issue stock and are neither owned by nor are the owners of any other corporate entity, in part or in whole. They have no parent companies, subsidiaries, affiliates, or members that have issued shares or debt

securities to the public. The corporations are operated by volunteer boards of directors.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iv

STATEMENT OF INTEREST OF AMICI CURIAE..............................................1

INTRODUCTION ................................................................................................2

ARGUMENT .......................................................................................................4

I.     The Power to Separate Americans from their Property is Inherently Legislative and Thus Must be Based on a Clear Statement from Congress ......................................................................4

II.    The Constitution Establishes the Separation of Powers as a Means of Ensuring the Rule of Law ..................................................10

     A.    Belief in separation of powers was widespread at the founding and had significant philosophical precedent .............10

     B.    The Framers infused the Constitution with their shared understanding of separation of powers .....................................12

III.    Those Who Created the Administrative State Knew that What They Were Proposing was Unconstitutional and Inconsistent with the Fundamental Purpose of the Constitution.............................14

     A.    These early architects of the administrative state believed that the Framers had gotten the purpose of government wrong ....................................................................15

     B.    These innovators of the administrative state believed that the structure of good government demands the separation of administration and politics .................................17

     C.    These innovators of administration were widely successful at undermining the basic structure of American federal government..................................................19

     D.    The ideas of these so-called progressives were, in fact, regressive and were inconsistent with the Constitution............20

CONCLUSION ..................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*American Power & Light Co. v. SEC*,
  329 U.S. 90 (1946) ........................................................9, 10

*Fletcher v. Peck*,
  6 Cranch 87 (1810)..............................................................5

*Gibbons v. Ogden*,
  22 U.S. 1 (1824) .................................................................4

*Gundy v. United States*,
  588 U.S. 128 (2019) ................................................... *passim*

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928) .............................................................9

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ...........................................................4, 8

*Mistretta v. United States*,
  488 U.S. 361 (1989) ..................................................... 9, 18-19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .............................................................4

*OPP Cotton Mills, Inc. v.
  Administrator of Wage and Hour Div., Dep't of Labor*,
  312 U.S. 126 (1941) ...........................................................10

*Perez v. Mortgage Bankers Ass'n*,
  575 U.S. 92, 115-16 (2015) ...................................................18

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
  881 F.3d 75 (C.A.D.C. 2018) ............................................ 12, 19

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  140 S. Ct. 2183 (2020) ............................................... 12, 18, 19

*Whitman v. American Trucking*,
  531 U.S. 457 (2001) .............................................................8

**Statutes & Other Authorities:**

U.S. Const. amend. X ................................................................13

U.S. Const. art. I, § 1 ..........................................................4, 12

U.S. Const. art. I, § 7, cl. 1 ......................................................7

U.S. Const. art. I, § 8, cl. 1 ...................................................7, 8

U.S. Const. art. I, § 8, cl. 18 ..................................................13

U.S. Const. art. II, § 1 ...................................................... 12, 13

U.S. Const. art. III, § 1 ...........................................................13

16 U.S.C. § 1821(h) ................................................................3

16 U.S.C. § 1853(b)(8) ............................................................2

Mass. Const. pt. 1 art. XXX ................................................10

3 EDMUND BURKE, *Reflections on the Revolution in France*, THE WORKS OF EDMUND BURKE (1839) ........................................... 21-22

Calvin Coolidge, President of the United States, Speech on the 150th Anniversary of the Declaration of Independence (July 5, 1926) https://millercenter.org/the-presidency/presidential-speeches/july-5-1926-declaration-independence-anniversary-commemoration ...........................21

Declaration of Independence para. 19 (U.S. 1776) ................8

Edwin J. Feulner, Jr, *Conservatives Stalk the House: The Story of the Republican Study Committee* (Green Hill Publishers, Inc. 1983) .........................1

Frank J. Goodnow, *The American Conception of Liberty* (1916) ...........................15

Franklin Delano Roosevelt, President of the United States, Address to the Commonwealth Club (September 23, 1932) ........................16

*House retirements so far are at a historic low*, Roll Call (July 9, 2025) https://rollcall.com/2025/07/09/house-open-seats-retirements-midterm-elections/. .......................................................................6

James M. Landis, *The Administrative Process* (1st ed. 1938) ................................18

James Madison, *Preface to Debates in the Convention, The Founders' Constitution*, art. I, § 8, cl. 1, https://press-

pubs.uchicago.edu/founders/documents/a1_8_1s2.html (Last visited
Oct. 24, 2025) .............................................................8, 10, 12, 13, 19

John Adams, Excerpt from *Thoughts on Government*,
https://www.senate.gov/artandhistory/history/common/generic/exerpt-
thoughts-on-government-adams-1776.htm (last visited Oct. 17, 2023) .............11

Mass. Const. pt. 1 art. XXX.................................................................10

Montesquieu, *Spirit of the Laws* § 11.6 (Thomas Nugent trans. 1752)
(1748)..............................................................................................11

Ronald J. Pestritto, *The Progressive Origins of the Administrative State:
Wilson, Goodnow, and Landis*, Social Philosophy and Policy (January
2007)...............................................................................14, 16, 17, 18

The Declaration of Independence para. 19 (U.S. 1776) .........................8

The Federalist No. 23 (Alexander Hamilton) (George Carey & James
McClellan eds., The Liberty Fund 2001). ..........................................21

The Federalist No. 33 (Alexander Hamilton) (George Carey & James
McClellan eds., 2001)......................................................................5

The Federalist No. 45 (James Madison) (George Carey & James
McClellan eds., The Liberty Fund 2001) ........................................4, 13

The Federalist No. 47 (James Madison) (George Carey & James
McClellan eds., The Liberty Fund 2001). ..................................3, 10, 12

The Federalist No. 51 (James Madison) (George Carey & James
McClellan eds., The Liberty Fund 2001) ..................................6, 13, 19

The Federalist No. 62 (James Madison) (George Carey & James
McClellan eds., The Liberty Fund 2001). ..........................................6

The Federalist No. 71 (Alexander Hamilton) (George Carey & James
McClellan eds., The Liberty Fund 2001) ........................................11, 12

The Federalist No. 73 (Alexander Hamilton) (George Carey & James
McClellan eds., The Liberty Fund 2001) ............................................7

The Federalist No. 78 (Alexander Hamilton) (George Carey & James
McClellan eds., The Liberty Fund 2001) ............................................5

Thomas Jefferson, Notes on the State of Virginia, Query XIII (1853) ..................11

Woodrow Wilson, *Constitutional Government in the United States* (1914)..........15

**STATEMENT OF INTEREST OF AMICI CURIAE**[1]

Advancing American Freedom (AAF) is a nonprofit organization that promotes and defends policies that elevate traditional American values, including the uniquely American idea that all people are created equal and endowed by their Creator with unalienable rights to life, liberty, and the pursuit of happiness. AAF "will continue to serve as a beacon for conservative ideas, a reminder to all branches of government of their responsibilities to the nation,"[2] and believes that the governmental structures established by the Constitution are necessary for the preservation of the liberty of the people. Advancing American Freedom files this brief on behalf of its 150,374 members nationwide including 3,384 members in the First Circuit.

Amici Advancing American Freedom, Inc.; American Conservative Union Foundation; American Encore; American Energy Institute; American Family Association; AFA Action; American Hindu Coalition; American Values; Americans For Fair Treatment; E. Calvin Beisner, Ph.D., President, Cornwall Alliance for the Stewardship of Creation; Center for Political Renewal; Center of the American Experiment; Constitutional Government Defense Fund; Eagle Forum; Frontline

---

[1] All parties have consented to the filing of this amicus brief. No person other than Amicus Curiae and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

[2] Edwin J. Feulner, Jr, *Conservatives Stalk the House: The Story of the Republican Study Committee* 212 (Green Hill Publishers, Inc. 1983).

Policy Council; Charlie Gerow; International Conference of Evangelical Chaplain Endorsers; JCCWatch.org; Tim Jones, Former Speaker, Missouri House, Founder, Leadership for America Institute; Josiah Bartlett Center for Public Policy; Jenny Beth Martin, Honorary Chairman, Tea Party Patriots Action; National Center for Public Policy Research; Nevada Policy; Project 21 Black Leadership Network; Rio Grande Foundation; Setting Things Right; Paul Stam, Former Speaker Pro Tem, NC House of Representatives; Students for Life Action; Students for Life of America; The Family Action Council of Tennessee, Inc.; The Family Foundation of Virginia; Upper Midwest Law Center; Yankee Institute; and Young America's Foundation believe, as did America's Founders, that compliance with the Constitution's limits on government power is essential for the preservation of American freedom.

## INTRODUCTION

This case concerns a fundamental question of good governance: whether the government can expropriate funds from private entities without clear congressional authorization. Under the district court's interpretation of the Magnuson-Stevens Act (MSA), the National Marine Fisheries Service (NMFS), an arm of the executive branch, can force fishing companies to pay the costs and daily salaries of a government monitor without clear congressional authorization. 16 U.S.C. § 1853(b)(8) allows fishery management plans, which are intended to help manage fish populations and regulate fishing, to "require that one or more observers be

carried on board a vessel of the United States engaged in fishing for species that are subject to the plan[.]"

The MSA does not contain a provision permitting the NMFS to force fishing companies to compensate these monitors, though the statute does provide for owners of foreign vessels fishing in American waters to cover the cost of on-board monitors. 16 U.S.C. § 1821(h). If Congress wanted to empower the NMFS to force American fishing companies to pay monitors, it could have.

When the Executive Branch wants greater funding for its programs, it must either follow existing and clearly granted authority from Congress or it must go to Congress for more funding. It cannot come up with its own revenue streams.

The Constitution vests the power of revenue raising in Congress alone. The Constitution separates the federal governments powers among three branches because the Framers knew that "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."[3] On the other hand, the framers of the administrative state knew that such combined power was a means of bypassing the political process to accomplish their regulatory agenda.

---

[3] The Federalist No. 47 at 250 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001).

This Court should rule for Plaintiffs-Appellants and enforce the Constitution's separation of powers.

## ARGUMENT

### I. The Power to Separate Americans from their Property is Inherently Legislative and Thus Must be Based on a Clear Statement from Congress.

The Constitution vests "[a]ll legislative Powers" of the national government "in a Congress of the United States." U.S. Const. art. I, § 1. For good reason, Congress is not empowered to delegate that power to any other entity.

The federal government is one of enumerated powers,[4] and enumeration implies limitation. *Gibbons v. Ogden*, 22 U.S. 1, 195 (1824). The Constitution vests "all legislative powers" of the federal government in "a Congress of the United States." U.S. Const. art. I, § 1.

Legislative power is "the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to 'prescribe the rules by

---

[4] The Federalist No. 45 at 241 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001) ("The powers delegated by the proposed constitution to the federal government, are few and defined."). *McCulloch v. Maryland*, 17 U.S. 316, 405 (1819) (The federal "Government is acknowledged by all to be one of enumerated powers. The principle that it can exercise only the powers granted to it would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge."). The Constitution, "rather than granting general authority to perform all the conceivable functions of government," "lists, or enumerates, the Federal Government's powers." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534 (2012). An "enumeration of powers is also a limitation of powers, because '[t]he enumeration presupposes something not enumerated.'" *Id*. at 534 (quoting *Gibbons v. Ogden*, 22 U.S. 1, 9 (1824)) (alteration in original).

which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'" *Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting) (quoting The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton); *Fletcher v. Peck*, 6 Cranch 87, 136 (1810)).

Alexander Hamilton explained that legislative power is the power that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated,"[5] one of which "is the power of laying and collecting taxes."[6] According to Blackstone, "Legislators and their laws are said to compel and oblige."[7] As Professor Philip Hamburger explains:

> [T]he natural dividing line between legislative and nonlegislative power was between rules that bound subjects and those that did not . . . It therefore was assumed that the enactment of legally binding rules could come only from a representative legislature and that the resulting rules could bind only subjects, not other peoples . . . [T]he executive could not make rules or duties that bound subjects, for these were legislative.[8]

The Constitution grants the national government's legislative powers to Congress alone because the framers "believed the new federal government's most dangerous power was the power to enact laws restricting the people's liberty."

---

[5] Federalist No. 78 at 383 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001).

[6] *See*, Federalist No. 33 at 160 (Alexander Hamilton) (George Carey & James McClellan eds., 2001) (What is the power of laying and collecting taxes, but a legislative power, or a power of making laws, to lay and collect taxes?").

[7] *Id.* (internal quotation marks omitted).

[8] *Id.*

*Gundy v. United States*, 588 U.S. 128, 154 (2019) (Gorsuch, J., dissenting). According to James Madison, there are two means of securing the liberty of the people against government abuse. "[T]he primary control on the government" is "a dependence on the people," but, he explained, experience had "taught mankind the necessity of auxiliary precautions."[9]

The most immediate source of the federal government's "dependence on," or accountability to, the people is the biennial election of members of the House of Representatives. Because the vast majority of members seek reelection,[10] the American people in general have an opportunity every other November to hold Congress accountable in a meaningful way.

Because popular accountability is not always sufficient to restrain government excess, the Constitution's structural limits on power act as "auxiliary precautions."[11] At the Founding, it was the "facility and excess of lawmaking" that "seem[ed] to be the diseases to which our governments [were] most liable."[12] As a cure to those "diseases," "the framers went to great lengths to make lawmaking difficult." *Gundy*, 588 U.S. at 154 (Gorsuch, J., dissenting). While, "[s]ome occasionally complain

---

[9] Federalist No. 51 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001).

[10] "Going back 80 years, the average number of House open seats has been 35," or less than 10% of the Houses members. *House retirements so far are at a historic low*, Roll Call (July 9, 2025 3:19 PM) https://rollcall.com/2025/07/09/house-open-seats-retirements-midterm-elections/.

[11] Madison, Federalist No. 51 *supra* note 9 at 269.

[12] Federalist No. 62, 321-22 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001).

about the arduous processes for new legislation," "to the framers these were bulwarks of liberty." *Id*.

These "arduous processes" "were also designed to promote deliberation," *id*., because, "[t]he oftener a measure is brought under examination, the greater the diversity in the situations of those who are to examine it, the less must be the danger of those errors which flow from want of due deliberation, or of those missteps which proceed from the contagion of some common passion or interest."[13]

Thus, vesting legislative power in Congress helped secure the liberty of the people by allowing for popular accountability and facilitating deliberative and careful lawmaking.

Congress's core legislative powers are enumerated in Article I, Section 8, of the Constitution. The first of those powers is, "To lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Further, this power is limited; "All bills for raising revenue [must] originate in the House of Representatives." U.S. Const. art. I, § 7, cl. 1.

That the power to tax is listed first among Congress's powers is no accident. The inability of the national government under the Articles of Confederation to raise

---

[13] Federalist No. 73, 381-82 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001).

revenue was the impetus for the constitutional convention.[14] But the Framers of the Constitution also knew, as the Supreme Court would later say, "[t]hat the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819). Among the founding generation's complaints against British rule was that King George III had "impos[ed] taxes on us without our consent." The Declaration of Independence para. 19 (U.S. 1776). When the Framers designed America's system of government, they consciously kept the taxing power close to the people and far from unilateral control.

The Constitution's vesting of all legislative power in Congress "is a bar on [that power's] further delegation." *FCC v. Consumers' Research*, No. 24-354, slip op. at 10 (June 27, 2025) (citing *Whitman v. American Trucking*, 531 U.S. 457, 472 (2001). The nondelegation doctrine, the Supreme Court's rule for enforcing this constitutional principle, "bars Congress from transferring its legislative power to another branch of Government." *Gundy*, 588 U.S. at 132 (opinion of Kagan, J.). *But see, Gundy*, 588 U.S. at 135 (opinion of Kagan, J.) ("The constitutional question is

---

[14] *See, e.g.*, James Madison, *Preface to Debates in the Convention, The Founders' Constitution*, art. I, § 8, cl. 1, https://press-pubs.uchicago.edu/founders/documents/a1_8_1s2.html (Last visited Oct. 24, 2025) ("At the date of the Convention, the aspect & retrospect of the pol: condition of the U.S. could not but fill the pub. mind with a gloom which was relieved only by a hope that so select a Body would devise an adequate remedy for the existing and prospective evils so impressively demanding it. It was seen that the public debt rendered so sacred by the cause in which it had been incurred remained without provision for its payment. The reiterated and elaborate efforts of Cong. to procure from the States a more adequate power to raise the means of payment had failed.").

whether Congress has supplied an intelligible principle to guide the delegee's use of discretion.").

To police the boundary between laws that legitimately empower the Executive Branch and laws that improperly delegating legislative power thereto, the Supreme Court has held that Congress must "lay down . . . an intelligible principle to which the person or body authorized" to exercise the power in question must "conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928). While the intelligible principle test has, at times, allowed Congress to empower the President with "extraordinarily capacious standards," *Gundy*, 588 U.S. at 149 (Alito, J., concurring), the fundamental prohibition remains clear: "No one, not even Congress, ha[s] the right to alter [the constitutional] arrangement" of powers. *Id.* 588 U.S. at 153 (Gorsuch, J., dissenting). "Our Members of Congress could not, even if they wished, vote all power to the President and adjourn *sine die.*" *Mistretta v. United States*, 488 U.S. 361, 415 (1989) (Scalia, J., dissenting).

Congress must make clear "both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Id.* (alteration in original) (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). The Supreme Court also considers whether "Congress has provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has

followed the law." *Id.* (alteration in original) (quoting *OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dep't of Labor*, 312 U.S. 126, 144 (1941)).

Here, the NMFS seeks to impose the cost of government observers on fishing companies without clear congressional authorization to do so. That Congress authorized it to impose those costs on foreign fishers demonstrates that it was capable of shifting the prices to companies. This Court should not allow the NMFS to create a new fee without congressional authorization.

## II. The Constitution Establishes the Separation of Powers as a Means of Ensuring the Rule of Law.

### A. *Belief in separation of powers was widespread at the founding and had significant philosophical precedent.*

John Adams explained the purpose of a government of separated powers in the Massachusetts Constitution. Under the state constitution, the executive, judicial, and legislative organs of the state government may not exercise the powers of one another so that, "it may be a government of laws and not of men." Mass. Const. pt. 1 art. XXX. In other words, the separation of powers is one of the fundamental solutions to the perpetual conflict between the need for government to protect rights because of human nature and the tendency of governments in which men rule to destroy the rights the institution exists to protect. For the Founders, the most important proponent of the separation of powers was Montesquieu.[15]

_____

[15] Madison, *supra* note 3 at 250-51 ("The oracle who is always consulted and cited on this

As Montesquieu wrote, "When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."[16] Further, "there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control," and if it were, "joined to the executive power the judge might behave with violence and oppression."[17] For all three powers to be exercised by the same person or body "would be an end of everything."[18]

The Founders shared Montesquieu's understanding. As Jefferson wrote, "The concentrating [of powers] in the same hands is precisely the definition of despotic government. It will be no alleviation that these powers will be exercised by a plurality of hands, and not by a single one. . . An elective despotism was not the government we fought for."[19] The founding generation's view of separation of

---

subject is the celebrated Montesquieu. If he be not the author of this invaluable precept in the science of politics, he has the merit at least of displaying and recommending it most effectually to the attention of mankind.").

[16] Montesquieu, *Spirit of the Laws* § 11.6 (Thomas Nugent trans. 1752) (1748).

[17] *Id.*

[18] *Id.*

[19] Thomas Jefferson, Notes on the State of Virginia, Query XIII, 128-29 (1853). *See also*, John Adams Excerpt from *Thoughts on Government*, https://www.senate.gov/artandhistory/history/common/generic/exerpt-thoughts-on-government-adams-1776.htm (last visited Oct. 17, 2023) ("A single Assembly is liable to all the vices, follies and frailties of an individual. Subject to fits of humour, starts of passion, flights of enthusiasm, partialities of prejudice, and consequently productive of hasty results and absurd judgments: And

powers as essential to liberty was so strong that a major antifederalist critique of the proposed Constitution was that it did not separate powers enough.[20]

B.    *The Framers infused the Constitution with their shared understanding of separation of powers.*

The design of the Constitution directly reflects an understanding of government that sees it as both the protector of, and a threat to, individual liberty. *See PHH Corp.* v. *Consumer Fin. Prot. Bureau*, 881 F.3d 75, 164 (C.A.D.C. 2018) (Kavanaugh, J., dissenting) ("To prevent tyranny and protect individual liberty, the Framers of the Constitution separated the legislative, executive, and judicial powers of the new national government.").

Article I establishes the legislative branch and vests "*All* legislative Powers" of the federal government in "a Congress of the United States which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1 (emphasis added). Article II vests "the 'executive Power' –all of it," *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020), in "a President of the United States." U.S. Const. art. II, § 1. Finally, Article III vests "the judicial Power of the United

---

all these errors ought to be corrected and defects supplied by some controuling power."); The Federalist No. 71 at 372 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001) ("The same rule, which teaches the propriety of a partition between the various branches of power, teaches us likewise that this partition ought to be so contrived as to render the one independent of the other.").

[20] Madison, *supra* note 3 at 249-50 ("One of the principal objections inculcated by the more respectable adversaries to the Constitution is its supposed violation of the political maxim that the legislative, executive, and judiciary departments ought to be separate and distinct.").

States . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. The judges of these courts "shall hold their Offices during good Behaviour," and may not have their compensation reduced while in office. *Id*. The Constitution only departs from this strict separation in specific ways to create a system of checks and balances.

Those checks and balances were meant to work along with the separation of powers to ensure that each branch could protect its own power. According to Madison, "the great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others."[21] He continued, "Ambition must be made to counteract ambition. The interest of the man must be connected with the constitutional rights of the place." *Id*.

The Constitution enumerates specific powers that Congress may exercise and vests it with the power, "[t]o make all Laws which shall be necessary and proper for carrying into Execution," its enumerated powers. U.S. Const. art. I, § 8, cl. 18. Those "powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X. Those powers that are delegated are not a blank check.[22] In contravention

---

[21] Madison, *supra* note 9 at 269.
[22] Madison, *supra* note 4 at 241-42 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001) ("The powers delegated by the proposed constitution to the federal

of these constitutional principles, there has been a concerted effort over the past century to comingle the powers of government in the executive branch.

## III. Those Who Created the Administrative State Knew that What They Were Proposing was Unconstitutional and Inconsistent with the Fundamental Purpose of the Constitution.

The administrative state became a major player in the federal government during the administration of Franklin Delano Roosevelt (FDR), largely as a result of his New Deal policies.[23] However, the ideas did not start with him. According to FDR himself, many of the principles for the New Deal came from President Woodrow Wilson.[24] Wilson, in turn, was influenced by Frank Goodnow, a professor at Columbia and later Johns Hopkins.[25] Finally, one of the most important early architects of the administrative state was James Landis.[26] "Through Landis' work on securities legislation, and his subsequent service on the [Federal Trade Commission (FTC)] and [Securities and Exchange Commission (SEC)]," he "became the animating force behind the growth of modern administration as we know it today."[27]

---

government, are few and defined.").

[23] *See* Ronald J. Pestritto, *The Progressive Origins of the Administrative State: Wilson, Goodnow, and Landis*, Social Philosophy and Policy, January 2007, 16, 16 n.1.

[24] *Id*. at 28.

[25] *See id*. at 25, 43.

[26] *Id*. at 25.

[27] *Id*. at 16.

A. *These early architects of the administrative state believed that the Framers had gotten the purpose of government wrong.*

In the minds of these men, the government cannot merely protect the rights of individuals because the complexity of the modern world demands government intervention. To Wilson:

> The object of constitutional government is to bring the active, planning will of each part of the government into accord with the prevailing popular thought and need . . .whatever institutions, whatever practices serve these ends, are necessary to such a system: those which do not, or which serve it imperfectly should be dispensed with or bettered.[28]

Goodnow also believed that America had moved past the Founders' vision of government. He wrote, "[W]hile insistence on individual rights may have been of great advantage at a time when the social organization was not highly developed, it may become a menace when social rather than individual efficiency is the necessary prerequisite of progress."[29] Apparently, then, it was a good thing that "the sphere of governmental action is continually widening and the actual content of individual private rights is being increasingly narrowed."[30]

Landis wrote similarly, "[t]he complexities of our modern society are increasing rather than decreasing," which "call[s] for greater surveillance by

---

[28] Woodrow Wilson, *Constitutional Government in the United States* 14 (1914) https://www.loc.gov/resource/gdcmassbookdig.constitutionalgo00wils_0/?sp=28&r=-0.831,-0.033,2.661,1.184,0.

[29] Frank J. Goodnow, *The American Conception of Liberty* 21 (1916) https://archive.org/details/americanconcepti00goodrich/page/n5/mode/2up.

[30] *Id.*

government."[31] Nonetheless, "modern government had to move beyond the separation of powers, since the end of government had changed from rights protection to what Landis called the 'promotion of the welfare of the governed' or, more generally, 'well-being.'"[32]

Somewhat more subtly, though no less dangerously, FDR said, "[t]he task of statesmanship has always been the re-definition of [the] rights [people enter into the social contract to protect] in terms of a changing and growing social order. New conditions impose new requirements upon Government and those who conduct Government."[33] Thus, contrary to the understanding that informed the drafting of the Constitution, these innovators of administration saw government's purpose not as rights protection but as the restructuring of society for social and economic efficiency with less and less regard paid to individual rights.

---

[31] Pestritto, *supra* note 23, at 35.
[32] *Id*. at 27.
[33] Franklin Delano Roosevelt, President of the United States, Address to the Commonwealth Club (September 23, 1932) https://teachingamericanhistory.org/document/commonwealth-club-address/.

B.      *These innovators of the administrative state believed that the structure of good government demands the separation of administration and politics.*

Because those who created the administrative state believed the purpose of government was different from that which animated the creation of the Constitution, they also thought the structures created by that Constitution had to go.

For Goodnow, "the sphere of administration," was "outside the sphere of constitutional law."[34] Further, in place of separation of powers, Goodnow and Wilson advocated for the separation of politics and administration.[35] According to Wilson the government is a living organism, not a machine, as the innovators thought. As he claimed, "No living thing can have its organs offset against each other, as checks, and live."[36] Landis, "fully conceded" that "[t]he growth of modern administration . . . does not fit within the form of American constitutionalism," specifically the separation of powers.[37]

As one example of this philosophy in practice, the SEC was designed based on the belief that complexity demands not only government intervention but government free of normal constraints, with sufficient flexibility to address apparently ever-arising issues.[38] Landis "pointed to the Securities and Exchange Act

---

[34] Pestritto, *supra* note 23, at 47.
[35] *See id.* at 25, 46-47.
[36] *Id.* at 39.
[37] *Id.* at 27.
[38] *See id.*

of 1934, which he had helped to draft, as an example of how to create an agency with powers flexible enough to meet unforeseen exigencies."[39] Landis thought "[t]he discretionary language with which the act empowered the SEC was a vast improvement" over the earlier Securities Act which gave the agency more limited powers.[40]

Landis complained that "[a] legalistic approach that reads a governing statute with the hope of finding limitations upon authority rather than grants of power with which to act decisively" was common because doing otherwise was a political gamble.[41] On the other hand, Landis held up as an example:

> One of the ablest administrators that it was my good fortune to know . . . [who] never read, at least more than casually, the statutes that he translated into reality. He assumed that they gave him power to deal with the broad problems of an industry and, upon that understanding, he sought his own solutions.[42]

The Supreme Court has, at times, imbibed the progressive view of government. *Seila Law*, 140 S. Ct. at 2212 (Thomas, J., concurring) (quoting *Perez*, 575 U.S. at 115-16 (Thomas, J., concurring) ("Unfortunately, this Court 'ha[s] not always been vigilant about protecting the structure of our Constitution,' at times endorsing a 'more pragmatic, flexible approach' to our Government's design.") (alteration in original). For example, the Court wrote in *Mistretta v. United States*,

---

[39] *Id.*
[40] *Id.*
[41] James M. Landis, *The Administrative Process*, 75 (1st ed. 1938).
[42] *Id.*

488 U.S. 361, 372 (1989), "[I]n our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." If that is the case, the Constitution may be amended. Until it is, however, those who govern the people are bound by that document as it is, not as they wish it were. Because the innovators of the administrative state had little respect for the Constitution and its limitations on power, it should be unsurprising that the system they created circumvents those limitations.

C. *These innovators of administration were widely successful at undermining the basic structure of American federal government.*

The administrative state is insulated from both methods of restraint of government foreseen by the Framers. According to Madison, "a dependence on the people" is the "primary controul" of government, but certain "auxiliary precautions" were also necessary.[43] As Justice Thomas has noted, when "independent agencies wield substantial power with no accountability to the President or the people they 'pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances." *Seila Law*, 140 S. Ct. at 2212 (Thomas, J., concurring) (quoting *PHH Corp.*, 881 F.3d at 165 (Kavanaugh, J., dissenting)).

---

[43] Madison, *supra* note 9 at 269.

The design of administrative agencies intentionally avoids both democratic and structural constraints. Enacting federal legislation is not easy, nor is it supposed to be. *Gundy v. United States*, 139 S. Ct. 2116, 2134 (2019) (Gorsuch, J., dissenting) (explaining that the rigors of bicameralism and presentment, "Article I's detailed and arduous processes for new legislation," were, "to the framers . . . bulwarks of liberty."). The slow, deliberative process protects liberty against populist whims in the federal government. Yet that same process now makes it practically impossible for Congress to oversee the Executive Branch's exercise of the legislative and judicial power. Thus, the people's representatives are often largely cut out of the lawmaking process. Perhaps legislators are happy to pass off their power, and thus their responsibility, to another body, but, for the sake of the people's liberty, the Constitution does not allow them to do so.

D.    *The ideas of these so-called progressives were, in fact, regressive and were inconsistent with the Constitution.*

Those who designed and established the administrative state thought of themselves as progressive, but they were not. As President Calvin Coolidge explained on the Declaration's 150th anniversary:

> It is often asserted that the world has made a great deal of progress since 1776, that we have had new thoughts and new experiences which have given us a great advance over the people of that day, and that we may therefore very well discard their conclusions for something more modern. But that reasoning can not be applied to this great charter. If all men are created equal, that is final. If they are endowed with inalienable rights, that is final. If governments derive their just powers

from the consent of the governed, that is final. No advance, no progress can be made beyond these propositions. If anyone wishes to deny their truth or their soundness, the only direction in which he can proceed historically is not forward, but backward toward the time when there was no equality, no rights of the individual, no rule of the people. Those who wish to proceed in that direction can not lay claim to progress. They are reactionary. Their ideas are not more modern, but more ancient, than those of the Revolutionary fathers.[44]

Hamilton argued that while the federal government would need extensive powers in the realms over which it had authority, "the most vigilant and careful attention of the people," was essential "to see that it be modelled in such a manner, as to admit of its being safely vested with the requisite powers."[45] As part of that vigilance, "If any plan which has been, or may be offered to our consideration, should not, upon a dispassionate inspection, be found to answer this description, it ought to be rejected."[46] The plan of the administrative state is, by design, inconsistent with the protections of which Hamilton was speaking. Because the view expressed by Hamilton was the view established in law by the adoption of the Constitution and which represented the general understanding of government and the Constitution at the time of the founding, the later meddling of "sophisters, economists, and calculators,"[47] must be rejected.

---

[44] Calvin Coolidge, President of the United States, Speech on the 150th Anniversary of the Declaration of Independence (July 5, 1926) https://millercenter.org/the-presidency/presidential-speeches/july-5-1926-declaration-independence-anniversary-commemoration.

[45] Federalist No. 23 at 116 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001).

[46] *Id*.

[47] 3 EDMUND BRUKE, *Reflections on the Revolution in France*, *in* THE WORKS OF EDMUND

**CONCLUSION**

This Court should rule for Plaintiffs-Appellants.

/s/ J. Marc Wheat
J. MARC WHEAT
  *Counsel of Record*
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com
*Counsel for Amici Curiae*

---

BURKE 19, 98 (1839).

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2026, I caused the foregoing Brief to be filed electronically using the Court's CM/ECF system. I further certify that service will be accomplished electronically on all counsel of record, who are registered CM/ECF users.

/s/ J. Marc Wheat
J. MARC WHEAT

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that This brief complies with the length limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and First Circuit Rule 32(g)(1) because this brief contains 5253 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Times New Roman 14-point font.

/s/ J. Marc Wheat
J. MARC WHEAT