# No. 25-1845

## In the United States Court of Appeals
## for the First Circuit

RELENTLESS INC.; HUNTRESS INC.; SEAFREEZE FLEET LLC,

*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF COMMERCE, HOWARD LUTNICK, in his official capacity as Secretary of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; LAURA GRIMM, in her official capacity as Administrator of NOAA; NATIONAL MARINE FISHERIES SERVICE, a/k/a NOAA Fisheries; EUGENIO PINIERO SOLER, in his official capacity as Assistant Administrator for NOAA Fisheries,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT OF RHODE ISLAND
No. 1:20-cv-00108-WES (Judge William E. Smith)

**BRIEF OF THE CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE*
IN SUPPORT OF APPELLANTS AND REVERSAL**

Christopher J. Walker
*Counsel of Record*
UNIVERSITY OF MICHIGAN
SCHOOL OF LAW
701 South State Street
Ann Arbor, MI 48109-3091
(734) 763-3812
chris.j.walker@umich.edu

*Counsel for the Chamber of Commerce
of the United States of America*

# CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America (Chamber) states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

**TABLE OF CONTENTS**

INTEREST OF *AMICUS CURIAE* ............................................................ 1

SUMMARY OF ARGUMENT ................................................................ 2

ARGUMENT ........................................................................................ 6

I. *Loper Bright* Requires Courts To Exercise Independent Judgment When Interpreting Statutes. ................................ 6

II. *Loper Bright* Cabins Federal Agencies' Policymaking Discretion. .............................................................................. 8

    A. Congress Can Specifically Delegate Authority To Agencies To Define Statutory Terms ............................. 9

    B. When Congress Grants General Rulemaking Authority, Agencies May Be Authorized To Fill Up Details And Regulate Subject To The Limits Of Flexible Terms ................................................................. 12

III. *Loper Bright* Reaffirms Existing Guardrails On Agency Policymaking. ........................................................................ 15

    A. The APA And *Loper Bright* Require Courts To Fix The Boundaries Of Statutory Delegations. ................. 16

    B. The Constitution Requires Courts To Rein In Excessive Statutory Delegations. ................................ 19

    C. The APA Requires Courts To Ensure Agencies Have Engaged In Reasoned Decisionmaking. ............. 21

IV. The Magnuson-Stevens Act Does Not Authorize The Commerce Department To Require Plaintiffs To Pay For Monitors On Their Fishing Vessels. ..................................... 22

A. The Statute's Substantive Provisions Do Not Authorize This Burdensome Cost-Shifting Regime. .................................................................. 22

B. The Statute's Catchall Provision Does Not Authorize This Burdensome Cost-Shifting Regime. .................................................................. 25

C. After *Loper Bright*, It Is Inappropriate For Courts To Rely On "Default Norms" Of Agency Deference. .................................................................. 30

CONCLUSION .................................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Batterton v. Francis*, 432 U.S. 416 (1977)................................ 9, 10, 17, 18

*Chevron v. NRDC*, 467 U.S. 837 (1984) ........................................ passim

*Dep't of Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012) ....................... 32

*FCC v. Consumers' Research,* 606 U.S. 656 (2025)................................ 20

*Goethel v. Dep't of Com.*, 854 F.3d 106 (1st Cir. 2017) .......................... 30

*Gundy v. United States*, 588 U.S. 128 (2019) .................................. 13, 14

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928)........... 20

*Kmart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ............................. 7, 18

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ......... passim

*Michigan v. EPA*, 576 U.S. 743 (2015)........................................... passim

*Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983)................................................................. 21, 22

*Relentless Inc. v. Dep't of Com.*, 2025 WL 1939025 (D.R.I. July 15, 2025) ....................................................................... 4, 25, 28

*Relentless, Inc. v. Dep't of Com.*, 62 F.4th 621 (1st Cir. 2023)............ 4, 30

*Russello v. United States*, 464 U.S. 16 (1983)....................................... 24

*Wayman v. Southard*, 23 U.S. 1 (1825)................................................ 13

*West Virginia v. EPA*, 597 U.S. 697 (2022)........................................... 20

iv

**Statutes**

16 U.S.C. § 1821 ....................................................................23, 29

16 U.S.C. § 1853 .............................................................. passim

16 U.S.C. § 1853a ................................................................23, 29

16 U.S.C. § 1854 ......................................................................24

16 U.S.C. § 1862 .........................................................23, 24, 29

26 U.S.C. § 7805 ......................................................................13

29 U.S.C. § 213 ........................................................................9

42 U.S.C. § 5846 ......................................................................9

42 U.S.C. § 607 (1977) ..............................................9, 10, 17

42 U.S.C. § 7412 .........................................................15, 18, 19, 28

5 U.S.C. § 5548 ......................................................................13

**Other Authorities**

Antonion Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ................................................. passim

Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315 (2000) ........................................................................20

Henry P. Monaghan, Marbury *and the Administrative State*, 83 Colum. L. Rev. 1 (1983) ..............................................................17

Jennifer L. Selin & David E. Lewis, *Sourcebook of United States Executive Agencies* (Admin. Conf. of U.S., 2d ed. 2018) ..............11, 32

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

U.S. Chamber *Amicus* Br., *Coca-Cola Co. v. Comm'r*, No. 24–13470
(11th Cir., filed Mar. 18, 2025) ..........................................................2

U.S. Chamber *Amicus* Br., *Lesko v. United States*, No. 23–1823 (Fed.
Cir., filed May 29, 2025) ....................................................................2

U.S. Chamber Supp. *Amicus* Br., *3M Co. v. Comm'r*, No. 23–3772 (8th
Cir., filed Oct. 2, 2024) ......................................................................2

## INTEREST OF *AMICUS CURIAE**

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus* briefs in cases, like this one, that raise issues of concern to the nation's business community.

In 2024, the Supreme Court consolidated this case with *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), overruled *Chevron* deference, vacated this Court's decision, and remanded for further proceedings. *See id.* at 412–13. Given the breadth of its membership and its

---

* Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* states that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. The parties consent to the filing of this brief.

long history of challenging regulatory overreach, the Chamber has a strong interest in how courts review agency statutory interpretations and is uniquely positioned to speak to the effects of *Loper Bright*. Indeed, the Chamber has filed numerous *amicus* briefs about the impact of *Loper Bright* in courts across the country. *See, e.g.*, U.S. Chamber *Amicus* Br., *Lesko v. United States*, No. 23–1823 (Fed. Cir., filed May 29, 2025); U.S. Chamber *Amicus* Br., *Coca-Cola Co. v. Comm'r*, No. 24–13470 (11th Cir., filed Mar. 18, 2025); U.S. Chamber Supp. *Amicus* Br., *3M Co. v. Comm'r*, No. 23–3772 (8th Cir., filed Oct. 2, 2024)

## SUMMARY OF ARGUMENT

In *Loper Bright*, the Supreme Court decisively rejected *Chevron* deference. Under that doctrine, courts were required to defer to a federal agency's interpretation of ambiguous statutory language so long as that interpretation was "reasonable." *Chevron v. NRDC*, 467 U.S. 837, 842–43 (1984). Now, courts must exercise independent judgment to determine the meaning of statutes that govern federal agencies. That means courts must conduct *de novo* review and use all of the traditional tools of statutory interpretation to arrive at the "best" reading of the statute.

In some instances, the best reading could be that Congress has authorized the agency to exercise a degree of policymaking discretion. *Loper Bright* recognizes two such categories: (1) when Congress expressly instructs the agency to define or give meaning to a statutory term; and (2) when both (a) Congress grants the agency general rulemaking authority, and (b) the agency "fills up the details" of a statutory scheme or regulates subject to the limits imposed by a statutory term that leaves the agency with flexibility, such as "appropriate" or "reasonable." Even in these circumstances, the court must still ensure the delegation is consistent with the Constitution, the agency's policymaking does not exceed the boundaries of the statutory delegation, and the agency's policymaking complies with the reasoned-decisionmaking requirements of the Administrative Procedure Act (APA).

The district court's decision cannot be squared with *Loper Bright*. Under the applicable rules of statutory interpretation, the Magnuson-Stevens Act does not authorize the Department of Commerce to require plaintiffs to pay for government-mandated at-sea monitors on their U.S. fishing vessels. Among other things, Congress expressly authorized the

agency to require certain domestic and foreign vessels to pay for such monitors, but Congress did not do so for the vessels at issue here.

Nevertheless, the district court held that a catchall, general "necessary and appropriate" rulemaking provision granted the agency "a large degree of discretionary authority" to impose a cost-shifting mechanism that is found nowhere in the statutory text. *Relentless Inc. v. Dep't of Com.*, 2025 WL 1939025, at *4 (D.R.I. July 15, 2025). While *Loper Bright* recognizes that agencies with general rulemaking authority have some discretion to fill up the details in the statutory scheme, adopting the cost-shifting regime at issue in this case, which Congress declined to create, goes far beyond that limited delegation. To hold otherwise would reinvent *Chevron* deference under a new name.

Finally, the district court erred in relying on dicta from this Court's pre-*Loper Bright* cases: specifically, that there is some "default norm" of statutory interpretation "that the government does not reimburse regulated entities for the cost of complying with properly enacted regulations . . . ." *Relentless, Inc. v. Dep't of Com.*, 62 F.4th 621, 629 (1st Cir. 2023) (internal quotation marks omitted). Particularly after *Loper Bright*, reliance on that "default norm" of agency deference is not

appropriate. To decide whether an agency is authorized to shift costs to regulated entities, a court must exercise independent judgment to determine that Congress directed or authorized the agency to do so. Congress did not do so here.

Moreover, even accepting this "default norm" as a general rule of thumb, it would not apply in this case. Requiring a business to pay for a government monitor is not some run-of-the-mill compliance cost. It is more akin to requiring a business to pay for a customs official, OSHA inspector, patent examiner, or SEC prosecutor. Holding that, absent express congressional authorization, agencies may force regulated entities to pay for individual enforcement agents would be a substantial change from the status quo and would raise serious constitutional concerns. Agencies would be permitted to bypass Congress's appropriations process—and Congress's exercise of the taxing power—without congressional authorization. Congress's power-of-the-pursue check on agencies' enforcement priorities would be cast aside. In light of these concerns, this Court should reject the agency's argument that the statute authorizes the agency to exercise such profound power.

**ARGUMENT**

## I. *Loper Bright* Requires Courts To Exercise Independent Judgment When Interpreting Statutes.

For decades, the Supreme Court had instructed courts to defer to agencies' reasonable interpretations of ambiguous statutes they administer. *See Chevron*, 467 U.S. at 842–43. In *Loper Bright*, however, the Court eliminated *Chevron* deference. Judicial review now requires courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412. In other words, courts must apply the traditional tools of statutory interpretation to determine the statute's best meaning.

Arriving at the best interpretation—or "fair reading," as Justice Scalia would frame it—involves "determining the application of a governing text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012). Under the traditional tools of statutory interpretation, courts begin with the statutory text. "Words are to be understood in their ordinary, everyday meanings," Justice Scalia explained, "unless the context indicates that they bear a technical sense." *Id.* at 69.

This independent judgment often involves the application of a collection of semantic, contextual, syntactic, structural, and substantive canons of statutory interpretation jurists have recognized and developed over the centuries. *See id.* at 53–339 (chronicling 57 canons). These interpretive tools, or canons, do not just focus myopically on the statutory terms that are most directly in dispute. "In ascertaining the plain meaning of the statute," the Supreme Court has instructed that "the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *Kmart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also* Scalia & Garner, *supra*, at 167–69 (classifying this interpretive tool as "the whole-text canon").[1]

---

[1] *Loper Bright* refers to another tool courts have applied in the context of agency statutory interpretation. Eight decades ago in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the Supreme Court suggested that courts should give "weight" to an agency interpretation based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 140. *Loper Bright* is careful to frame *Skidmore* as a form of "respect"— not controlling deference. *See, e.g.*, 603 U.S. at 412–13; *id.* at 403. In other words, the government sometimes has views that are helpful to understand a statutory framework, typically due to its informed and contemporaneous understanding of the statute's meaning at its enactment or its specialized expertise implementing a complex statutory scheme. The government has not invoked *Skidmore* respect in this case—for good reason.

In sum, the objective of courts exercising independent judgment is to "use every tool at their disposal to determine the *best* reading of the statute and resolve the ambiguity"—"'the reading the court would have reached' if no agency were involved." *Loper Bright*, 603 U.S. at 400 (quoting *Chevron*, 467 U.S. at 843 n.11). Gone are the days of *Chevron* deference when statutory ambiguity "somehow relieved [courts'] obligation to independently interpret the statutes." *Id.*

## II. *Loper Bright* Cabins Federal Agencies' Policymaking Discretion.

*Loper Bright* rejects *Chevron*'s holding that statutory ambiguity authorizes agencies to exercise discretion. As discussed above, statutory ambiguity calls for judicial interpretation, not agency policymaking. Thus, if agencies are to exercise policymaking discretion, it must be because the statute's best reading directs them to do so. *Loper Bright* identifies two categories of statutory language—specific and general—that can mean Congress has delegated a degree of policymaking authority to an agency.

## A. Congress Can Specifically Delegate Authority To Agencies To Define Statutory Terms.

*Loper Bright* recognizes that Congress may vest in "an agency the authority to give meaning to a particular statutory term." 603 U.S. at 394. The Court's citations are instructive. *See id.* at 395 & n.5 (citing *Batterton v. Francis*, 432 U.S. 416, 425 (1977); 29 U.S.C. § 213(a)(15); 42 U.S.C. § 5846(a)(2)).

Consider *Batterton*. In this pre-*Chevron* case, the Supreme Court assessed the meaning of "unemployment" in a section of the Social Security Act. *See* 432 U.S. at 418–19. The Court explained that "[o]rdinarily, administrative interpretations of statutory terms are given important but not controlling significance"; they are entitled to "mere deference or weight." *Id.* at 424, 425. The provision at issue in *Batterton*, however, did not raise an ordinary statutory-interpretation question. Instead, "Congress in [42 U.S.C. § 607(a)] expressly delegated to the Secretary the power to prescribe standards for determining what constitutes 'unemployment' for purposes of AFDC-UF eligibility." *Id.* at 425. The provision provided that "[t]he term 'dependent child' shall . . . include a needy child . . . who has been deprived of parental support or care by reason of the unemployment (*as determined in accordance with standards*

*prescribed by the Secretary*) of his father . . . ." *Id.* at 418 n.2 (quoting 42 U.S.C. § 607 (1977)) (emphasis added). Because of this specific delegation, "Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term." *Id.* at 425.

To be sure, *Batterton* was decided in a different era of statutory interpretation—nearly half a century ago and some seven years before *Chevron* itself. As such, the Supreme Court's use of "interpret" there was understandably antiquated. When Congress has specifically charged an agency to define terms in a statute, the agency's subsequent definition is not an act of interpretation, but one of policymaking. *Loper Bright* appreciates this nuance, by reframing the statutory provision in *Batterton* as an example of Congress's "'expressly delegat[ing]' to an agency the authority to *give meaning* to a particular statutory term." 603 U.S. at 394–95 (quoting *Batterton*, 423 U.S. at 425) (emphasis added). *Loper Bright* invokes two other examples of specific delegations; these examples similarly concern instances where Congress has specifically and expressly tasked the agency with defining certain terms in a statute. *See* 603 U.S. at 395 n.5.

It is important to underscore what *Loper Bright* does *not* categorize as a specific delegation to define statutory terms: provisions that generally authorize the agency to engage in rulemaking or adjudicative activities. When Congress wants to authorize an agency to give meaning to statutory language, it must expressly direct the agency to define, or give meaning to, certain terms. And the agency must follow the procedures Congress requires—such as rulemaking or formal adjudication—to promulgate those definitions.

A contrary holding would effectively gut *Loper Bright*'s overruling of *Chevron* deference. Congress has given most agencies general rulemaking authority. *See* Jennifer L. Selin & David E. Lewis, *Sourcebook of United States Executive Agencies* 118–19 (Admin. Conf. of U.S., 2d ed. 2018). If that were enough to justify judicial deference to an agency's reading of a statute, courts would not be permitted to exercise "independent judgment" in most cases. That is not what the Supreme Court intended when it identified the narrow circumstances in which courts should respect the discretion statutes provide to agencies. Moreover, reading a general rulemaking provision in this way would effectively eliminate *Loper Bright*'s specific delegation category as well as render

superfluous each statutory provision in which Congress has specifically delegated definitional authority to an agency.

**B.    When Congress Grants General Rulemaking Authority, Agencies May Be Authorized To Fill Up Details And Regulate Subject To The Limits Of Flexible Terms.**

The fact that general rulemaking provisions do not authorize agencies to define statutory terms does not mean those provisions are irrelevant after *Loper Bright*. They simply serve a different purpose: giving agencies authority to "fill up the details" of a statutory scheme and to "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" *Loper Bright*, 603 U.S. at 395 (citations omitted).

1.    **Fill Up The Details.** When Congress enacts a regulatory scheme, it typically charges an agency with implementing Congress's policy decisions. That implementation often requires agencies to fill up the minor details in the statutory scheme. To vest an agency with this implementation authority, Congress includes a general rulemaking or standards-setting provision in the statute. *See* 16 U.S.C. § 1853(b)(14) (providing the agency at issue here with authority to "prescribe such other measures, requirements, or conditions and restrictions as are determined

to be necessary and appropriate for the conservation and management of the fishery"), *see also, e.g.*, 5 U.S.C. § 5548 (granting the Office of Management and Budget authority to "prescribe regulations, subject to the approval of the President, necessary for the administration of this subchapter"); 26 U.S.C. § 7805(a) (granting the Treasury Secretary authority to "prescribe all needful rules and regulations for the enforcement of this title"). *Loper Bright* recognizes that when Congress has granted an agency general rulemaking authority, a court exercising independent judgment may conclude—after looking at the structure and design of the statute as a whole—that the statute's best interpretation authorizes the agency to fill up certain implementation details. *See Loper Bright*, 603 U.S. at 394–96.

With respect to filling up the details, *Loper Bright* refers to *Wayman v. Southard*, 23 U.S. 1 (1825). As Justice Gorsuch has explained, "[i]n *Wayman v. Southard*, this Court upheld a statute that instructed the federal courts to borrow state-court procedural rules but allowed them to make certain 'alterations and additions.'" *Gundy v. United States*, 588 U.S. 128, 157 (2019) (Gorsuch, J., dissenting). Since "Congress had announced the controlling general policy when it ordered

federal courts to follow state procedures," Justice Gorsuch observed, "the residual authority to make 'alterations and additions' did no more than permit courts to fill up the details." *Id.* at 157–58. Or as the *Wayman* Court put it, the Constitution draws a line between "important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details." *Wayman*, 23 U.S. at 43.

In his *Gundy* dissent, Justice Gorsuch provided several other helpful examples of statutes authorizing agencies to fill up the details:

> In *In re Kollock*, for example, the Court upheld a statute that assigned the Commissioner of Internal Revenue the responsibility to design tax stamps for margarine packages. Later still, and using the same logic, the Court sustained other and far more consequential statutes, like a law authorizing the Secretary of Agriculture to adopt rules regulating the "use and occupancy" of public forests to protect them from "destruction" and "depredations." Through all these cases, small or large, runs the theme that Congress must set forth standards "sufficiently definite and precise to enable Congress, the courts, and the public to ascertain" whether Congress's guidance has been followed.

588 U.S. at 158 (Gorsuch, J., dissenting) (footnotes omitted).

**2. Flexible Terms.** *Loper Bright* also recognizes that Congress sometimes uses capacious statutory terms like "appropriate" or

"reasonable" that "'leave[] agencies with flexibility.'" 603 U.S. at 395 (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). For example, the Court referred to a provision of the Clean Air Act, construed in *Michigan v. EPA*, that directs the EPA to regulate power plants only "if the Administrator finds such regulation is *appropriate and necessary*." 42 U.S.C. § 7412(n)(1)(A) (emphasis added). With respect to "appropriate and necessary," the Court has observed that "[o]ne does not need to open up a dictionary in order to realize the capaciousness of this phrase." *Michigan v. EPA*, 576 U.S. at 752. In other words, the best interpretation of "appropriate and necessary" is that Congress has delegated a degree of policymaking authority to the agency in deciding whether to regulate, subject to a court's independent judgment of the limits of what the phrase "appropriate and necessary" means.

### III. *Loper Bright* Reaffirms Existing Guardrails On Agency Policymaking.

If a court determines that Congress has delegated policymaking authority to an agency—whether by directing the agency to define a statutory term, to fill up the details of a statutory scheme, or to regulate subject to limits like "reasonable" or "appropriate"—that is not the end of the matter. "When the best reading of a statute is that it delegates

discretionary authority to an agency," *Loper Bright* reaffirms, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." 603 U.S. at 395. Accordingly, the court must enforce the guardrails of both the Constitution and all relevant statutory requirements.

## A. The APA And *Loper Bright* Require Courts To Fix The Boundaries Of Statutory Delegations.

The APA commands courts to set aside an agency action if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Throughout its decision in *Loper Bright*, the Court also reinforced that the independent judgment inquiry extends beyond courts' determining the statute's best meaning. When a court determines the best interpretation is that Congress has delegated a degree of discretion to the agency, the next step is for the court to "exercise [] independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

In articulating this principle, the Court invoked Henry Monaghan's assertion that courts must "fix the boundaries of delegated authority."

*Loper Bright*, 603 U.S. at 395 (quoting Henry P. Monaghan, Marbury *and the Administrative State*, 83 Colum. L. Rev. 1, 27 (1983)) (cleaned up). As Professor Monaghan explained, this "judicial role" involves courts "defining the range of permissible criteria" and "specify[ing] what the statute cannot mean, and some of what it must mean, but not all that it does mean." Monaghan, *supra*, at 27.

Revisiting *Loper Bright*'s examples of statutory delegations helps underscore that judicial role. With respect to specific delegations for agencies to define statutory terms, agencies' discretion is not boundless. For instance, in *Batterton*, if the agency had defined "unemployment" to include a parent who had a full-time, full-salaried job, a court would have to exercise independent judgment to declare that the agency's policymaking exceeded its statutory authority. *See Batterton*, 432 U.S. at 418 n.2 (providing that "[t]he term 'dependent child' shall . . . include a needy child . . . who has been deprived of parental support or care by reason of the unemployment . . . of his father . . . . (quoting 42 U.S.C. § 607 (1977))). The Supreme Court said as much in *Batterton*: "Of course, the Secretary's statutory authority to prescribe standards is not unlimited. He could not, for example, adopt a regulation that bears no relationship

to any recognized concept of unemployment or that would defeat the purpose of the AFDC-UF program." *Id.* at 428.

The same is true with respect to delegations based on general rulemaking authority. Applying the traditional tools of statutory interpretation, courts must ensure agencies use their general rulemaking authority to truly fill up minor details, details of implementation, in their statutory scheme and that such interstitial gap-filling is permissible under "the particular statutory language at issue, as well as the language and design of the statute as a whole." *Kmart*, 486 U.S. at 291.

When it comes to flexible statutory terms, the court must exercise independent judgment to ensure the agency "regulate[s] subject to the limits imposed by a term or phrase." *Loper Bright*, 603 U.S. at 395. *Loper Bright*'s invocation of *Michigan v. EPA* is instructive. *See id.* In *Michigan v. EPA*, the Supreme Court reviewed a statutory delegation that commanded the "EPA to add power plants to [a regulatory] program if (but only if) the Agency finds regulation 'appropriate and necessary.'" 576 U.S. at 752 (quoting 42 U.S.C. § 7412(n)(1)(A)). The Court concluded that the term "appropriate" is capacious and "leaves agencies with flexibility," but that "an agency may not 'entirely fai[l] to consider an important aspect

of the problem' when deciding whether regulation is appropriate." *Id.* (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court held that, "[r]ead naturally in the present context, the phrase 'appropriate and necessary' requires at least some attention to cost." *Id.* It was thus "unreasonable for EPA to read § 7412(n)(1)(A) to mean that cost is irrelevant to the initial decision to regulate power plants." *Id.* at 759.

**B.    The Constitution Requires Courts To Rein In Excessive Statutory Delegations.**

*Loper Bright* also repeatedly underscores that courts should ensure that congressional delegations of policymaking discretion are "subject to constitutional limits." 603 U.S. at 395; *accord id.* at 404 (same); *id.* at 413 ("consistent with constitutional limits"). That means courts must assess whether, among other things, the statute delegating discretion to the agency complies with the nondelegation doctrine. The nondelegation doctrine provides that Congress cannot delegate its legislative power to another entity. Accordingly, the Supreme Court has held that, when Congress delegates policymaking authority to federal agencies, "Congress shall lay down by legislative act an intelligible principle to which the

person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

In addition to the nondelegation doctrine, courts have recognized several canons of statutory interpretation—"nondelegation canons"— that construe statutes more narrowly to avoid excessive delegations. *See generally* Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315 (2000). The major questions doctrine may be the most recently identified variant of such a canon. *See, e.g.*, *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Indeed, in *FCC v. Consumers' Research* last Term, Justice Kavanaugh observed that "many of the broader structural concerns about expansive delegations have been substantially mitigated by this Court's recent case law in related areas—in particular (i) the Court's rejection of so-called *Chevron* deference and (ii) the Court's application of the major questions canon of statutory interpretation." 606 U.S. 656, 705 (2025) (Kavanaugh, J., concurring); *accord id.* at 745 (Gorsuch, J., dissenting) ("To its credit, the Court has sometimes mitigated its failure to police legislative delegations by deploying other tools, like the major questions doctrine and *de novo* review of statutory terms . . . .").

## C.   The APA Requires Courts To Ensure Agencies Have Engaged In Reasoned Decisionmaking.

As *Loper Bright* underscores, reviewing courts must also "ensure that agencies exercise their discretion consistent with the APA." 603 U.S. at 404. When it comes to agency policymaking, the APA commands courts to set aside an agency action if, among other things, it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The Supreme Court has explained that, to survive arbitrary-and-capricious review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (1983) (internal quotation marks omitted). Articulating what has been coined the APA's reasoned-decisionmaking requirement, the *State Farm* Court identified a number of ways in which an agency action would be arbitrary and capricious: "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Id.*; *see also Loper Bright*, 603 U.S. at 395 (discussing this "reasoned decisionmaking" requirement and citing *State Farm*).

## IV. The Magnuson-Stevens Act Does Not Authorize The Commerce Department To Require Plaintiffs To Pay For Monitors On Their Fishing Vessels.

### A. The Statute's Substantive Provisions Do Not Author- ize This Burdensome Cost-Shifting Regime.

Under *Loper Bright*, a court must exercise independent judgment to arrive at the statute's "best reading." 603 U.S. at 400. As detailed in Part I *supra*, this involves "us[ing] every tool at [this Court's] disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* That toolkit consists of all of the traditional tools of statutory interpreta- tion, including the text, structure, and design of the statute as well as the various interpretive canons.

On its face, the Magnuson-Stevens Act's substantive provisions do not authorize, much less require, the cost-shifting regime challenged in this litigation. The key substantive provision provides that the agency "may . . . require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the

plan . . . ." 16 U.S.C. § 1853(b)(8).[2] No one seriously argues that this statutory text expressly provides for or authorizes this cost-shifting regime. Like all the other conceivably relevant substantive provisions of the statute, the provision simply is silent on whether the vessels at issue can be required to pay for monitors.

Looking at the whole text, structure, and design of the statute reinforces this straightforward conclusion. As detailed in Appellants' brief (at 32–41), Congress expressly authorized both the permissive use of industry-funded observers (with respect to vessels in another region, *id.* § 1862(a)) and the mandatory use of industry-funded observers (with respect to certain domestic vessels that only have "limited access," *id.* § 1853a(e)(2)), and certain foreign vessels, *id.* § 1821(h)). Congress considered both distinct authorities and conveyed neither in this context. To construe the statute otherwise would violate the bedrock canon that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion

---

[2] Subsection 1853(a) ("[r]equired provisions") and Subsection 1853(b) ("[d]iscretionary provisions") contain several other provisions, none of which refers to industry-funded observers.

or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted); *accord* Scalia & Garner, *supra*, at 174 ("If possible, every word and every provision is to be given effect . . . . None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

This anti-surplusage presumption is further reinforced by the reality that, where Congress has expressly authorized cost-shifting for certain domestic vessels, it has put strict caps on the level of fees to ensure that the financial burden of paying for government inspectors does not render the fishing enterprise uneconomical. *See* 16 U.S.C. § 1862(b)(2)(E) (2% cap in the North Pacific context); *id.* § 1854(d)(2)(B) (3% cap in the context of limited access privilege programs).

Faithfully following *Loper Bright*'s command to exercise independent judgment and apply all of the tools of statutory interpretation, it is hard to see how any interpretation—let alone the best interpretation—of the statute's substantive provisions leads to the conclusion that these provisions authorize the agency to require plaintiffs to pay for the government-mandated monitors on their U.S. fishing vessels.

**B.    The Statute's Catchall Provision Does Not Authorize This Burdensome Cost-Shifting Regime.**

Recognizing that the substantive provisions of the statute provide no avenue for the agency to impose this cost-shifting regime, the district court turned to a catchall, general rulemaking provision, which authorizes the agency to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(14). Ignoring *Loper Bright*'s instructions, the district court concluded that "[t]his provision, in so uncertain terms, delegates to [the agency] a large degree of discretionary authority." *Relentless*, 2025 WL 1939025, at *4. This attempt to resurrect *Chevron* deference under an implied delegation theory fails on both fronts under *Loper Bright*: the agency is not filling up the details, and it is not regulating subject to the limits of flexible terms.[3]

---

[3] No one contends Congress specifically delegated to this "agency the authority to give meaning to a particular statutory term." *Loper Bright*, 603 U.S. at 394; *see* Part II.B *supra* (detailing how Congress can specifically delegate definitional authority). Accordingly, *amicus* focuses on the general implied delegation guidance from *Loper Bright*.

**1. Fill Up the Details.** While *Loper Bright* recognizes agencies with general rulemaking authority have discretion to "fill up the details" in a statutory scheme, filling up the details is not "a large degree of discretionary authority." As detailed in Part II.B.1 *supra*, "fill up the details" delegations involve filling interstitial gaps. They do not authorize an agency, through statutory silence, to read into the statute a cost-shifting regime that Congress declined to expressly include. Whether to require domestic vessels to pay for government monitors is an important substantive decision that requires Congress's express authorization—as reinforced by the fact that Congress has expressly authorized, and, at times, even required, such cost-shifting with respect to other fishing vessels. *See* Part IV.A *supra*.

Concluding that statutory silence combined with general rulemaking authority allows the agency to implement this cost-shifting regime conflicts with *Loper Bright*'s holding that "*Chevron* is overruled" and that "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous," 603 U.S. 412–13, or "silent" on "the specific issue." *Id.* at 379 (quoting *Chevron*, 467 U.S. at 842).

**2. Flexible Terms.** No one has identified a flexible term in the statute's substantive provisions that could implicitly delegate policymaking authority to the agency. Instead, the district court focused on the "necessary and appropriate" language from the catchall, general rulemaking provision that authorizes the agency to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(14).

This is a category error. When *Loper Bright* recognizes that Congress at times may implicitly delegate policymaking authority to an agency "to regulate subject to the limits imposed by a term or phrase that "'leaves agencies with flexibility,'" 603 U.S. at 395 (*Michigan v. EPA*, 576 U.S. at 752), the Supreme Court was not referring to catchall, general rulemaking provisions—but to specific grants of substantive regulatory authority. *Loper Bright*'s invocation of *Michigan v. EPA* is instructive. There, the Supreme Court reviewed a substantive provision of the Clean Air Act that did not authorize the agency to "regulate electric utility steam generating units" unless the agency "finds such regulation is appropriate and necessary after considering the results of the study

required by this subparagraph." 42 U.S.C. § 7412(n)(1)(A); *see also Michigan v. EPA*, 576 U.S. at 771–773 (analyzing "appropriate and necessary" language).

A general rulemaking provision like Section 1853(b)(14), without more, cannot be sufficient to allow the agency to read into statutory silence the authority to do more than fill up the minor implementation details. As discussed in Part II.B *supra*, Congress has given most agencies general rulemaking authority. If each of those general rulemaking provisions constitute "a large degree of discretionary authority," *Relentless*, 2025 WL 1939025, at *4, the district court's approach would effectively gut *Loper Bright*'s overruling of *Chevron* deference.

Even if this Court were to recognize an implied delegation solely from a general rulemaking provision, this particular provision on its face does not grant the agency "a large degree of discretionary authority." To reach the contrary conclusion, the district court fixated on the "necessary and appropriate" language and completely ignored the catchall limitation that the agency may only "prescribe *such other* measures, requirements, or conditions and restrictions . . . ." 16 U.S.C. § 1853(b)(14) (emphasis added). As Justice Scalia has explained, "[t]he *ejusdem generis* canon

applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics, as in *dogs, cats, horses, cattle, and other animals*." Scalia & Garner, *supra*, at 199. When there is a catchall phrase, the residual "such other" category of actions "apply only to the persons or things [or regulatory actions] of the same general kind of class specifically mentioned." *Id.*; *see also id.* at 200–202 (citing and discussing various cases implicating *ejusdem generis*).

In other words, in Section 1853(b)(14), Congress merely delegated to the agency the authority to fill up the details of the statutory scheme with regulatory provisions similar to those authorized in the provisions preceding the catchall provision in Section 1853, so long as those fill-up-the-details additions "are determined to be necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(14). As detailed in Part IV.A *supra*, unlike the substantive provisions of Sections 1821, 1853a, and 1862 relating to other fishing vessels, the substantive provisions that precede Section 1853(b)'s catchall provision do not authorize the agency to require these vessels to pay for the government-mandated monitors. Nor do these provisions contain any other substantive text that is remotely similar to such a cost-shifting

regime. *Cf.* 16 U.S.C. § 1853(b)(1) (authorizing fees for certain permits but no mention of fees for at-sea monitors). Accordingly, Section 1853(b)'s catchall provision grants no such discretion. This is a textbook misapplication of the *ejusdem generis* canon.

## C. After *Loper Bright*, It Is Inappropriate For Courts To Rely On "Default Norms" Of Agency Deference.

The district court also erred in relying on this Court's pre-*Loper Bright* dicta that there is some "default norm" of interpretation "that the government does not reimburse regulated entities for the cost of complying with properly enacted regulations, at least short of a taking.'" *Relentless*, 62 F.4th at 629 (quoting *Goethel v. Dep't of Com.*, 854 F.3d 106, 117–18 (1st Cir. 2017) (Kayatta, J., concurring)). This move fails for at least two reasons.

First, this "default norm" is, at bottom, an agency deference doctrine that instructs courts to presume, absent express statutory authorization, that agencies can shift compliance costs to the regulated public. Such a presumption does not survive *Loper Bright*; courts must now exercise independent judgment to determine whether the best interpretation authorizes the agency to impose those costs on the regulated. Some statutes may, and others may not, but each requires its own analysis.

To be sure, *Loper Bright* commands courts to "interpret statutes, no matter the context, based on the traditional tools of statutory construction . . . ." 603 U.S. at 403. These tools include substantive canons, such as constitutional avoidance, the presumption against federal preemption, and the rule of lenity. *See* Scalia & Garner, *supra*, at 247–251, 290–294, 296–303 (discussing these canons). They also include the nondelegation canons, discussed in Part III.B *supra*, such as the major questions doctrine. Substantive canons typically narrow the scope of a statute based on constitutional concerns and values. This purported "default norm," by contrast, is not one of these venerable canons, but instead a pro-agency deference doctrine—deferring to an agency's interpretation of the scope of its power to impose regulatory costs. *Loper Bright* rejects such deference, instructing courts to exercise independent judgment to resolve statutory ambiguities "about the scope of an agency's own power—perhaps the occasion on which abdication in favor of the agency is *least* appropriate." 603 U.S. at 401.

Second, even if the Court adhered to this novel "default norm," requiring a business to pay for a government-mandated monitor is not an ordinary and customary cost of compliance. It is more like an agency

requiring, without express statutory authorization, that a business pay the salary of a customs official, OSHA inspector, patent examiner, or SEC prosecutor. But agency personnel (and contractors performing governmental functions) are ordinarily funded through the regular appropriations process *unless* Congress expressly authorizes the imposition of user fees or other cost-shifting mechanisms. *See generally* Selin & Lewis, *supra*, at 109 tbl.13 (listing all agencies that, by statute, are authorized "to assess and collect fees or charges for the purpose of covering a substantial portion of the cost of operating expenses incurred by the agency").

Interpreting statutes to allow an agency to circumvent Congress's appropriations process without express authorization would be a major change to the status quo, *see id.* at 107–110, and raise serious constitutional concerns. After all, the power of the purse is Congress's primary mechanism to prevent regulatory overreach. *See, e.g.*, *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (per Kavanaugh, J.) ("The Appropriations Clause is . . . a bulwark of the Constitution's separation of powers among the three branches of the National Government. It is particularly important as a restraint on Executive Branch officers[.]"); Selin & Lewis, *supra*, at 107 ("Arguably, the most important vehicle by

which Congress controls administrative agencies is appropriations."). There is no basis to presume Congress would freely—and silently—give away such a core Article I power. Yet this purported "default norm" would do just that.

These grave separation-of-powers concerns further underscore how the district court's reading of the statute cannot possibly be considered "filling up the details" in a statutory scheme. This Court should therefore hold that the statute does not authorize the regulation's cost-shifting regime.

## CONCLUSION

For these reasons, the Court should reverse the district court.

Respectfully submitted,

January 23, 2026

/s/ Christopher J. Walker
Christopher J. Walker
    *Counsel of Record*
UNIVERSITY OF MICHIGAN
SCHOOL OF LAW
701 South State Street
Ann Arbor, MI 48109-3091
(734) 763-3812
chris.j.walker@umich.edu
* *Institutional affiliation is provided for identification purposes only. Professor Walker is Of Counsel and Consultant at the U.S. Chamber Litigation Center.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify pursuant to Fed. R. App. P. 32(g)(1) that the foregoing brief has been prepared using proportionally-spaced typeface and includes 6,500 words according to the Microsoft Word count function, excluding those materials not required to be included under Fed. R. App. P. 32(f).

January 23, 2026

/s/ Christopher J. Walker
Christopher J. Walker
   *Counsel of Record*
UNIVERSITY OF MICHIGAN
SCHOOL OF LAW
701 South State Street
Ann Arbor, MI 48109-3091
(734) 763-3812
chris.j.walker@umich.edu

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. I further certify that counsel for the parties in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

January 23, 2026

/s/ Christopher J. Walker
Christopher J. Walker
  *Counsel of Record*
UNIVERSITY OF MICHIGAN
SCHOOL OF LAW
701 South State Street
Ann Arbor, MI 48109-3091
(734) 763-3812
chris.j.walker@umich.edu