# United States Court of Appeals

*for the*

# First Circuit

---

Case No. 25-1845

**RELENTLESS INC.; HUNTRESS INC.; SEAFREEZE FLEET LLC,**

*Plaintiffs–Appellants*,

v.

**U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; LAURA GRIMM, in her official capacity as Administrator of NOAA; NATIONAL MARINE FISHERIES SERVICE, a/k/a NOAA Fisheries; EUGENIO PINIERO SOLER, in his official capacity as Assistant Administrator for NOAA Fisheries,**

*Defendants–Appellees.*

---

On Appeal from the United States District Court for the District of Rhode Island,
Case No. 1:20-cv-00108-WES (Hon. William E. Smith)

## BRIEF FOR *AMICUS CURIAE* LANDMARK LEGAL FOUNDATION IN SUPPORT OF PLAINTIFFS–APPELLANTS AND REVERSAL

MICHAEL J. O'NEILL
MATTHEW C. FORYS
RICHARD P. HUTCHISON
LANDMARK LEGAL FOUNDATION
19415 Deerfield Avenue, Suite 312
Leesburg, VA 20176
(703) 554-6105

AMIT R. VORA
*Counsel of Record*
KASOWITZ LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Landmark Legal Foundation is a non-profit legal corporation. It has no parent corporation and issues no stock.

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES.............................................................................. iii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ......................................1

INTRODUCTION & SUMMARY OF THE ARGUMENT................................. 2

ARGUMENT .................................................................................................. 4

   I.   The District Court's Interpretation of the Magnuson-Stevens Act (MSA) Contravenes the Major Questions Doctrine. .................................................... 4

     A.   The MSA Does Not Clearly Authorize the Department of Commerce to Force Herring Fishers to Directly Contract with and Pay Government Monitors. ....................................................................................................... 6

     B.   Congressional Appropriations, Not Forced Industry Contracting, Typically Fund Government Monitors............................................................ 8

     C.   Requiring Specific Authorization to Shift Labor Costs Preserves Congress's Constitutional Role. ...................................................................10

   II.   *Goethel* Does Not Support Affirmance. ......................................................12

CONCLUSION................................................................................................15

CERTIFICATE OF COMPLIANCE ................................................................16

CERTIFICATE OF SERVICE .........................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Biden v. Nebraska,*
600 U.S. 477 (2023) ...................................................................4

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ............................................................... 1, 2

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ...................................................................4

*Goethel v. Dep't of Com.,*
854 F.3d 106 (1st Cir. 2017) ................................................ 3, 12, 13

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .............................................................1, 2, 12

*Relentless, Inc. v. Dep't of Com.,*
2025 WL 1939025 (D.R.I. July 15, 2025) ................................ 12-13

*Relentless, Inc. v. Dep't of Com.,*
62 F.4th 621 (1st Cir. 2023) ........................................................ 1, 12

*Rotkiske v. Klemm,*
589 U.S. 8 (2019) .......................................................................7

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ...................................................................4

*Wayman v. Southard,*
23 U.S. (10 Wheat.) 1 (1825) .....................................................4

*West Virginia v. EPA,*
597 U.S. 697 (2022) .......................................................4, 6, 7, 10

*Whitman v. Am. Trucking Assocs.,*
531 U.S. 457 (2001) ...................................................................5

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 1 ............................................................... 11

U.S. Const. art. I, § 9, cl. 7 ............................................................... 11

## Statutes

7 U.S.C. § 2219a ................................................................................ 8

16 U.S.C. § 1801(a)(8) ...................................................................... 6

16 U.S.C. § 1821(h)(4) ...................................................................... 7

16 U.S.C. § 1821(h)(6) ...................................................................... 6

16 U.S.C. § 1827(d) ........................................................................... 6

16 U.S.C. § 1853(b)(14) ................................................................ 2, 6

16 U.S.C. § 1858(g)(1)(D) ................................................................ 7

21 U.S.C. § 455(a) ............................................................................. 8

21 U.S.C. § 456(b) ............................................................................. 8

21 U.S.C. § 603 .................................................................................. 8

21 U.S.C. § 695 .................................................................................. 8

42 U.S.C. § 2215(b)(2) .................................................................... 10

42 U.S.C. § 6927(c) ........................................................................... 9

## Other Authorities

Steven G. Calabresi, Mark E. Berghausen & Skylar Albertson, *The Rise and Fall of the Separation of Powers*, 106 Nw. U. L. Rev. 527 (2012) .................. 11

The Federalist No. 58 (James Madison) ............................................. 11

H.R. Rep. No. 119-271 (2025) ........................................................... 9

Anthony R. Marshak, Cong. Rsch. Serv., R48469, *The Seafood Import Monitoring Program* (2025) ...............................9

S. Rep. No. 118-70 (2023) ...............................10

U.S. Dep't of Agric., *2026 USDA Budget Explanatory Notes—Food Safety and Inspection Service* (2025) ...............................8

U.S. Dep't of Hous. & Urb. Dev., *FY 2026 Congressional Justifications* (2025) ...............................9

U.S. Dep't of Labor, *FY 2026 Congressional Budget Justification, Occupational Safety and Health Administration* (2025) ...............................9

U.S. Env't. Prot. Agency, *FY 2026 Justification of Appropriation Estimates for the Committee on Appropriations* (2025) ...............................9

Adrian Vermeule, *Chevron by Any Other Name*, The New Digest (June 28, 2024), https://thenewdigest.substack.com/p/chevron-by-any-other-name ...............................2

**STATEMENT OF INTEREST OF *AMICUS CURIAE***

Landmark Legal Foundation is a national public interest law firm committed to (i) preserving the principles of limited government, separation of powers, and federalism, (ii) advancing an originalist approach to the Constitution, and (iii) defending individual rights and responsibilities. Specializing in constitutional history and litigation, Landmark filed an amicus brief supporting the petitioners in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (decided with *Relentless v. Dep't of Com.*, No. 22-1219) (overruling *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Landmark files this amicus brief supporting the petitioners in this remanded *Relentless* proceeding to assist this Court in implementing *Loper Bright* and in navigating the post-*Chevron* constitutional landscape.[1]

---

[1] This brief is filed under Fed. R. App. P. 29(a). Counsel for all parties have been notified of and have consented to the brief's filing. No party's counsel authored this brief, no party or its counsel contributed money to prepare the brief, and no person other than amicus, its members, or its counsel contributed money intended to fund the preparation or submission of the brief.

## INTRODUCTION & SUMMARY OF THE ARGUMENT

Although *Loper Bright* meant that the court below, on remand, could no longer give *Chevron* deference to the Department of Commerce's statutory interpretation, the court permitted the Department to accomplish the same ends through different means: the court read the authorizing statute as delegating to the Department the power to create a novel funding scheme that skirts the congressional appropriations process. But the statute does not delegate that extraordinary authority. The court plucked that delegation from thin air, giving the agency power that Congress never gave it—a power grab that the separation of powers, the bedrock of individual liberty, forbids. Because that style of *Loper Bright* delegation[2] is a wolf in *Chevron*'s clothing, and because *Chevron*—the sheep—is dead, this Court should reverse.

In holding that the Magnuson-Stevens Act (MSA), 16 U.S.C. § 1801 *et seq.,* delegates to the Department the power to force Atlantic herring fishers to directly contract with and pay government at-sea monitors (ASMs), the district court leaned heavily on a "necessary and appropriate" clause in the MSA, 16 U.S.C. § 1853(b)(14). But neither that clause nor any other in the MSA delegates to the Department the sweeping and singular power to make private regulated entities

---

[2] *See* Adrian Vermeule, *Chevron by Any Other Name*, The New Digest (June 28, 2024), https://thenewdigest.substack.com/p/chevron-by-any-other-name (coining the term).

directly contract with and pay the salaries of government monitors. Only a clear congressional authorization may confer such power on an agency; there is none here.

Equally misplaced is the district court's reliance on *Goethel*'s concurring opinion, which noted that the "default norm" is for private entities to pay for regulatory-compliance costs "without express statement." *Goethel v. Dep't of Com.*, 854 F.3d 106, 117-18 (1st Cir. 2017) (Kayatta, J., concurring). Even if that general observation is accurate, requiring herring fishers to directly contract with and pay ASMs is an unprecedented departure from the standard way to fund agency monitoring costs: congressional appropriations. In fact, across the federal government, amicus was unable to identify any funding scheme analogous to forced ASM contracting. The "default norm," as far as it goes, does not license regulators to craft novel, coercive cost-shifting structures that lack clear statutory grounding.

If the decision under review is permitted to stand, it will signal that courts may bless agencies' seizing on vague statutory terms to shift unassailably public costs, such as the salaries of government monitors, onto private entities. Yet *Chevron*'s demise was supposed to curb agencies' all-too-common habit of arrogating to themselves power that Congress never granted them while the judiciary stood idly by. This Court should reject the Department's invitation to resurrect *Chevron* in a different name. The separation of powers demands no less.

**ARGUMENT**

## I. The District Court's Interpretation of the Magnuson-Stevens Act (MSA) Contravenes the Major Questions Doctrine.

"[I]n a system of separated powers, a reasonably informed interpreter would expect Congress to legislate on 'important subjects' while delegating away only 'the details.'" *Biden v. Nebraska*, 600 U.S. 477, 515 (2023) (Barrett, J., concurring) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825)). So when Congress wishes to give agencies the authority to make "decisions of vast economic and political significance," it will "speak clearly." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation modified); *accord West Virginia v. EPA*, 597 U.S. 697, 701 (2022) ("[T]his Court doubts that Congress intended to delegate decisions of such economic and political significance … to any administrative agency.") (citation modified); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."). That is, "[t]he agency … must point to clear congressional authorization for the power it claims." *West Virginia*, 597 U.S. at 723. After all, "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." *Id.* (citation modified).

Under the major questions doctrine, and contrary to the district court's reading, the MSA does not empower the Department to obligate herring fishers to directly contract with and pay government monitors' salaries. The MSA contains no clear statement delegating that power to the Department. And if the Department is to claim that power, Congress must say so clearly, because the question is major. Indeed, if agencies employing or contracting monitors, inspectors, or observers may shift the associated labor costs onto private regulated entities and thereby evade the traditional congressional appropriations process, even without clear congressional authorization to do so, then the private sector will be forced to shoulder a far greater share of public expenditures than constitutionally warranted. Agencies across the federal government could obligate private parties to cover the entire cost of monitors, inspectors, or observers, either by contracting with the government or contracting with third parties for their services, despite the absence of clear legislative will to enable such public-to-private cost shifting. Because Congress does not "hide elephants in mouseholes," *see Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001), the district court's reading of the MSA should be reversed.

**A.    The MSA Does Not Clearly Authorize the Department of Commerce to Force Herring Fishers to Directly Contract with and Pay Government Monitors.**

While the MSA authorizes the Department to implement "measures, requirements, or conditions and restrictions" that are "necessary and appropriate for the conservation and management of the fishery," 16 U.S.C. § 1853(b)(14), those "vague," "modest," and "subtle" terms, *see West Virginia*, 597 U.S. at 723, are no substitute for a clear statement. So too with the MSA's platitude that the "collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States." 16 U.S.C. § 1801(a)(8). Those words cannot bear the weight that the district court and the Department assign them; they fall well short of clearly delegating to the Department the "power it claims," *see West Virginia*, 597 U.S. at 723.

As other MSA provisions show, moreover, Congress knows how to clearly delegate to the Department the power to require fishers to directly contract with and pay for ASMs. Congress adopted that approach for *foreign* fishers under particular circumstances, for example. *See, e.g.*, 16 U.S.C. § 1827(d) (authorizing the Secretary to "impose" fees on foreign fishers "in an amount sufficient to cover all of the costs of providing an observer aboard that vessel"); *id.* § 1821(h)(6) (providing for, if "insufficient appropriations," "a reasonable schedule of fees that certified observers

or their agents shall be paid by the owners and operators of foreign fishing vessels for observer services"); *id.* § 1821(h)(4) (authorizing the Secretary to impose on foreign fishers "a surcharge in an amount sufficient to cover all the costs of providing a United States observer aboard that vessel"). "Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019).

Nor does the MSA's penalty provision supply the requisite legislative clarity. The MSA authorizes the Department to penalize vessel owners and operators for failing to make "any payment required for observer services provided to or contracted by an owner or operator." 16 U.S.C. § 1858(g)(1)(D). But that language does not clarify *when* the Department may force fishers to pay observers, and *which* fishers the Department may so compel. That authority must stem from a clear predicate delegation—like the provisions about *foreign* fishers. That is because a penalty clause is not itself "clear congressional authorization for the power [the agency] claims," *see West Virginia*, 597 U.S. at 723. It supplies enforcement when a separate statutory provision clearly grants the underlying power and a private regulated entity violates it. The penalty provision here is thus not surplusage: even if it does not reach herring fishers absent a clear predicate authorization, it applies to foreign fishers and others for whom Congress provided the predicate.

At bottom, no MSA provision clearly grants the Department the authority to force herring fishers to directly contract with and pay ASMs. Affirming the district court's contrary reading would pave the way for similarly vague language in other statutes to be read the same way, exposing private regulated entities across industries to massive compliance costs.

**B.    Congressional Appropriations, Not Forced Industry Contracting, Typically Fund Government Monitors.**

Several federal monitoring, inspection, and compliance regimes are predominantly funded through congressional appropriations. In the fiscal year 2026 budget materials for the U.S. Department of Agriculture (USDA), for example, requested appropriations for the Food Safety and Inspection Service are around $1.2 billion, with about eighty percent allocated to salary and benefits for personnel, including the field workforce. U.S. Dep't of Agric., *2026 USDA Budget Explanatory Notes—Food Safety and Inspection Service* 24-5, -17 (2025). Congress also specifically requires the USDA to perform federal inspections into animal slaughter, *see* 21 U.S.C. § 603(a), (b); 21 U.S.C. §§ 455(a), 456(b), and it assigns the financial burden of these regimes to the federal government, *see* 21 U.S.C. § 695; 7 U.S.C. § 2219a.

The Department of Housing and Urban Development (HUD) funds inspections through appropriations, too. The fiscal year 2026 budget materials request $143 million for  HUD's Office of Inspector General, including $107.4

million for personnel costs. U.S. Dep't of Hous. & Urb. Dev., *FY 2026 Congressional Justifications* 37-1 (2025).

Similarly, the Occupational Safety and Health Administration (OSHA) funds its inspectors through congressional appropriations rather than forced industry contracting. U.S. Dep't of Labor, *FY 2026 Congressional Budget Justification, Occupational Safety and Health Administration* 21 (2025). OSHA's fiscal year 2026 request includes $582.4 million for salaries and expenses, of which $219.3 million is dedicated to federal-enforcement inspections. H.R. Rep. No. 119-271, at 25 (2025). The Environmental Protection Agency (EPA) follows the same model for compliance monitoring, requesting $70.5 million for fiscal year 2026 to that end. U.S. Env't. Prot. Agency, *FY 2026 Justification of Appropriation Estimates for the Committee on Appropriations* 124 (2025). And the EPA's Hazardous Waste Management inspections are funded through fees that reimburse the agency for inspection costs— not forced industry contracting. 42 U.S.C. § 6927(c).

Consider also the Seafood Import Monitoring Program (SIMP), which is funded through annual congressional appropriations to the National Marine Fisheries Service (NMFS). Congress provided about $6.2 million in fiscal years 2023, 2024, and 2025 to support the program's administration. Anthony R. Marshak, Cong. Rsch. Serv., R48469, *The Seafood Import Monitoring Program (SIMP)* 9–10

(2025). While NMFS administers SIMP's reporting and recordkeeping framework, front-line enforcement and inspection is carried out by the U.S. Customs and Border Protection, which reviews SIMP documentation, detains non-compliant shipments, and denies entry using its general, publicly funded customs-enforcement authorities. *Id*. at 4–8. Overall, then, the funding for SIMP's labor costs comes from Congress—not from private regulated entities.[3]

If "vague," "modest," and "subtle" terms, *see West Virginia*, 597 U.S. at 723, such as those in the MSA can allow an agency to offload labor costs for monitoring activities onto private actors, then regulated entities across the USDA, HUD, OSHA, EPA, and NMFS spheres could be saddled with over a billion dollars in new costs. The major questions doctrine, however, forecloses weaponizing cryptic language to impose such an enormous financial burden on American enterprise.

### C. Requiring Specific Authorization to Shift Labor Costs Preserves Congress's Constitutional Role.

Yet another reason why novel agency funding schemes warrant exacting separation-of-powers scrutiny is that they risk circumventing Congress's appropriations process. The power of the purse is a core congressional power. U.S.

---

[3] Still more, the Federal Aviation Administration (FAA) funds its inspectors through appropriations. Its federal budget includes a line item for inspection personnel. S. Rep. No. 118-70, at 26 (2023). And the Nuclear Regulatory Commission (NRC) funds its inspectors through a system of fees collected from private regulated entities—not through forced industry contracting. 42 U.S.C § 2215(b)(2).

Const. art. I, § 8, cl. 1; *id.* art. I, § 9, cl. 7. Along with oversight functions, the threat of cutting appropriations serves as a check on agencies executing the laws. Constitutional scholars have long explored the formal and informal levers of control that the appropriations process affords elected representatives over agencies. Professor Calabresi and others have even criticized this control as excessive, highlighting the "elaborate set of oversight and appropriations committees and subcommittees that follow everything the Executive Branch tries to do." Steven G. Calabresi, Mark E. Berghausen & Skylar Albertson, *The Rise and Fall of the Separation of Powers*, 106 Nw. U. L. Rev. 527, 536 (2012).

Congress can and does wield the power of the purse to assert its authority, and as Madison himself explained: "This power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." The Federalist No. 58 (James Madison). So when, as here, a court empowers an agency to shift the costs of its monitoring program from Congress to the private regulated entities themselves, the agency insulates itself from needing to seek appropriations for its program—which removes a vital layer of democratic accountability to elected representatives that the agency and its monitoring program would otherwise have faced.

While compliance costs and regulatory fee schedules are neither new nor inherently improper, their potential to free agencies from the traditional appropriations process should raise suspicions. In other words, courts should look for specific language exempting costly programs like ASMs from the appropriations process. Here, explicit statutory authorization for the Department to pass these costs off to industry is nowhere to be found. This Court need not open the door to shifting labor costs onto private regulated entities with unclear statutory authority. By reversing the district court's decision, it can cut this cascade of regulatory cost-shifting off at the pass and avoid potential conflicts with the major questions doctrine down the line, not only in this industry but also in many others.

## II.   *Goethel* Does Not Support Affirmance.

According to *Goethel*'s concurring opinion: "The default norm … is that the government does not reimburse regulated entities for the cost of complying with properly enacted regulations, at least short of a taking." 854 F.3d at 117-18 (Kayatta, J., concurring). *Relentless I*, before *Loper Bright* overruled it, restated this "default norm" as evidence that the government was within its rights to force herring fishers to contract with monitors. *Relentless, Inc. v. Dep't of Com.*, 62 F.4th 621, 629 (1st Cir. 2023). And the court below relied on this "default norm" to reason that Plaintiffs–Appellants faced "an uphill textual climb" in opposing the proposition that the MSA

and its implementing regulations can "place[] the associated costs on" them. *Relentless, Inc. v. Dep't of Com.*, 2025 WL 1939025, at \*4 (D.R.I. July 15, 2025).

As a threshold matter, while *Goethel* concerned fishers under the purview of the Northeast Multispecies Fishery Management Plan who were burdened with ASMs and associated costs under Department regulations, *Goethel*'s majority opinion did "not reach the question of whether the industry funding requirement contravenes the edicts of the relevant statutes or the Constitution." 854 F.3d at 108. This Court affirmed the suit's dismissal on timeliness grounds—not on the merits. *Id*. The observation in *Goethel*'s concurrence would thus be dicta even if it were in the majority opinion. And even if the "default" is that "the government does not reimburse regulated entities for the cost of complying with properly enacted regulations," *see id*. at 117-18 (Kayatta, J., concurring), this general aside does not entail that the Department may force herring fishers to directly contract with and pay ASMs absent clear congressional authorization. Amicus conducted a thorough review of agencies that conduct monitoring. Besides the fishers here and in *Goethel*, amicus was unable to find any other circumstance where an agency funded monitors in this manner. As shown above, numerous federal agencies employ or contract with monitors, inspectors, or observers, but industry contracting does not pay their salaries. The standard practice is to fund them instead through congressional

appropriations or fees. In practice, that is, agencies that use monitors, inspectors, or observers almost never impose the kind of private contracting and full cost-shifting the government claims the MSA authorizes here. Forced contracting is the exception, not the norm. *See supra* at 8-10.

Compelling herring fishers to retain and pay monitors thus does not reflect a regulatory "default," but rather amounts to an exceptional funding scheme—one that transfers the government's chosen enforcement costs to a regulated party and does so through compelled private contracting. That is precisely the sort of consequential policy choice that the Constitution reserves for Congress. Absent a clear statutory command, the Department's approach collapses the separation of powers by letting the Executive both invent the funding mechanism and enforce it. Rather than treat this novel arrangement as normal, this Court should require the clear congressional authorization that our constitutional structure demands.

## CONCLUSION

This district court's grant of summary judgment to the Defendants–Appellees should be reversed.

Respectfully submitted,

/s/ Amit R. Vora
Amit R. Vora
*Counsel of Record*
Kasowitz LLP
1633 Broadway
New York, New York 10019
(212) 506-1834

Michael J. O'Neill
Matthew C. Forys
Richard P. Hutchison
Landmark Legal Foundation
19415 Deerfield Avenue, Suite 312
Leesburg, VA 20176
(703) 554-6105

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 3,018 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word for Office in a proportionally spaced 14-point Equity font.

/s/ Amit R. Vora

Amit R. Vora

## CERTIFICATE OF SERVICE

I certify that on January 23, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notification of that filing to all counsel of record.

<u>/s/ Amit R. Vora</u>

Amit R. Vora